David Karl Gross, ABA #9611065
Birch Horton Bittner & Cherot
510 L Street, Suite 700
Anchorage, Alaska 99501
Telephone:  907.276.1550
dgross@bhb.com

Edward E. McNally, ABA #9203003
Marc E. Kasowitz *(Pro Hac Vice pending)*
Hector Torres *(Pro Hac Vice pending)*
Kasowitz Benson Torres LLP
1633 Broadway
New York, NY  10019
Telephone:  212.506.1700
mkasowitz@kasowitz.com
htorres@kasowitz.com
emcnally@kasowitz.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| KLOOSTERBOER INTERNATIONAL FORWARDING LLC and ALASKA REEFER MANAGEMENT LLC,<br><br>    Plaintiffs,<br><br>vs.<br><br>UNITED STATES OF AMERICA, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. CUSTOMS AND BORDER PROTECTION, and TROY A. MILLER, U.S. Customs and Border Protection Acting Commissioner, in his official capacity,<br><br>    Defendants. | Case No.: 3:21-cv-_____ (____) |

## **COMPLAINT**

Kloosterboer International Forwarding LLC ("KIF") and Alaska Reefer Management LLC ("ARM") (collectively, "Plaintiffs"), by and through their undersigned attorneys, bring this action against the United States of America ("U.S."), U.S. Department of Homeland Security ("DHS"), U.S. Customs and Border Protection ("CBP"), and Troy A. Miller in his official capacity as the Acting Commissioner of CBP (collectively, "Defendants"), and allege as follows:

## PRELIMINARY STATEMENT

1.     In mid-August 2021, CBP began issuing, without warning, notices of massive penalties—totaling nearly $25 million to KIF and over $325 million to various companies in Plaintiffs' supply chain, including many small family-owned American companies as well as others (the "Penalty Notices")—for alleged violations of the Jones Act in shipping frozen seafood products from Dutch Harbor, Alaska ("Dutch Harbor") to Calais, Maine through the port of Bayside, New Brunswick, Canada ("Bayside").[1] CBP's Penalty Notices effectively have shut down a critical shipping route that—for over 20 years—has been approved by CBP as complying with the Jones Act, and which is essential to the delivery of frozen seafood to consumers, fast food chains, and school lunch

---

[1]     The draconian penalties noticed by CBP are now more than 35 times the largest Jones Act penalties ever collected. *Alaska Oil Company Agrees to Pay $10 Million in Penalties to Settle Federal Claims for Violating the Jones Act*, U.S. Dep't of Just. (Apr. 4, 2017), https://www.justice.gov/usao-ak/pr/alaska-oil-company-agrees-pay-10-million-penalties-settle-federal-claims-violating-jones.

and food bank programs throughout the United States. The scope of the Penalty Notices assessed to date is more than twice the annual value of all frozen Alaskan seafood transported through the Bayside port to U.S. destinations. This unjustifiable agency overreach is crippling and threatens to destroy Plaintiffs' businesses, along with an entire supply chain transporting frozen seafood from Alaska to the eastern United States through Bayside. Moreover, the Penalty Notices are threatening hundreds of jobs in Alaska and throughout the U.S. in the frozen seafood shipping industry, and unless they are withdrawn, will likely result in higher prices and shortages of frozen seafood across the eastern United States.

2. What makes these crushing penalties so egregious is that the CBP has imposed them despite the fact that for the entire period of their existence, Plaintiffs have been—and continue to be—in full compliance with both the Jones Act and CBP's long-established interpretive rulings regarding the Act.

3. The Notices of Penalty were issued without any prior warning nor any opportunity for Plaintiffs to address the alleged violations, and notwithstanding many years of consistent shipping practices by Plaintiffs in accordance with an exception to the Jones Act involving the use of a Canadian rail line. At all relevant times, CBP was fully aware of the use of Canadian rail trackage in part, in connection with Plaintiffs' shipments through the Bayside Port, and through its review of bills of lading and customs documentation for every shipment that crossed the U.S. border from Canada. CBP never

once raised any concerns or questions to Plaintiffs or any other company in the chain of distribution, until it suddenly completely reversed itself in its regulatory practices, without any notice to the affected parties, by serving the Penalty Notices. By any standard, CBP's conduct presents an egregious violation of Plaintiff's constitutional and statutory rights.

4. Plaintiffs have been—and continue to be—in full compliance with a long-recognized statutory exception in the Jones Act, referred to as the "Third Proviso," and CBP's own long-established, publicly-disclosed interpretive rulings and guidance concerning the Jones Act, extending over 20 years. CBP's penalties apparently are being imposed as a result of Plaintiffs' use of a transportation route that includes the use of certain rail trackage in Canada—even though that use is expressly allowed—not only by the express language of the Third Proviso, but also by CBP's own published interpretative rulings that remain in effect.

5. Defendants' wrongful assessment of such unlawful and devastating penalties on Plaintiff KIF and other companies in its chain of distribution violates Plaintiffs' constitutional and statutory rights in the following ways: (a) Plaintiffs' rights to notice and an opportunity to comment on Defendants' apparent material changes in regulatory policy and practice, which suddenly purport to make unlawful Plaintiffs' transportation methods that have been in compliance with the Jones Act and its "Third Proviso" exception for more than 20 years; (b) KIF's rights under the Eighth Amendment to the U.S. Constitution to be free from excessive fines, where the fines assessed against it are almost 15 times its annual

net income; and (c) KIF's rights to due process of law under the Fifth Amendment to the U.S. Constitution. By reason of Defendants' continued unlawful conduct in assessing such extraordinary and unprecedented penalties, Plaintiffs are entitled to injunctive and declaratory relief, damages, attorneys' fees, costs and disbursements, and such other relief as is just and proper.

