David Karl Gross, ABA #9611065
Birch Horton Bittner & Cherot
510 L Street, Suite 700
Anchorage, Alaska 99501
Telephone: 907.276.1550
dgross@bhb.com

Edward E. McNally, ABA #9203003
Marc E. Kasowitz *(Pro Hac Vice To Be Filed)*
Hector Torres *(Pro Hac Vice To Be Filed)*
Kasowitz Benson Torres LLP
1633 Broadway
New York, New York 10019
Telephone: 212.506.1700
emcnally@kasowitz.com
mkasowitz@kasowitz.com
htorres@kasowitz.com

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| KLOOSTERBOER INTERNATIONAL FORWARDING LLC and ALASKA REEFER MANAGEMENT LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) ) | Case No.: 3:21-cv-_____ (____) |
| UNITED STATES OF AMERICA, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. CUSTOMS AND BORDER PROTECTION, and TROY A. MILLER, U.S. Customs and Border Protection Acting Commissioner, in his official capacity, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## DECLARATION OF PER K. BRAUTASET

Pursuant to 28 U.S.C. § 1746, I, Per K. Brautaset, declare as follows:

1.      I am the President of plaintiff Alaska Reefer Management LLC ("ARM"), which, along with ARM's wholly-owned subsidiary, plaintiff Kloosterboer International Forwarding LLC ("KIF") (f/k/a Freight Logistics LLC), arranges transportation and related logistics services for the movement of our customers' frozen seafood products from Alaska to the Eastern U.S.

2.      I have been employed by ARM or an ARM affiliate for over thirty years, and have been its President since 2010.  As President, I am responsible for all aspects of our business.  I have personal knowledge of the facts set forth in this Declaration.

3.      I submit this declaration in support of Plaintiffs' motion for a Temporary Restraining Order and Preliminary Injunction, which is precipitated by the enormous and unprecedented penalties that the United States Customs and Border Protection Agency ("CBP") has imposed on KIF, and on ARM and KIF's customers and third-party strategic partners, in connection with the transport of frozen seafood products from Dutch Harbor, Alaska ("Dutch Harbor") to the Eastern U.S. via Bayside, New Brunswick, Canada ("Bayside") and Calais, Maine.  Those penalties, which I understand have all been issued within the last three weeks and thus far total approximately $350 million and may be increasing, have caused immediate and severe harm to ARM and KIF.  In addition to those crippling financial fines, the penalties have brought this crucial transportation system to a halt and threaten to destroy the critical Dutch Harbor-Maine (and points

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.            CASE NO. 3:21-CV-_____ (____)
DECLARATION OF PER K. BRAUTASET                                                      PAGE 2 OF 19

Case 3:21-cv-00198-SLG   Document 7   Filed 09/02/21   Page 2 of 19

beyond) transportation system which has been in existence for more than twenty years and is essential to supply seafood to customers and consumers in the Eastern U.S.

4. Furthermore, ARM, KIF, their customers, and their third-party strategic partners now face the threat of continuing, catastrophic penalties, as CBP continues to issue penalties related to the same transportation system, and the amounts of those penalties continue to accrue.

## I. ARM and KIF Overview

5. ARM, a wholly-owned subsidiary of American Seafoods Group LLC, was formed in 2009 under the laws of Delaware and its headquarters are located at 2025 First Avenue, Suite 1205, Seattle, Washington, 98121.

6. KIF engages ARM to provide ocean carriage from the port of loading to the port of discharge. Specifically, ARM contracts with vessels for the transportation of the frozen seafood products of KIF's customers, seafood companies that harvest and process fish, known as "shippers," – from Dutch Harbor via third-party non-coastwise qualified vessels (*i.e.* foreign-flagged vessels) – to the port in Bayside.

7. KIF, a wholly-owned subsidiary of ARM, was formed under the laws of Alaska and its headquarters are located at 2025 First Avenue, Suite 1205, Seattle, Washington, 98121. ARM acquired KIF in September 2018.

