David Karl Gross, ABA #9611065
Birch Horton Bittner & Cherot
510 L Street, Suite 700
Anchorage, Alaska 99501
Telephone: 907.276.1550
dgross@bhb.com

Edward E. McNally, ABA #9203003
Marc E. Kasowitz *(Pro Hac Vice To Be Filed)*
Hector Torres *(Pro Hac Vice To Be Filed)*
Kasowitz Benson Torres LLP
1633 Broadway
New York, New York 10019
Telephone: 212.506.1700
emcnally@kasowitz.com
mkasowitz@kasowitz.com
htorres@kasowitz.com

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| KLOOSTERBOER INTERNATIONAL FORWARDING LLC and ALASKA REEFER MANAGEMENT LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES OF AMERICA, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. CUSTOMS AND BORDER PROTECTION, and TROY A. MILLER, U.S. Customs and Border Protection Acting Commissioner, in his official capacity,<br><br>Defendants. | Case No.: 3:21-cv-_____ (____) |

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.  CASE NO. 3:21-cv-_____ (____)
DECLARATION OF INGE ANDREASSEN                                              PAGE 1 OF 16

Case 3:21-cv-00198-SLG   Document 9   Filed 09/02/21   Page 1 of 16

# DECLARATION OF INGE ANDREASSEN

Pursuant to 28 U.S.C. § 1746, I, Inge Andreassen, declare as follows:

1. I am the President of American Seafoods Company LLC ("ASC"), which is engaged in the harvesting, processing and selling of frozen seafood products.

2. I began working at ASC in 1995 as the Director of Operations. From 1996 to 2005, I served as ASC's Vice President of Operations. I have been the President of ASC since 2005, and I am familiar with ASC's organization and business operations.

3. I submit this declaration in support of Plaintiffs' motion for a Temporary Restraining Order and Preliminary Injunction seeking to enjoin the issuance or assessment of penalties in connection with the transport of frozen seafood products from Alaska to the lower 48 states. I have personal knowledge of the facts set forth in this Declaration.

4. ASC supports immediate judicial intervention in this situation, to avoid irreparable harm to us and the essential Dutch Harbor, Alaska ("Dutch Harbor") to Bayside, New Brunswick, Canada ("Bayside") route we have depended on for 20 years. We have already received approximately $46 million dollars in fines and we have had to halt customer deliveries on the East Coast or face additional crippling fines, without a clear explanation. The financial threat to our business is real and sizable both in terms of fines, but also in terms of customer service. Our customers depend on us and this route for the timely delivery of frozen seafood cargo that is designed well in advance each year around our fishing season, and the Lenten season when fish consumption rises in the

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.   CASE NO. 3:21-cv-_____ (____)
DECLARATION OF INGE ANDREASSEN                                              PAGE 2 OF 16

Case 3:21-cv-00198-SLG   Document 9   Filed 09/02/21   Page 2 of 16

U.S. Without immediate judicial intervention, we are facing the options of having to (1) relocate goods back to Dutch Harbor for reshipment into the United States; (2) create a log jam in Dutch Harbor which is a limited sized port, and we will compete with all the other industry products being sent back; (3) delay and pay for transport to carry goods back to the U.S. mainland from Bayside at a time when temperature controlled shipping containers are running short; or (4) miss critical time windows required by our customers. Alternatively, we can ship the product overseas, which will result in letting our U.S. customers down, and also opens the door to foreign sourced fish. Without intervention, we believe we will lose sales this year and incur higher costs, and we anticipate our customers will also lose sales this year if they run reduced volumes on factory lines due to product shortages. We are struggling to calculate the cost and loss of revenue associated with this incredible level of disruption, but we can estimate that if 10% of our U.S. targeted product gets delayed, we are looking at over $5 million in lost revenue this year, plus all of the costs described above (some transportation quotes we are receiving are suggesting double the current cost to ship). If we have to let our U.S. customers down, we will have to deal with that fallout.

## I. ASC Overview

5. ASC, a wholly-owned subsidiary of American Seafoods Group LLC ("ASG"), which operates a fleet of six at-sea catcher-processor vessels in sustainable fisheries in the Bering Sea and the North Pacific Ocean, is the world's largest at-sea processor of Wild Alaskan Pollock ("Pollock"), with approximately $400 million in

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.    CASE NO. 3:21-cv-_____ (____)
DECLARATION OF INGE ANDREASSEN                                          PAGE 3 OF 16

Case 3:21-cv-00198-SLG   Document 9   Filed 09/02/21   Page 3 of 16

annual sales. ASC also harvests, processes at-sea, and sells Wild Pacific Hake in the U.S., and distributes its seafood products all over the world. Pollock is one of the most important species in terms of volume and total value for both retail and food services applications.

