E. BRYAN WILSON
Acting United States Attorney

SETH M. BEAUSANG
Assistant U.S. Attorney
U.S. Attorney's Office, District of Alaska
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Rm. 253
Anchorage, Alaska 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-2344
E-mail: Seth.Beausang@usdoj.gov

Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| KLOOSTERBOER INTERNATIONAL FORWARDING LLC and ALASKA REEFER MANAGEMENT LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES OF AMERICA, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. CUSTOMS AND BORDER PROTECTION, and TROY A. MILLER, U.S. Customs and Border Protection Acting Commissioner, in his official capacity,<br><br>Defendants. | Case No. 3:21-cv-00198-SLG<br><br>**UNITED STATES' OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

## INTRODUCTION

Prior to 2012, Plaintiffs utilized the New Brunswick Southern Railway

("NBSR") as a through route over Canadian rail lines for the transportation of their product from Alaska to Maine and other destinations in the United States. Plaintiffs knew that U.S. Customs and Border Protection ("CBP") had previously issued a Ruling Letter concluding that the NBSR route met the requirements of the Third Proviso to the Jones Act. There was also a rate tariff on file with the STB for this route. All was good.

In 2012, because Plaintiffs believed the NBSR was too costly, Plaintiffs radically changed their method of transporting seafood. Plaintiffs devised a scheme whereby instead of using an established Canadian railway that would transport their product from one destination to another, they decided to utilize a specially-built mini-railtrack, approximately 100 feet in length, that goes nowhere. Plaintiffs' product travels the length of the track and back, after which the product is driven by truck to the United States. According to Plaintiffs, this special railway, called the Bayside Canadian Railway ("BCR") is utilized for the "transportation" of their product over a "through route." CBP disagrees, and therefore has issued Notices of Penalty to Plaintiffs for millions of dollars in Jones Act penalties, because Plaintiffs did not use coastwise-qualified vessels to transport their product from Alaska. The potential penalties are large because Plaintiffs have been engaged in this illegal conduct for many years.

Kloosterboer v. United States, et al.
Case No. 3:21-cv-00198-SLG  Page 2 of 43

Having received the Notices of Penalty, Plaintiffs seemingly could have reverted to using the NBSR, or another legal method of transportation, and sought review of CBP's actions, either in an administrative process or through an action under the Administrative Procedure Act. Instead, Plaintiffs seek breathtaking equitable relief on an expedited basis. Specifically, they ask this Court to permanently enjoin CBP from collecting penalties for what CBP believes was years of flagrantly illegal conduct. Not only that, Plaintiffs ask the Court to permanently enjoin CBP from seeking any penalties for this conduct for the duration of this litigation—even if the Court ultimately concludes that Plaintiffs' scheme is illegal. In short, Plaintiffs are asking the Court for a license to break the law. There is no authority for that kind of equitable relief. Plaintiffs brought this situation upon themselves, they have not shown that they are likely to suffer irreparable harm without an injunction, and they are not entitled to equitable relief from this Court.

## STATEMENT OF FACTS[1]

Plaintiff Kloosterboer International Forwarding LLC ("KIF") is an Alaskan wholly-owned subsidiary of Plaintiff Alaska Reefer Management LLC ("ARM"). KIF and ARM arrange transportation and related services for the

---

[1] Facts taken from Plaintiffs' complaint are assumed true only for purposes of this opposition.

Kloosterboer v. United States, et al.
Case No. 3:21-cv-00198-SLG  Page 3 of 43

transportation of frozen seafood products from Alaska to the eastern United States. [Dkt. 1 ¶¶ 21-25]

ARM specifically arranges ocean carriage of the products from the port of loading in Alaska to the port of discharge in Bayside, New Brunswick, Canada. [Dkt. 1 ¶ 21] KIF is a registered non-vessel operating common carrier specializing in refrigerated freight services for frozen seafood products originating in Alaska (i.e., the arrangement of transportation and cold storage from place of product receipt to its ultimate destination on behalf of shippers), including those moving through the Bayside Port. [Dkt. 1 ¶ 21] KIF and ARM arrange for the further transportation of the products from Bayside to and through the border crossing at Calais, Maine, and into the United States. [Dkt. 1 ¶¶ 24-25]

ARM contracts with non-coastwise-qualified vessels to transport merchandise to the Bayside Port. [Dkt. 1 ¶ 22] Attempting to take advantage of the Third Proviso to the Jones Act, which would otherwise prohibit the use of non-coastwise-qualified vessels to transport merchandise from Alaska to Maine, KIF contracts with Kloosterboer Bayside Cold Storage ("KBB") to transfer the frozen seafood products, once they arrive at the Bayside Port, onto trucks that are then driven onto flat rail cars on the rail trackage of the BCR. [Dkt. 1 ¶¶ 28, 31] The BCR track is approximately 100 feet in length and is

Kloosterboer v. United States, et al.
Case No. 3:21-cv-00198-SLG  Page 4 of 43

located near the cold-storage facility in the Port of Bayside. The BCR is entirely located within the Port of Bayside. The trucks travel on the rail cars the length of the rail trackage and back. The trucks are then driven off the rail cars and directly to the Calais, Maine border crossing and into the United States. [Dkt. 1 ¶ 31] Upon information and belief, the BCR was constructed and is operated for the sole purpose to attempt to evade the requirements of the Jones Act.

Frozen seafood products have been shipped from Alaska to Bayside since at least the 2000s. [Dkt. 7 ¶ 17] However, the BCR has only been utilized since 2012. [Dkt. 8 ¶ 15] Prior to that, the manner of transportation of seafood from Alaska to Maine was drastically different.

The prior manner was disclosed to CBP in 1998, 2000 and 2001 by two other shippers, Sunmar Shipping Inc. ("Sunmar") and American Seafoods Company LLC ("ASC"), when they sought and obtained Ruling Letters from CBP to ensure that their manner of transportation would comply with the Third Proviso. [Dkt. 6, Ex. 23, 6, & 7] Sunmar, in 2001, described the prior manner of transportation as follows:

> Sunmar is an ocean carrier engaged in the transportation of cargoes between points in the United States, Canada, Northern Europe, and Russia. The transportation currently under consideration involves the shipment of frozen fish products from fishing vessels and shore plants in the Dutch Harbor, Alaska area on foreign-flag, non-coastwise-qualified vessels and then by intermodal carriage via the New Brunswick Southern Railway

Kloosterboer v. United States, et al.
Case No. 3:21-cv-00198-SLG  Page 5 of 43

("NBS Railway"), a Canadian rail line, for ultimate delivery, via a through bill of lading, to cold storage facilities in Boston or Gloucester and other points in the United States.

Sunmar will charter foreign-flag, non-coastwise-qualified vessels from foreign owners (the "Vessels"). The products loaded onto the Vessels in the Dutch Harbor area will be unitized for intermodal carriage and handling under the through bill of lading. The Vessels will then move the cargo from Dutch Harbor to New Brunswick, Canada.

When the Vessels arrive in New Brunswick, Canada, the products will be discharged to the Bayside Food Terminal near Bayside, New Brunswick, where they will be staged for intermodal carriage. At the Bayside terminal, the products will be transferred into intermodal reefer trailers. The loaded trailers will be hauled by truck to either McAdam, New Brunswick or Saint John, New Brunswick, where the trailers will be loaded onto rail flat cars.

The rail cars will then be moved by the NBS Railway over rail trackage in Canada, either from McAdam to Saint John, or Saint John to McAdam. At either of these rail-truck transfer facilities, the NBS Railway truck trailers will be offloaded and then driven from there into the United States via the St. Stephen, New Brunswick/Calais, Maine, border crossing. After entry, the trailers will be trucked to a cold storage facility in the United States. Sunmar will be documented as the shipper, while each respective customer is the consignee and the Canadian rail carrier will be NBS Railway.

