IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| KLOOSTERBOER INTERNATIONAL FORWARDING LLC and ALASKA REEFER MANAGEMENT, LLC<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA, et al.<br><br>Defendants. | Case No.: 3:21-cv-00198-SLG |

## DECLARATION OF MICHAEL HEBERT

I, Michael Hebert, declare the following to be based on my personal knowledge, information acquired by me in the course of performing my official duties, information contained in the records of U.S. Customs and Border Protection ("CBP"), and information supplied to me by current CBP employees:

1. I am employed by CBP as a Supervisory Customs and Border Protection Officer and have been employed by CBP for 23 years. Over that time I have served as a Customs and Border Protection Officer and Supervisory Customs and Border Protection Officer. I have been a Supervisory Customs and Border Protection Officer for 17 years, 11 of which I served as the Port Director for CBP's port of entry at Morgan City, Louisiana.

2. I currently am assigned to the Jones Act Division of Enforcement (JADE), within the Office of Field Operations, located in New Orleans, Louisiana. I am the Chief of JADE and lead and direct its activities, in accordance with CBP's mission to enforce the Jones Act and the direction provided by my superiors. JADE's mission is, in part, to provide information and guidance to CBP and industry stakeholders to ensure uniformity in coastwise trade enforcement and compliance, to advocate for

1

enforcement of coastwise trade laws, and to assist ports with any issues involving coastwise trade to include allegations and investigatory procedures. JADE monitors incoming allegations of violations of the coastwise laws and works with the CBP ports of entry to evaluate such allegations.

3. As part of the duties described above, and over my career with CBP working with industry and intergovernmental partners, I have worked extensively with entry documentation and bills of lading associated with the entry of merchandise to the United States through CBP ports of entry. In addition, I have developed substantial knowledge and familiarity with the Jones Act and various transportation methods and routes used in a variety of industries. Much of the information I evaluate comes from open sources available on the internet, from allegations presented to CBP by private parties that often are persons and companies or their representatives within a particular industry, from CBP sources such as import/entry and vessel entry data, and from intergovernmental partners' information and data.

4. I am familiar with the situation involving the Jones Act penalties issued in August 2021 to a variety of entities regarding the transportation of frozen seafood from Dutch Harbor, Alaska, to Bayside, New Brunswick, Canada, and then through the CBP port of entry at Calais, Maine. In April 2017, JADE received an allegation about potential violation of the Jones Act and began evaluating the matter. A copy of the written allegation, redacted, is attached hereto as Exhibit A. CBP obtained permission to disclose this redacted document from the attorney who wrote it. In that letter, the complainant asserts the purported violators' non-compliance with the "Third Proviso" of the Jones Act. The issue raised by the letter is that the tariff filing with the Surface

Transportation Board (STB) is inadequate because it has no expiration date, is outdated with regard to rates quoted therein, does not expressly encompass the identified violators or their movements of merchandise, and fails to describe the rail route or routes used. Based upon the allegations presented, JADE began an internal evaluation of the matter.

5. CBP had knowledge of the transportation route as it existed in the late 1990s and early-to-mid 2000s, based upon requests for administrative rulings and CBP rulings issued in response thereto, and subsequent litigation in the *Horizon* case in the District Court for the District of Columbia, regarding those rulings. During the course of my inquiry into the allegation, I obtained video clips from the internet showing the Plaintiffs' current operation and rail movement that occurs in Bayside, Canada. Because the current rail operation is drastically different from that of which CBP was aware previously by virtue of a number of U.S. Customs Service or CBP administrative rulings, I began a more extensive internal evaluation.

6. Attached as Exhibit B are screen captures that JADE obtained from the internet showing images of the rail, where a rail car mover is used to move a set of rail cars loaded with a tractor-trailer along the rail, and comments made in chat boxes associated with social media posts of the rail operation. JADE also obtained videos from open sources showing this operation. One video from 2017 was identified by JADE on October 16, 2017, on Kloosterboer Bayside's Facebook page; JADE downloaded the video file, and that is attached as Exhibit C (filed conventionally herewith). JADE determined that the video file was removed from Kloosterboer Bayside's Facebook page at some point between August 26 and 27, 2021. On August

27, 2021, another video file from 2015 was obtained by JADE from a Facebook page; JADE downloaded the video file, and that is attached as Exhibit D (filed conventionally herewith). As Plaintiffs indicate in their current pleadings, the rail is a straight line of approximately 100 feet in length, the rail cars are moved to one end and then back to where they started, and the track itself is fully contained within the Bayside facility.

