

North America Europe Asia

1700 K Street, NW
Washington, DC 20006
T +1 202 282 5000
F +1 202 282 5100

**CONSTANTINE G. PAPAVIZAS**
**Partner**
**(202) 282-5732**
**cpapavizas@winston.com**

April 12, 2017

By E-Mail

Mr. Michael J. Hebert Jr.
U.S. Customs & Border Protection
Jones Act Division of Enforcement (JADE)
New Orleans Field Office
400 Canal Street
New Orleans, LA 70101

Re: Jones Act Third Proviso

Dear Mr. Hebert:

We write to bring potentially serious Jones Act violations to your attention involving the movements over many years of frozen fish and fish products from Dutch Harbor, Alaska to U.S. destinations on foreign-flag vessels without complying with all facets of the Jones Act Third Proviso.

As you know, the Third Proviso of the Jones Act, included originally as part of section 27 of the Merchant Marine Act, 1920, as presently codified provides that the Jones Act:

> does not apply to the transportation of merchandise between points in the continental United States, including Alaska, over through routes in part over Canadian rail lines and connecting water facilities if the routes are recognized by the Surface Transportation Board and rate tariffs for the routes have been filed with the Board.

46 U.S.C. § 55116. The Third Proviso formerly referenced the Interstate Commerce Commission ("ICC") which was replaced by the Surface Transportation Board ("STB") in 1995.

As indicated by the U.S. Supreme Court regarding the Third Proviso – "its evident purpose was to avoid disturbance of established routes, recognized by the Interstate Commerce Commission as in the public interest, between Northwestern and Eastern states through the lake ports." *Central Vermont Transp. Co. v. Durning*, 294 U.S. 33, 39 (1935). The reason that the proviso was necessary was that section 27 added into law, for the first time, the phrase "or by land


and water" making the Jones Act applicable to transportation partly on land and partly on water. In other words, the Third Proviso was a grandfather provision – never intended to be a general exception to the Jones Act.

From 1998 to 2005, CBP issued several rulings[1] generally having to do with the issue of whether and how the Third Proviso was still available given changes in the route and tariff legal requirements resulting from the transition from the ICC to the STB. The context was mainly the shipment of frozen seafood products from Dutch Harbor, Alaska to final U.S. destinations via foreign-flag vessel and rail trackage in Canada, which would be prohibited by the Jones Act but for the potential application of the Third Proviso.

CBP, noting that the Third Proviso is a "limited exception," observed (incorrectly) that STB no longer "recognized" routes and no longer accepted "rate tariffs" for routes. Therefore, CBP concluded that the only way to interpret the Third Proviso and continue to give it effect was to permit all transportation "over through routes in part over Canadian rail lines" without any associated STB filing.

CBP's view was flatly rejected in *Horizon Lines, LLC v. U.S.*, 414 F. Supp. 2d 46 (D.D.C. 2006) and then again in *Horizon Lines, LLC v. U.S.*, 429 F. Supp. 2d 92 (D.D.C. 2006). In those cases, the court quoted the *Central Vermont* case to the effect that "'[a]n interpretation of the proviso which would enable foreign owned vessels to carry merchandise in coastwise traffic [without complying with its terms] would go beyond its purpose and in large measure defeat the prohibition of section 27.'" 414 F. Supp. 2d at 60. The court concluded in part that it is "more consistent with the statute and accepted principles of statutory interpretation, to limit the scope of the Proviso to comport with the STB's current rate filing requirements." *Id.* at 58-59.

The case was remanded to CBP and there is no further publicly available record that we could discover on the matter vis-a-vis CBP, although there are two publicly available records at the STB.

First, on December 19, 2007, the STB denied a petition by Horizon Lines, LLC for a declaratory order that certain movements by Sunmar Shipping, Inc. and American Seafoods Company ("ASC") "between Alaska and Boston, MA, on through bills of lading via foreign-flag vessels and Canadian rail lines, and truck lines operating in Canada and the United States are 'sham movements." STB Finance Docket No. 35039.

In large measure, the STB rendered that decision based on its belief that both "Sunmar and ASC have since filed tariffs with the Board under 49 U.S.C. 13702 for the movements at issue." *Id.* at 2. In addition, the STB concluded that it does not have responsibility to enforce the Jones Act and so determine whether the route was in fact a "sham" to evade the Jones Act. *Id.* at 4.

[1] Customs Rulings HQ 116185 (March 28, 2005), HQ 116021 (Jan. 21, 2004), HQ 115446 (Aug. 9, 2001) & HQ 114507 (Oct. 26, 1998).



Second, we requested from STB all tariff filings made by any of the following companies known to be engaged in the transportation of merchandise from Alaska to Canada for delivery to U.S. destinations: American Seafoods Company; Alaska Reefer Management LLC or ARM; Alaska Reefer Logistics; ARA Logistics Inc.; and Kloosterboer International Freight Forwarding or KIF.

The STB responded that there is a single tariff on file effective September 26, 2006 filed by ASC, apparently to stave off any allegation in connection with the STB proceeding that there was no tariff filing.[2] Tariff STB AICN 00001 (attached). STB did not produce any Sunmar tariff. Moreover, none of the other parties engaged in coastwise transportation utilizing foreign vessels filed a tariff according to the response we received from STB. The 2006 ASC tariff purports to have no expiration date although it provides for a fixed freight rate (which has not been changed by amendment since 2006) and a fixed fuel surcharge.

What the filing of this tariff shows is that a tariff can be filed with the STB – which was not ever fully taken into account by CBP in its earlier rulings – and that even those claiming to have the benefit of the Third Proviso believe that such a filing is necessary. Moreover, it confirms that the U.S. District Court in *Horizon Lines* indicated, which is that such a filing could and should be made.

At the same time, the 2006 ASC tariff is inadequate for the purpose. It is outdated and therefore ineffective. Indeed, the booking note attached to the tariff was good only to December 31, 2006, and the fixed 2006 rates cannot be as a practical matter the current rates. It does not expressly encompass the parties, like those named above, which are actually engaged in coastwise movements on foreign-flag vessels. And, it does not even attempt to describe the route or routes taken to circumvent the Jones Act except vaguely on the title page.

Moreover, upon information and belief, much of the merchandise that is transported from Dutch Harbor to Canada that is later transshipped to U.S. destinations is shipped to Canada on a bill of lading that provides that Canada is the final destination. In other words, there is no through bill of lading where the ultimate destination is the United States via intermediate Canadian places. The STB believed in 2007 that through bills of lading were being used.

When Congress replaced the ICC with the STB, it could have been more explicit as to how the Third Proviso would function with the STB's new tariff regime. That, however, was not done. It has fallen to CBP to enforce the Jones Act and continue to treat the Third Proviso – always intended to be a narrow exception akin to a grandfather provision – in a meaningful way. If CBP permits persons to engage in the U.S. non-contiguous trade by merely filing a vague "perpetual" tariff and then skirt the basic "through route" requirement by not even utilizing through bills of

---

[2] STB permits entities to engage in electronic posting in lieu of filing with the STB. Regulations for the Publication, Posting and Filing of Tariffs for the Transportation of Property by or with a Water Carrier in the Noncontiguous Domestic Trade, STB Ex Parte No. 580 (Dec. 2, 1998). We could find no record that any of the affected entities have taken advantage of this permission and posted such tariffs electronically.



lading, then it would have eliminated any constraints on the exception and "in large measure defeated" the Jones Act.

The U.S. District Court in 2006 directed CBP to act "more consistent with the statute and accepted principles of statutory interpretation" and "to limit the scope of the Proviso to comport with the STB's current rate filing requirements." We herein urge CBP to follow that direction and ensure that the Third Proviso is not used as a path to obliterate the Jones Act in the non-contiguous trade just because a portion of the movement occurs over a Canadian rail line.