## **PARTIES**

6.     Plaintiff Kloosterboer International Forwarding LLC ("KIF") is an Alaska Limited Liability Company with its principal place of business at 2025 First Avenue, Suite 1205, Seattle, Washington 98121.

7.     Plaintiff Alaska Reefer Management LLC ("ARM") is a Delaware Limited Liability Company with its principal place of business at 2025 First Avenue, Suite 1020, Seattle, Washington 98121. ARM is a wholly-owned subsidiary of American Seafoods Group LLC, and together with KIF, provides transportation and logistics services to vital seafood processing companies operating in Alaska fisheries.

8.     Defendant U.S. is the government of The United States of America.

9.     Defendant U.S. Department of Homeland Security ("DHS") is a department and agency of the United States.

10.     Defendant U.S. Customs and Border Patrol ("CBP") is an agency within DHS and is subject to direction and oversight by DHS. CBP is headquartered at 1300 Pennsylvania Avenue, N.W., Washington, D.C. 20229. Upon information and belief, CBP

operates 12 ports of entry into Alaska and 18 ports of entry into Maine, has employees located at those ports of entry, and directs, manages, and communicates with those employees, and the public at large, as to CBP's various policies, including but not limited to, border management and control, customs, immigration, border security, international travel, and trade.

11.     Defendant Troy A. Miller is the Acting Commissioner of CBP and is sued in his official capacity.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 702.

13.     This District is an appropriate venue for this action pursuant to 28 U.S.C. §§ 1391(b)(1), (b)(2), and (e)(1)(B).

## FACTUAL BACKGROUND

14.     The United States supports and protects the fleet of vessels, built in the U.S., owned by U.S. citizens and registered under the U.S. flag by granting those vessels by law, with various exceptions, the exclusive right to transport cargo between points within the United States.  That law, enacted in 1920 and known as the "Jones Act," is codified at 46 U.S.C. § 55101, *et seq.*  In particular, 46 U.S.C. § 55102(b) provides:

> Except as otherwise provided in this chapter or Chapter 121 of this title, a vessel may not provide any part of transportation or merchandise by water,

or by land and water, between points in the United States to which the Coastwise laws apply, either directly or via a foreign port, unless the vessel—

(i)     is wholly owned by citizens of the United States for purposes of engaging in the coastwise trade; and

(ii)     has been issued a certificate of documentation with a coastwise endorsement under chapter 121 or is exempt from documentation by would otherwise be eligible for such a certificate or endorsement.

15.     The Jones Act provides a penalty for a violation of subsection (b) as follows:

Merchandise transported in violation of subsection (b) is liable to seizure by and forfeiture to the Government.  Alternatively, an amount equal to the value of the merchandise (as determined by the Secretary of Homeland Security) or the actual cost of the transportation, whichever is greater, may be recovered from any person transporting the merchandise or causing the merchandise to be transported.  46 U.S.C. § 55102(c).

16.     There are long-established exceptions to the general prohibition under the Jones Act against the use of non-coastwise qualified vessels in domestic shipping.  At issue here is the exception concerning the transportation of merchandise utilizing Canadian rail lines, often referred to as the "Third Proviso" because of its location in a prior version of the codified Jones Act.  46 U.S.C. § 55116.  The Third Proviso states that the prohibition on non-coastwise qualified vessels:

does *not* apply to the transportation of merchandise between points in the continental United States, including Alaska, over **through routes in part over Canadian rail lines** and connecting water facilities **if the routes are recognized by the Surface Transportation Board** and **rate tariffs for the routes have been filed with the Board**.

46 U.S.C. § 55116 (all emphasis supplied unless otherwise indicated).

17. The plain language of the Third Proviso statutory provision thus establishes a three-part test to determine whether a shipper may utilize non-coastwise qualified vessels in transporting merchandise between two points in the United States:

> (1) the transportation of merchandise must utilize "through routes in part over Canadian rail lines…";
>
> (2) the routes must be "recognized" by the Surface Transportation Board; and
>
> (3) rate tariffs for the routes have been filed with the STB.

18. Beginning on or about August 9, 2021, CBP began issuing Penalty Notices to KIF and others involved in the transportation of frozen seafood from Alaska to the continental United States for alleged violations of the Jones Act, without identifying the specific nature of the alleged violations. These Penalty Notices levy draconian fines—to date totaling more than $350 million to Plaintiff KIF and others in its frozen seafood supply chain. Plaintiffs, who have been operating for more than 20 years in accordance with the CBP-approved regulatory guidance governing the Third Proviso and without any CBP challenge, were completely blindsided by the Penalty Notices.

19. The Penalty Notices were issued to KIF and the other companies in the chain of product distribution without prior warning or the ability to address any claimed violation of the Jones Act. For the entire time they have been in business, Plaintiffs have complied with CBP's regulatory guidance and rulings involving substantially identical shipping practices under the Third Proviso exception.

20. CBP's issuance of Penalty Notices, based on an apparently secret, undisclosed change in its interpretation of the Third Proviso, and without any advance warning or regulatory guidance, poses an existential threat to Plaintiffs' businesses, and has disrupted the entire supply chain transporting frozen seafood to the eastern United States through Bayside.