8. ARM and KIF together offer an end-to-end service to shippers, ensuring quality standards and timeliness, while handling the complexity of negotiating with multiple vendors and managing the documentation requirements.

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.          CASE NO. 3:21-CV-_____ (____)
DECLARATION OF PER K. BRAUTASET                                              PAGE 3 OF 19

Case 3:21-cv-00198-SLG   Document 7   Filed 09/02/21   Page 3 of 19

## II. The Bayside Program

9.    ARM and KIF support the supply chains of shippers by providing carefully-calibrated logistics services from Dutch Harbor to ports in Asia and Europe, to Bayside, and from Bayside to points in the Eastern U.S. via the Calais, Maine border crossing.  Those contracted services include the transportation of customers' seafood products from cold storage in Dutch Harbor onto non-coastwise qualified vessels that then sail to Bayside; the transfer of seafood product from the vessels to cold-storage facilities in Bayside; and the later transfer from those facilities onto trucks.  The trucks are subsequently loaded onto flat rail cars on rail trackage in Bayside, and then unloaded and driven to the U.S. through the Calais, Maine border crossing; and once they obtain clearance from CBP, continue to deliver their cargo to each of the shippers' customers, which are located in the Eastern U.S. (the "Bayside Program").

10.    An overview of ARM's logistics services consists of the following:  KIF contracts with ARM to identify properly-equipped conventional refrigerated vessels, also known as "reefer vessels," with the capability to provide high-quality, pre-cooled shipping at temperature settings appropriate for the respective seafood product carried. Once such vessels are identified, ARM negotiates contracts with the ship owners to provide vessels to transport the shippers' seafood products from Dutch Harbor to Bayside.

11.    KIF contracts with shippers for the transportation of their seafood to the U.S.  In addition to contracting with ARM, KIF contracts for ocean freight, cold-storage

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                    CASE NO. 3:21-CV-_____ (____)
DECLARATION OF PER K. BRAUTASET                                                          PAGE 4 OF 19

Case 3:21-cv-00198-SLG   Document 7   Filed 09/02/21   Page 4 of 19

for the seafood products, and trucking services for the delivery of its shipper customers'

seafood products, beginning with delivery by the shippers of their seafood products to

cold storage in Dutch Harbor and onward to the U.S. for delivery to the shippers' end-

customers' location, or wherever is directed by the shipper.

12.     Specifically, KIF contracts with Kloosterboer Dutch Harbor LLC ("KDH"),

an affiliate of ARM, for the coordination of cold-storage services in Dutch Harbor, and

with a non-affiliated third-party entity, Kloosterboer Bayside Cold Storage ("KBB"), for

the coordination of cold-storage services and management of a qualified railway and use

of said railway at Bayside.  KIF also contracts with various non-affiliated third-party

trucking providers for the transport of the shippers' seafood products from Bayside to the

U.S. via the Calais, Maine border crossing.

13.     Reliable, temperature-controlled, timely, and uninterrupted shipments are

essential for the shippers because of "just-in-time" delivery systems and food safety and

quality standards required by their customers.  "Just-in-time delivery" refers to delivering

frozen seafood products to the customer for their immediate use, minimizing the need for

long-term storage, thereby reducing their costs and inventory management requirements.

14.     The entire carefully-calibrated operation is critically dependent on the

availability of a reliable transportation network and a supply chain that timely provides

such deliveries.  This network requires ARM and KIF to coordinate vessels, cold-storage

availability, and trucks – all of which must be in the right place at the right time – to

ensure a seamless, timely and efficient movement of the seafood products through the

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                    CASE NO. 3:21-CV-_____ (____)
DECLARATION OF PER K. BRAUTASET                                                              PAGE 5 OF 19

Case 3:21-cv-00198-SLG   Document 7   Filed 09/02/21   Page 5 of 19

entire supply chain.  The starting point of this supply chain is Dutch Harbor, a remote

port with inclement weather.  Very high volumes of fish, coming from various fishing

companies, arrive at Dutch Harbor simultaneously.  The limited availability of resources

at Dutch Harbor, coupled with the uncertainties of where the seafood markets will sell,

requires logistics to be exact so as to not paralyze any operations.  Much advance

planning goes into ensuring supply chains are ready for the high volumes and can

accommodate last minute changes in weather.