6. ASC has offices in Dutch Harbor and Seattle, Washington – as well as Denmark, Japan, and China – with over 130 non-seafaring employees and over 800 seafaring, seasonally-contracted employees from all over the U.S., who work in Alaska, Washington, and/or Oregon and on ASC's vessels operating off the coasts of those States. Those employees include captains, mates, engineers, pursers, stewards, mechanics, harvesting and processing crews, medical staff, cooks, electricians, factory technicians, quality control technicians, and administrative and business staff.

7. Approximately 13% of the total Pollock harvested and processed by ASC in this region is shipped to Bayside, and transported from Bayside to the U.S. via the U.S.-Canadian border crossing in Calais, Maine. ASC contracts with plaintiffs Kloosterboer International Forwarding LLC ("KIF"), who partners with Alaska Reefer Management LLC ("ARM"), for logistical services related to the transportation of ASC's seafood products. ASC relies on KIF's efficient and reliable transportation service, which ensures timely delivery of ASC's frozen seafood products in the U.S. to its customers.

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.　　　　CASE NO. 3:21-cv-_____ (____)
DECLARATION OF INGE ANDREASSEN　　　　　　　　　　　　　　　　　PAGE 4 OF 16

Case 3:21-cv-00198-SLG　Document 9　Filed 09/02/21　Page 4 of 16

## II. ASC's Customers

8. ASC has long and well-established partnership relationships with all of its customers. Over 40% of those customers have been in partnership with ASC for over twenty years.

9. ASC's U.S. direct customers, food processors with factories in the lower 48 States, use ASC's seafood products to make foods sold to U.S. customers, including the United States Department of Agriculture ("USDA"). The seafood products sold to the USDA are provided to school lunch and food bank programs throughout the country.

10. ASC's direct customers, include, among others:

- High Liner Foods: One of the largest frozen seafood producers in North America. Founded in 1899, High Liner Foods' seafood product portfolio includes a variety of wild and farmed seafood species. High Liner retail brands include Sea Cuisine and Fisher Boy, and High Liner also sells to restaurant chains and food service providers.

- Channel Fish Processing: A privately-owned seafood processing company located in Boston, Massachusetts that supplies both fresh and frozen seafood from Alaska and North Atlantic fisheries. Channel Fish Processing is also one of the largest suppliers of Pollock to the USDA food bank and school lunch programs. Pollock is one of the largest volume species in its

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.   CASE NO. 3:21-cv-_____ (____)
DECLARATION OF INGE ANDREASSEN                                       PAGE 5 OF 16

Case 3:21-cv-00198-SLG   Document 9   Filed 09/02/21   Page 5 of 16

portfolio, which is sold to retail and food services in the U.S. market under private label brands.

11. ASC's direct customers in the U.S. generally further process the fish and then sell branded and private label products into retail and foodservice. Most of these customers buy from more than one supplier. Overall, Pollock products are purchased by consumers in the U.S. at retailers such as Walmart, Kroger, and Costco; major restaurant chains, such as Arby's, Long John Silvers, and Burger King; and foodservice distributors serving schools and 'mom and pop' restaurants.

12. ASC's U.S. customers are all involved in a highly inter-connected and inter-dependent process that not only employs U.S. workers, but also provides large quantities of seafood products to U.S. consumers. The transport of frozen seafood from Alaska to Maine is entirely dependent on guaranteed temperature-controlled environments on shipping vessels and in storage facilities, and the timely delivery of the frozen seafood product.

13. ASC's business requires a dependable transportation system because of the "just-in-time" delivery systems required by its customers, which allows ASC's customers to immediately use ASC's products to meet their manufacturing and processing schedules, and for compliance with their own downstream contractual commitments.

### III. ASC's Frozen Seafood Production and Distribution

14. The commercial fishing companies operating in Alaska provide employment for approximately 37,000 residents of Alaska, the lower 48 States and

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.   CASE NO. 3:21-cv-_____ (____)
DECLARATION OF INGE ANDREASSEN                                        PAGE 6 OF 16

Case 3:21-cv-00198-SLG   Document 9   Filed 09/02/21   Page 6 of 16

foreign countries. An estimated one-third of those workers operate out of the Dutch Harbor port and are involved in the harvesting and/or processing of Pollock from the Bering Sea. ASC is one of the largest commercial fishing companies that harvests fish from the Bering Sea that is then transported through Dutch Harbor. Alaska's Pollock fishery, which employs approximately 12,000 workers, is the largest fishery for human consumption in the world.