[Dkt. 6, Ex. 6 at 1-2]

Under these past operations, the rail movement occurred under the control of either the NBSR, or the NBSR in conjunction with the Canadian Pacific Railway, and involved rail movements of approximately 34 to 91 miles or more. [Hebert Decl. ¶ 8] CBP was made aware of these past operations

Kloosterboer v. United States, et al.
Case No. 3:21-cv-00198-SLG  Page 6 of 43

through various requests for Ruling Letters. [Hebert Decl. ¶ 8] It is common and encouraged for shippers to request administrative rulings from CBP concerning CBP's conclusions about how the Jones Act applies in specific factual scenarios. [Hebert Decl. ¶ 11]

CBP responded to Sunmar's request by issuing a Ruling Letter stating CBP's conclusion that Sunmar's proposed manner of transportation would comply with the Third Proviso. CBP's Ruling Letter stated in part:

> The Third Proviso simply permits transportation between two coastwise points that would otherwise be prohibited by that statute when such transportation is on a through route recognized, or exempted by, the STB and is in part over Canadian rail lines.

> HOLDING:

> The transportation of frozen fish indirectly between coastwise points, in part via both foreign-flag vessel and rail trackage in Canada, as described above, is in accord with the Third Proviso to 46 U.S.C. App. § 883.

[Dkt. 6, Ex. 6 at 6] CBP issued a similar Ruling Letter to ASC. [Dkt. 6, Ex. 7]

CBP further concluded that Sunmar was not required to file a rate tariff for the proposed through route with the Surface Transportation Board ("STB") in order to comply with the Third Proviso. [Dkt. 6 at 25] Subsequently, CBP's Letter Ruling was challenged under the Administrative Procedure Act. In that case, the court granted the plaintiff's motion for summary judgment and held that CBP's conclusion that no rate tariff needed to be filed for the proposed

Kloosterboer v. United States, et al.
Case No. 3:21-cv-00198-SLG  Page 7 of 43

Case 3:21-cv-00198-SLG   Document 38   Filed 09/10/21   Page 7 of 43

through route, in order to meet the requirements of the Third Proviso, was arbitrary and capricious because it violated the plain language of the Third Proviso. *Horizon Lines, LLC. v. United States*, 414 F. Supp. 2d 46, 60 (D.D.C. 2006). The court stated that its vacatur of the Sunmar Ruling Letter had the effect of revoking as a matter of law all substantially identical CBP rulings. *Id.* at 54 n.5.

After the decision in *Horizon*, ASC filed a rate tariff with the STB for the above-described manner of transportation utilizing the NBSR. Specifically, ASC's rate tariff filing identifies the NBSR as the Canadian rail carrier used in the transportation of frozen seafood products from Dutch Harbor to Maine via Bayside. [Dkt. 7 ¶ 30] The tariff filing expressly describes ASC's intermodal transportation as follows: "water and rail transportation and related services, southbound between Dutch Harbor, Alaska and named places in the Eastern United States" using carrier New Brunswick Southern Railway Company Limited, issued on August 28, 2006. [Dkt. 7 ¶ 31]

In 2012, KBB decided to cease using the NBSR as part of the transportation of seafood from Alaska to Maine in order to save costs and for other business reasons. [Dkt. 8 ¶ 15] KBB decided to utilize the BCR instead of the NBSR. [*Id.*] KIF was aware and supportive of this change because its customers, when the NBSR was in use, experienced difficulties in reliably

Kloosterboer v. United States, et al.
Case No. 3:21-cv-00198-SLG   Page 8 of 43

Case 3:21-cv-00198-SLG   Document 38   Filed 09/10/21   Page 8 of 43

providing timely delivery to end-customers and extremely high transportation fees. [Dkt. 8 ¶ 15] Moreover, the distance of the NBSR from the U.S. border, depending on where the seafood products were off-loaded in St. John, Canada (where the seafood products were transported along the NBSR), was anywhere from 30 to 50 miles away from the Calais, Maine border crossing. [Dkt. 8 ¶ 15]

Plaintiffs allege that it is their "understanding that CBP was apprised of the change from NBSR to the BCR rail trackage in 2012." [Dkt. 8 ¶ 16] It is undisputed that no new rate tariff was filed with the STB for the new route. No entity sought a new Ruling Letter from CBP for the new manner of transportation. The only "disclosure" in the record of this new manner of transportation is via various bills of lading, which are submitted to CBP at the time of entry of merchandise into the United States. Bills of lading are commercial documents (not CBP forms) that should be included in all shipments. [Hebert Decl. ¶ 10]

Plaintiffs provided an example of such a bill of lading that they claim notified CBP of their change in operations. [Dkt. 8 Ex. 2] This bill of lading lists the "routing" of the shipment which takes place after it is unladen from the cargo vessel. [Hebert Decl. ¶ 10] The example indicates that the shipment moves from "Kloosterboer Bayside to Bayside Canadian Railway North," then from "Bayside Canadian Rail to Bayside Canadian Railway South," then from

Kloosterboer v. United States, et al.
Case No. 3:21-cv-00198-SLG  Page 9 of 43

"Bayside Canadian Rail" to "New Bedford, MA." [*Id.*] In fact, the shipment does not go from the Bayside Canadian Rail to New Bedford, but rather, the final transportation to New Bedford is done by the tractor-trailer, in this example, operated by John Cook trucking. [*Id.*] Plaintiffs' bill of lading also misleadingly suggests that Bayside Canadian Railway North and Bayside Canadian Railway South are discrete stops on the railway, and it fails to disclose that the train reverses itself and returns with the merchandise to its original position. The bill of lading does not provide any other factual details about the nature of the railway in use. [*Id.*] CBP does not expect it to, because that is not the purpose of the document; CBP does not use a bill of lading for the purpose of understanding the detailed facts about the rail being used. [*Id.*] Instead, CBP utilizes the bill of lading to know what merchandise is in the shipment, the quantity of the merchandise in the shipment, the entities involved in the transportation of the shipment, from where the shipment and merchandise originated, and to where and to whom the shipment is to be delivered. [*Id.*]

The Jones Act Division of Enforcement (JADE), within CBP's Office of Field Operations, provides information and guidance to CBP and industry stakeholders to ensure uniformity in coastwise trade enforcement and compliance, advocates for enforcement of coastwise trade laws, and assists ports with any issues involving coastwise trade to include allegations and

Kloosterboer v. United States, et al.
Case No. 3:21-cv-00198-SLG   Page 10 of 43

Case 3:21-cv-00198-SLG   Document 38   Filed 09/10/21   Page 10 of 43

investigatory procedures. [Hebert Decl. ¶ 2] JADE monitors incoming allegations of violations of the coastwise laws and works with the CBP ports of entry to evaluate such allegations. [Hebert Decl. ¶ 2]

In April 2017, JADE received a letter from a third party alleging potential violations of the Jones Act and began evaluating the matter. [Hebert Decl. ¶ 4 & Ex. A] In the letter, the complainant asserted that Plaintiffs were not complying with the Third Proviso. [*Id.*] The issue raised by the letter was that the tariff filing with the STB was inadequate because it had no expiration date, was outdated with regard to rates quoted therein, did not expressly encompass the identified violators or their movements of merchandise, and failed to describe the rail route or routes used. [*Id.*] Based upon the allegations presented, JADE began an internal evaluation of the matter. [*Id.*]