7. To understand the rail movements involved as considered in previous U.S. Customs Service or CBP administrative rulings, I reviewed the ruling letters cited by Plaintiffs in their motion for a temporary restraining order that contained facts about the rail movements. I reviewed: HQ 111987 (December 2, 1991); HQ 112085; HQ 113365 (March 10, 1995); HQ 114407 (July 23, 1998); HQ 115124 (August 11, 2000); and HQ 115446 (August 9, 2001).

8. The past operations of the rail by the entities transporting frozen seafood from Dutch Harbor to Bayside, Canada, as discerned from facts stated in U.S. Customs Service administrative rulings (hereinafter referred to as "CBP rulings"), involved movements over rail lines operated by the New Brunswick Southern Railway Company (NBSR), and sometimes in conjunction with Canadian Pacific Railway, in and between the rail terminals of Saint John, McAdam, and Saint Stephen, each of which are in New Brunswick, Canada. As described in the CBP rulings, the frozen seafood product would be trucked to those locations because the railways did not connect directly to the Bayside facility. Once placed upon the railway at one of these locations, the train would carry the frozen seafood to another rail terminal where it would be offloaded and then again transported to the United

4

States by truck. Accordingly, depending on which Canadian rail terminals the particular shipment was moving between, the rough approximate distance (using "Google maps") between Saint John and McAdam is 91 miles; and between McAdam and Saint Stephen is 34 miles. Thus, under the past operations of which CBP was aware, the rail movement occurred under the control of either NBSR or NBSR in conjunction with Canadian Pacific Railway and involved rail movements of approximately 34 to 91 miles or more.

9. Some of the rulings I reviewed involved movements on the U.S. and Canadian west coasts, also discussing the use of the "Third Proviso." In those rulings, the Canadian rail portion of the transportation was significant in length. For example, in HQ 111987 and HQ 113365, the transportation of ore was done by non-coastwise qualified vessel from Hawke Inlet, Alaska, to Vancouver, British Columbia. The ore was then transported over Canadian rail from Vancouver, British Columbia, to Montana. The exact distance of the rail movement is not stated in the ruling letters, but the minimum distance (using "Google maps") from Vancouver to the Montana border is approximately 470 miles; by rail it likely is a greater distance. In HQ 112085, the ruling involved frozen seafood transported by non-coastwise qualified vessel from Dutch Harbor to Vancouver, British Columbia, and from there by Canadian rail to the United States (the exact location is not stated in the ruling). Assuming entry to the closest U.S. port of entry in Blaine, Washington, the Canadian rail line movement (again estimating using "Google maps") was probably a minimum of 16 miles and up to 40 or more miles.

10. When trucks (tractor-trailers) enter the United States from Canada, certain

paperwork is presented to CBP. Included in this paperwork is a bill of lading, which describes the merchandise being carried, where it is coming from, and the various parties involved in the transportation. Bills of lading are commercial documents (not CBP forms) that should be included in all shipments. An example of a bill of lading is seen at Plaintiffs' filing docket 8, Exhibit 2, page 1. This bill of lading lists the "routing" of the shipment which takes place after it is unladen from the cargo vessel. This example indicates that the shipment moves from "Kloosterboer Bayside to Bayside Canadian Railway North," then from "Bayside Canadian Rail to Bayside Canadian Railway South," then from "Bayside Canadian Rail" to "New Bedford, MA." In fact, the shipment does not go from the Bayside Canadian Rail to New Bedford, Massachusetts, but rather, the final transportation to New Bedford is done by the tractor-trailer, in this example, operated by John Cook trucking. As is evident from this document, there is no detailed description of the rail in use. The bill of lading, however, does not provide factual details about the nature of the railway in use. CBP does not expect it to, because that is not the purpose of the document. CBP utilizes the bill of lading to know what merchandise is in the shipment, the quantity of the merchandise in the shipment, the entities involved in the transportation of the shipment, from where the shipment and merchandise originated, and to where and to whom the shipment is to be delivered. CBP does not use a bill of lading for the purpose of understanding the detailed facts about the rail being used.

11. If there was a situation involving facts not identical to that considered by a prior CBP ruling, a party should request an administrative ruling from CBP. It is a

common practice in the industry to request a prospective ruling from CBP. If making such a request, the detailed facts of the situation must be given by the company to CBP to permit CBP to fully evaluate the matter. This process is set forth in CBP regulations (19 C.F.R. Part 177) and CBP's Informed Compliance Publication for the Jones Act, accessible on CBP's public website at CBP.gov (https://www.cbp.gov/sites/default/files/assets/documents/2020-Oct/Jones-Act-Informed-Compliance-Publication-September-2020.pdf).

This declaration comprises 7 pages, including this one. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this 10th day of September, 2021.

Michael Hebert