Very truly yours,

Constantine G. Papavizas

Attachment

cc:     Lisa Burley, Esquire

OFFICIAL FILE

RECEIVED
SURFACE TRANSPORTATION
BOARD

2006 AUG 28 P 2: 27

# TARIFF STB AICN 00001

## NAMING
## RULES, TERMS, CONDITIONS
## AND BREAK-BULK FROZEN SEAFOOD FREIGHT RATES

## FOR
## WATER/RAIL TRANSPORTATION
## AND RELATED SERVICES

## SOUTHBOUND BETWEEN
## DUTCH HARBOR, ALASKA
## AND NAMED PLACES IN THE EASTERN UNITED STATES

**ISSUED BY:**

**AMERICAN SEAFOODS COMPANY LLC**
**2025 First Avenue, Suite 900**
**Seattle, WA 98121**
**Contact: Per Brautaset**
**Telephone: (206) 448-0300**
**Facsimile: (206) 448-0505**

**AICN**

**Issue Date: August 28, 2006**
**Effective Date: September 26, 2006**
**Expiration Date: Until Canceled**

Case 3:21-cv-00198-SLG Document 39-1 Filed 09/10/21 Page 5 of 28

## REVISION CHECK SHEET

| Page Number | Revision Number | Page Number | Revision Number | Page Number | Revision Number | Page Number | Revision Number |
|---|---|---|---|---|---|---|---|
| 1 | 0 | | | | | | |
| 2 | 0 | | | | | | |
| 3 | 0 | | | | | | |
| 4 | 0 | | | | | | |
| 5 | 0 | | | | | | |
| 6 | 0 | | | | | | |
| 7 | 0 | | | | | | |
| 8 | 0 | | | | | | |
| 9 | 0 | | | | | | |
| 10 | 0 | | | | | | |
| 11 | 0 | | | | | | |
| 12 | 0 | | | | | | |
| 13 | 0 | | | | | | |
| 14 | 0 | | | | | | |
| 15 | 0 | | | | | | |
| 16 | 0 | | | | | | |
| 17 | 0 | | | | | | |
| 18 | 0 | | | | | | |
| 19 | 0 | | | | | | |
| 20 | 0 | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

## TARIFF SUPPLEMENTS

None

TARIFF STB AIGN 00001
ORIGINAL PAGE 2

ISSUE DATE: AUGUST 28, 2006
EFFECTIVE DATE: SEPTEMBER 26, 2006

Exhibit A
6 of 28

## TABLE OF CONTENTS

| Subject | Item No. | Page No. |
|---|---|---|
| Application of Rates – General | 100 | 7 |
| Application of Rates – Estimated Freight Charges | 101 | 7 |
| Frozen Seafood Freight Rates | 102 | 7 |
| Fuel Surcharge | 103 | 7 |
| Customs or In Bond Shipments | 104 | 8 |
| Bills of Lading, Freight Bills and Statements of Charges -- Documentation | 200 | 8 |
| Bills of Lading | 201 | 8 |
| Changes to Tariff | 300 | 8 |
| C.O.D. | 301 | 9 |
| Lien | 302 | 9 |
| Effective Dates | 303 | 9 |
| Explosives, Hazardous Materials, Hazardous Waste and other Dangerous Goods | 304 | 9 |
| Shipping Temperature | 305 | 9 |
| Insurance | 306 | 9 |
| Water, Transportation By – Carriage of Goods By Sea | 307 | 9 |
| Water, Transportation By – Rules of Coast Guard | 308 | 10 |
| Value, Declaration of Higher (Ad Valorem) | 309 | 10 |
| Weight – Billing | 310 | 10 |
| Loss/Damage Claims – Conditions Precedent | 400 | 11 |
| Loss/Damage Claims, Filing of | 401 | 12 |
| Loss/Damage Claims, Acknowledgement of | 402 | 13 |
| Loss/Damage Claims, Investigation of | 403 | 14 |
| Loss/Damage Claims, Disposition of | 404 | 14 |
| Processing of Salvage | 405 | 15 |
| Overcharge Claims, Conditions Precedent | 406 | 16 |
| Overcharge Claims, Filing of | 407 | 16 |
| Overcharge Claims, Documentation of | 408 | 17 |

| Subject | Item No. | Page No. |
|---|---|---|
| Overcharge Claims, Investigation of | 409 | 18 |
| Overcharge Claims, Record of | 410 | 18 |
| Overcharge Claims, Acknowledgement of | 411 | 18 |
| Unidentified Payments | 412 | 19 |
| Overcharge Claims, Disposition of | 413 | 20 |

TARIFF STB AIGN 0001
ORIGINAL PAGE 4

ISSUE DATE: AUGUST 28, 2006
EFFECTIVE DATE: SEPTEMBER 26, 2006

Exhibit A
8 of 28

## PARTICIPATING CARRIERS

| SCAC Alpha Code | Name of Carrier |
|---|---|
| AICN | American Seafoods Company LLC |
| NBSR | New Brunswick Southern Railway Company Limited |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

TARIFF STB AICN 00001 ISSUE DATE: AUGUST 28, 2006
ORIGINAL PAGE 5 EFFECTIVE DATE: SEPTEMBER 26, 2006

Exhibit A
9 of 28

## DEFINITIONS

| | |
|---|---|
| Carrier | Carrier refers to American Seafoods Company LLC, its subcontractors, authorized agents and all directors, officers and employees thereof. |
| Consignee | Consignee refers to the entity identified by Shipper to receive the goods. |
| Goods | Goods refers to those items of personal property with respect to which Carrier has been requested to or does provide services, including all packing and packaging thereof as well as all other articles or materials associated therewith, including, but without limitation, crates, cradles, pallets, and containers. The terms "goods" shall be deemed synonymous with "shipments," "cargo," "cargoes," "pieces," "packages," "commodities," and "personal property." |
| Shipper | Shipper refers to the entity engaging Carrier with respect to the goods, unless the context herein otherwise clearly indicates to the contrary, and shall include the owner, consignor, Consignee and all others who may have a right of claim by, through or with respect to the goods. |

## ABBREVIATIONS

| | |
|---|---|
| LBS | Pounds |
| MT | Metric Tons |
| WM | 2,000 pounds or 40 cubic feet, whichever produces the greater revenue |
| USD | United States Dollars |

## REFERENCE MARKS

| | |
|---|---|
| ^ | Denote increase |
| ± | Denote decrease |
| o | Denote no change in rates |
| # | Denote reissued matter or page |
| ○ | Denote a change in wording resulting in neither an increase nor decrease |
| + | Denote an addition |
| ⚙ | Denote a deletion |
| € | Subject to an expiration date |

## RULES, TERMS AND CONDITIONS OF SERVICE

| | Item No. |
|---|---|
| **Application of Rates – General**<br><br>(1) Rates apply via a combination of water-rail routes.<br>(2) Goods to named places herein will be accepted and handled only when the quantity offered equals or exceeds a quantity of 500 metric tons.<br>(3) Rates do not include pick up in Alaska other than at Dutch Harbor. | 100 |
| **Application of Rates – Estimated Freight Charges**<br><br>Upon request, Carrier will furnish, either orally, in writing or by electronic means, an estimate of the freight, fuel, and Customs or in bond shipment charges applicable to any given shipment moved or to be moved under the provisions of this tariff. The estimate will be given on the basis of the effectively published tariff provisions according to the facts concerning the shipment which have been made known to Carrier. Estimates are furnished as a convenience to the shipping public, and represent nothing more than an approximation of freight charges which is not binding on either party. | 101 |
| **Frozen Seafood Freight Rates**<br><br>The freight rate for shipment of frozen seafood is :<br><br>USD 350.00 per metric ton<br><br>Applicable to deliveries in Boston, MA and New Bedford, MA. | 102 |
| **Fuel Surcharge**<br><br>The water transportation of all shipments is subject to a fuel surcharge of USD 50.00 per metric ton. | 103 |

| | Item No. |
|---|---|
| **Customs or In Bond Shipments**<br><br>(1) Shipments moving under United States Customs Bond will move on one bill of lading and will not be allowed to mix on the same bill of lading with shipments not moving under Customs bond.<br><br>(2) When shipments move under United States Customs Bond or delivery by carrier is required to be made under United States Customs supervision, a charge of USD 35.00 per shipment will be assessed. | 104 |
| **Bills of Lading, Freight Bills and Statements of Charges – Documentation**<br><br>Upon request, Carrier will provide the following documentation as part of the transportation services:<br><br>(1) Bill of lading, as set forth in Item 201, which shall be deemed to have been issued for each shipment.<br><br>(2) Freight Bill. | 200 |
| **Bills of Lading**<br><br>The front page and full terms and conditions of Carrier's bill of lading shall be applicable to all goods received and/or transported by Carrier unless otherwise specifically agreed between Shipper and Carrier in writing, and the individual terms and conditions of Carrier's bill of lading are fully incorporated into this tariff as if separately set forth herein. **Copy attached: 2006 AMERICAN SEAFOODS BILL OF LADING** | 201 |
| **Changes to Tariff**<br><br>Changes to this tariff will be made by reprinting the entire page. Such reprinted pages will be designated "Revised Page" and will bear the same page number as the original. Revised pages will not show a cancellation notice except when such is necessary because of suspension, rejection or other specific reason. Except where a specific cancellation is shown on a new revised page, each revised page cancels any and all prior revised or original pages which bear the same page number.<br><br>Example: "1st Revised Page 7" cancels "Original Page 7"<br>"2d Revised Page 7" cancels "1st Revised Page 7 and "Original Page 7" | 300 |