## I. Overview of Plaintiffs' Business Operations

21. ARM, along with its wholly-owned subsidiary KIF, arranges transportation and related logistics services for seafood companies operating in Alaska fisheries. KIF is a registered non-vessel operating common carrier specializing in refrigerated freight services for seafood products originating in Alaska (*i.e.* the arrangement of transportation and cold storage from place of product receipt to its ultimate destination on behalf of shippers) for frozen seafood products, including those moving through the Bayside Port.

22. KIF engages ARM to provide ocean carriage from the port of loading to the port of discharge. Specifically, ARM contracts with vessels for the transportation of the frozen seafood products of KIF's customers known as "shippers," who are seafood companies that harvest and process fish, from Dutch Harbor, Alaska via third-party non-coastwise qualified vessels (*i.e.* foreign-flagged vessels) to Bayside.

23. Together, ARM and KIF offer an end-to-end service to shippers, ensuring quality standards and timeliness, while negotiating with multiple vendors and managing the documentation requirements.

## II. The Bayside Program

24. ARM and KIF support the supply chains of shippers by providing carefully-calibrated logistics services from Dutch Harbor to ports in Asia and Europe, to Bayside, and from Bayside to points in the eastern U.S. via the Calais, Maine border crossing.

25. These contracted services include the transportation of customers' seafood products from cold storage in Dutch Harbor onto non-coastwise qualified vessels that then sail to Bayside; the transfer of seafood product from the vessels to cold-storage facilities in Bayside; and the later transfer from those facilities onto trucks. The trucks are subsequently loaded onto flat rail cars on Canadian rail trackage in Bayside and are then unloaded and driven to the U.S. through the Calais, Maine border crossing (the "Bayside Program"). Once they obtain clearance from the CBP, the trucks continue to deliver their cargo to each of the shippers' customers, which are located in the eastern U.S.

26. KIF contracts with ARM to identify properly-equipped conventional refrigerated vessels, also known as reefer vessels, with the capability to provide high-quality, pre-cooled shipping at temperature settings appropriate for the respective seafood product carried. Once such vessels are identified, ARM negotiates contracts with the ship owners to provide vessels to transport the shippers' seafood products from Dutch Harbor to Bayside.

27. In addition to contracting with ARM, KIF contracts for ocean freight, cold-storage for the seafood products, and trucking services for the delivery of its shipper

Case 3:21-cv-00198-SLG   Document 1   Filed 09/02/21   Page 10 of 35

customers' seafood products, beginning with delivery by the shippers of their seafood products to cold storage in Dutch Harbor and onward to the U.S. for delivery to the shippers' end-customers' location, or wherever is directed by the shipper.

28.     Specifically, KIF contracts with Kloosterboer Dutch Harbor LLC ("KDH"), an affiliate of ARM, for the coordination of cold-storage services in Dutch Harbor, and a non-affiliated third-party entity, Kloosterboer Bayside Cold Storage ("KBB"), for the coordination of cold-storage services and management of a qualified railway and the use of that railway at Bayside.  KIF also contracts with various non-affiliated third-party trucking providers for the transport of the shippers' seafood products from Bayside to the U.S. via the Calais, Maine border crossing.

29.     Reliable, temperature-controlled, timely, and uninterrupted shipments are essential for the shippers because of "just-in-time" delivery systems and food safety and quality standards required by their customers.  Just-in-time delivery refers to delivering frozen seafood products to the customer for their immediate use, minimizing the need for long-term storage, thereby reducing their costs and inventory management requirements.

30.     The entire carefully-calibrated operation is critically dependent on the availability of a reliable transportation network and a supply chain that timely provides such deliveries.  Dutch Harbor is a remote port, has limited resources available, regularly faces inclement weather, and has high volumes of fish that simultaneously arrive from various fishing companies.  These factors, taken together with the uncertainties of where

the seafood markets will sell, requires ARM and KIF to coordinate vessels, cold-storage availability, and trucks—all of which must be in the right place at the right time—to ensure a seamless, timely, and efficient movement of seafood products through the entire supply chain.

31.     After the products arrive and are stored in Bayside, they are transferred onto the trucks that are loaded onto flat rail cars on the rail trackage of Bayside Canadian Railway ("BCR"), a registered Canadian railroad and a member of the Railway Association of Canada.  KBB makes all arrangements with the BCR relating to the trucks.  The BCR is approximately 100 feet in length and is located near the cold-storage facility in the Port of Bayside.  The BCR is entirely located within the Port of Bayside connected to a Canadian waterway.  The trucks travel the length of the rail trackage and back.  After the trucks are unloaded from the BCR rail trackage, they drive directly to the Calais, Maine border crossing and into the U.S.

32.     KIF, as ARM's business partner with responsibility for overseeing the transportation of customers' Alaska-originating seafood products' delivery into the U.S., ensures that the customers' products can enter the U.S. by contracting with third-party strategic partners, which are responsible for the preparation and submission to CBP of all required documentation.

33.     The Bayside Program has been in place since the latter half of 2000.  Although various entities involved in the Bayside Program have changed names or

ownership since that date, the route has remained in place. ARM and KIF have offered the Bayside Program to their customers since 2011, including use of the third-party BCR rail line since April 2012.

34.     At all relevant times, CBP was aware, through the bills of lading and other customs documentation, of Plaintiffs' use of the Bayside Program, including the use of the BCR, in their ordinary course of transport within Canada as part of their shipping of goods to the eastern United States.

35.     CBP had never advised ARM or KIF that the Bayside Program transportation route was not in compliance with U.S. laws or regulations, or that CBP had any concerns about the legality of the transportation route.