  15. After the products arrive and are stored in Bayside, they are transferred

onto the trucks that are loaded onto flat rail cars on the Bayside Canadian Rail ("BCR")

rail trackage, a registered Canadian railroad and a member of the Railway Association of

Canada.  KBB makes all arrangements with the BCR relating to the trucks.  The BCR is

approximately one hundred feet in length and is located near the cold-storage facility in

the port of Bayside.  The BCR is entirely located within the port of Bayside, which is

connected to a Canadian waterway.  The trucks travel the length of the rail trackage and

back.  After the trucks are unloaded from the BCR rail trackage, they drive directly to the

Calais, Maine border crossing and into the U.S.

  16. KIF, as ARM's business partner with responsibility for overseeing the

transportation of customers' Alaska-originating seafood products' delivery into the U.S.,

ensures that the customers' products can enter the U.S. by contracting with third-party

strategic partners that are responsible for the preparation and submission to CBP of all

required documentation.

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.  CASE NO. 3:21-CV-_____ (____)
DECLARATION OF PER K. BRAUTASET  PAGE 6 OF 19

Case 3:21-cv-00198-SLG Document 7 Filed 09/02/21 Page 6 of 19

17.     The Bayside Program has largely been in place since at least 2000, well before ARM's formation. While the entities involved in the Bayside Program have changed names or ownership since its inception, the route has remained in place. KIF and ARM have offered the Bayside Program to shippers since 2011, including use of the third-party BCR rail line since April 2012.

18.     Before CBP suddenly commenced issuing penalty notices in mid-August 2021, as described below (*see* ¶ 33), CBP had never advised ARM or KIF that the Bayside Program – which has been in place for at least twenty years and in which modifications have been disclosed to CBP – was not in compliance with U.S. laws or regulations, or that CBP had any concerns about the legality of the transportation route. Nor am I aware that any of ARM's strategic partners, KIF, any vessel owners, or any of KIF's customers, strategic partners or vendors ever received any guidance or ruling from CBP advising them of any CBP concerns related to the legality of the BCR.

## III.     Lack of Suitable Coastwise Qualified Vessels or Other Modes of Transportation at Dutch Harbor

19.     The development of the Bayside route solved a problem for two important seafood-centric areas of the United States: the high-volume, remote fishing areas of Alaska, and the traditional and important fish processing markets in the Northeast. This is a critical corridor for seafood, but not specifically for other goods. The shortage of alternatives for efficient transport of frozen seafood, enabling low cost, high temperature consistency delivery to the East Coast continues today.

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.          CASE NO. 3:21-CV-_____ (____)
DECLARATION OF PER K. BRAUTASET                                                PAGE 7 OF 19

Case 3:21-cv-00198-SLG   Document 7   Filed 09/02/21   Page 7 of 19

20.     ARM contracts with owners of non-coastwise qualified vessels for the Bayside Program because no viable options exist for the use of coastwise qualified vessels for the voyage between Dutch Harbor and Bayside.  Only two shipping companies currently offer coastwise qualified vessels for refrigerated cargo in Dutch Harbor.  One of the shipping companies is a large container carrier.  The other is a small, conventional reefer vessel operator with very limited capacity.  There are also two barge companies offering transportation services for refrigerated cargo.  All four of these companies terminate their ocean transportation services from Dutch Harbor in Washington State.  Collectively, these vessels and barges are limited in number and limited in refrigerated capacity in comparison to the high volume, fast paced Bering Sea fisheries. Included in this already-limited supply are vessels that date back to the early 1960s, which cannot meet the demanding temperature controlled carriage of frozen seafood products from Dutch Harbor to the Eastern U.S.