15. Pollock is harvested twice a year, in two official seasons. "A" Season begins on January 20, and "B" Season begins on June 10. Pursuant to the American Fisheries Act, a closed number of companies have the right to harvest and/or process raw Pollock from the Bering Sea – and even those granted rights are limited to quotas, set by the U.S. government, as to the volume and season in which they can harvest. ASC is directly allocated roughly 17.5% of the total quota for Pollock, and also fishes for several Native Alaska corporations, which are allocated a quota, but do not directly fish in the Bering Sea. Given the fixed quota, and, therefore, fixed supply, many customers that rely on Pollock in the U.S. contract with multiple fishing companies, including ASC.

16. During the two Pollock fishing seasons, virtually the entire harvest is transported expeditiously from Dutch Harbor to the lower 48 States and to foreign markets in Europe and Asia. Approximately 370 million pounds of ASC's frozen Pollock products are transported out of Dutch Harbor and downstream to customers during <u>each</u> of the two seasons.

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.     CASE NO. 3:21-cv-_____ (____)
DECLARATION OF INGE ANDREASSEN     PAGE 7 OF 16

Case 3:21-cv-00198-SLG  Document 9  Filed 09/02/21  Page 7 of 16

17. In an average Pollock season, ASC produces approximately one million pounds of seafood products daily, which must be warehoused in cold-storage facilities and moved to transport vessels for shipment. In this fast-paced, high-volume, compressed supply network, fishing companies, including ASC, all rely on the same limited cold-storage facilities and transportation options, designed to allow them to offload quickly and return to the fishing grounds.

18. Because Dutch Harbor is one of the most remote ports in the U.S. and subject to harsh conditions, ASC relies on KIF's, and its strategic partner ARM's, highly-specialized services to successfully and efficiently transport its seafood products out of Dutch Harbor. An integral component of this supply chain consists of properly-equipped and certified cold-storage facilities and shipping vessels, with the capacity to store and transport ASC's frozen seafood product at appropriate and stable temperatures.

19. For ASC, which carries a factory on board each of its catcher-processor vessels, the transportation process begins with the harvesting and processing of the seafood in the Bering Sea and, once full, the delivery of its product to the port in Dutch Harbor, where ASC seafood product is moved from the catcher-processor vessels into cold-storage facilities. The seafood product is then loaded for shipment onto third-party vessels, which are arranged by KIF, through its contracts with ARM.

20. These third-party vessels transport ASC's seafood products – which are destined for its customers in the Eastern U.S. – from Dutch Harbor through the Panama Canal to Bayside. ASC uses KIF's contracted transportation and cold-storage network to

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.     CASE NO. 3:21-cv-_____ (____)
DECLARATION OF INGE ANDREASSEN     PAGE 8 OF 16

Case 3:21-cv-00198-SLG   Document 9   Filed 09/02/21   Page 8 of 16

transport its frozen seafood products to Bayside and then Calais, Maine because this is a well-established route under the Third Proviso of the Jones Act. The Third Proviso allows for third-party foreign vessels to be used in connection with the transportation of goods from Alaska to the United States when a Canadian railway is part of the transportation process.

**IV.    ASC's Prior Use of the New Brunswick Southern Railroad**

21.    In the early 2000s, before engaging ARM's transportation logistics services for its seafood products in 2009 and, later, KIF's in 2018 (*see* below at ¶ 22), ASC contracted directly with third-parties for the transportation of ASC's seafood products by vessels, railway and trucks, utilizing the New Brunswick Southern Railroad ("NBSR"), a Canadian rail line. This transportation process was similar to KIF's current transportation process (*see* below at ¶ 22): ASC's seafood products were shipped from Dutch Harbor to Bayside by vessel where the seafood product was offloaded to cold storage before being loaded onto trucks. The trucks then drove to Saint John, New Brunswick (approximately 50 miles from the U.S. point of entry). Once the trucks reached St. John, the product was off loaded onto the NBSR, moved a short distance aboard rail, and then re-loaded onto the trucks, which continued on to the U.S. through the Calais, Maine border crossing and delivered the product to customers in the U.S.

22.    In 2009, ASC contracted with ARM to handle and coordinate the transportation of ASC's seafood products. ARM contracted with third-parties to secure the vessels and cold storage facilities essential for the transportation of ASC's seafood

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.    CASE NO. 3:21-cv-_____ (____)
DECLARATION OF INGE ANDREASSEN                                              PAGE 9 OF 16

Case 3:21-cv-00198-SLG   Document 9   Filed 09/02/21   Page 9 of 16

products from Bayside to Calais. I understand that in 2012, ARM's third-party strategic partners began using the Bayside Canadian Railway ("BCR") instead of the NBSR to transport ASC's seafood products. In 2018, ASC began directly contracting with KIF for its transportation needs.