CBP had knowledge of the transportation route referenced in the letter as it existed in the late 1990s and early-to-mid 2000s, based upon requests for administrative rulings and CBP rulings issued in response thereto, and subsequent litigation in the *Horizon* case. [Hebert Decl. ¶ 5] As part of its investigation, JADE obtained video clips from the internet showing Plaintiffs' current operation and that rail movement on the BCR. [Hebert Decl. ¶ 6 & Exs. C & D] JADE also obtained from the internet images of the rail, where a rail car mover is used to move a set of rail cars loaded with a tractor-trailer along

Kloosterboer v. United States, et al.
Case No. 3:21-cv-00198-SLG   Page 11 of 43

Case 3:21-cv-00198-SLG   Document 38   Filed 09/10/21   Page 11 of 43

the rail, and comments made in chat boxes associated with social media posts of the rail operation. [Hebert Decl. ¶ 6 & Ex. B] Because the current rail operation was drastically different from the prior operation, JADE began a more extensive internal evaluation. [Hebert Decl. ¶ 5]

In 2021, as a result of a lengthy investigation and internal evaluation involving several components within the Agency, CBP determined that Plaintiffs and others were liable to the United States for civil penalties equal to the value of the merchandise transported or the value of the transportation, whichever is greater. An example of the Notices of Penalty issued by CBP in this matter is found at Dkt. 7-4. The Notices of Penalty invited the recipients to submit a petition to the Fines, Penalties, and Forfeitures Officer concerning the Notices. [Dkt. 7, Ex. 4 at 4] By law recipients of a Notice of Penalty have the right to file such a petition for remission or mitigation of the penalties. *See, e.g.*, 19 U.S.C. § 1618; 19 C.F.R. §§ 171.1, 171.12, 171.21. The Notices of Penalty are not self-executing; CBP must bring a judicial action to compel payment. 19 C.F.R. § 171.22.

## ARGUMENT

## I.  Standard of review.

To obtain a preliminary injunction, Plaintiffs must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable

Kloosterboer v. United States, et al.
Case No. 3:21-cv-00198-SLG   Page 12 of 43

harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The last two elements merge when the Government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Plaintiffs may also obtain a preliminary injunction if they make a lesser showing on the first element, that there are "serious questions going to the merits," if they also make an enhanced showing on the fourth element, that the "balance of hardships tips sharply in the plaintiff's favor.*" Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014).

"[I]njunctive relief is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

## II. Plaintiffs have not met their burden to show that they are likely to prevail on Count I.

Plaintiffs have not established that they are likely to prevail on the merits of Count I, which seeks a declaratory judgment that their manner of transportation of frozen seafood from Alaska to Maine complies with the Third Proviso. Nor have Plaintiffs shown even a serious question going to the merits of Count I. Under the plain language of the statute and based on the undisputed facts, Plaintiffs' utilization of the BCR to transport seafood from

Kloosterboer v. United States, et al.
Case No. 3:21-cv-00198-SLG   Page 13 of 43

Alaska to Maine does not meet the requirements of the Third Proviso.

Pursuant to the Jones Act, 46 U.S.C. § 55102, a vessel may not provide any part in the transportation of merchandise by water, or by land and water, between points in the United States, either directly or via a foreign port, unless the vessel is coastwise-qualified, i.e., U.S.-built, U.S.-registered, and U.S.-owned. The Jones Act was enacted, in part, to ensure a vibrant U.S. maritime industry. 46 U.S.C. § 50101.

There is no dispute that the seafood Plaintiffs transport is merchandise, which was transported from one U.S. coastwise point (Alaska) to another U.S. coastwise point (Maine and subsequent U.S. destinations), in part by the use of a foreign-flag, non-coastwise qualified vessel. This case arises from Plaintiffs' reliance on the Third Proviso as an exemption to the requirement that Plaintiffs use a coastwise-qualified vessel for this transportation.

Under the Third Proviso, 46 U.S.C. § 55116, the requirement to use coastwise-qualified vessels "does not apply to the transportation of merchandise between points in the continental United States, including Alaska, over through routes in part over Canadian rail lines and connecting water facilities if the routes are recognized by the Surface Transportation Board and rate tariffs for the routes have been filed with the Board."

Kloosterboer v. United States, et al.
Case No. 3:21-cv-00198-SLG   Page 14 of 43

To qualify for the Third Proviso, Plaintiffs must establish that their use of the BCR meets three elements: 1) there must be "transportation of merchandise" over a "through route"; 2) "in part over Canadian rail lines"; and 3) the routes must be recognized by the STB and rate tariffs for the routes must have been filed with the STB. As an exception to the general requirements of the Jones Act, the Third Proviso should be construed narrowly. *See, e.g.*, *Comm'r of Internal Revenue v. Clark*, 489 U.S. 726, 739 (1989) ("In construing [statutes] in which a general statement of policy is qualified by an exception, we usually read the exception narrowly in order to preserve the primary operation of the provision."); *but see Am. Mar. Ass'n v. Blumenthal*, 590 F.2d 1156, 1165 (D.C. Cir. 1978) (holding that the Jones Act in general should be "construed strictly" because it imposes a forfeiture).

Failing to meet any element renders the Third Proviso inapplicable. Plaintiffs' manner of transportation via the BCR does not meet the requirements of the Third Proviso for at least two reasons.

### A. Plaintiffs' use of the BCR is not "transportation" over a "through route."

Plaintiffs' use of the BCR is not "transportation" over a "through route." The term "through route" is not defined in the statute, but has been defined by the U.S. Supreme Court as "an arrangement, express or implied, between

Kloosterboer v. United States, et al.
Case No. 3:21-cv-00198-SLG   Page 15 of 43

connecting railroads for the continuous carriage of goods from the originating point on the line of one carrier to destination on the line of another." *St. Louis Sw. Ry. Co. v. United States*, 245 U.S. 136, 145 (1917); *see also BNSF Ry. Co. v. Surface Transp. Bd.*, 748 F.3d 1295, 1299 (D.C. Cir. 2014) (in the context of railroads, defining a "through route" as "routes where two railroads must carry the shipment to get from origin to destination"). As defined by the Supreme Court, a "through route" requires a "continuous carriage of goods" from one point to another. Plaintiffs accept this definition. [Dkt. 5 at 35 n.10]

"Continuous" is defined by the Oxford English Dictionary as: "Characterized by continuity; extending in space without interruption of substance; having no interstices or breaks; having its parts in immediate connection; connected, unbroken;" and "In unbroken connection with; joined continuously to; forming one mass with." OED Online, Oxford University Press, Sept. 2021 (http://www.oed.com/view/Entry/40280).

Here, Plaintiffs' movement of merchandise via the BCR is not part of a continuous carriage of goods. As described by Plaintiffs, and as seen in the video of the BCR in operation, the rail cars with the merchandise go by rail from point A, to point B, then back to point A, all within the Bayside Port, before the merchandise is offloaded from the rail cars and transported by truck to the United States. [Hebert Decl. Exs. C & D] There is nothing about the

Kloosterboer v. United States, et al.
Case No. 3:21-cv-00198-SLG   Page 16 of 43

movement along the BCR that resembles a continuous carriage of goods along a route. The merchandise also does not move "without interruption" in a "connected, unbroken" manner. The BCR does not connect to any destination. Instead, the merchandise travels by rail for approximately 100 feet, and then *reverses* course over that same distance. Even without focusing on the dictionary definitions of each word in the Supreme Court's definition of a through route, there is no question that the movement of merchandise back and forth on the BCR is completely unlike what the Supreme Court described.