| | Item No. |
|---|---|
| **C.O.D.**<br><br>Collect on delivery (C.O.D.) shipments will not be accepted. | 301 |
| **Lien**<br><br>Carrier shall have a lien upon all goods transported hereunder, which lien shall survive delivery, to secure payment of sums due hereunder. Carrier may assert such lien rights at any time, including withholding delivery until full payment is made and/or public or private sale of the personal property is effected; sale proceeds shall be first applied to all costs of sale, then to all sums due Carrier, with the balance to be paid to Shipper. | 302 |
| **Effective Dates**<br><br>Shipments are governed by the rates and rules in effect on the date that the shipment(s) are physically received by Carrier. | 303 |
| **Explosives, Hazardous Materials, Hazardous Waste and other Dangerous Goods**<br><br>Carrier refuses to carry any goods that in its judgment are hazardous, dangerous, objectionable or otherwise likely to injure any container, equipment, or other personal property, or which, in Carrier's judgment, are not able to be safely loaded, stowed, secured, unloaded or delivered. | 304 |
| **Shipping Temperature**<br><br>All goods are to be shipped at a temperature less than or equal to negative twenty-two degrees centigrade. | 305 |
| **Insurance**<br><br>Rates named herein do not include any first party or Shipper's interest cargo insurance provided by Carrier for the benefit of Shipper. | 306 |
| **Water, Transportation By – Carriage of Goods By Sea**<br><br>Any portion of the transportation of goods by water shall be subject to the Carriage of Goods By Sea Act (46 U.S.C. § 1300 et seq.) and the liability of Carrier for loss or damage to the goods shall be limited as follows: neither Carrier nor the vessel shall be liable for any loss or damage to or in connection with the transportation of the goods in an amount exceeding USD 500 per package or the equivalent in other currency (with any Shipper provided container to be considered the relevant package) or for goods not shipped in packages, per customary freight unit, unless the nature and value of such goods have been declared in writing by Shipper to Carrier before shipment and inserted on the front of the bill of lading, and Shipper has paid increased freight charges resulting from such declaration. | 307 |

| | Item No. |
|---|---|
| **<u>Water, Transportation By – Rules of Coast Guard</u>**<br><br>The transportation of goods by water shall be subject to all rules and regulations prescribed by the U.S. Coast Guard. | 308 |
| **<u>Value, Declaration of Higher (Ad Valorem)</u>**<br><br>Shipper has the option of declaring a higher valuation for the goods pursuant to Section 10 of the Carrier's bill of lading published at Item 201. Should Shipper wish to declare a higher valuation for the goods, Shipper must either inform Carrier in writing of such higher value before the goods are shipped (in which event Carrier shall be authorized to utilize such value and to insert it on the face of the bill of lading) or must insert such higher value in the appropriate space on the front of the bill of lading before goods are shipped; in declaring a higher value, Shipper expressly agrees to pay an additional charge at the rate of five percent (5%) of such higher value. In the event of a declaration of higher value by Shipper, Carrier's maximum limit for liability shall not exceed such declared higher value, with claims for loss or damage to goods adjusted as set forth in Section 10 of the bill of lading published at Item 201.<br><br>Unless Shipper has declared a higher value as set forth in this Item and has paid the additional charge therefore, Shipper agrees that the goods received and transported on the basis that the Carrier's maximum liability for loss of or damage to such goods shall be USD 800.00 per package or freight unit for all goods. | 309 |
| **<u>Weight – Billing</u>**<br><br>Weights provided by Shipper and shown on the bill of lading are subject to verification by Carrier, and the actual scale estimated or agreed weight as ascertained by Carrier will be the applicable weight of the goods. | 310 |

| | Item No. |
|---|---|
| **<u>Loss/Damage Claims – Conditions Precedent</u>**<br><br>The following are conditions precedent to recovery against Carrier with respect to any loss or damage to goods, including injury, delay, shortage, misdelivery, failure to deliver and the like.<br><br>(1) The goods must be carefully inspected by Shipper or Consignee immediately upon delivery, and any loss or damage which would then be evident must be noted on Carrier's copy of the bill of lading and/or delivery receipt or the goods shall be conclusively presumed to have been delivered in the same good order, count and condition as when received.<br>(2) In the event of loss or damage which would not be ascertainable at delivery, written notice of loss, damage, shortage, etc. involving the goods must be given to Carrier within fifteen days of delivery, after which time with no such notice having been given it shall be conclusively presumed that the goods were delivered in the same good order, count and condition as when received.<br>(3) In the event of goods which are delayed, lost or otherwise not delivered, Carrier must be given written notice of the delay, loss or failure to deliver within fifteen days from the date upon which the goods should have been delivered or the goods shall be conclusively presumed to have been delivered in the same good order, count and condition as when received.<br>(4) Carrier shall have a reasonable opportunity to inspect the goods, including their packing and packaging, in the same condition as upon delivery and before any alteration or destruction thereof.<br>(5) Written claim for loss/damage, specifying the particulars thereof, must be filed with the Carrier within nine months of delivery or the date by which the goods should have been delivered.<br>(6) Any suit against the Carrier must be filed within two years from the date that the Carrier provides written notice that it has disallowed a claim or any part of a claim specified in the notice.<br>(7) There shall be no recovery against Carrier until freight and all charges due Carrier have been paid in full.<br>(8) In the event of loss or injury occurring in the custody of Carrier, the liability of Carrier will be determined by the bill of lading and the law applicable to water transportation. The liability of the delivering carrier is the same as that of the water carrier.<br>Offers of compromise from Carrier and communications from Carrier's insurer shall not constitute a disallowance of a claim or any part thereof. | 400 |

| | Item No. |
|---|---|
| **<u>Loss/Damage Claims, Filing of</u>**<br><br>A claim for loss or damage to goods, including injury, delay, shortage, misdelivery, failure to deliver and the like, shall not be paid by Carrier unless filed with Carrier within the time limits applicable thereto and as otherwise may be required by law, the terms and conditions of the bill of lading or transportation agreement and all tariff provisions applicable thereto as follows:<br>(1) A written and/or electronic communication (when agreed to by Carrier and Shipper or Receiver involved) from the claimant must be filed with Carrier within the appropriate time limit.<br>(2) Such communication must contain facts sufficient to identify the shipment of goods.<br>(3) Such communication must assert that Carrier is liable for the alleged loss, damage, etc.<br>(4) Such communication must make a claim for a specific or determinable amount of money.<br>*Provided that*, where claims are electronically handled, procedures are established to ensure reasonable carrier access to supporting documents.<br><br>Bad order reports, appraisal reports of damage, notations of shortage or damage, or both, on freight bills, delivery receipts, inspection reports, bills of lading or other documents issued by Carrier or their inspection agencies, standing alone, shall not be sufficient communication for purposes of this Item, whether or not such indicates the extent of loss, damage, etc. and/or a dollar figure for such loss, damage, etc.<br>Whenever a loss, damage, etc. claim is presented against Carrier for an uncertain amount, such "USD -100 more or less," Carrier shall determine the condition of the goods involved at the time of delivery, if it was delivered, and shall ascertain as nearly possible the extent, if any, of the loss, damage, etc. for which it may be responsible. It shall not, however, voluntarily pay a claim under such circumstances unless and until a formal claim in writing for a specified or determinable amount of money shall have been filed in accordance herewith.<br>If investigation of a claim develops that one or more other carriers have been presented with a similar claim on the same shipment, Carrier investigating such claim shall communicate with each such other carrier and, prior to any agreements entered into, between, or among them as to the proper disposition of such claim or claims, shall notify all claimants of the receipt of conflicting or overlapping claims and shall require further substantiation, on the part of each claimant of his/her title to the property involved or his/her right with respect to such claim. | 401 |