### III.    The CBP Regulatory Guidance Governing the Use of Canadian Rail Lines to Comply with the Third Proviso of the Jones Act

#### A.    CBP's Regulatory Guidance Authorized Plaintiffs' Transportation Route in Bayside and the Use of a Canadian Rail Line

36.     In its domestic coastwise transport of goods, Plaintiffs' operations are governed by the Jones Act, 46 U.S.C. §§ 55102, 55106, which generally requires that certain merchandise be transported between American ports on American-flagged vessels wholly owned by United States citizens for purposes of engaging in the coastwise trade.

37.     Since commencing operations, Plaintiffs have always transported product to the eastern United States pursuant to an exception to the Jones Act's requirements, known as the "Third Proviso," 46 USC § 883. The Third Proviso permits products to be

transported between Alaska and the continental United States by a foreign vessel, provided that the products are also transported in part over Canadian rail lines and that rate tariffs have been filed with and recognized by the Surface Transportation Board ("STB"), the successor to the Interstate Commerce Commission.

38.     In a series of ruling letters issued between 1992 and 2005, CBP repeatedly confirmed that transportation routes substantially similar to Plaintiffs' route satisfied the requirements for application of the Third Proviso exemption.  In fact, CBP expressly approved of American Seafoods Company LLC's ("ASC") operations in 2000.

39.     On August 11, 2000, in Ruling Letter 115124, CBP considered whether ASC's transportation of frozen fish between "a coastwise point in [Dutch Harbor, Alaska] and another coastwise point in the continental United States [Calais, Maine] . . . accomplished in part by non-coastwise qualified vessels and in part over Canadian rail lines" was in accordance with the Third Proviso.  Cargo was shipped on non-coastwise vessels from Dutch Harbor to Pusan, South Korea, and trans-loaded onto another non-coastwise qualified vessel.  That vessel would then sail to Bayside.

40.     When it arrived in Bayside, the cargo was discharged onto intermodal reefer trailers under the control of the New Brunswick Southern Railway ("NBSR"), the rail carrier used by ASC at the time.  The loaded trailers were hauled by truck to Saint John, New Brunswick, and then loaded onto rail flat cars.  From Saint John, the rail cars were

Case 3:21-cv-00198-SLG   Document 1   Filed 09/02/21   Page 14 of 35

moved by the NBSR "over rail trackage in Canada to a subsequent Canadian rail junction located nearer the U.S. border by rail."

41.      At the transfer point, NBSR truck trailers were offloaded and then driven into the United States at the Calais, Maine, border crossing.  CBP held that this method and route of transport "in part via *both foreign-flag vessel* and *rail trackage in Canada . . .* is in accord with the Third Proviso."

42.      On August 9, 2001, CBP issued a Third Proviso Ruling Letter for Sunmar Shipping Inc. (the "Sunmar Ruling Letter").   CBP considered whether Sunmar's transportation of frozen fish along virtually the same route (without the stop in South Korea) and utilizing virtually the same methods was lawful under the Third Proviso.  After considering Sunmar's routes and methods of transportation, CBP held that "[t]he transportation of frozen fish indirectly between coastwise points, *in part via both foreign-flag vessel and rail trackage in Canada*, as described above, *is in accord with the Third Proviso*."  (Ruling Letter 115446.)

43.      CBP also held, after analyzing the statutory history of the abolition of the Interstate Commerce Commission (which historically set tariff rates and collected rail tariff filings) and the authority of its successor, the STB, that transportation "between coastwise points of commodities which are exempt from requirements regarding rate tariffs, through the utilization of foreign-flag vessels and Canadian rail trackage, *is not prohibited merely because no tariffs may be filed to cover the movements*."  (Ruling Letter 115446.)  CBP

also specifically noted that it "has previously ruled that transportation scenarios *nearly identical to the one currently under consideration* did not violate the Third Proviso." (Ruling Letter 115446 (citing Ruling Letters 114407 (July 23, 1998), and 115124 (August 11, 2000).)

44.     Thereafter, on January 21, 2004, CBP denied a request by Horizon Lines ("Horizon"), a coastwise qualified shipping line under the Jones Act, to reconsider the Sunmar Ruling Letter.  In this ruling, the CBP specifically rejected any implied "commercial reasonableness" requirement and noted that a "through route" does not require the most direct route.  (Ruling Letter 116021.)

45.     On March 28, 2005, CBP reaffirmed its prior holdings in the Sunmar Ruling Letter, including an argument raised by Horizon that the "sham" railroad movements at issue therein were not protected by the Third Proviso.  The CBP rejected this argument and held that "[t]he ruling in HQ 115446 accords with the Third Proviso to 46 U.S.C. App. 883, as previously reconsidered and reaffirmed in HQ 116021."  (Ruling Letter 116185.)

### B.     The *Horizon* Litigation and CBP's Failure to Take Any Action Following Remand

46.     In response to the prior CBP rulings, on May 12, 2005, Horizon filed an action in the U.S. District Court for the District of Columbia (the "District Court"), challenging the Sunmar Ruling Letter (the "Horizon Case").  ASC successfully moved to intervene in the Horizon case on the grounds that the ASC Ruling Letter (Ruling Letter

Case 3:21-cv-00198-SLG   Document 1   Filed 09/02/21   Page 16 of 35

115124) was substantially identical to the challenged Sunmar Ruling Letter, and the ASC Ruling Letter would therefore be revoked by operation of law if the Sunmar Ruling were set aside.

47.     On February 10, 2006, the District Court in the Horizon Case held that the Sunmar Ruling Letter was arbitrary and capricious for failing to explain adequately its conclusion that Sunmar qualified for Jones Act exemption under the Third Proviso, even though it had not filed a tariff with the STB for the route.