21.     And, due to limited supply of containers and supporting infrastructure in Dutch Harbor, the refrigerated containers are not pre-cooled before the seafood products are loaded in Dutch Harbor to the required negative twenty degrees Celsius, nor can many of the loaded containers be maintained at the required temperature while at Dutch Harbor awaiting loading to container vessels and/or barges that will transport them to Washington State.  Failure to maintain the containers at the required temperature may result in spoilage of the seafood product while in transit.

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.            CASE NO. 3:21-CV-_____ (____)
DECLARATION OF PER K. BRAUTASET                                                      PAGE 8 OF 19

Case 3:21-cv-00198-SLG   Document 7   Filed 09/02/21   Page 8 of 19

22.     The lack of available coastwise qualified vessels and barges, coupled with the lack of refrigerated capacity and/or equipment, which would result in ineffective service, significant delays, and an inability to predict when seafood products will be loaded or arrive in Washington State, make the barges and coastwise qualified vessels impractical for regular and steady use in the supply chain for the high volume of Alaska seafood products bound for the Eastern U.S.

23.     Compounding all of the difficulties described above, is the lack of available infrastructure and equipment to move additional volumes of seafood products from the Western U.S. to the Eastern U.S.  Even if KIF, ARM or the shippers themselves could count on the availability of reliable refrigerated transport from Dutch Harbor to Washington State, sufficient to handle the volumes of shippers' seafood products, which they cannot, the dual problem of insufficient cold storage to receive that product and lack of available rail car reefer transportation from the Western U.S. to the Eastern U.S. remains.

24.     Rail transport is not a viable transportation alternative.  Transporting perishable items by reefer rail car is far less efficient and reliable than transporting those items with refrigerated trucks because deliveries will take at least twice as long.  In some cases, *i.e.*, for transport to downstream customers in New Bedford, Massachusetts, the product will have to be additionally transferred from the railway to a truck and/or to a secondary cold storage before continuing on to its final destination.  The manufacture of

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.          CASE NO. 3:21-CV-_____ (____)
DECLARATION OF PER K. BRAUTASET                                                      PAGE 9 OF 19

Case 3:21-cv-00198-SLG   Document 7   Filed 09/02/21   Page 9 of 19

new reefer rail cars also has been limited, increasing the challenge of replacing aged

reefer rail cars.

25.     There is limited available capacity of reefer rail cars and dramatically

increased time and expense associated with such transportation, as well as significant

competition from non-refrigerated cargo.

26.     Motor carriers also lack the required temperature-controlled refrigerated

trailers essential for safely and reliably transporting seafood products over land across the

country.  Additionally, there is a lack of cross-continent truck drivers available to

transport this additional product.

27.     Even assuming viable alternative modes of transportation were available to

replace the high volume of seafood products moving through Bayside, the costs required

to implement those modes, as set forth above, would be prohibitive and the timing

required to transition to such modes would be impracticable.  Moreover, even if the

required number of temperature-controlled trucks were available, the costs of

transportation would be at least 100% higher than the Bayside Program costs, rendering

this option commercially unsustainable.

**IV.     No Immediate Alternatives Exist for the Industry Attacked by CBP**

28.     In addition to the lack of suitable coastwise qualified vessels, cold-storage

capacity in Dutch Harbor is very limited.  And the fishing season is very high-volume

and fast-paced.  Adding incremental capacity to absorb additional volume will require

massive capital improvement projects and development of additional real estate for the

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                    CASE NO. 3:21-CV-_____ (____)
DECLARATION OF PER K. BRAUTASET                                                      PAGE 10 OF 19

Case 3:21-cv-00198-SLG   Document 7   Filed 09/02/21   Page 10 of 19

installation of container-charging slots and plugs, *i.e.*, the space and electric infrastructure necessary to provide the adequate area and electricity to store and cool the refrigerated containers. Such expansion is unlikely because the owners of the real estate surrounding Dutch Harbor have so far been reluctant to lease more of the available flat-level property within any reasonable distance to the port. The existing domestic container vessels are limited in the number of slots and plugs to accommodate refrigerated containers, which are carried alongside dry containers, flat racks, and other non-refrigerated goods.