V. **ASC's Filing of a Rate Tariff with the Surface Transportation Board ("STB")**

23. In 2006, ASC filed a tariff with the STB out of an abundance of caution in light of a U.S. District Court decision. At all relevant times, between 2006 to the present, it is my understanding that all documentation submitted on behalf of ASC reported the transportation system, including the use of the NBSR or BCR rail lines in Canada. To my knowledge, CBP never provided notice to any representative of ASC that CBP had any Jones Act-related concerns or questions with respect to the Alaska-Maine transportation system.

VI. **CBP Issues Notices of Penalties to ASC and its Partners**

24. Beginning on August 9, 2021, CBP suddenly commenced issuing notices of penalties to ASC for purported violations of the Jones Act ("Penalty Notices") in connection with the shipment of ASC's frozen seafood products from Dutch Harbor to Calais via Bayside. ASC received the first notice by Federal Express on August 17, 2021. Sixteen additional notices were received during the following week, through August 25, 2021. All seventeen Penalty Notices relate to the shipment of ASC's seafood product, during 2017 through 2020, from Dutch Harbor to Calais, Maine. The current

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.   CASE NO. 3:21-cv-_____ (____)
DECLARATION OF INGE ANDREASSEN                    PAGE 10 OF 16

Case 3:21-cv-00198-SLG   Document 9   Filed 09/02/21   Page 10 of 16

total amount of the penalties is approximately $46 million. Copies of Penalty Notices are attached hereto as Exhibits 1-17.

25. The Penalty Notices simply refer to the use of non-coastwise qualified vessels for the shipment of seafood product from Dutch Harbor. Entirely absent from the notice is any recognition concerning the Third Proviso, pursuant to which ASC was allowed to use non-coastwise qualified vessels for the Dutch Harbor-Maine transport of its seafood products.

26. We have been informed by ARM, and have verified ourselves, that there is a limited availability of domestic-flagged vessels, West coast cold-storage, and other U.S. rail transportation systems necessary to deliver on temperature-controlled time sensitive routes to support ASC's Eastern U.S. customers' needs. There is no rail system over which ASC's seafood products can be reliably delivered to the Eastern U.S. with the same guarantee of temperature control – a requirement for transport of ASC's seafood products. Further, there are not a sufficient number of trucks, trailers or reefer equipment available to reliably and timely transport ASC's product to its customers in the required timeframe.

27. Even assuming the necessary vessel-rail-truck combinations were available, any alternative would result in nearly double the cost for transportation. These substantially increased costs would result in increased costs to our U.S. customers, and presumably the U.S. consumer.

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.   CASE NO. 3:21-cv-_____ (____)
DECLARATION OF INGE ANDREASSEN                                              PAGE 11 OF 16

Case 3:21-cv-00198-SLG   Document 9   Filed 09/02/21   Page 11 of 16

## VII. CBP's Improper and Unfounded Penalties Are Causing ASC Direct and Irreparable Harm

28. The unprecedented Penalty Notices issued to ASC and its transportation partners has severely limited ASC's shipments to its customers in the Eastern U.S. As noted above, 13% of ASC's finished Pollock products are shipped to its customers in the Eastern U.S. via Bayside. This corridor is critical to us as it represents over 90% of our entire U.S. Pollock sales. Absent immediate relief, ASC's Eastern U.S. customers will be severely harmed because they will be unable to deliver the seafood product that has been promised to their customers. This disruption to the entire supply chain will also inflict serious harm on U.S. consumers, who will be deprived of U.S. harvested and processed Alaskan seafood routinely supplied by ASC and other Alaska seafood processors, which utilize the Dutch Harbor-Maine transportation system. These supply shortages also will result in increased prices, as clearly evidenced by price increases for other products that have already resulted from the breakdown of the worldwide transportation and storage network as a result of the COVID-19 pandemic.

29. At the operational level, ASC has been unable to deliver hundreds of thousands of pounds of seafood product ordered by its customers. Substantial quantities of ASC's frozen seafood products bound for the Eastern U.S. are currently stranded in different parts of the supply chain:

- 11.54 million pounds of seafood product are being held in cold-storage in Bayside;

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.   CASE NO. 3:21-cv-_____ (____)
DECLARATION OF INGE ANDREASSEN                                             PAGE 12 OF 16

Case 3:21-cv-00198-SLG   Document 9   Filed 09/02/21   Page 12 of 16

- 13.28 million pounds of seafood product are in transit and/or will be received into cold-storage in Bayside as of the end of this week;
- 2 million pounds of seafood product are currently on board ASC fishing vessels scheduled for trans loading into Dutch Harbor;
- 10.38 million pounds of seafood product are being held in cold-storage in Dutch Harbor.