Furthermore, the movement of merchandise via the BCR defies the concept of "transportation." The Supreme Court has stated that "[t]ransportation implies the taking up of persons or property at some point and putting them down at another." *Gloucester Ferry Co. v. Pennsylvania*, 114 U.S. 196, 203 (1885); *see also Black's Law Dictionary* at 1729 (10th ed. 2014) (defining "transportation" as "movement of goods or persons from one place to another by a carrier"); OED Online, Sept. 2021 (http://www.oed.com/view/Entry/205017) (defining "transport" as "[t]o carry, convey, or remove from one place or person to another; to convey across"). The merchandise does not travel along the BCR "from one place to another," it begins and ends in the same place. While on the BCR, the merchandise also never leaves the Bayside Port. For all of these reasons, the BCR is not part of

Kloosterboer v. United States, et al.
Case No. 3:21-cv-00198-SLG   Page 17 of 43

a "transportation" over a "through route."

The Court should reject Plaintiffs' straw man argument that CBP's issue with the BCR is that it is a "sham or commercially impractical Canadian rail movement to achieve 'technical compliance' with the literal terms of the statute." [Dkt. 5 at 39] The concept of "commercial soundness" was raised in the *Horizon* litigation because the cargo in that case was transported on Canadian rail further away from the U.S. port of entry, and not on a direct route that otherwise could have been taken without using rail. The *Horizon* court, in a footnote, rejected the argument that "the commercial soundness of a proposed route" should determine whether the route meets the Third Proviso. 414 F. Supp. 2d at 55 n.6.

CBP did not consider the commercial soundness of the BCR when it issued the Notices of Penalty in this case. Rather, CBP determined that the rail operation itself, i.e., its inherent nature, does not meet the statutory requirements of the Third Proviso. To construe the BCR as being part of a "through route in part over Canadian rail lines" would make the requirements of the Third Proviso meaningless. Such a construction would also make the Third Proviso a broad exception to the Jones Act when it is supposed to be read narrowly. *Clark*, 489 U.S. at 739. Plaintiffs' use of the BCR does not meet the requirements of the Third Proviso because Plaintiffs are not using the BCR for

Kloosterboer v. United States, et al.
Case No. 3:21-cv-00198-SLG   Page 18 of 43

Case 3:21-cv-00198-SLG   Document 38   Filed 09/10/21   Page 18 of 43

"transportation" over a "through route." The commercial soundness of the BCR is irrelevant.

Plaintiffs cite *United States v. Louisiana & P.R. Co.*, 234 U.S. 1 (1914) and *Sea-Land Serv., Inc. v. Fed. Mar. Comm'n*, 404 F.2d 824 (D.C. Cir. 1968) in support of their argument the BCR qualifies as part of a through route [Dkt. 5 at 43], but those cases are inapposite. *Louisiana & P.R. Co.*, was concerned with the Interstate Commerce Commission's regulatory authority over "plant facilities," determining whether something was private carriage or common carriage, and whether financial allowances to certain parties involved in the industrial activities and movements by rail were permissible. 234 U.S. at 23-24.

*Sea-Land* involved a jurisdictional dispute between two regulatory agencies. 404 F.2d at 825. In that case, the court held that a through route under the Shipping Act of 1916 could include activities that were minimal, or incidental to a dominant mode of transportation, but critically the court also held that for a through route "[w]hat is required is that both motor and water carriers hold themselves out to the public as participants in a joint transportation endeavor and file appropriate tariff schedules reflecting these joint rates and through services." *Id.* at 827. That holding is of no help to Plaintiffs, as the BCR is not a participant in a "joint transportation endeavor."

Kloosterboer v. United States, et al.
Case No. 3:21-cv-00198-SLG   Page 19 of 43

Case 3:21-cv-00198-SLG   Document 38   Filed 09/10/21   Page 19 of 43

In determining whether Plaintiffs' use of the BCR qualifies as a through route, the Court should be informed by the Supreme Court's decision in *Central Vermont Transp. Co. v. Durning*, 294 U.S. 33 (1935). In that case, which rejected a different attempt to expand the Third Proviso as inconsistent with the "words of the statute and the unmistakable policy of Congress," the Supreme Court discussed the origins and the purpose of the Third Proviso:

> [The exception's] evident purpose was to avoid disturbance of established routes, recognized by the Interstate Commerce Commission as in the public interest, between the northwestern and eastern states through the lake ports. In these routes foreign-owned water carriers participated as well as Canadian and American rail lines.... The proviso obviously would enable American carriers, participating in such through routes, to retain the benefits of the traffic which in some instances might otherwise be diverted to all water transportation by foreign owned vessels between points in Canada and the United States.

*Central Vermont*, 294 U.S. at 39.

As described by the Supreme Court, the intent of the Third Proviso was to exempt certain existing movements of merchandise from the Jones Act in order to protect U.S. carriers. It was not enacted to expand the use of foreign-flagged vessels. In the same matter, the Second Circuit discussed the context surrounding the passage of the exception, and concluded that Congress specifically enacted the "Canadian rail lines" exception to permit existing U.S. – Canada – U.S. traffic routes from the Midwestern states through the Great

Kloosterboer v. United States, et al.
Case No. 3:21-cv-00198-SLG   Page 20 of 43

Lakes and Canada, ultimately to the Eastern states. *Central Vermont Transp. Co. v. Durning*, 71 F.2d 273, 276 (2d Cir. 1934). These existing routes were commonly understood at the time to be the "through routes" that were intended to fall within the Third Proviso: routes operated by different carriers but as part of a continuous journey from one coastwise point to another, in part over the Great Lakes and in part within Canadian territory.

By contrast, the BCR was constructed solely as an attempt to make otherwise impermissible coastwise traffic appear to fall within the statutory exception. Plaintiffs are not using an existing and recognized route, or even a "route." To adopt a construction of the statute that would permit Plaintiffs to invoke the exception in this way, in the words of the Supreme Court in *Central Vermont*, would do "violence to the words of the statute and would thwart its purpose." 294 U.S. at 38.

### B. Plaintiffs cannot show that they have filed the required routes and tariff rates with the STB.

The Court should also reject Plaintiffs' attempt to invoke the Third Proviso exception because Plaintiffs have not filed the required route and tariff rates with the STB in connection with their use of the BCR. The *Horizon* court held that the plain language of the Third Proviso requires a carrier to file a route and tariff rate with the STB in order to invoke the benefit of the Third

Kloosterboer v. United States, et al.
Case No. 3:21-cv-00198-SLG   Page 21 of 43

Proviso. *Horizon*, 414 F. Supp. 2d at 60.

Plaintiffs attempt to sidestep the *Horizon* ruling by claiming that CBP's pre-*Horizon* rulings, which had concluded that there was no filing requirement, "remain unchanged and in effect." [Dkt. 5 at 40] That is incorrect, as those past CBP rulings were overruled and negated by the decision in *Horizon*. *See* 19 C.F.R. § 177.12(d)(1)(iv) (no notice required when judicial decision overturns findings in an administrative ruling). CBP did not need to take any action to revoke or modify its pre-*Horizon* rulings concerning the filing requirement. *See also Horizon*, 414 F. Supp. 2d at 54 n.5 (stating that "any substantially identical Customs ruling will be revoked as a matter of law if the Court vacates the Sunmar rulings").

The Court should also reject Plaintiffs' argument that ARM did not need to file a rate tariff for the BCR route because "[w]hen ARM took over the vessel chartering operation in 2009 from ASC … it stepped into ASC's shoes as the shipper in the tariff." [Dkt. 5 at 40] A tariff filing that fails to identify the correct company performing the purported ocean transportation is not valid, and the rate information contained in the document would likely no longer be valid. *See* 49 U.S.C § 13702(b)(2)(A) (requiring tariff filings with the STB to include, at a minimum, "the carriers that are parties to it"); *see also* § 13702(b)(5) (allowing "carriers to change rates, classifications, rules, and

Kloosterboer v. United States, et al.
Case No. 3:21-cv-00198-SLG  Page 22 of 43

Case 3:21-cv-00198-SLG   Document 38   Filed 09/10/21   Page 22 of 43

practices without filing complete tariffs" under certain circumstances).