| | Item No. |
|---|---|
| **Loss/Damage Claims, Acknowledgement of**<br><br>Carrier shall, upon receipt of a loss, damage, etc. claim in the manner described herein, acknowledge the receipt of such claim in writing or electronically to the claimant within 30 days after the date of its receipt, unless Carrier shall have paid or declined such claim in writing or electronically within 30 days of the receipt thereof. Carrier shall indicate in its acknowledgement to the claimant what, if any, additional documentary evidence or other pertinent information may be required by it to further process the claim as its preliminary examination of the claim, as filed, may have revealed.<br>Carrier shall at the time each claim is received create a separate file and assign thereto a successive claim file number and note that number on all documents filed in support of the claim and all records and correspondence with respect to the claim, including the acknowledgement of receipt. At the time such claim is received, Carrier shall cause the date of receipt to be recorded on the face of the claim document, and the date of receipt shall also appear in Carrier's acknowledgement of receipt to claimant. Carrier shall also cause the claim file number to be noted on the shipping order, if in its possession, and the delivery receipt, if any, covering the shipment, unless Carrier has otherwise established an orderly and consistent internal procedure for assuring:<br>(1) That all information contained in shipping orders, delivery receipts, tally sheets, and all other pertinent records made with respect to the transportation of the shipment on which claim is made, is available for examination upon receipt of a claim;<br>(2) That all such records and documents (or true and complete reproductions thereof) are in fact examined in the course of the investigation of the claim (and an appropriate record is made that such examination has in fact taken place); and<br>(3) That such procedures prevent the duplicate or otherwise unlawful payment of claims. | 402 |

| | Item No. |
|---|---|
| **<u>Loss/Damage Claims, Investigation of</u>**<br><br>Prompt Investigation: Each loss, damage, etc. claim filed with Carrier in the manner prescribed herein shall be promptly and thoroughly investigated if investigation has not already been made prior to Carrier's receipt thereof.<br><br>Supporting Documentation: When a necessary part of an investigation and/or when requested by Carrier, each claim shall be supported by the original bill of lading, evidence of freight charges, if any, and either the original invoice, a photographic copy of the original invoice, or an exact copy thereof or any extract made therefrom, certified by the claimant to be true and correct with respect to the goods and value involved in the claim; or certification of prices or values, with trade or other discounts, allowance or deductions, of any nature whatsoever and the terms thereof, or depreciation reflected thereon; *Provided, however*, that where goods involved in a claim have not been invoiced to Consignee shown on the bill of lading or where an invoice does not show price or value, or where the goods involved have been sold, or where the goods have been transferred at booking values only, Carrier shall, before voluntarily paying a claim, require the claimant to establish destination value in the quantity, shipped, transported, or involved; *Provided, further*, that when supporting documents are determined to be a necessary part of an investigation, the supporting documents are retained by Carriers for possible inspection by applicable federal agencies.<br><br>Verification of loss: When an asserted claim for loss of an entire shipment cannot be otherwise authenticated upon investigation, Carrier shall obtain from Consignee a certified statement in writing that the goods for which the claim is filed have not been received from any other source. | 403 |
| **<u>Loss/Damage Claims, Disposition of</u>**<br><br>Subject to the provisions of this tariff, Carrier, upon receipt of a loss, damage, etc. claim as required herein, shall pay, decline, or make a firm compromise settlement offer in writing or electronically to the claimant within 120 days after receipt of the claim by Carrier; *Provided, however,* that if the claim cannot be processed and disposed of within 120 days after receipt thereof, Carrier shall at that time and at the expiration of each succeeding 60-day period while the claim remains pending, advise the claimant in writing or electronically of the status of the claim and the reason for the delay in making final disposition thereof and it shall retain a copy of such in its claim file thereon. | 404 |

| Processing of Salvage | Item No. 405 |
|---|---|
| Whenever goods transported by Carrier are damaged or alleged to be damaged and are, as a consequence thereof, not delivered or rejected or refused upon delivery to the owner, consignee, or person entitled to receive such goods, Carrier, after giving due notice, whenever practicable to do so to the owner and other parties who may have an interest therein, and unless advised to the contrary after giving such notice, shall undertake to sell or dispose of such goods directly or by the employment of a competent salvage agent. Carrier shall only dispose of the property in a manner that will fairly and equally protect the best interest of all persons having an interest therein. Carrier shall create an itemized record sufficient to identify the goods involved so has to be able to correlate them to the shipment or transportation involved, and claim, if any, filed thereon. Carrier shall also assign to each lot of goods a successive lot number and note that lot number on its record of the shipment and claim, if any claim is filed thereon.<br><br>Whenever disposition of salvage goods shall be made directly to an agent or employee of Carrier or through a salvage agent or company in which Carrier or one or more of its directors, officers or managers has any interest, financial or otherwise, Carrier's salvage records shall fully reflect the particulars of each transaction, relationship, or both as the case may be.<br><br>Upon receipt of a claim on a shipment on which the salvage has been processed in the above-described manner, Carrier shall record in its claim filed thereon the lot number assigned, the amount of money, if any, recovered from the disposition of the goods, and the date of transmittal of such money to the person or persons lawfully entitled to receive the same. | |

| | Item No. |
|---|---|
| **Overcharge Claims, Conditions Precedent**<br><br>The following are condition precedents to recovery against Carrier with respect to any overcharge claim, whether for overcharge, duplicate payment, over collections or otherwise:<br><br>1. Shipper must contest the original bill or subsequent bill within 180 days of its receipt in order to have the right to contest such charges.<br>2. Suit against Carrier must be filed within 18 months after such claim accrues, or within 3 years after such claim accrues in the event the claimant has filed a complaint with the Surface Transportation Board.<br>3. The time limitations set forth in paragraph 2, above, shall be extended 6 months from the time written notice is given to the claimant by the Carrier of any disallowance of any part of the claim specified in the notice if a written claim is given to Carrier within those limitation periods. The limitation periods are extended for 90 days from the time Carrier begins a civil action if Carrier has separately sued with respect to the same transportation within the limitations period or Carrier collects the charge for that transportation (without bringing a civil action) if that collection occurs within the limitations period. | 406 |
| **Overcharge Claims, Filing of**<br><br>A overcharge claim, whether for overcharge, duplicate payment, overcollection or otherwise, shall not be paid unless filed in writing with the Carrier that collected the freight and other transportation charges. American Seafoods Company LLC shall be the carrier to process all such claims. When claim is filed with another carrier participating in the transportation, that carrier shall transmit the claim to American Seafoods within 15 days after receipt of the claim. If American Seafoods is unable to dispose of the claim for any reason, the claim may be filed with or transferred to any participating carrier for final disposition.<br><br>A single claim may include more than one shipment provided the claim on each shipment involves:<br>(1) the same tariff issue or authority or circumstances;<br>(2) single line service by the same carrier; or<br>(3) service by the same interline carriers. | 407 |

| | Item No. |
|---|---|
| **Overcharge Claims, Documentation of** | 408 |

(a) Overcharge claims shall be accompanied by sufficient information to allow Carrier to conduct an investigation and pay or decline the claim within the time limitations set forth herein. Claims shall include the name of the claimant, its file number, if any, and the amount of the refund sought to be recovered, if known.

(b) Except when the original freight bill is not a paper document but is electronically transmitted, claims for overcharge shall be accompanied by the original freight bill. Additional information may include, but is not limited to, the following:

- (1) the rate, classification, or commodity description or weight claimed to have been applicable;
- (2) complete tariff authority for the rate, classification, or commodity description claimed;
- (3) freight bill payment information; and
- (4) other documents or data which is believed by claimant to substantiate the basis for its claim.

(c) Claims for duplicate payment and overcollection shall be accompanied by the original freight bill(s) for which charges were paid (except when the original freight bill is not a paper document but is electronically transmitted) and by freight bill payment information.

(d) Regardless of the provisions of paragraphs (a), (b), and (c) above, the failure to provide sufficient information and documentation to allow Carrier to conduct an investigation and pay or decline the claim within the allowable time limitation shall not constitute grounds for disallowance of the claim. Rather, Carrier shall comply with Item 409 to obtain the additional information required.