48.     The Court also rejected Horizon's claim that the Third Proviso contains an implied prohibition on "sham or commercially impractical Canadian rail movement to achieve 'technical compliance' with the literal terms of the statute."  The Court held that the Third Proviso as enacted (which Congress has never amended or repealed) contains no limits on specific rail routes and does not require evaluation of the commercial soundness of a proposed route.

49.     The Court remanded the dispute to CBP for further proceedings, and on April 14, 2006, denied a motion by ASC to alter or amend its decision.  Despite being remanded to CBP for further proceedings, CBP *never* took any regulatory action after the Horizon Case, and has *never* sought to revoke the Sunmar Ruling Letter, alter or modify the guidance contained therein, nor take any action to modify its rulemaking on the Third Proviso.  Indeed, all of CBP's guidance on the Third Proviso has remained in place for over

15 years before CBP's decision to drastically change its enforcement guidance by issuing the Penalty Notices.

50.     By letter dated June 13, 2007 to ASC's counsel, CBP confirmed that it would not promulgate any "commercial soundness" regulations which Horizon had requested.

**IV.     ASC's Filing of a Rate Tariff with the STB**

51.     On August 28, 2006, out of an abundance of caution in the aftermath of *Horizon*, ASC filed a rate tariff (Tariff STB AICN 0001).  The rate tariff filing expressly described the ASC intermodal transportation as follows:  "water and rail transportation and related services, southbound between Dutch Harbor, Alaska and named places in the Eastern United States" using carrier New Brunswick Southern Railway Company Limited ("NBSR") (the "2006 Tariff").

52.     This tariff as filed by ASC, although not required by CBP interpretive guidance, remains in full force and effect.  When ARM took over the vessel chartering operation in 2009 from ASC, it stepped into ASC's shoes as the shipper in the tariff.  CBP has consistently held that no rate tariff filing is required and did not modify or revoke their interpretive rulings on that issue in the wake of *Horizon*.  Therefore, shippers (including ARM as successor to ASC's tariff) are not required to amend or file new rate tariffs to satisfy the Third Proviso according to CBP's own regulatory guidance.  As a result, when the NBS railroad named in the 2006 tariff was replaced by the BCR railroad in 2012, ARM was not required to formally notify or request approval from CBP for that change.

Case 3:21-cv-00198-SLG   Document 1   Filed 09/02/21   Page 18 of 35

53.     The following year, on May 23, 2007, Horizon filed a petition with the STB seeking an order declaring that certain movements of goods by Sunmar and ASC between Alaska and Boston, via foreign-flag vessels and Canadian rail lines and truck lines operating in Canada and the United States, were "sham movements" designed to circumvent the Jones Act.  The STB denied Horizon's request on December 18, 2007, holding that the "Third Proviso" did not contain any provision requiring the STB to evaluate the "commercial soundness of a proposed route."  This followed the Court's ruling in the Horizon case rejecting the claim that the Third Proviso contained an implied prohibition against "sham or commercially impractical Canadian rail movements to achieve technical compliance with the literal terms of the [Jones Act's Third Proviso]."

## V.     CBP Issues Notices of Penalties to KIF and Related Companies

54.     On or around August 9, 2021, CBP began issuing, on the customers and strategic partners of ARM and KIF who have been involved in the Bayside Program, enormous Penalty Notices for purported violations of the Jones Act.

55.     To date, upon information and belief, CBP has issued more than 170 penalty notices relating to the Bayside Program which collectively total more than $350 million in fines covering a time period going back nearly five years.

56.     Those notices of penalties have been served on almost all customers, participants and servicers associated with contracting to transport seafood products or facilitate the delivery of such seafood products via the Bayside Program.

57.     KIF was served with two penalty notices, totaling approximately $25 million.

58.     Five ship owners who ARM contracts for the use of the vessels that deliver the seafood products from Dutch Harbor to Bayside, have collectively provided to ARM nine notices of penalty, totaling approximately $55 million and contend that ARM is responsible for payment.

59.     In addition, to date, ARM has received notices concerning ship owners and charters who have been assessed penalties totaling over $65 million. The notices inform ARM that: (1) insurance policy carriers have been advised of CBP's notices; (2) while vessel owners intend to object to the penalties, they are putting ARM on notice for the amounts of the penalties and defense costs; and/or (3) vessel owners are holding ARM liable for the penalties assed by CBP.

60.     At least nine of KIF's shipper customers have also informed KIF that penalty notices have been issued to them, totaling approximately $139 million.

61.     CBP also has issued similar penalty notices to the two cold-storage facilities KIF contracts with to store its customers' seafood product in Dutch Harbor and Bayside respectively, totaling approximately $37 million.

62.     Two importers and nine trucking companies contracted by KIF also received substantial notices of penalty totaling approximately $95 million.

63.     All of these KIF shipper customers contend that KIF is liable for the penalties issued to them by CBP.

64.     In addition, as a result of these penalty notices, certain third-party trucking partners refuse to transport any goods from Bayside.

65.     CBP's issuance of the penalty notices described above has effectively paralyzed the Bayside Program, Plaintiff's business using that Program, the contractors described above, the frozen seafood in transit and/or cold storage, and Plaintiffs' customers and other downstream processors and sellers of the frozen seafood, among others.