29.     The challenge presented by the extremely limited availability of coastwise qualified vessels has been exacerbated by the COVID-19 pandemic, which has caused a system-wide crisis in the shipping industry. Initially, at the onset of the pandemic, demand for consumer goods radically declined, leading to cancellation of a significant number of sailings. But as the pandemic progressed, and (a) consumers began to order increasing quantities of products online, and (b) businesses began to stockpile inventory, supplies, parts, and raw materials in anticipation of future COVID-19 waves, the demand for shipping containers and vessels surged. This problem was further exacerbated by delays and congestion in global ports caused by lockdowns, COVID-19 outbreaks, and the need for social-distancing. All of these factors have had a downstream effect on the availability of coastwise qualified vessels and equipment.

## V.     The Tariff and the Railway

30.     I understand that, in or about August 2006, American Seafoods Company LLC ("ASC"), a shipper and current customer of KIF, filed a rate tariff (Tariff STB

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.          CASE NO. 3:21-CV-_____ (____)
DECLARATION OF PER K. BRAUTASET                                          PAGE 11 OF 19

Case 3:21-cv-00198-SLG   Document 7   Filed 09/02/21   Page 11 of 19

AICN 0001) with the Surface Transportation Board ("STB"), which identifies the New Brunswick Southern Railway ("NBSR") as the Canadian rail carrier used for the transport of frozen seafood products from Dutch Harbor to Maine via Bayside. My understanding is that ASC's filing was undertaken solely out of an abundance of caution because, even though the Third Proviso of the Jones Act states that rate tariffs for routes were to be filed with the STB, according to CBP's interpretative rulings and guidance, no such filing was required.

31.    The tariff filing expressly describes ASC's intermodal transportation as follows: "water and rail transportation and related services, southbound between Dutch Harbor, Alaska and named places in the Eastern United States" using carrier New Brunswick Southern Railway Company Limited, issued on August 28, 2006 (the "2006 Tariff"). A copy of the 2006 Tariff is attached hereto as Exhibit 1.

32.    Prior to 2012, shippers utilized the NBSR to transport seafood products from Dutch Harbor to Maine. In 2012, KBB, which, as stated above, is a non-affiliated, third-party entity, modified the Canadian trackage used as part of the Bayside Program, by switching from the NBSR to the BCR rail line. The use of the NBSR as part of the transportation route was disclosed to CBP, before April 2012, in bills of lading included in the documentation packets supplied to CBP. A copy of a March 29, 2012 customs documentation packet is attached hereto as Exhibit 2, pages 1, 5. The use of the BCR as part of the transportation route was disclosed to CBP, after April 2012, in bills of lading

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.          CASE NO. 3:21-CV-_____ (____)
DECLARATION OF PER K. BRAUTASET                                              PAGE 12 OF 19

Case 3:21-cv-00198-SLG   Document 7   Filed 09/02/21   Page 12 of 19

included in the documentation packets supplied to CBP.  A copy of an April 9, 2012

customs documentation packet is attached hereto as Exhibit 3, pages 1, 5.

33.     Before CBP suddenly commenced issuing the penalty notices in mid-

August, CBP had never expressed any objection or concerns with respect to the Bayside

Program, which includes the Canadian rail component.

**VI.     CBP Issues Enormous Penalty Notices to ARM and KIF's Customers and Service Providers**

34.     As stated above, I understand that CBP has issued and served on KIF's

customers and KIF and ARM's strategic partners, which have been involved in the

Bayside Program, notices of enormous penalties for purported violations of the Jones

Act.  Those notices, many of which were forwarded to me directly by the various parties

who received them, and involving a total, to date, of $350 million in fines and a total of

175 separate citations alleging violations dating back nearly five years, all seem to relate

to the Bayside Program.  The notices of penalties appear to have been served on almost

all customers, participants, and servicers who were associated with contracting to

transport seafood products or facilitating the delivery of such seafood products via the

Bayside Program:

- KIF, which contracts ARM's services, was served with two penalty notices, totaling approximately $25 million.