30. Further, due to constraints in cold-storage facilities and other viable ways to transport ASC's seafood products to its customers in the Eastern U.S., if ASC is unable to continue using its current transportation process for delivery of its seafood products to the Eastern U.S., ASC will be compelled to divert the seafood products slated for its American business customers to Europe.

31. This disruption is occurring in the season that seafood further processing factories substantially increase their operations in preparation for next year's Christian Lent observance. Many of ASC's U.S.-owned and operated customers have informed ASC that their U.S.-based businesses are in jeopardy due to demands from their downstream customers, which have increased substantially since the onset of the COVID-19 Pandemic. Forced layoffs of employees likely will result if ASC is unable immediately to resume its seafood deliveries. One of ASC's large U.S. customers, for instance, has informed ASC that if it cannot obtain the seafood products expected from ASC within the next few weeks, it will not only run out of inventory, but the jobs of over 200 employees will be in jeopardy. Another of ASC's customers, Channel Fish

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.　　　CASE NO. 3:21-cv-_____ (____)
DECLARATION OF INGE ANDREASSEN　　　PAGE 13 OF 16

Case 3:21-cv-00198-SLG　Document 9　Filed 09/02/21　Page 13 of 16

Processing, informed ASC that if it does not receive the seafood products from ASC and other similarly-situated suppliers expeditiously, it likely will experience devastating hardship to its U.S. business, resulting in the layoff of 50% of its more than 140 employees.

32. CBP's conduct here is particularly disruptive because of the absence of alternatives in the short term – a global cargo crisis has meant that intense planning has gone into reserving ships for this Pollock season, even beyond the normal challenges caused by the inclement weather and distance. This crisis has meant that all alternative options already are showing delays or just not available, including ships to transport product down the West Coast or even substandard U.S. overland transport.

33. Absent meaningful and prompt judicial or other relief restoring ASC's ability to supply its seafood product, I expect that many of ASC's Eastern U.S. customers will suffer extreme harm from delays and the inability to receive Pollock; and are likely to have to seek an alternative to Pollock from foreign sources, which are not similarly constrained, in Europe and Asia. This shift to foreign-sourced seafood will deal a death knell to the excellent work that has been undertaken to distinguish U.S. harvested Wild Alaska Pollock and other U.S. seafood. ASC is a contributor to the Genuine Alaska Pollock Producers, a trade marketing organization that has invested millions of dollars supporting communications to celebrate and differentiate U.S.-sourced seafood from foreign imports.

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.　　　　CASE NO. 3:21-cv-_____ (____)
DECLARATION OF INGE ANDREASSEN　　　　　　　　　　　　　　　　　PAGE 14 OF 16

Case 3:21-cv-00198-SLG　　Document 9　　Filed 09/02/21　　Page 14 of 16

34. Substantial price increases for U.S. frozen seafood products sold to downstream customers and consumers, as noted above, is another inevitable consequence of the reduction in the supply of this critical seafood product because of the threat to the Dutch Harbor-Maine transportation system.

35. The USDA commodity procurement program, which helps feed families and children in need across the country, will also be severely impacted by this supply interruption. The program purchased 12.5 million pounds of Pollock in 2020, and an additional 13.4 million pounds this year to date. Most of this seafood product is converted to consumer-friendly seafood products in the Eastern U.S., which means that any delay in the raw material supply will prevent needy families, and re-opening schools from receiving this healthy protein.

36. In short, absent urgent judicial relief, the imposition of CBP's penalties and the threat of continuing issuance of such penalties, will severely and irreparably damage ASC's Eastern U.S. business and its customers, and will cause enormous harm to other downstream customers and, ultimately, the U.S. consumer.

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.     CASE NO. 3:21-cv-_____ (____)
DECLARATION OF INGE ANDREASSEN     PAGE 15 OF 16

Case 3:21-cv-00198-SLG    Document 9    Filed 09/02/21    Page 15 of 16

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: Roche Harbor, Washington
August 31, 2021

_____
Inge Andreassen

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.　　CASE NO. 3:21-cv-_____ (____)
DECLARATION OF INGE ANDREASSEN　　PAGE 16 OF 16

Case 3:21-cv-00198-SLG   Document 9   Filed 09/02/21   Page 16 of 16