Furthermore, ASC's filing does not identify the route that ARM is using. ASC's filing states that the route utilizes the NBSR. At the time of that filing, the BCR had not even been constructed. Even if ARM could "step into the shoes" of ASC, it cannot rely on a filing for a completely different route to meet the requirements of the Third Proviso. Plaintiffs' assertion that they were not required "to formally notify or request approval from CBP for the change" in the railway [Dkt. 5 at 41] is irrelevant. To meet the Third Proviso exception Plaintiffs were required to file their route with the STB. *Horizon*, 414 F. Supp. 2d at 60.

## III. Plaintiffs have not met their burden to show that they are likely to prevail on Counts II and III.

The Court should also reject Plaintiffs' argument that they are likely to prove a violation of 19 U.S.C. § 1625(c)(1) & (2), which require CBP to publish a proposed interpretive ruling or decision which would:

> (1)    modify (other than to correct a clerical error) or revoke a prior interpretive ruling or decision which has been in effect for at least 60 days; or

> (2)    have the effect of modifying the treatment previously accorded by the Customs Service to substantially identical transactions.

19 U.S.C. §§ 1625(c)(1) and (2). Plaintiffs argue that CBP's Penalty Notices

Kloosterboer v. United States, et al.
Case No. 3:21-cv-00198-SLG   Page 23 of 43

"are premised on some tacit modification or revocation of its long-standing Third Proviso interpretative rulings." [Dkt. 5 at 46] Plaintiffs' argument is meritless.

There is no evidence that CBP modified or revoked a prior interpretive ruling, decision, or treatment. Rather, it was Plaintiffs that modified and revoked their prior business operations when KBB abandoned the use of the NBSR and began using the BCR, with KIF's encouragement. CBP's prior Ruling Letters never sanctioned the use of the BCR to meet the Third Proviso. All of those letters predated even the *existence* of the BCR.

Nor did CBP's prior Letter Rulings involve facts "substantially identical" to the BCR operation. [Dkt. 5 at 47] A review of the rulings reveals that each dealt with facts significantly different. Specifically, the rail lines subject to the previous rulings involved established routes used to move rail cars in a continuous manner from one facility to another over many miles. [Hebert Decl. ¶¶ 7-9] None of those routes involved the "transportation" of merchandise along a specialized mini-track from point A, to point B, and then back.

Plaintiffs are experienced importers of merchandise who know how to seek an administrative ruling as to the applicability of the Third Proviso from CBP by fully disclosing their change in operations. Many carriers have done that, including ASC and Sunmar, who sought and obtained Ruling Letters for

Kloosterboer v. United States, et al.
Case No. 3:21-cv-00198-SLG   Page 24 of 43

their use of the NBSR. [Hebert Decl. ¶ 7] Plaintiffs never did. Instead, Plaintiffs changed their operations to a model radically different from any other transportation model previously reviewed by CBP, without seeking a Ruling Letter, and without filing their new route with the STB.

The Court should reject Plaintiffs' assertion that CBP was "well aware of the specific rail trackage being used by Plaintiffs since the rail line began operations in 2012." [Dkt. 5 at 13] Plaintiffs apparently base this assertion on the fact that they submitted bills of lading to CBP when merchandise entered the country. Plaintiffs' assertion is meritless.

CBP does not rely upon bills of lading to provide the type of detailed facts necessary to determine if a particular operation complies with the Third Proviso. [Hebert Decl. ¶ 10]. Indeed, Plaintiffs' bills of lading provided no details about their operation other than the name of the new railway. Rather, CBP and regulated entities use the Ruling Letter process for that purpose, as Plaintiffs well know. If Plaintiffs wanted the benefit of an administrative ruling on whether their change in operations complied with the Third Proviso, they could have had such a ruling nearly a decade ago (the answer would have been "no"). Instead, in the best light, Plaintiffs chose to assume the risk that their own interpretation of the statute, involving drastically different facts from prior scenarios, would align with CBP's interpretation. At worst,

Kloosterboer v. United States, et al.
Case No. 3:21-cv-00198-SLG  Page 25 of 43

Case 3:21-cv-00198-SLG  Document 38  Filed 09/10/21  Page 25 of 43

Plaintiffs chose to proceed in the manner they did hoping they would not get caught.[2]

To a considerable degree, CBP relies upon the trade community to be forthright in its transactions with the Government. Specifically, CBP expects the entities who are bringing merchandise into the United States to exercise reasonable care, file truthful paperwork, and when there is doubt, to use CBP's administrative rulings program. 19 U.S.C. § 1484(a) (reasonable care shall be used to make entry of merchandise); 19 C.F.R. Part 177 (Administrative Rulings); [Hebert Decl. ¶ 11]; CBP Informed Compliance Publication, "Reasonable                    Care"                    (Sept.                    2017) (https://www.cbp.gov/sites/default/files/assets/documents/2020-

---

[2] As additional evidence that Plaintiffs' hands are unclean in this action for equitable relief, consider that Plaintiffs never completed an STB filing for the BCR, which is a relatively simple administrative task. Furthermore, videos of the BCR were removed from social media shortly after Notices of Penalty were issued, even though reference to the BCR or the Third Proviso were not included in those Notices. [Hebert Decl. ¶ 6] Also, as pointed out in Plaintiffs' motion, CBP agreed to a two-week pause in the issuance of penalties at the behest of Plaintiffs' counsel. [Dkt. 15 ¶ 10] This pause was so Plaintiffs' counsel could provide the Agency with some form of documentary evidence establishing that CBP approved Plaintiffs' use of the BCR or other proof that its transportation model was not a violation of the Jones Act. [*Id.*] While the Agency engaged with Plaintiffs' counsel in good faith, Plaintiffs never submitted any supporting documentation to the Agency. Instead, it is apparent that their time was spent drafting their pleadings and filings to this Court, including a request for expedited consideration of their motion which provided the Government limited time to respond.

Kloosterboer v. United States, et al.
Case No. 3:21-cv-00198-SLG   Page 26 of 43

Feb/icprescare2017revision.pdf). CBP does not and cannot perform an in-depth investigation about every movement of merchandise into this country. In this case, CBP only became aware of the nature of the BCR operation when a third-party presented an allegation to CBP about a potential violation of the Jones Act, at which time CBP began investigating the matter. Plaintiffs appear to have taken advantage of CBP's familiarity and acceptance of their NBSR operation, and CBP's expectation that Plaintiffs would have sought a Ruling Letter had they made the kind of radical change that they made to their operations in 2012.

## IV. Plaintiffs have not met their burden to show that they are likely to prevail on Count IV.

Plaintiffs are also unlikely to succeed on the merits of their claim that the issuance of the Notices of Penalty in this matter violates their due process rights. Specifically, Plaintiffs allege that the Agency failed to give Plaintiffs fair notice that their conduct violated the Jones Act prior to CBP issuing the Notices of Penalty. [Dkt. 5 at 50] According to Plaintiffs, CBP is relying on "new, secretively implemented interpretative guidance." [Dkt. 5 at 51] Plaintiffs' argument is meritless.