(e) Carrier shall accept copies instead of the original documents required to be submitted in this Item where Carrier is furnished with an agreement entered into by the claimant which indemnifies Carrier for subsequent duplicate claims which might be filed and supported by the original documents.

| | Item No. |
|---|---|
| **<u>Overcharge Claims, Investigation of</u>**<br><br>(a) Upon receipt of a overcharge claim, whether written or otherwise, Carrier shall promptly initiate an investigation and establish a file, as set forth in Item 410.<br>(b) If Carrier discovers an overcharge, duplicate payment, or overcollection which has not been the subject of a claim, it shall promptly initiate an investigation and comply with the provisions in Item 413.<br>(c) In the event Carrier processing the claim requires information or documents in addition to that submitted with the claim, it shall promptly notify the claimant and request the information required. This includes notifying the claimant that a written or electronically transmitted claim must be filed before Carrier becomes subject to the time limits for setting such a claim under Item 412. | 409 |
| **<u>Overcharge Claims, Record of</u>**<br><br>At the time a claim is received, Carrier shall create a separate file and assign it a successive claim file number and note that number on all documents filed in support of the claim and all records and correspondence with respect to the claim, including the written or electronic acknowledgment of receipt required under Item 411. If pertinent to the disposition of the claim, Carrier shall also note that number on the shipping order and delivery receipt, if any, covering the shipment involved. | 410 |
| **<u>Overcharge Claims, Acknowledgement of</u>**<br><br>Upon receipt of a written or electronically transmitted claim, Carrier shall acknowledge its receipt in writing or electronically to the claimant within 30 days after the date of receipt except when Carrier shall have paid or declined the claim in writing or electronically within that period. Carrier shall include the date of receipt in its written or electronic acknowledgement, which shall be placed in the file for that claim. | 411 |

| | Item No. |
|---|---|
| **Unidentified Payments**<br><br>Carrier shall have an established procedure for identifying and properly applying all unidentified payments. If Carrier does not have sufficient information with which properly to apply such a payment, it shall notify the payor of the identified payment within 60 days of receipt of the payment and request information which will enable it to identify the payment. If Carrier does not receive the information requested within 90 days from the date of the notice, it may treat the unidentified payment in fact of freight charges owing to it. Following the 90-day period, the regular claims procedure under this tariff shall be applicable.<br><br>Notice under this Item shall be in writing and clearly indicate that it is a final notice and not a bill. Notice shall include: check number, amount, and date; the payor's name; and any additional basic information Carrier is able to provide.<br><br>The final notice also must inform payor that: (i) Applicable regulations allow Carrier to retain conditionally the payment as revenue in the absence of a timely response by the payor; and (ii) following the 90-day period the regular claims procedure shall be applicable.<br><br>Upon Carrier's receipt of information from the payor, Carrier shall, within 14 days: (i) make a complete refund of such funds to the payor; or (ii) notify the payor that the information supplied is not sufficient to identify the unapplied payment and request additional information; or (iii) notify the payor of Carrier's determination that such payment was applicable to particular freight charges lawfully due. Where no refund is made by Carrier, Carrier shall advise the payor of its right to file a formal claim for refund in accordance with the regular claims procedures set forth in this tariff.<br><br>When a carrier which participates in a transportation movement, but did not collect the transportation charges, finds that an overpayment has been made, that carrier shall immediately notify American Seafoods Company LLC. When American Seafoods discovers or is notified by such a participating carrier that an overcharge, duplicate payment, or overcollection exists for any transportation charge which has not been the subject of a claim, American Seafoods shall create a file as if a claim had been submitted and shall record in the file the date it discovered or was notified of the overpayment. The carrier that collected the charges shall then refund the amount of the overpayment to the person who paid the transportation charges or to the person that made duplicate payment within 30 days from the date of such discovery or notification. | 412 |

| | Item No. |
|---|---|
| **Overcharge Claims, Disposition of**<br><br>Carrier shall pay, decline to pay, or settle each written or electronically communicated claim within 60 days after its receipt, except where the claimant and said Carrier agree in writing or electronically to a specific extension based upon extenuating circumstances. If Carrier declines to pay a claim or makes settlement in an amount different from that sought, it shall notify the claimant in writing or electronically of the reason(s) for its action, citing tariff authority or other pertinent information developed as a result of its investigation | 413 |

**END**

| Shipper (full style and address) | BIMCO LINER BILL OF LADING<br>CODE NAME: "CONLINEBILL 2000"<br>Amended January 1950; August 1952; January 1973; July 1974; August 1976; January 1978; November 2000. | |
|---|---|---|
| Consignee (full style and address) or Order | B/L No. | Reference No. |
| | Vessel carrier: ASC LLC | |
| Notify Party (full style and address) | Port of loading | |
| | Port of discharge | |

PARTICULARS DECLARED BY THE SHIPPER BUT NOT ACKNOWLEDGED BY THE CARRIER

| Container No./Seal No./Marks and Numbers | Number and kind of packages; description of cargo | Gross weight, kg | Measurement, m³ |
|---|---|---|---|
| | | | |

Draft Copy

**SHIPPED** on board in apparent good order and condition (unless otherwise stated herein) the total number of Containers/Packages or Units indicated in the Box opposite entitled "Total number of Containers/Packages or Units received by the Carrier" and the cargo as specified above, weight, measure, marks, numbers, quality, contents and value unknown, for carriage to the Port of discharge or so near thereunto as the vessel may safely get and lie always afloat, to be delivered in the like good order and condition at the Port of discharge unto the lawful holder of the Bill of Lading, on payment of freight as indicated to the right plus other charges incurred in accordance with the provisions contained in this Bill of Lading. In accepting this Bill of Lading the Merchant* expressly accepts and agrees to all its stipulations on both Page 1 and Page 2, whether written, printed, stamped or otherwise incorporated, as fully as if they were all signed by the Merchant. One original Bill of Lading must be surrendered duly endorsed in exchange for the cargo or delivery order, whereupon all other Bills of Lading to be void. IN WITNESS whereof the Carrier, Master or their Agent has signed the number of original Bills of Lading stated below right, all of this tenor and date.

| Total number of Containers/Packages or Units received by the Carrier | |
|---|---|
| Shipper's declared value | Declared value charge |
| Freight details and charges<br>as per Conline Booking Note dated: 21st October 2005 | |

| Carrier's name/principal place of business | Date shipped on board | Place and date of issue |
|---|---|---|
| AMERICAN SEAFOODS COMPANY<br>2025 FIRST AVE. SUITE 900<br>SEATTLE, WA 98121 | Number of original Bills of Lading | |
| | Pre-carriage by** | |
| Signature<br>................ Carrier<br>or, for the Carrier<br>................ as Master<br>*(Master's name/signature)*<br>................ as Agents<br>*(Agent's name/signature)* | Place of receipt by pre-carrier** | |
| | Place of delivery by on-carrier** | |

*As defined hereinafter (Cl. 1)
**Applicable only when pre-/on-carriage is arranged in accordance with Clause 6

Printed and sold by Fr. G. Knudtzons Bogtrykkeri A/S, Vallensbaekvej 61, DK-2625 Vallensbaek, Fax: +45 4366 0701

Copyright, published by The Baltic and International Maritime Council (BIMCO), Copenhagen, 2000

**1. Definition.**
"Merchant" includes the shipper, the receiver, the consignor, the consignee, the holder of the Bill of Lading, the owner of the cargo and any person entitled to possession of the cargo.

**2. Notification.**
Any mention in this Bill of Lading of parties to be notified of the arrival of the cargo is solely for the information of the Carrier and failure to give such notification shall not involve the Carrier in any liability nor relieve the Merchant of any obligation hereunder.

**3. Liability for Carriage Between Port of Loading and Port of Discharge.**
(a) The International Convention for the Unification of Certain Rules of Law relating to Bills of Lading signed at Brussels on 25 August 1924 ("the Hague Rules") as amended by the Protocol signed at Brussels on 23 February 1968 ("the Hague-Visby Rules") and as enacted in the country of shipment shall apply to this Contract. When the Hague-Visby Rules are not enacted in the country of shipment, the corresponding legislation of the country of destination shall apply, irrespective of whether such legislation may only regulate outbound shipments.
When there is no enactment of the Hague-Visby Rules in either the country of shipment or in the country of destination, the Hague-Visby Rules shall apply to this Contract save where the Hague Rules as enacted in the country of shipment or, if no such enactment is in place, the Hague Rules as enacted in the country of destination apply compulsorily to this Contract.
The Protocol signed at Brussels on 21 December 1979 ("the SDR Protocol 1979") shall apply where the Hague-Visby Rules apply, whether mandatorily or by this Contract.
The Carrier shall in no case be responsible for loss of or damage to cargo arising prior to loading, after discharging, or with respect to deck cargo and live animals.
(b) If the Carrier is held liable in respect of delay, consequential loss or damage other than loss of or damage to the cargo, the liability of the Carrier shall be limited to the freight for the carriage covered by this Bill of Lading, or to the limitation amount as determined in sub-clause 3(a), whichever is the lesser.
(c) The aggregate liability of the Carrier and/or any of his servants, agents or independent contractors under this Contract shall, in no circumstances, exceed the limits of liability for the total loss of the cargo under sub-clause 3(a) or, if applicable, the Additional Clause.