**VI.     CBP Violated Plaintiffs' Statutory Rights to Notice and Opportunity to Comment on CBP's Secret Change in Regulatory Practice and Enforcement**

     **A.     CBP Violated 19 U.S.C. § 1625(c)(1) Because it Unlawfully Modified its Enforcement Guidance by Issuing the Penalties**

66.     Under Section 1625(c), a proposed interpretive ruling or decision must be published in the *Customs Bulletin*[2] which would "(1) modify (other than to correct a clerical error) or revoke a prior interpretive ruling or decision *which has been in effect for at least 60 days*; or (2) have the effect of modifying the treatment previously accorded by the

---

[2]     "*Customs Bulletin and Decisions* provides a weekly compilation of decisions, rulings, regulations, notices, and abstracts concerning customs and related matters of the U.S. Customs and Border Protection, U.S. Court of Appeals for the Federal Circuit and U.S. Court of International Trade." U.S. Customs & Border Protection, Customs Bulletin and Decisions, https://www.cbp.gov/trade/rulings/bulletin-decisions (last visited Aug. 23, 2021).

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.    CASE NO. 3:21-cv-_____ (____)
COMPLAINT    PAGE 21 OF 35
01118604.DOCX

Customs Service to *substantially identical transactions*." 19 U.S.C. §§ 1625(c)(1) and (2) (emphasis added).

67.     CBP must then give "interested parties" an opportunity to submit "comments on the correctness of the proposed ruling or decision" for at least 30 days after publication in the *Customs Bulletin*.  19 U.S.C. § 1625(c).  Thereafter, CBP "shall publish a final ruling or decision in the *Customs Bulletin* within 30 days after the closing of the comment period," with the final ruling or decision becoming effective 60 days after the date of its publication. 19 U.S.C. § 1625(c).

68.     In issuing the Penalty Notices based on alleged Jones Act violations relating to identical conduct that had for decades been interpreted by CBP to be in accordance with the Third Proviso, CBP violated 19 U.S.C. § 1625(c)(1) by improperly modifying guidance contained in the Ruling Letters that were more than 60 days old without providing notice or an opportunity for comment.

69.     The Ruling Letters discussed above clearly fall under the protection of Section 1625(c)(1).  The Ruling Letters have been in effect for years or even decades, far older than the 60-day effective duration requirement.

70.     There is no evidence that CBP ever published in the *Customs Bulletin* a decision modifying or revoking the Ruling Letters.

71.     Absent any attempt to modify or revoke its Ruling Letters, CBP is prohibited from altering its enforcement practices as to the Third Proviso issues specifically addressed in those letters.

> **B.     CBP Violated 19 U.S.C. § 1625(c)(2) Because it Improperly Modified the Treatment Previously Accorded to Substantially Identical Transactions**

72.     The Ruling Letters constitute a "treatment previously accorded by the Customs Service."  Ruling Letters are explicitly referenced in the statute as a form of interpretive ruling.  19 U.S.C. § 1625(a).

73.     The Ruling Letters govern "substantially identical transactions" to those engaged in by Plaintiffs with respect to its shipping route and practices.  The term "substantially identical transaction" is meant to be read broadly and include "multiple parties," and not just the parties that requested the ruling letters.  Interpretive guidance contained in ruling letters even extends to "transactions of parties other than the person claiming entitlement to the statute's notice and comment process."

74.     The Ruling Letters clearly govern the transactions at issue and were heavily relied on by Plaintiffs in forming their business practices.  The transactions forming the basis of the Penalty Notices constitute "substantially identical transaction[s]" for purposes of Section 1625(c)(2).

Case 3:21-cv-00198-SLG   Document 1   Filed 09/02/21   Page 23 of 35

75.     CBP's decision to issue the Penalty Notices has the effect of "modifying the previous treatment with respect to" its interpretation of the Third Proviso.  Plaintiffs have continually conducted their operations in accordance with the Third Proviso.

76.     CBP's decision to issue the Penalty Notices violated the notice and comment requirements of Section 1625(c) because CBP has not published *any* interpretive ruling or decision in the *Customs Bulletin* purporting to modify any of the Ruling Letters.  Failure to comply with this mandatory notice and comment procedure invalidates both past and future penalties assessed under 42 U.S.C. § 55102, 19 C.F.R. 4.80(b), and 19 C.F.R. 113.64.

## CLAIMS FOR RELIEF

### Count I

### Declaratory Judgment as to Plaintiffs' Compliance with the Third Proviso Exception to the Jones Act

77.     Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 76.

78.     The Jones Act "does not apply to the transportation of merchandise between points in the continental United States, including Alaska, over through routes in part over Canadian rail lines and connecting water facilities if the routes are recognized by the Surface Transportation Board and rate tariffs for the routes have been filed with the Board." 46 U.S.C. § 55116.

79.     Thus, the Third Proviso establishes the following three-part test to determine whether a shipper may utilize non-coastwise qualified vessels in transporting merchandise between two points in the United States:  (i) the transportation of merchandise must utilize "through routes[3] in part over Canadian rail lines . . .";  (ii) the routes must be "recognized" by the STB; and (iii) rate tariffs for the routes have been filed with the STB.

80.     Plaintiffs have satisfied each of these requirements in connection with their non-contiguous domestic trade, and thus qualify under the Third Proviso exception to the Jones Act.

81.     Plaintiffs' transportation practices, described above, are lawful under the Jones Act.

82.     The relief sought in this case does not involve any determination of state law issues.

83.     Declaratory relief will clarify the legal relations between the parties.  This case presents an actual controversy within the jurisdiction of this Court.  The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise

---

[3]     A "through route" is defined as an agreement between connecting carriers for the continuous carriage of goods from the originating point on the line of one carrier to the destination point on the line of another.  *See Thompson v. United States*, 343 U.S. 549, 556 (1952) (quoting *St. Louis Southwestern R. Co. v. United States* 245 U.S. 136, 140 n.2 (1917)).  As such, a "through route" includes all the points along the route, not just the origin and destination.

appropriate. The Court may order a speedy hearing of a declaratory-judgment action. Fed R. Civ. P. 57.