- Five ship owners who ARM contracts with for ships to deliver seafood from Dutch Harbor to Bayside, have provided ARM with nine notices of penalty totaling approximately $55 million.

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                    CASE NO. 3:21-CV-_____ (____)
DECLARATION OF PER K. BRAUTASET                                                       PAGE 13 OF 19

Case 3:21-cv-00198-SLG   Document 7   Filed 09/02/21   Page 13 of 19

- To date, ARM has now been contacted by or on behalf of ship owners and charterers who have been assessed penalties from CBP totaling over $65 million, based on communications received. The communications inform ARM that: (1) insurance policy carriers have been informed of CBP's notices; (2) ship owners intend to object to the penalties and are placing ARM on notice for the amounts of the penalties and defense costs; and/or (3) have informed ARM that they are holding ARM liable for the penalties assed by CBP. A sample communication received by ARM concerning penalty notices issued to the vessels Charles Island and Duncan Island are attached hereto as Exhibit 4.

- I understand from KIF that (1) at least nine of KIF's shipper customers have informed KIF that a total of approximately $139 million in penalty notices have been issued to them, (2) CBP has issued similar penalty notices to the two cold-storage facilities KIF contracts with to store its customers' seafood product in Dutch Harbor and Bayside, totaling approximately $37 million, and (3) two importers and nine trucking companies contracted by KIF received notices of approximately $95 million in penalties.

- KIF has also informed ARM that certain third-party trucking partners stated that they refuse to transport any goods from Bayside.

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.            CASE NO. 3:21-CV-_____ (____)
DECLARATION OF PER K. BRAUTASET                                            PAGE 14 OF 19

Case 3:21-cv-00198-SLG   Document 7   Filed 09/02/21   Page 14 of 19

**VII. Severe and Imminent Irreparable Harm to ARM and KIF Precipitated By CBP's Notices of Penalty**

35. The delivery of seafood products to the Eastern U.S. customers, facilitated and arranged by KIF and ARM has been brought to a complete halt as a direct result of CBP's sudden issuance of $350 million in crippling penalties and the imminent threat and risk of additional penalties. The extremely harsh and severe nature of that penalty is underscored by the fact that the current size of the penalty is equivalent to approximately 2.3 times the annual value of the frozen Alaskan seafood transported using the Bayside Program, which is estimated at just under $150 million. The Bayside Program and the entire Dutch Harbor-Maine frozen seafood supply chain are paralyzed, and if this continues much longer, the existing and daily increasing damage will utterly destroy this important and crucial supply chain for the Alaska seafood industry, including its downstream customers and the U.S. consumer. As a result, consumers will see shortages of products and increased prices until this route is able to resume operations.

36. As a result of the penalties issued upon KIF and the ship owners to date, absent judicial relief, ARM faces imminent destruction of its business. ARM's average net income for the two prior years is $1.6 million. If the third-parties alleging ARM has some form of liability prevail, even if various supply chain participants were still willing to participate in the Bayside Program and potentially incur additional fines (which they are not), ARM would be unable to continue as an on-going business.

37. Further, the CBP penalty notices sent to ARM by representatives of ship owners, which currently total approximately $65 million represent a potential existential

threat to ARM's business. If ARM is found liable for such penalties, despite any ARM arguments opposing such claims, it will not be able to indemnify such losses.

38. Likewise, ARM cannot provide any aid or coverage for the amount of penalties sustained to date by KIF.

39. Furthermore, notwithstanding the punitive penalties already assessed by CBP on, ARM, KIF, their respective customers, and their third-party strategic partners now face the threat of continuing, catastrophic penalties, as CBP continues to issue penalties related to the Bayside Program, and the amounts of those penalties continue to accrue. Indeed, CBP has issued separate penalty notices in connection with each use of the transportation system, and ARM and KIF therefore anticipate that additional penalties will be issued for subsequent movements in 2020 and/or 2021. This is particularly harmful to ARM and KIF because CBP has continued to issue penalties while allowing the Bayside Program to continue.