It is well settled that "laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television*

Kloosterboer v. United States, et al.
Case No. 3:21-cv-00198-SLG   Page 27 of 43

*Stations, Inc.*, 567 U.S. 239, 253 (2012). A statute that forbids or requires certain conduct would only violate the Due Process Clause if "men of common intelligence must necessarily guess at its meaning." *Id.* (citing *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926)).

"A statute is vague not when it prohibits conduct according 'to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all.' " *Botosan v. Paul McNally Realty*, 216 F.3d 827, 836 (9th Cir. 2000) (quoting *Coates v. City of Cincinnati*, 402 U.S. 611 (1971)). Moreover, because the Jones Act "is a statute that regulates commercial conduct, it is reviewed under a less stringent standard of specificity" than, for example, criminal laws or restrictions on speech. *Id.* (citing *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982)). A statute need not have "mathematical certainty" to survive a vagueness challenge; instead, it may be marked by "flexibility and reasonable breadth, rather than meticulous specificity." *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) (citation omitted).[3]

---

[3] Plaintiffs cite *ExxonMobil Pipeline Co. v. United States Dep't of Transportation*, for the proposition that "fair notice requires the agency to have state[d] with ascertainable certainty what is meant by the standards [it] has promulgated," 867 F.3d 564, 578 (5th Cir. 2017), but they are misreading that case. The quoted language from *ExxonMobile* dealt with when an agency's interpretation of its own regulations is entitled to *Auer* deference, which is not

Kloosterboer v. United States, et al.
Case No. 3:21-cv-00198-SLG   Page 28 of 43

CBP is relying on the plain language of the statute to support its Notices of Penalty, specifically the statutory terms "transportation" and "through route." Plaintiffs do not—and cannot—establish that these terms are impermissibly vague. They are common terms in the industry and have been defined by numerous courts all the way to the Supreme Court. At the end of the day, the Court may agree or disagree with CBP's interpretation, but Plaintiffs cannot transform an APA claim into a constitutional violation merely because Plaintiffs disagree with CBP's interpretation.[4]

Plaintiffs' due process argument is particularly curious given that Plaintiffs failed to avail themselves of the well-recognized Ruling Letter process. [Hebert Decl. ¶ 11] In other words, they had the opportunity for more process, but declined to pursue that. When a defendant challenges the statute as applied to his own conduct, whether the statute is vague "turns on whether the statute provided adequate notice to him that his particular conduct was

---

at issue here. CBP has not promulgated a regulation interpreting the terms "transportation" and "through route." There is no need, as those terms are unambiguous.

[4] Plaintiffs' reliance on *Furie Operating Alaska, LLC v. U.S. Dep't of Homeland Sec.*, is misplaced [Dkt. 5 at 50 n.23], as that case dealt with the court's jurisdiction to hear a dur process claim. 2015 WL 4076843, at *7 (D. Alaska July 6, 2015). CBP is not questioning the Court's jurisdiction to consider Plaintiffs' due process claim, the Agency's is simply arguing that the claim is meritless.

proscribed." *United States v. Harris*, 705 F.3d 929, 932 (9th Cir. 2013). If the defendant had actual notice that his conduct was prohibited, "there is no due process problem." *United States v. Backlund*, 689 F.3d 986, 997 (9th Cir. 2012). Here, the Court can infer that Plaintiffs failed to seek a Ruling Letter because they suspected CBP would not sanction their conduct.

To the extent Plaintiffs also argue that it was a violation of due process for the Agency to fail to provide them pre-notice of the Notices of Penalty [Dkt. 5 at 51-52], that claim, too, is meritless. Plaintiffs cite no authority for their argument. The Agency was unaware of Plaintiffs' transportation scheme until a third-party complaint was filed with the Agency. [Hebert Decl. ¶ 4] After investigation of the illegal transportation of merchandise by Plaintiffs and other entities, the Agency appropriately issued Notices of Penalty to the violators. Due process merely requires notice and a meaningful opportunity to be heard in accordance with the requirements in *Mathews v. Eldridge*, 424 U.S. 319 (1976). CBP's Notices of Penalty are not self-executing, Plaintiffs have a right to be heard in an administrative process, and Plaintiffs will receive (and are currently receiving) additional due process before they ever will be obligated to pay a penalty. There is also no statutory requirement for CBP to

Kloosterboer v. United States, et al.
Case No. 3:21-cv-00198-SLG   Page 30 of 43

Case 3:21-cv-00198-SLG   Document 38   Filed 09/10/21   Page 30 of 43

issue pre-penalty notice for penalties issued pursuant to the Jones Act.[5] Plaintiffs' due process claim is meritless.

Furthermore, as Plaintiffs appear to acknowledge, they have no intention of changing their business practices. The outcome thus would have been the same if CBP had provided pre-notice of the Notices of Penalty: the penalties would have been the same given the longstanding violations, penalties would have continued to accrue if Plaintiffs continued their conduct, supply chain members may have been scared off for fear of liability, and Plaintiffs would have disputed CBP's interpretation of 46 U.S.C. § 55116 and likely initiated litigation. Having failed to avail themselves of the opportunity to seek an administrative ruling from CBP prior to changing their business operation, Plaintiffs assumed the risk that CBP, a law enforcement agency, might decide that Plaintiffs' business practices violated the Jones Act and issue penalties for said violations.

## V. Plaintiffs have not met their burden to show that they are likely to prevail on Count V.

---

[5] Six statutes that CBP enforces require the issuance of pre-penalty notices either by statute or policy: 1) 19 U.S.C. § 1466 (vessel repair penalty); 2) 19 U.S.C. § 1584 (non-narcotic manifest penalty over $1,000); 3) 19 U.S.C. § 1592 (commercial fraud penalty); 4) 19 U.S.C. § 1593a (false drawback penalty); 5) 19 U.S.C. § 1641 (broker penalty); and 6) 19 U.S.C. § 1509(g). *See also* 19 C.F.R. Part 162, Subpart G; 19 C.F.R. Part 171, Appendices B-C; 19 C.F.R. Part 163. There is no similar requirement for Jones Act penalties.

Also meritless is Plaintiffs' claim that the Notices of Penalty violate the Excessive Fines Clause of the Eighth Amendment. [Dkt. 5 at 52-53] Pursuant to 46 U.S.C. § 55102, merchandise transported in violation of the Jones Act is liable to seizure, or "[a]lternatively, an amount equal to the value of the merchandise ... or the actual cost of the transportation, whichever is greater, may be recovered from any person transporting the merchandise or causing the merchandise to be transported." 46 U.S.C. § 55102(c). Plaintiffs claim KIF's penalties to date, issued pursuant to this section, total nearly $25 million. The Court should reject Plaintiffs' claim that such penalties violate the Eighth Amendment.

The Court should not even reach Plaintiffs' Eighth Amendment claim because it is premature. This is not a collection action. Plaintiffs state that they will be expeditiously filing a Petition for Remission or Mitigation with CBP. [Dkt. 5 at 30] As a result, there is no way to know what penalty CBP will ultimately seek to collect from Plaintiffs—and therefore no way to judge whether that unknown penalty is grossly disproportionate to the gravity of Plaintiffs' conduct.[6]

---

[6] Thus, this case is distinguishable from *Kalthoff v. Douglas County*, upon with Plaintiffs rely, because in *Douglas County* the court found that a fine might violate the Eighth Amendment, and issued an injunction, because the government entity in that case in many instances was "without any authority

Kloosterboer v. United States, et al.
Case No. 3:21-cv-00198-SLG   Page 32 of 43

Assuming the Court reaches Plaintiffs' Eighth Amendment claim, two questions must generally be addressed: 1) is the statutory provision a fine, i.e., does it impose a punishment; and 2) if so, is the fine excessive? *Wright v. Riveland*, 219 F.3d 905, 915 (9th Cir. 2000).