**4. Law and Jurisdiction.**
Disputes arising out of or in connection with this Bill of Lading shall be exclusively determined by the courts and in accordance with the law of the place where the Carrier has his principal place of business, as stated on Page 1, except as provided elsewhere herein.

**5. The Scope of Carriage.**
The intended carriage shall not be limited to the direct route but shall be deemed to include any proceeding or returning to or stopping or slowing down at or off any ports or places for any reasonable purpose connected with the carriage including bunkering, loading, discharging, or other cargo operations and maintenance of Vessel and crew.

**6. Substitution of Vessel.**
The Carrier shall be at liberty to carry the cargo or part thereof to the Port of discharge by the said or other vessel or vessels either belonging to the Carrier or others, or by other means of transport, proceeding either directly or indirectly to such port.

**7. Transhipment.**
The Carrier shall be at liberty to tranship, lighter, land and store the cargo either on shore or afloat and reship and forward the same to the Port of discharge.

**8. Liability for Pre- and On-Carriage.**
When the Carrier arranges pre-carriage of the cargo from a place other than the Vessel's Port of loading or on-carriage of the cargo to a place other than the Vessel's Port of discharge, the Carrier shall contract as the Merchant's Agent only and the Carrier shall not be liable for any loss or damage arising during any part of the carriage other than between the Port of loading and the Port of discharge even though the freight for the whole carriage has been collected by him.

**9. Loading and Discharging.**
(a) Loading and discharging of the cargo shall be arranged by the Carrier or his Agent.
(b) The Merchant shall, at his risk and expense, handle and/or store the cargo before loading and after discharging.
(c) Loading and discharging may commence without prior notice.
(d) The Merchant or his Agent shall tender the cargo when the Vessel is ready to load and as fast as the Vessel can receive including, if required by the Carrier, outside ordinary working hours notwithstanding any custom of the port. If the Merchant or his Agent fails to tender the cargo when the Vessel is ready to load or fails to load as fast as the Vessel can receive the cargo, the Carrier shall be relieved of any obligation to load such cargo, the Vessel shall be entitled to leave the port without further notice and the Merchant shall be liable to the Carrier for deadfreight and/or any overtime charges, losses, costs and expenses incurred by the Carrier.
(e) The Merchant or his Agent shall take delivery of the cargo as fast as the Vessel can discharge including, if required by the Carrier, outside ordinary working hours notwithstanding any custom of the port. If the Merchant or his Agent fails to take delivery of the cargo the Carrier's discharging of the cargo shall be deemed fulfilment of the contract of carriage. Should the cargo not be applied for within a reasonable time, the Carrier may sell the same privately or by auction. If the Merchant or his Agent fails to take delivery of the cargo as fast as the Vessel can discharge, the Merchant shall be liable to the Carrier for any overtime charges, losses, costs and expenses incurred by the Carrier.
(f) The Merchant shall accept his reasonable proportion of unidentified loose cargo.

**10. Freight, Charges, Costs, Expenses, Duties, Taxes and Fines.**
(a) Freight, whether paid or not, shall be considered as fully earned upon loading and non-returnable in any event. Unless otherwise specified, freight and/or charges under this Contract are payable by the Merchant to the Carrier on demand. Interest at Libor (or its successor) plus 2 per cent. shall run from fourteen days after the date when freight and charges are payable.
(b) The Merchant shall be liable for all costs and expenses of fumigation, gathering and sorting loose cargo and weighing onboard, repairing damage to and replacing packing due to excepted causes, and any extra handling of the cargo for any of the aforementioned reasons.
(c) The Merchant shall be liable for any dues, duties, taxes and charges which under any denomination may be levied, *inter alia*, on the basis of freight, weight of cargo or tonnage of the Vessel.
(d) The Merchant shall be liable for all fines, penalties, costs, expenses and losses which the Carrier, Vessel or cargo may incur through non-observance of Customs House and/or import or export regulations.
(e) The Carrier is entitled in case of incorrect declaration of contents, weights, measurements or value of the cargo to claim double the amount of freight which would have been due if such declaration had been correctly given. For the purpose of ascertaining the actual facts, the Carrier shall have the right to obtain from the Merchant the original invoice and to have the cargo inspected and its contents, weight, measurement or value verified.

**11. Lien.**
The Carrier shall have a lien on all cargo for any amount due under this contract and the costs of recovering the same and shall be entitled to sell the cargo privately or by auction to satisfy any such claims.

**12. General Average and Salvage.**
General Average shall be adjusted, stated and settled in London according to the York-Antwerp Rules 1994, or any modification thereof, in respect of all cargo, whether carried on or under deck. In the event of accident, danger, damage or disaster before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which or for the consequence of which the Carrier is not responsible by statute, contract or otherwise, the Merchant shall contribute with the Carrier in General Average to the payment of any sacrifice, losses or expenses of a General Average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the cargo. If a salving vessel is owned or operated by the Carrier, salvage shall be paid for as fully as if the salving vessel or vessels belonged to strangers.

**13. Both-to-Blame Collision Clause.**
If the Vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, negligence or default of the Master, Mariner, Pilot or the servants of the Carrier in the navigation or in the management of the Vessel, the Merchant will indemnify the Carrier against all loss or liability to the other or non-carrying vessel or her Owner in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the owner of the cargo paid or payable by the other or non-carrying vessel or her Owner to the owner of the cargo and set-off, recouped or recovered by the other or non-carrying vessel or her Owner as part of his claim against the carrying vessel or Carrier. The foregoing provisions shall also apply where the Owner, operator or those in charge of any vessel or vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect of a collision or contact.

**14. Government directions, War, Epidemics, Ice, Strikes, etc.**
(a) The Master and the Carrier shall have liberty to comply with any order or directions or recommendations in connection with the carriage under this Contract given by any Government or Authority, or anybody acting or purporting to act on behalf of such Government or Authority, or having under the terms of the insurance on the Vessel the right to give such orders or directions or recommendations.
(b) Should it appear that the performance of the carriage would expose the Vessel or any cargo onboard to risk of seizure, damage or delay, in consequence of war, warlike operations, blockade, riots, civil commotions or piracy, or any person onboard to risk of loss of life or freedom, or that any such risk has increased, the Master may discharge the cargo at the Port of loading or any other safe and convenient port.
(c) Should it appear that epidemics; quarantine; ice; labour troubles, labour obstructions, strikes, lockouts (whether onboard or on shore); difficulties in loading or discharging would prevent the Vessel from leaving the Port of loading or reaching or entering the Port of discharge or there discharging in the usual manner and departing therefrom, all of which safely and without unreasonable delay, the Master may discharge the cargo at the Port of loading or any other safe and convenient port.
(d) The discharge, under the provisions of this Clause, of any cargo shall be deemed due fulfilment of the contract of carriage.
(e) If in connection with the exercise of any liberty under this Clause any extra expenses are incurred they shall be paid by the Merchant in addition to the freight, together with return freight, if any, and a reasonable compensation for any extra services rendered to the cargo.

**15. Defences and Limits of Liability for the Carrier, Servants and Agents.**
(a) It is hereby expressly agreed that no servant or agent of the Carrier (which for the purpose of this Clause includes every independent contractor from time to time employed by the Carrier) shall in any circumstances whatsoever be under any liability whatsoever to the Merchant under this Contract of carriage for any loss, damage or delay of whatsoever kind arising or resulting directly or indirectly from any act, neglect or default on his part while acting in the course of or in connection with his employment.
(b) Without prejudice to the generality of the foregoing provisions in this Clause, every exemption from liability, limitation, condition and liberty herein contained and every right, defence and immunity of whatsoever nature applicable to the Carrier or to which the Carrier is entitled, shall also be available and shall extend to protect every such servant and agent of the Carrier acting as aforesaid.
(c) The Merchant undertakes that no claim shall be made against any servant or agent of the Carrier and, if any claim should nevertheless be made, to indemnify the Carrier against all consequences thereof.
(d) For the purpose of all the foregoing provisions of this Clause the Carrier is or shall be deemed to be acting as agent or trustee on behalf of and for the benefit of all persons who might be his servants or agents from time to time and all such persons shall to this extent be or be deemed to be parties to this Contract of carriage.

**16. Stowage.**
(a) The Carrier shall have the right to stow cargo by means of containers, trailers, transportable tanks, flats, pallets, or similar articles of transport used to consolidate goods.
(b) The Carrier shall have the right to carry containers, trailers, transportable tanks and covered flats, whether stowed by the Carrier or received by him in a stowed condition from the Merchant, on or under deck without notice to the Merchant.