84. Plaintiffs are entitled to a declaration (i) that their transportation of merchandise utilizing non-coastwise vessels is in compliance with the Jones Act, 46 U.S.C. § 55102, under the Third Proviso exception thereto, 46 U.S.C. § 55116; and (ii) invalidating the Penalty Notices issued by CBP as set forth above.

## Count II

### Violation of 19 U.S.C § 1625(C)(1) - Improper Modification or Revocation of an Interpretive Ruling More Than 60 Days Old

85. Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 84.

86. Under 19 U.S.C. § 1625(c)(1), a proposed interpretive ruling or decision must be published in the *Customs Bulletin* which would "modify (other than to correct a clerical error) or revoke a prior interpretive ruling or decision which has been in effect for at least 60 days." 19 U.S.C. § 1625(c)(1).

87. CBP must then give "interested parties" an opportunity to submit "comments on the correctness of the proposed ruling or decision" for at least 30 days after publication in the *Customs Bulletin*. 19 U.S.C. § 1625(c). Thereafter, CBP "shall publish a final ruling or decision in the *Customs Bulletin* within 30 days after the closing of the comment period," with the final ruling or decision becoming effective 60 days after the date of its publication. 19 U.S.C. § 1625(c).

88.	In issuing the Penalty Notices based on alleged Jones Act violations relating to identical conduct that had for decades been interpreted by CBP to be in accordance with the Third Proviso, CBP violated 19 U.S.C. § 1625(c)(1) by improperly modifying guidance contained in the Ruling Letters that was more than 60 days old without providing notice or an opportunity for comment.

89.	The Ruling Letters constitute a "treatment previously accorded by the Customs Service."  Ruling Letters are explicitly referenced in the statute as a form of interpretive ruling.  19 U.S.C. § 1625(a).

90.	The newest Ruling Letter has been in effect for over 16 years (*see* Ruling Letter 116185, dated March 28, 2005), with other Ruling Letters dating back into the 1990s (*see, e.g.*, Ruling Letter 113365, dated March 10, 1995), making them far older than the 60-day effective duration requirement.  *See* 19 U.S.C. § 1625(c)(1).

91.	CBP has never published a decision modifying or revoking the Ruling Letters in the *Customs Bulletin*.

92.	Absent any attempt to modify or revoke its Ruling Letters, CBP is prohibited from altering its enforcement practices as to the Third Proviso issues specifically addressed in those letters.

93.	As a result of CBP's actions, CBP is in violation of 19 U.S.C § 1625(c)(1).

## Count III

## Violation of 19 U.S.C § 1625(C)(2) - Improper Modification or Revocation
## of an Interpretive Ruling Concerning a "Substantially Identical Transaction"

94.     Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 93.

95.     Under 19 U.S.C. § 1625(c)(2), a proposed interpretive ruling or decision must be published in the *Customs Bulletin* which would "have the effect of modifying the treatment previously accorded by the Customs Service to substantially identical transactions." 19 U.S.C. § 1625(c)(2).

96.     The Ruling Letters constitute a "treatment previously accorded by the Customs Service." Ruling Letters are explicitly referenced in the statute as a form of interpretive ruling. 19 U.S.C. § 1625(a).

97.     The Ruling Letters govern "substantially identical transactions" to those engaged in by ASC with respect to its shipping route and practices. The term "substantially identical transaction" is meant to be read broadly and include "multiple parties," and not just the parties that requested the ruling letters.

98.     Interpretive guidance contained in ruling letters even extends to "transactions of parties other than the person claiming entitlement to the statute's notice and comment process."

99.     Ruling Letters clearly govern the transactions at issue and were heavily relied on by Plaintiffs in forming their business practices. The transactions forming the basis of

the Penalties constitute "substantially identical transaction[s]" for purposes of Section 1625(c)(2).

100. CBP's decision to issue the Penalty Notices has the effect of "modifying the previous treatment with respect to" its interpretation of the Third Proviso. Plaintiffs have continually operated their shipping operations in accordance with the Third Proviso.

101. CBP has consistently and repeatedly confirmed in the Ruling Letters that substantially identical transactions, *e.g.*, Sunmar's shipping practices, were compliant with the Jones Act's Third Proviso exception.

102. CBP has not altered this guidance in over 15 years, *see* Ruling Letter 116185, dated March 28, 2005, and did not revoke, amend or alter its guidance in wake of the *Horizon* action.

103. The proposed decision violated the notice and comment requirements of Section 1625(c) because CBP has not published *any* interpretive ruling or decision in the *Customs Bulletin* purporting to modify any of the Ruling Letters.

104. Failure to comply with this mandatory notice and comment procedure invalidates both past and future penalties assessed to KIF under 42 U.S.C. § 55102, 19 C.F.R. 4.80(b), and 19 C.F.R. 113.64.

## Count IV

### Denial of Due Process in Violation of the Fifth Amendment
### to the United States Constitution  (Plaintiff KIF Only)

105.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 104.

106.    CBP's imposition of the Penalty Notices, which are unprecedented and based on secretive conduct, violates KIF's rights under the Due Process Clause of the Fifth Amendment.

107.    Under the Due Process Clause, laws regulating individuals or entities "must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

108.    In the administrative agency context, fair notice requires the agency to "state with 'ascertainable certainty' what is meant by the standards it has promulgated." *ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*, 867 F.3d 564, 578 (5th Cir. 2017).