40. The immediate effect on ARM, KIF, their customers, and the service providers who are engaged in ARM's Bayside Program's carefully-calibrated Alaska-Maine transport system is devastating. Virtually overnight, the penalty notices have essentially caused a shutdown of the Bayside Program and the supply chain that brings Alaskan fish to the Eastern U.S. At the precise moment that fishing volumes are high due to the fishing season, cold storage in Dutch Harbor is particularly tight, and shipping services overall are in short supply.

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.      CASE NO. 3:21-CV-_____ (____)
DECLARATION OF PER K. BRAUTASET                                          PAGE 16 OF 19

Case 3:21-cv-00198-SLG   Document 7   Filed 09/02/21   Page 16 of 19

41.     All aspects of the supply chain are currently impacted and under severe and increasing stress.  Vessels that were scheduled to depart Dutch Harbor for Bayside are now on hold.  A vessel which was scheduled to depart Dutch Harbor on August 18, 2021, for instance, did not leave the port until August 28, 2021.  Its Eastern U.S.-bound cargo was either offloaded, or diverted before being loaded, and the vessel was loaded with product destined solely for Canada and Europe.  The vessel departed ten days late and short 1.65 million pounds of product that it otherwise would have carried.

42.     ARM and KIF also have incurred serious reputational risk.  The cryptic nature of CBP's sudden issuance of notices of the massive penalties being imposed on the companies in the supply chain – which do not specify the precise basis of the alleged violations – has caused and is continuing to cause great uncertainty and instability in the supply chain.  Even if the penalties are determined to be unfounded (as Plaintiffs intend to demonstrate), the harm to the future of ARM and KIF's businesses is imminent and cannot await the time necessary for judicial review of CBP's conduct.  Indeed, without judicial intervention, ARM and KIF are at risk of incurring new penalties and its strategic partners will continue to claim that ARM is liable for payment of these penalties, potentially jeopardizing its relationship with third-party providers of services essential to continue the current Bayside Program.

43.     In addition, I understand that many of the shippers are relatively small family-owned American businesses that critically rely on the availability of the Bayside Program to transport their seafood products.  While the penalties assessed on these

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.          CASE NO. 3:21-CV-_____ (____)
DECLARATION OF PER K. BRAUTASET                                              PAGE 17 OF 19

Case 3:21-cv-00198-SLG   Document 7   Filed 09/02/21   Page 17 of 19

shippers is already crippling, the demise of the Bayside Program also would be crippling to their businesses this season and will have long-term reverberating effects on their U.S. customers' business and income stream, absent immediate relief allowing operations to resume.

44.     One of ARM and KIF's customers, for example, the O'Hara Corporation, a family-run business that owns and operates five Alaska fishing and processing ships and partly owns a re-processing factory on the East Coast of the U.S., has informed ARM and KIF that, unless its shipments are delivered expeditiously, part of its re-processing factory will be at risk of ceasing operations due to a lack of raw material supply – which will result in a reduction of its workforce and higher prices for consumers of the end seafood product.

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.          CASE NO. 3:21-CV-_____ (____)
DECLARATION OF PER K. BRAUTASET                                              PAGE 18 OF 19

Case 3:21-cv-00198-SLG   Document 7   Filed 09/02/21   Page 18 of 19

I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

Dated:  Lake McMurray, Washington
        September 1, 2021

_____
Per K. Brautaset

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.          CASE NO. 3:21-CV-_____ (____)
DECLARATION OF PER K. BRAUTASET                                              PAGE 19 OF 19

Case 3:21-cv-00198-SLG   Document 7   Filed 09/02/21   Page 19 of 19