Even assuming the proposed penalties are a fine such that the Eighth Amendment applies, Plaintiffs' claim is still meritless. In *United States v. Bajakajian*, the Supreme Court explained that reviewing courts should give substantial deference to the broad authority of the legislature to determine an appropriate punishment. 524 U.S. 321, 337 (1998). A fine is unconstitutionally excessive under the Eighth Amendment if its amount "is grossly disproportional to the gravity of the defendant's offense." *Id.* at 336-37.

In *Bajakajian*, the Supreme Court identified the following four factors to determine whether a punishment is grossly disproportional: (1) the nature and extent of the underlying offense; (2) whether the underlying offense related to other illegal activities; (3) whether other penalties may be imposed for the offense; and (4) the extent of the harm caused by the offense. *See United States v. $100,348 in U.S. Currency*, 354 F.3d 1110, 1122 (9th Cir. 2004) (enunciating the "*Bajakajian* factors").

---

to lower the fines for particular violators' circumstances." 2021 WL 3010006, at *6 (D. Nev. July 15, 2021).

Here, those factors support deferring to the broad authority of Congress to determine the penalty for a Jones Act offense. Considering the first factor, Plaintiffs' evasion of the Jones Act was carried out over many years. That is one reason their penalties are so high. The largest Jones Act penalty that Plaintiffs reference as a comparison was a one-time event that the company disclosed in advance to the Government, and for which the company unsuccessfully sought a Jones Act waiver. [Dkt. 6-2]; *see also Furie Operating Alaska, LLC v. U.S. Dep't of Homeland Sec.*, 2013 WL 1628639, at *1-2 (D. Alaska Apr. 15, 2013) (describing history of the case). By contrast, Plaintiffs' actions were not a one-time error or oversight, but rather part of a calculated and secret scheme to find a loophole in the Jones Act, which was only revealed when the Government received a tip from a third party.

The second and third factors are usually neutral in civil cases. *See Pimentel v. City of Los Angeles*, 974 F.3d 917, 923 (9th Cir. 2020).

The fourth factor weighs heavily against Plaintiffs' argument. The harm to the public and the nation from a company evading the requirements of the Jones Act, especially over a lengthy period of time, are substantial. [Strong Decl. ¶ 11; Anderson Decl. ¶ 7; Lauer Decl. ¶ 8; Baggen Decl. ¶ 10; Roberts Decl. ¶¶ 3-6] The Court should defer to Congress' judgment that the Jones Act is important enough to warrant severe penalties for violations.

Kloosterboer v. United States, et al.
Case No. 3:21-cv-00198-SLG   Page 34 of 43

## VI. Plaintiffs have not met their burden to show that they are likely to prevail on Count VI.

Plaintiffs are also unlikely to prevail on Count VI, which asks the Court to invoke "constitutional tolling." Plaintiffs' claim is meritless.

Plaintiffs' request for an injunction pursuant to the constitutional tolling doctrine is striking. Not only do they request an injunction to prevent CBP from temporarily issuing additional Notices of Penalty while the litigation continues, they also ask the Court to permanently enjoin CBP from ever collecting penalties related to this case from Plaintiffs, or anyone else, in the past, or in the future as long as Plaintiffs' judicial challenge is pending. [Dkt. 5 at 27-29] Essentially, Plaintiffs ask this Court for a get-out-of-jail-free card for them and everyone they deal with in transporting seafood to Bayside, that operates to absolve Plaintiffs and those unnamed entities of any consequences for their illegal conduct in the past or in the future—*even if the Court ultimately agrees with CBP's interpretation of the Third Proviso*. There is no authority for the Court to enter such an extraordinary injunction.

While Plaintiffs rely heavily on an older Ninth Circuit case to support their claim, *United States v. Pacific Coast European Conference*, 451 F.2d 712 (9th Cir. 1971), a more recent case is closer to the facts here. In *United States v. Louisiana-Pac. Corp.*, the Louisiana–Pacific Corporation ("LP") was

Kloosterboer v. United States, et al.
Case No. 3:21-cv-00198-SLG  Page 35 of 43

assessed a $4 million civil penalty by the Federal Trade Commission for violating a consent order. 967 F.2d 1372, 1374 (9th Cir. 1992). Prior to the Government's assessment of the penalties, LP had filed to reopen the consent order. *Id.* at 1375. But critically, LP never contested the underlying validity of the consent order. *Id.* at 1378. Nevertheless, LP argued that the Government should not be able to assess penalties during the pendency of its motion to reopen, invoking the constitutional tolling doctrine and the *Pacific Coast* decision that Plaintiffs rely on. *Id.*

The Ninth Circuit rejected LP's argument. Relying on a similar case from the Second Circuit, the court held that because LP was not contesting the validity of the consent order, but rather was challenging the Government's *interpretation* of the order, constitutional tolling was not appropriate. *Id.*

The same is true here. Plaintiffs are not challenging the validity of the Jones Act, of course not. What Plaintiffs are challenging is CBP's *interpretation* of the Third Proviso. Thus, the constitutional doctrine does not apply. *Id.*[7]

---

[7] The other cases Plaintiffs rely on are distinguishable for the same reasons. One case Plaintiffs cite actually directly contradicts their argument. *See, e.g.*, *Kansas-Nebraska Nat. Gas Co. v. Dep't of Energy*, 1979 WL 998, at *13 (D. Kan. July 31, 1979) (denying a stay of penalties and holding: "When the person challenging the interpretation or regulation is not in compliance with it, as plaintiff here is not, risk-free litigation would become risk-free noncompliance as well.").

Kloosterboer v. United States, et al.
Case No. 3:21-cv-00198-SLG   Page 36 of 43

By contrast, in *Pacific Coast* the defendants challenged the validity of both the underlying statute, which had been recently enacted, and the order which gave rise to the penalties in that case. 451 F.2d at 718. It was those unique circumstances which led the Ninth Circuit to conclude that the defendants had a "right to test the validity of the Act and Commission order free from the risk of statutory penalties" *Id.* at 719. Plaintiffs cite no cases holding the constitutional tolling doctrine applies whenever a party mounts a substantial challenge to an agency's interpretation of a statute, and the Government is aware of none.[8]

## VII. Plaintiffs have not established that they are likely to suffer irreparable harm absent injunctive relief.

Even if Plaintiffs could establish the other elements necessary for an injunction, the Court should still deny relief because Plaintiffs have not shown that they are likely to suffer irreparable harm that is causally connected to CBP's issuance of the Notices of Penalty. *See, e.g.*, *Nat'l Wildlife Fed'n v. Nat'l*

---

[8] *Oklahoma Operating Co. v. Love*, 252 U.S. 331 (1920) provides no support for Plaintiffs' argument. That case involved a challenge to a "legislative order," which triggered penalties for noncompliance. *Id.* at 336-38. Plaintiffs are not challenging a legislative order. They were simply caught violating the Jones Act by a law enforcement agency. Like all defendants, they will have their day in court and can argue their innocence. But the Court has no authority to preemptively absolve Plaintiffs for illegal conduct even if it were to conclude, at this early stage, that Plaintiffs have reasonable grounds to challenge the Notices of Penalty.

Kloosterboer v. United States, et al.
Case No. 3:21-cv-00198-SLG   Page 37 of 43

*Marine Fisheries Serv.*, 886 F.3d 803, 819 (9th Cir. 2018) ("[t]here must be a 'sufficient causal connection' between the alleged irreparable harm and the activity to be enjoined," such as a "showing that 'the requested injunction would forestall' the irreparable harm....") (quotations omitted).