**17. Shipper-Packed Containers, trailers, transportable tanks, flats and pallets.**
(a) If a container has not been filled, packed or stowed by the Carrier, the Carrier shall not be liable for any loss of or damage to its contents and the Merchant shall cover any loss or expense incurred by the Carrier, if such loss, damage or expense has been caused by:
(i) negligent filling, packing or stowing of the container;
(ii) the contents being unsuitable for carriage in container; or
(iii) the unsuitability or defective condition of the container unless the container has been supplied by the Carrier and the unsuitability or defective condition would not have been apparent upon reasonable inspection at or prior to the time when the container was filled, packed or stowed.
(b) The provisions of sub-clause (i) of this Clause also apply with respect to trailers, transportable tanks, flats and pallets which have not been filled, packed or stowed by the Carrier.
(c) The Carrier does not accept liability for damage due to the unsuitability or defective condition of reefer equipment or trailers supplied by the Merchant.

**18. Return of Containers.**
(a) Containers, pallets or similar articles of transport supplied by or on behalf of the Carrier shall be returned to the Carrier in the same order and condition as handed over to the Merchant, normal wear and tear excepted, with interiors clean and within the time prescribed in the Carrier's tariff or elsewhere.
(b) The Merchant shall be liable to the Carrier for any loss, damage to, or delay, including demurrage and detention incurred by or sustained to containers, pallets or similar articles of transport during the period between handing over to the Merchant and return to the Carrier.

**ADDITIONAL CLAUSE**
**U.S. Trade. Period of Responsibility.**
(i) In case the Contract evidenced by this Bill of Lading is subject to the Carriage of Goods by Sea Act of the United States of America, 1936 (U.S. COGSA), then the provisions stated in said Act shall govern before loading and after discharge and throughout the entire time the cargo is in the Carrier's custody and in which event freight shall be payable on the cargo coming into the Carrier's custody.
(ii) If the U.S. COGSA applies, and unless the nature and value of the cargo has been declared by the shipper before the cargo has been handed over to the Carrier and inserted in this Bill of Lading, the Carrier shall in no event be or become liable for any loss or damage to the cargo in an amount exceeding USD 500 per package or customary freight unit.

Draft Copy

# BIMCO LINER BOOKING NOTE
## CODE NAME: "CONLINEBOOKING 2000"

| Field | Entry |
|---|---|
| Agents (full style and address) | |
| Place and date | London, 21st October 2005 |
| Vessel | To be nominated |
| Time for shipment (about) | 1/1/2006 to 12/31/2006 |
| Carrier (full style and address) | AMERICAN SEAFOODS COMPANY LLC<br>2025 First Avenue, Suite 900<br>Seattle, WA 98121 |
| Port of loading** | One good and safe port Alaska |
| Port of discharge | |
| Merchant* (full style and address) | |
| Merchant's representatives at loading port (full style and address) | |

| Container No./Seal No./Marks and Numbers (if available) | Number and kind of packages; description of cargo | Gross weight, kg (if available) | Measurement, m³ (if available) |
|---|---|---|---|
| | | | |

Draft Copy

| Field | Entry |
|---|---|
| Freight details and charges | |
| Special terms, if agreed | |
| Freight (state prepayable or payable at destination) | |

It is hereby agreed that this Contract shall be performed subject to the terms contained on Page 1 and 2 hereof which shall prevail over any previous arrangements and which shall in turn be superseded (except as to deadfreight) by the terms of the Bill of Lading.

| Signature (Merchant) | Signature (Carrier) |
|---|---|
| | AMERICAN SEAFOODS COMPANY 2025 FIRST AVE. SUITE 900 SEATTLE, WA 98121<br>AMERICAN SEAFOODS COMPANY LLC |

*As defined hereinafter (Cl. 1)
**(or so near thereunto as the Vessel may safely get and lie always afloat)

Printed and sold by Fr. G. Knudtzons Bogtrykkeri A/S, Vallensbækvej 61, DK-2625 Vallensbaek, Fax: +45 4366 0701 by authority of The Baltic and International Maritime Council (BIMCO), Copenhagen

Copyright, published by The Baltic and International Maritime Council (BIMCO), Copenhagen, 2000

# FULL TERMS OF THE CARRIER'S BILL OF LADING FORM*

**1. Definition.**

"Merchant" includes the shipper, the receiver, the consignor, the consignee, the holder of the Bill of Lading, the owner of the cargo and any person entitled to possession of the cargo.

**2. Notification.**

Any mention in this Bill of Lading of parties to be notified of the arrival of the cargo is solely for the information of the Carrier and failure to give such notification shall not involve the Carrier in any liability nor relieve the Merchant of any obligation hereunder.

**3. Liability for Carriage Between Port of Loading and Port of Discharge.**

(a) The International Convention for the Unification of Certain Rules of Law relating to Bills of Lading signed at Brussels on 25 August 1924 ("the Hague Rules") as amended by the Protocol signed at Brussels on 23 February 1968 ("the Hague-Visby Rules") and as enacted in the country of shipment shall apply to this Contract. When the Hague-Visby Rules are not enacted in the country of shipment, the corresponding legislation of the country of destination shall apply, irrespective of whether such legislation may only regulate outbound shipments.

When there is no enactment of the Hague-Visby Rules in either the country of shipment or in the country of destination, the Hague-Visby Rules shall apply to this Contract save where the Hague Rules as enacted in the country of shipment or, if no such enactment is in place, the Hague Rules as enacted in the country of destination apply compulsorily to this Contract.

The Protocol signed at Brussels on 21 December 1979 ("the SDR Protocol 1979") shall apply where the Hague-Visby Rules apply, whether mandatorily or by this Contract.

The Carrier shall in no case be responsible for loss of or damage to cargo arising prior to loading, after discharging, or with respect to deck cargo and live animals.

(b) If the Carrier is held liable in respect of delay, consequential loss or damage other than loss of or damage to the cargo, the liability of the Carrier shall be limited to the freight for the carriage covered by this Bill of Lading, or to the limitation amount as determined in sub-clause 3(a), whichever is the lesser.

(c) The aggregate liability of the Carrier and/or any of his servants, agents or independent contractors under this Contract shall, in no circumstances, exceed the limits of liability for the total loss of the cargo under sub-clause 3(a) or, if applicable, the Additional Clause.

**4. Law and Jurisdiction.**

Disputes arising out of or in connection with this Bill of Lading shall be exclusively determined by the courts and in accordance with the law of the place where the Carrier has his principal place of business, as stated on Page 1, except as provided elsewhere herein.

**5. The Scope of Carriage.**

The intended carriage shall not be limited to the direct route but shall be deemed to include any proceeding or returning to or stopping or slowing down at or off any ports or places for any reasonable purpose connected with the carriage including bunkering, loading, discharging, or other cargo operations and maintenance of Vessel and crew.

**6. Substitution of Vessel.**

The Carrier shall be at liberty to carry the cargo or part thereof to the Port of discharge by the said or other vessel or vessels either belonging to the Carrier or others, or by other means of transport, proceeding either directly or indirectly to such port.

**7. Transhipment.**

The Carrier shall be at liberty to tranship, lighter, land and store the cargo either on shore or afloat and reship and forward the same to the Port of discharge.

**8. Liability for Pre- and On-Carriage.**

When the Carrier arranges pre-carriage of the cargo from a place other than the Vessel's Port of loading or on-carriage of the cargo to a place other than the Vessel's Port of discharge, the Carrier shall contract as the Merchant's Agent only and the Carrier shall not be liable for any loss or damage arising during any part of the carriage other than between the Port of loading and the Port of discharge even though the freight for the whole carriage has been collected by him.

**9. Loading and Discharging.**

(a) Loading and discharging of the cargo shall be arranged by the Carrier or his Agent.

(b) The Merchant shall, at his risk and expense, handle and/or store the cargo before loading and after discharging.

(c) Loading and discharging may commence without prior notice.

(d) The Merchant or his Agent shall tender the cargo when the Vessel is ready to load and as fast as the Vessel can receive including, if required by the Carrier, outside ordinary working hours notwithstanding any custom of the port. If the Merchant or his Agent fails to tender the cargo when the Vessel is ready to load or fails to load as fast as the Vessel can receive the cargo, the Carrier shall be relieved of any obligation to load such cargo, the Vessel shall be entitled to leave the port without further notice and the Merchant shall be liable to the Carrier for deadfreight and/or any overtime charges, losses, costs and expenses incurred by the Carrier.