109.    CBP utterly has failed to satisfy this standard because CBP's newly-contrived position with respect to transportation conduct that purportedly violates the Third Proviso is directly contrary to CBP's long-standing interpretative rulings on which KIF and others in the industry have relied.  Such a lack of notice deprives KIF of its right to due process.

110.    The enormous and unprecedented CBP penalties here render even more egregious CBP's failure to provide clarity in the actions with which CBP expects compliance.

111.    CBP's more than $350 million in penalties issued to date to KIF and companies in its frozen seafood supply chain through Bayside offends "elementary fairness" and violates KIF's right to due process.

## Count V

### Excessive Fines in Violation of the Eighth Amendment to the United States Constitution  (Plaintiff KIF Only)

112.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 111.

113.    Under the Excessive Fines clause of the Eighth Amendment to the United States Constitution, the United States may not impose a fine disproportional to the offense committed.

114.    CBP's imposition of the Penalty Notices under the facts and circumstances concerning KIF's transportation operations is an unconstitutionally excessive fine and must be set aside.

115.    The penalties were issued without any prior warning or ability to address any alleged violations, and notwithstanding decades of consistent shipping practices by KIF in accordance with CBP interpretive rulings.

116. The penalties are grossly disproportionate in relation to the Jones Act violations KIF has allegedly committed.

117. The penalties are excessive as they are more than 35 times the highest reported Jones Act penalty of $10 million levied in the over-100-year history of the Jones Act. The penalties are also more than twice the annual value of all frozen Alaskan seafood transported through the Bayside port to U.S. destinations.

118. CBP's penalty enforcement under the Jones Act, as applied to KIF, is unconstitutional under the Eighth Amendment.

## Count VI

**Permanent Injunction Pursuant to The Constitutional Tolling Doctrine**

119. Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 118.

120. Under the constitutional tolling doctrine, parties are protected from non-compliance with statutory and regulatory provisions during the entire period they are judicially challenging the validity of penalties issued under those laws—regardless of the ultimate outcome of their challenge—provided they have raised substantial questions as to the constitutionality of CBP's actions.

121. Courts have repeatedly recognized that judicial review is merely nominal and illusory if the party to be affected can appeal to the courts only at the risk of having to pay penalties so great that it is better to yield to orders of uncertain legality rather than to ask for

the protection of the law." *Wadley S. Ry. Co. v. Georgia*, 235 U.S. 651 (1915). Because of the enormity of the penalties issued by CBP as well as the ongoing nature of CBP's penalty enforcement, Plaintiffs face a "Hobson's choice" that they are constitutionally protected from having to make. To allow this challenge to proceed without threat of additional penalties for the alleged Jones Act violations, the Court should enjoin CBP from ever issuing or enforcing additional Penalty Notices to Plaintiffs and any other company in the supply chain of the Bayside Program for any alleged violations of the Jones Act during the period that Plaintiffs are pursuing their administrative and judicial remedies, regardless of the outcome of this litigation.

122. As set forth in the Counts alleged above, Plaintiffs have, at minimum, reasonable grounds for challenging Defendants' issuance of the Penalty Notices.

123. Plaintiffs lack an adequate remedy at law.

124. Accordingly, Plaintiffs are entitled to a permanent injunction prohibiting Defendants from assessing any penalties, including by issuing any additional Penalty Notices, for alleged violations of the Jones Act relating in any way to shipments through Bayside to U.S. destinations at any time during the period from the commencement of this action through the entry of a final judgment, and regardless of the outcome of the action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Kloosterboer International Forwarding LLC and Alaska Reefer Management LLC pray that the Court:

1.    Enter a judgment that the Plaintiffs' transportation of merchandise utilizing non-coastwise vessels is in compliance with the Jones Act, 46 U.S.C. § 55102, under the Third Proviso exception thereto, 46 U.S.C. § 55116;

2.    Enter a judgment that CBP improperly modified or revoked a prior agency interpretive ruling or decision which has been in effect for at least 60 days, 19 U.S.C. § 1625(c)(1);

3.    Enter a judgment that CBP improperly modified or revoked a prior agency interpretive ruling or decision which would have the effect of modifying the treatment previously accorded by the CBP to substantially identical transactions," 19 U.S.C. § 1625(c)(2);

4.    Enter a judgment that Defendants' conduct violates the Due Process clause of the Fifth Amendment;

5.    Enter a judgment that Defendants' conduct in issuing Jones Act Penalty Notices to KIF and other companies in the chain of distribution are unconstitutionally excessive under the Eighth Amendment;

6.    Enter a permanent injunction prohibiting Defendants from enforcing any Penalty Notices issued to KIF;

7.    Enter a permanent injunction prohibiting Defendants from issuing, or seeking to enforce, any Penalty Notices to Plaintiffs for alleged violations of the Jones Act

during the period from the commencement of this action through the entry of a final judgment.

8.      Awarding Plaintiffs' compensatory damages, as well as their costs of suit, including reasonable attorneys' fees; and

9.      Granting such other and further relief, at law and in equity to which Plaintiffs may be justly entitled.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all claims triable to a jury.

DATED this 1st day of September, 2021.

BIRCH HORTON BITTNER & CHEROT
Attorneys for Plaintiff

By:      ___/s/ David Karl Gross___
         David Karl Gross, ABA #9611065

KASOWITZ BENSON TORRES LLP
Edward E. McNally, ABA #9203003
Marc E. Kasowitz (pro hac vice pending)
Hector Torres (pro hac vice pending)