Plaintiffs make two arguments in an attempt to satisfy the irreparable harm element. First, they argue that they have established constitutional violations and do not need to show irreparable harm. [Dkt. 5 at 54-55] Second, Plaintiffs argue that they are suffering irreparable harm because their Bayside Program is "at a complete standstill." [Dkt. 5 at 55-56] Each argument is meritless.

### A. Plaintiffs' constitutional claims are meritless.

As explained, each of Plaintiffs' constitutional claims are meritless. The Court should not relieve Plaintiffs from having to establish irreparable harm based on meritless constitutional claims.

### B. That Plaintiffs' illegal Bayside Program is at a standstill is not irreparable harm.

Plaintiffs argue that their Bayside Program is at a standstill. [Dkt. 5 at 55-56] They say third parties will not participate in the program because they fear additional penalties. [*Id.*] They also say if they are not permitted to resume the Bayside Program there will be hundreds of seafood processor jobs lost.

Kloosterboer v. United States, et al.
Case No. 3:21-cv-00198-SLG   Page 38 of 43

[Dkt. 5 at 53-54] But Plaintiffs fail to explain why resuming the Bayside Program is the only way to avoid these alleged harms.

For example, Plaintiffs fail to explain why they have not simply resumed using the NBSR route that CBP has already sanctioned and which Plaintiffs used until 2012. NBSR still exists. *See* https://nbmrailways.com/ Plaintiffs ceased using NBSR for business reasons, because decided that their costs were too high. [Dkt. 8 ¶ 15] Plaintiffs provide no information related to any recent attempts to contact NBSR to inquire about the rail line's abilities to meet Plaintiffs' current transportation needs. Nor do Plaintiffs state that they have explored any other options for transporting product to the East Coast that does not involve transiting through the West Coast, which Plaintiffs allege is too difficult.[9] Plaintiffs have trucks in Bayside. Have they explored any other Canadian railroads? They don't say.[10]

---

[9] Even on this point, Plaintiffs' claim is suspect. Plaintiffs appear to speculate as to the feasibility of other modes or routes of transportation involving the West Coast but do not demonstrate that they have actually vetted any potential options.

[10] Even if Plaintiffs were to investigate options now that they should have investigated a month ago, to the extent they discover that it will be difficult to establish an alternative route in Canada in a matter of days is a problem Plaintiffs caused by their insistence on utilizing only the low-cost BCR route. That is not a reason for an injunction.

Kloosterboer v. United States, et al.
Case No. 3:21-cv-00198-SLG   Page 39 of 43

Thus, Plaintiffs' irreparable harm, if any, seems to be caused by their insistence that they use the low-cost BCR route and no other method to keep the Bayside route intact, and ultimately their insistence on using foreign-flagged vessels to ship product to Bayside. It cannot be overemphasized that Plaintiffs voluntarily abandoned a compliant rail arrangement to begin using the BCR for business reasons—without seeking an advance ruling from CBP whether that arrangement would comply with the Third Proviso—and now argue the Court must grant an injunction to allow them to continue using the BCR due to adverse financial consequences. The Court should not grant an injunction to save Plaintiffs from incurring costs that they incurred as recently as 2012, especially since the Court's injunction would thwart the purposes of the Jones Act and harm others not parties to this case. That alternative methods to transport product to Bayside are more costly does not justify an injunction or continued violations of the Jones Act.[11]

**VIII. An injunction is not in the public interest.**

An injunction is also not in the public interest for several reasons. First, Plaintiffs seek an injunction that would allow them to break the law while this

---

[11] Plaintiffs' insistence that CBP give them a "safe harbor" for the Bayside Program [Dkt. 5 at 25] is curious given their assertion in their Motion that CBP has already approved their program. [Dkt. 5 at 36]

Kloosterboer v. United States, et al.
Case No. 3:21-cv-00198-SLG   Page 40 of 43

case is pending, and that would permanently absolve them and others for past violations. Obviously, that is not in the public interest.

Second, an injunction will cause additional harms to law-abiding companies using coastwise-qualified vessels to transport seafood. Plaintiffs' scheme has already harmed several U.S.-based shipping companies and an injunction will continue these harms. [Strong Decl. ¶¶ 9-11; Anderson Decl. ¶ 7; Lauer Decl. ¶ 9; Baggen Decl. ¶¶ 10-11; Roberts Decl. ¶¶ 2-8] Moreover, as indicated by the third-party complaint in this case, Plaintiffs' scheme also impacts other U.S. industries, such as the rail and trucking industries, due to a lack of continued investment. Conversely, denying Plaintiffs' Motion will likely result in immediate benefits to those same U.S. companies. [*See, e.g.*, Strong Decl. ¶ 13 (stating that since CBP began issuing Notices of Penalty in this case Coastal's bookings on coastwise qualified vessels have "increased substantially")]

Third, permitting the Bayside Program to continue through an injunction is contrary to the intent of the Third Proviso. As noted above, in the *Central Vermont* decision, the Supreme Court stated that the Third Proviso was enacted to avoid disturbance of established routes in order to enable U.S. carriers, participating in such through routes, to retain business that might otherwise be diverted to foreign-owned vessels. *Central Vermont*, 294 U.S. at

Kloosterboer v. United States, et al.
Case No. 3:21-cv-00198-SLG  Page 41 of 43

39. To enter an injunction allowing Plaintiffs' Bayside Program to continue would harm the same U.S. companies that the Third Proviso was enacted to benefit.

Fourth, an injunction would be contrary to the purpose of the Jones Act, which was enacted, in part, to ensure a vibrant U.S. maritime industry. 46 U.S.C. § 50101. Plaintiffs' blatant use of the BCR to evade the coastwise-qualified requirement, rather than investing in the U.S. maritime industry, speaks to the very core of what the Jones Act was meant to protect. The alleged "tremendous shortage of coastwise qualified vessels in the United States merchant fleet" [Dkt. 5 at 15] is directly attributable to conduct like that of Plaintiffs in this case. [Roberts Decl. ¶¶ 2-8]

Plaintiffs' conduct is even more confusing because they were already operating under an exception to the Jones Act, but that was not enough for them, and they changed their business model to trim even more costs from their operation, flouting the law in the process. Finally, demonstrating the important public interest of the Jones Act itself, the Agency is only authorized to waive the requirements of the Jones Act for reasons that implicate national defense. 46 U.S.C. § 501(b)(1). Authority to grant this extremely rare waiver is vested with the Secretary of the Department of Homeland Security. Plaintiffs' Bayside Program is completely outside the realm of the waiver requirements.

Kloosterboer v. United States, et al.
Case No. 3:21-cv-00198-SLG   Page 42 of 43

# CONCLUSION

For all of these reasons, the Court should deny Plaintiff's Motion.

RESPECTFULLY SUBMITTED this 10th day of September 2021, in Anchorage, Alaska.

E. BRYAN WILSON
Acting United States Attorney

s/ Seth M. Beausang
Assistant U.S. Attorney
Attorney for the Defendant

**CERTIFICATE OF SERVICE**
I hereby certify that on September 10, 2021,
a copy of the foregoing was served electronically on:

David Karl Gross, ABA #9611065
Edward E. McNally, ABA #9203003
Marc E. Kasowitz *(Pro Hac Vice)*
David J. Abrams *(Pro Hac Vice)*
David E. Ross *(Pro Hac Vice)*
Hector Torres (Pro Hac Vice)
Kim Conroy *(Pro Hac Vice)*
Attorneys for Plaintiffs

s/ Seth M. Beausang
Office of the U.S. Attorney

Kloosterboer v. United States, et al.
Case No. 3:21-cv-00198-SLG   Page 43 of 43