(e) The Merchant or his Agent shall take delivery of the cargo as fast as the Vessel can discharge including, if required by the Carrier, outside ordinary working hours notwithstanding any custom of the port. If the Merchant or his Agent fails to take delivery of the cargo the Carrier's discharging of the cargo shall be deemed fulfilment of the contract of carriage. Should the cargo not be applied for within a reasonable time, the Carrier may sell the same privately or by auction. If the Merchant or his Agent fails to take delivery of the cargo as fast as the Vessel can discharge, the Merchant shall be liable to the Carrier for any overtime charges, losses, costs and expenses incurred by the Carrier.

(f) The Merchant shall accept his reasonable proportion of unidentified loose cargo.

**10. Freight, Charges, Costs, Expenses, Duties, Taxes and Fines.**

(a) Freight, whether paid or not, shall be considered as fully earned upon loading and non-returnable in any event. Unless otherwise specified, freight and/or charges under this Contract are payable by the Merchant to the Carrier on demand. Interest at Libor (or its successor) plus 2 per cent. shall run from fourteen days after the date when freight and charges are payable.

(b) The Merchant shall be liable for all costs and expenses of fumigation, gathering and sorting loose cargo and weighing onboard, repairing damage to and replacing packing due to excepted causes, and any extra handling of the cargo for any of the aforementioned reasons.

(c) The Merchant shall be liable for any dues, duties, taxes and charges which under any denomination may be levied, *inter alia*, on the basis of freight, weight of cargo or tonnage of the Vessel.

(d) The Merchant shall be liable for all fines, penalties, costs, expenses and losses which the Carrier, Vessel or cargo may incur through non-observance of Customs House and/or import or export regulations.

(e) The Carrier is entitled in case of incorrect declaration of contents, weights, measurements or value of the cargo to claim double the amount of freight which would have been due if such declaration had been correctly given. For the purpose of ascertaining the actual facts, the Carrier shall have the right to obtain from the Merchant the original invoice and to have the cargo inspected and its contents, weight, measurement or value verified.

**11. Lien.**

The Carrier shall have a lien on all cargo for any amount due under this contract and the costs of recovering the same and shall be entitled to sell the cargo privately or by auction to satisfy any such claims.

**12. General Average and Salvage.**

General Average shall be adjusted, stated and settled in London according to the York-Antwerp Rules 1994, or any modification thereof, in respect of all cargo, whether carried on or under deck. In the event of accident, danger, damage or disaster before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which or for the consequence of which the Carrier is not responsible by statute, contract or otherwise, the Merchant shall contribute with the Carrier in General Average to the payment of any sacrifice, losses or expenses of a General Average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the cargo. If a salving vessel is owned or operated by the Carrier, salvage shall be paid for as fully as if the salving vessel or vessels belonged to strangers.

**13. Both-to-Blame Collision Clause.**

If the Vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, negligence or default of the Master, Mariner, Pilot or the servants of the Carrier in the navigation or in the management of the Vessel, the Merchant will indemnify the Carrier against all loss or liability to the other or non-carrying vessel or her Owner in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the owner of the cargo paid or payable by the other or non-carrying vessel or her Owner to the owner of the cargo and set-off, recouped or recovered by the other or non-carrying vessel or her Owner as part of his claim against the carrying vessel or Carrier. The foregoing provisions shall also apply where the Owner, operator or those in charge of any vessel or vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect of a collision or contact.

**14. Government directions, War, Epidemics, Ice, Strikes, etc.**

(a) The Master and the Carrier shall have liberty to comply with any order or directions or recommendations in connection with the carriage under this Contract given by any Government or Authority, or anybody acting or purporting to act on behalf of such Government or Authority, or having under the terms of the insurance on the Vessel the right to give such orders or directions or recommendations.

(b) Should it appear that the performance of the carriage would expose the Vessel or any cargo onboard to risk of seizure, damage or delay, in consequence of war, warlike operations, blockade, riots, civil commotions or piracy, or any person onboard to risk of loss of life or freedom, or that any such risk has increased, the Master may discharge the cargo at the Port of loading or any other safe and convenient port.

(c) Should it appear that epidemics; quarantine; ice; labour troubles, labour obstructions, strikes, lockouts (whether onboard or on shore); difficulties in loading or discharging would prevent the Vessel from leaving the Port of loading or reaching or entering the Port of discharge or there discharging in the usual manner and departing therefrom, all of which safely and without unreasonable delay, the Master may discharge the cargo at the Port of loading or any other safe and convenient port.

(d) The discharge, under the provisions of this Clause, of any cargo shall be deemed due fulfilment of the contract of carriage.

(e) If in connection with the exercise of any liberty under this Clause any extra expenses are incurred they shall be paid by the Merchant in addition to the freight, together with return freight, if any, and a reasonable compensation for any extra services rendered to the cargo.

**15. Defences and Limits of Liability for the Carrier, Servants and Agents.**

(a) It is hereby expressly agreed that no servant or agent of the Carrier (which for the purpose of this Clause includes every independent contractor from time to time employed by the Carrier) shall in any circumstances whatsoever be under any liability whatsoever to the Merchant under this Contract of carriage for any loss, damage or delay of whatsoever kind arising or resulting directly or indirectly from any act, neglect or default on his part while acting in the course of or in connection with his employment.

(b) Without prejudice to the generality of the foregoing provisions in this Clause, every exemption from liability, limitation, condition and liberty herein contained and every right, defence and immunity of whatsoever nature applicable to the Carrier or to which the Carrier is entitled, shall also be available and shall extend to protect every such servant and agent of the Carrier acting as aforesaid.

(c) The Merchant undertakes that no claim shall be made against any servant or agent of the Carrier and, if any claim should nevertheless be made, to indemnify the Carrier against all consequences thereof.

(d) For the purpose of all the foregoing provisions of this Clause the Carrier is or shall be deemed to be acting as agent or trustee on behalf of and for the benefit of all persons who might be his servants or agents from time to time and all such persons shall to this extent be or be deemed to be parties to this Contract of carriage.

**16. Stowage.**

(a) The Carrier shall have the right to stow cargo by means of containers, trailers, transportable tanks, flats, pallets, or similar articles of transport used to consolidate goods.

(b) The Carrier shall have the right to carry containers, trailers, transportable tanks and covered flats, whether stowed by the Carrier or received by him in a stowed condition from the Merchant, on or under deck without notice to the Merchant.

**17. Shipper-Packed Containers, trailers, transportable tanks, flats and pallets.**

(a) If a container has not been filled, packed or stowed by the Carrier, the Carrier shall not be liable for any loss of or damage to its contents and the Merchant shall cover any loss or expense incurred by the Carrier, if such loss, damage or expense has been caused by:

(i) negligent filling, packing or stowing of the container;

(ii) the contents being unsuitable for carriage in container; or

(iii) the unsuitability or defective condition of the container unless the container has been supplied by the Carrier and the unsuitability or defective condition would not have been apparent upon reasonable inspection at or prior to the time when the container was filled, packed or stowed.

(b) The provisions of sub-clause (i) of this Clause also apply with respect to trailers, transportable tanks, flats and pallets which have not been filled, packed or stowed by the Carrier.

(c) The Carrier does not accept liability for damage due to the unsuitability or defective condition of reefer equipment or trailers supplied by the Merchant.

**18. Return of Containers.**

(a) Containers, pallets or similar articles of transport supplied by or on behalf of the Carrier shall be returned to the Carrier in the same order and condition as handed over to the Merchant, normal wear and tear excepted, with interiors clean and within the time prescribed in the Carrier's tariff or elsewhere.

(b) The Merchant shall be liable to the Carrier for any loss, damage to, or delay, including demurrage and detention incurred by or sustained to containers, pallets or similar articles of transport during the period between handing over to the Merchant and return to the Carrier.

**ADDITIONAL CLAUSE**

**U.S. Trade. Period of Responsibility.**

(i) In case the Contract evidenced by this Bill of Lading is subject to the Carriage of Goods by Sea Act of the United States of America, 1936 (U.S. COGSA), then the provisions stated in said Act shall govern before loading and after discharge and throughout the entire time the cargo is in the Carrier's custody and in which event freight shall be payable on the cargo coming into the Carrier's custody.

(ii) If the U.S. COGSA applies, and unless the nature and value of the cargo has been declared by the shipper before the cargo has been handed over to the Carrier and inserted in this Bill of Lading, the Carrier shall in no event be or become liable for any loss or damage to the cargo in an amount exceeding USD 500 per package or customary freight unit.

*BIMCO LINER BILL OF LADING

Code Name: "Conlinebill 2000"
Amended January 1950; August 1952; January 1973; July 1974; August 1976; January 1978; November 2000