David Karl Gross, ABA #9611065
Birch Horton Bittner & Cherot
510 L Street, Suite 700
Anchorage, Alaska 99501
Telephone: 907.276.1550
dgross@bhb.com

Edward E. McNally, ABA #9203003
Marc E. Kasowitz *(Pro Hac Vice)*
Hector Torres *(Pro Hac Vice)*
David J. Abrams *(Pro Hac Vice)*
Kim Conroy *(Pro Hac Vice)*
David E. Ross *(Pro Hac Vice)*
Kasowitz Benson Torres LLP
1633 Broadway
New York, NY 10019
Telephone: 212.506.1700
emcnally@kasowitz.com
mkasowitz@kasowitz.com
htorres@kasowitz.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| KLOOSTERBOER INTERNATIONAL FORWARDING LLC and ALASKA REEFER MANAGEMENT LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES OF AMERICA, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. CUSTOMS AND BORDER PROTECTION, and TROY A. MILLER, U.S. Customs and Border Protection Acting Commissioner, in his official capacity,<br><br>Defendants. | Case No.: 3:21-cv-00198-SLG |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR RENEWED MOTION FOR
<u>TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>**

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.　　　　　CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' REPLY IN SUPPORT OF RENEWED MOTION　　　　　PAGE 1 OF 20
01131961.DOCX

Case 3:21-cv-00198-SLG   Document 84   Filed 10/08/21   Page 1 of 20

Plaintiffs Kloosterboer International Forwarding LLC ("KIF") and Alaska Reefer Management LLC ("ARM") submit this Reply in Support of their Renewed Motion for Temporary Restraining Order and Preliminary Injunction (the "Renewed Motion") (Dkt. 65), respectfully showing as follows.

## PRELIMINARY STATEMENT

Nothing in the Government's Opposition to Plaintiff's Renewed Motion (the "Opposition") in any way undermines Plaintiffs' overwhelming showing that this Court's urgent intervention is essential to prevent continued irreparable harm to Plaintiffs and destruction of their businesses precipitated by CBP's unprecedented and crippling penalties. As a result of CBP's utter disregard for the rights of Plaintiffs and their partners in this critical supply chain, approximately 26 million pounds of frozen Alaska seafood,[1] which customers are demanding and should have been delivered weeks ago, remain stranded in warehouses in Bayside, Canada because of Plaintiffs' inability to resume operations with the threat of enormous additional penalties hanging over their heads. CBP's egregious conduct here—remaining silent and allowing the product to enter the United States for over four years while fully aware of the use of the BCR Route that was fully consistent with more than twenty years of CBP ruling letters, before imposing and threatening grossly disproportionate penalties, coupled with insisting that

---

[1] In addition to the twenty-six million pounds of product stranded in New Brunswick, Canada, an additional eleven million pounds of seafood products have been immobilized at Dutch Harbor, Alaska due to Plaintiffs' inability to transport the additional products without fear of incurring additional penalties. (Declaration of Mikel Durham dated October 8, 2021 ("Durham Dec.") ¶ 5).

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.     CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' REPLY IN SUPPORT OF RENEWED MOTION     PAGE 2 OF 20
01131961.DOCX

Case 3:21-cv-00198-SLG    Document 84    Filed 10/08/21    Page 2 of 20

the NBSR Railroad be used, which remains unavailable, make no sense, serve no interest and harm the public interest.  CBP's conduct seems designed to destroy the businesses of Plaintiffs and their partners in the supply chain who use the BCR Route, destroying in the process hundreds of American jobs and raising prices to American consumers.  Only this Court's urgent intervention can forestall such irresponsible and fundamentally unfair agency overreach.

It is particularly imperative that Plaintiffs be allowed to transport into the United States the 26 million pounds of seafood currently stranded at the Bayside Port without the risk of any additional penalties, much less the additional $41 million being threatened by CBP.  Plaintiffs' clients' desperately need this product to be immediately transported to attempt to meet the remaining just-in-time requirements and demands of their end-customers.  Now that the rate tariff for the BCR Route has been filed and this Court has suggested that the BCR Route is "substantially identical" to the NBSR Route that was approved by CBP, the CBP has presented no legitimate basis for its continued refusal to allow the shipment of this product into the United States.  Because of the logistics required to arrange for more than 600 truckloads to deliver this product to customers, it is urgent that Plaintiffs be allowed to proceed immediately.

As previously demonstrated, and contrary to anything in the Opposition, Plaintiffs KIF and ARM indisputably have been irreparably harmed by the CBP-induced paralysis of the frozen seafood supply chain.  Separate and apart from the excessive $25 million in penalties assessed on KIF, which will crush and imminently lead to the destruction of KIF's business (Dkt. 8 ¶ 26), and the potential third-party liability that will result in the

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.　　　　　　　　　CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' REPLY IN SUPPORT OF RENEWED MOTION　　　　　　　　　　　　PAGE 3 OF 20
01131961.DOCX

Case 3:21-cv-00198-SLG　　Document 84　　Filed 10/08/21　　Page 3 of 20

demise of ARM's business (Dkt. 7 ¶ 36), KIF and ARM already have lost substantial business and are continuing to lose business, and they continue to incur substantial fixed overhead and supply costs and have been deprived of operating revenues. In sum, KIF and ARM's reputations have been seriously damaged. (Dkt. 8 ¶ 33; Dkt. 7 ¶ 42).

Plaintiffs' business partners, customers and the U.S. based end-customers also have suffered and are continuing to suffer severe harm because of the paralysis of the supply chain, including that:

- The crippling penalties have harmed all of KIF's business partners, many of whom are Alaskan family-owned businesses. (Dkt. 8 ¶¶ 17-24, 29-30; Dkt. 11; Dkt. 12).

- The threat of additional penalties has paralyzed KIF's ability to provide its customers' seafood products to the Eastern U.S., resulting in shortages and increased consumer costs. (*See, e.g.*, Dkt. 8 ¶¶ 24, 27; Dkt. 9 ¶ 28; Dkt. 11).

- Plaintiffs' end-customers to whom KIF transports its clients' seafood products risk being irreparably harmed—likely to result in the loss of American jobs and likely closure of American facilities. (Dkt. 8 ¶ 25; Dkt. 9 ¶ 31; Dkt. 14).

- And as discussed above, twenty-six million pounds of seafood slated for American businesses which need the product to process their own products, many of which is processed in advance of the Christian Lent season, is stranded at Bayside Port (Dkt. 8 ¶ 27; Durham Dec. ¶ 5).

Accordingly, Plaintiffs respectfully request that the Court grant the desperately needed injunctive relief which would harm no legitimate interest of anyone, including CBP, and would save an important food supply industry while this litigation proceeds.

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.  CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' REPLY IN SUPPORT OF RENEWED MOTION  PAGE 4 OF 20
01131961.DOCX

Case 3:21-cv-00198-SLG   Document 84   Filed 10/08/21   Page 4 of 20

# ARGUMENT

## I. Plaintiffs Seek Preliminary, Not Permanent Injunctive Relief at this Stage.

Defendants argue that Plaintiffs' renewed Motion should be denied because Plaintiffs seek permanent rather than preliminary injunctive relief. (Dkt. 77 at 3-6). Defendants are wrong, and they mischaracterize the relief Plaintiffs seek. Plaintiffs are not seeking a permanent injunction at this point barring CBP from ever issuing penalties going forward should CBP ultimately prevail in this case, however unlikely that may be. Instead, Plaintiffs seek an order precluding CBP's issuance of additional fines on Plaintiffs, and companies in their supply chain, beyond those enormous fines already issued, while the parties litigate the validity or not of the existing fines and litigate Plaintiffs' compliance with the Third Proviso. The preliminary relief Plaintiffs seek is the minimum relief that Plaintiffs urgently need to get the supply chain moving again without a sword of Damocles over their heads and those of Plaintiffs' truckers, shippers and others who rightly fear that CBP will drop that sword on them while this case is ongoing if they participate in any shipments as part of the Bayside Program. It is that threat that has paralyzed the supply chain.

Here, Plaintiffs cannot continue to operate, and will remain shut down as long as CBP is threatening to impose fines that would effectively bankrupt the members of the supply chain, even before the claims here can be litigated to conclusion. While the relief Plaintiffs seek has one aspect of permanence—that fines cannot be imposed covering the period *pendent lite*, should CBP prevail it can of course impose penalties for any future violations.

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.  CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' REPLY IN SUPPORT OF RENEWED MOTION  PAGE 5 OF 20
01131961.DOCX

Case 3:21-cv-00198-SLG   Document 84   Filed 10/08/21   Page 5 of 20

In addition to the Defendants' mischaracterization of the relief Plaintiffs seek, Defendants also rely on extreme and plainly distinguishable case law. Defendants cite to a sexual predator case, and two environmental cases, where courts declined to grant permanent injunctive relief on preliminary injunction applications by the alleged predator and by alleged polluters who wanted to continue their claimed wrongdoing free of any penalty.[2] (Dkt. 77 at 4-6). This case is plainly distinguishable, as here, there is no question that the shipment of Alaskan Pollock into the United States while this case is litigated is indisputably good for society and presents no harm to anyone. Furthermore, for the reasons set forth above, Plaintiffs do not seek permanent relief on this Motion.

Accordingly, the Government's challenge to the Motion on this basis is flat wrong and should be rejected.

## II. Plaintiffs Are Entitled to Preliminary Injunctive Relief.

Contrary to CBP's argument (Dkt. 77 at 6-7), there is no ambiguity in terms of the urgent injunctive relief that Plaintiffs are seeking from the Court. To be clear, given the

---

[2] For example, the Government cites to *Nichiro Gyogyo Kaisha, Ltd. v. Baldrige*, 594 F. Supp. 80 (D.D.C. 1984), which is completely distinguishable from the present case. First, penalties assessed in *Nichiro* are dwarfed by the penalties at issue here. *Compare id.* at 82 (thirteen penalties of $25,000 to each vessel involved, totaling $325,000) *with* Dkt. 5 at 10 (CBP has assessed 175 Penalty Notices totaling more than $350 million). These penalties are "so heavy as to erect an unfair barrier against the endeavor of an honest litigant to obtain the judgment of the Court." *Id.* at 83 n.4 (D.D.C. 1984) (*quoting Life & Cas. Ins. Co. of Tenn. v. McCray*, 291 U.S. 566, 575 (1934)). Second, the Government in *Nichiro* did not present that plaintiff with the Hobson's choice Plaintiffs are facing here. To the contrary, the Government avoided the court's invocation of constitutional tolling because, in part, the Government represented to the court at oral argument that "no additional fines will be assessed against plaintiffs pending resolution of the present dispute." *Nichiro*, 594 F. Supp. at 82 (emphasis added).

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.　　　　　CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' REPLY IN SUPPORT OF RENEWED MOTION　　　　　PAGE 6 OF 20
01131961.DOCX

Case 3:21-cv-00198-SLG   Document 84   Filed 10/08/21   Page 6 of 20

extraordinary facts and "necessities" (*see* Dkt. 64 at 7) here, Plaintiffs respectfully submit that, under the Court's inherent power to fashion equitable relief, they are entitled to an injunction prohibiting CBP from ever issuing any penalties in addition to the more than $350 million that already have been issued and that CBP seeks to enforce, for any shipments until the final adjudication of this action—irrespective of the outcome on the merits. No other relief would preserve the status quo and avoid the wanton destruction of Plaintiffs' businesses.[3]

This relief is particularly appropriate because the only objections CBP has ever raised to the use of the BCR Route are not only wrong or fully resolved but are purely technical—that the route is not "substantially identical" to the NBSR Route and a tariff had not been filed with the STB specifically identifying the BCR rail line. As to the first objection, as Plaintiffs have shown and as this Court has indicated,[4] the BCR Route—which was disclosed to CBP nearly ten years ago, which CBP itself admits it has known about for at least four years, and which accomplishes the same "trip to nowhere" in Canada more quickly and efficiently than the CBP-approved NBSR Route—is substantially identical to the NBSR Route. And CBP's second purported objection has

---

[3] Plaintiffs also respectfully submit that the relief they request and desperately need is also fully and independently justified under the constitutional tolling doctrine—there could be no more appropriate facts for its application—as well as under the Court's inherent authority. (*See* Dkt. 5 at 17-21; Dkt. 47 at 8-13).

[4] "[T]he BCR Route includes, in part, the use of a rail in Canada. At least in terms of functionality, the BCR rail line would appear to be substantially identical to other Canadian rail lines on which merchandise is carried solely to comply with the Third Proviso." (*See* Dkt. 64 at 20).

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.　　　　　　　　　　CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' REPLY IN SUPPORT OF RENEWED MOTION　　　　　　　　　　　　　　　　PAGE 7 OF 20
01131961.DOCX

Case 3:21-cv-00198-SLG　　Document 84　　Filed 10/08/21　　Page 7 of 20

been fully resolved by the filing of the KIF rate tariff (which includes the BCR) with the STB on September 30, 2021. (*See* Dkt. 65 at 3; Dkt. 66-1).

The need and justification for the injunctive relief requested are only further confirmed by the disproportionate penalties CBP has already issued, for, at most, technical violations CBP has long been fully aware of. Those penalties amount in total to more than thirty-five times the largest penalty ever issued and collected by the CBP since the enactment of the Jones Act more than a century ago, and the $25 million penalty against KIF alone amounts to nearly fifteen times its annual net income.

CBP's purported offer to allow the movement of the 26 million pounds of seafood stranded at the Bayside Port—allowing *only* the trucking companies who transport that product into the United States to be free of any risk of penalties—is entirely illusory and actually places Plaintiffs in a worse position than absent any such offer. When that product was initially transported, Plaintiffs were operating with the understanding that they were in full compliance with the Jones Act and the Third Proviso, and with CBP's repeated ruling letters for more than 20 years. Now, CBP is seeking to place Plaintiffs in the untenable position of facing additional penalties of approximately $41 million by allowing the transport of that product, even though they now understand that CBP claims that any such shipment violates the Jones Act because the BCR is supposedly unlawful and for some other unspecified reasons that they, to this date, have refused to disclose to Plaintiffs. If CBP actually had any interest in addressing the 26 million pounds of stranded Bayside cargo, they would not be making what they clearly know are

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.　　　　　　　　　　　CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' REPLY IN SUPPORT OF RENEWED MOTION　　　　　　　　　　　　　　　　　PAGE 8 OF 20
01131961.DOCX

Case 3:21-cv-00198-SLG　　Document 84　　Filed 10/08/21　　Page 8 of 20

unworkable proposals seven weeks after the Bayside program was shut down by CBP's actions.

Moreover, CBP's insistence on continuing to expose Plaintiffs and other supply chain partners with penalty exposure for the shipment of those 26 million pounds is particularly unsupportable and reprehensible now that the rate tariff for the BCR Route has been filed, a point not even addressed in the Opposition,[5] and since this Court has indicated that the BCR Route is "substantially identical" to the NBSR Route that was approved by CBP. (*See* Dkt. 64 at 19-20). Indeed, even during the most recent discussions, CBP simply refuses to provide any explanation as to the reason that, particularly in light of these developments, CBP continues to insist that Plaintiffs and others conduct business under the threat of additional crippling penalties.

Underscoring the illusory and disingenuous nature of that offer is CBP's continued refusal—for well more than one month—even to meet with Plaintiffs' principal to discuss potential solutions to the problem of shipping those 26 million pounds. CBP continues to insist, for some unknown reason that they still have refused to identify, that all the product must be moved within an 8-week time frame. Apart from refusing to identify the reasons for this arbitrary requirement, it logistically would be impossible to move all that product—which will require arranging for more than 600 truckloads to travel to distant points in the Eastern U.S., in the midst of the COVID-19 pandemic, within an 8-week period. And as a result of CBP's conduct, there currently is a severe shortage of available

---

[5] In fact, the word "tariff" does not even appear in the Opposition. (*See* Dkt. 77).

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.  CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' REPLY IN SUPPORT OF RENEWED MOTION  PAGE 9 OF 20
01131961.DOCX

Case 3:21-cv-00198-SLG   Document 84   Filed 10/08/21   Page 9 of 20

trucking companies. But despite repeated requests by Plaintiffs, CBP simply refuses requests for a meeting of the principals to seek a workable resolution. An injunction from this Court is Plaintiffs' last and only resort.

**III. An Injunction is Necessary to Avoid Irreparable Harm to Plaintiffs and Third Parties.**

Contrary to CBP's baseless assertions otherwise, KIF and ARM have clearly demonstrated that both companies face imminent harm due to the destruction of both enterprises in the face of the Government's crippling penalties. *See* Dkt. 7 at 36; Dkt. 8 at 26. And Plaintiffs' reputation in the industry has been irreparably harmed to the extent that it has been accused of violating the law and has been unable to supply much needed seafood products for weeks.[6] (Dkt. 8 ¶ 33; Dkt. 7 ¶ 42). To suggest that Plaintiffs have not suffered irreparable harm ignores the realities of the situation and is belied by the various declarations submitted by Plaintiffs.

The declarations and reply declarations submitted by Plaintiffs make clear that KIF and ARM cannot resume their shipments of frozen Alaska seafood to the Eastern United States without third-parties willing to provide shipping, trucking, importing and cold storage services, which cannot be accomplished under the threat of additional devastating penalties being assessed. (*See generally* Dkt. 5 at 19-24). Plaintiffs' business partners, customers and the U.S. based end-customers also have suffered and are

---

[6] That Plaintiffs will struggle to attract future customers can also not be denied. Plaintiffs have also had to pay supply and transportation costs with no compensation and spend an enormous amount on attorney's fees fighting the unprecedented fines.

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.     CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' REPLY IN SUPPORT OF RENEWED MOTION     PAGE 10 OF 20
01131961.DOCX

Case 3:21-cv-00198-SLG    Document 84    Filed 10/08/21    Page 10 of 20

continuing to suffer severe harm because of the paralysis of the supply chain, including that:

- The crippling penalties have harmed all of KIF's business partners, many of whom are Alaskan family-owned businesses (Dkt. 7 ¶¶ 4, 39–40; Dkt. 8 ¶¶ 17-24, 27, 29-30; Dkt. 51 ¶ 4);

- The threat of additional penalties has paralyzed KIF's ability to provide its customers' seafood products to the Eastern U.S., resulting in shortages and increased consumer costs (Dkt. 7 ¶¶ 35, 44; Dkt. 8 ¶¶ 25, 27; Dkt. 9 ¶¶ 28, 34; Dkt. 10 ¶ 12; Dkt. 11 ¶ 9; Dkt. 50 ¶¶ 4, 7–9; *see also* Alexander Dec. (Oct. 8, 2021) ¶¶ 7-9, 11; Zaffiro Dec. (Oct. 8, 2021) ¶¶ 3-5, 7; Connelly Dec. (Oct. 8, 2021) ¶ 12); Johnson Dec. (Oct. 8, 2021) ¶ 3);

- Plaintiffs'' end-customers to whom KIF transports its clients' seafood products risk being irreparably harmed – likely to result in the loss of American jobs and likely closure of American facilities (Dkt. 7 ¶ 4–5, 40, 43–44; Dkt. 8 ¶ 25; Dkt. 9 ¶¶ 31, 36; Dkt. 11 ¶¶ 8–9; Dkt. 14 ¶¶ 6–7; *see also* Alexander Dec. (Oct. 8, 2021) ¶ 8; Zaffiro Dec. (Oct. 8, 2021) ¶ 9; Connelly Dec. (Oct. 8, 2021) ¶ 7); and

- And as discussed above, twenty-six million pounds of seafood[7] slated for American businesses which need the product to process their own products, many of which is processed in advance of the Christian Lent season, is stranded at Bayside Port. (Dkt. 7 ¶ 41; Dkt. 8 ¶ 27; Dkt. 9 ¶ 29; Dkt. 51 ¶ 6, 11; Johnson Dec. (Oct. 8, 2021) ¶ 3.).[8]

---

[7] In addition to the twenty-six million pounds of product stranded in Bayside, New Brunswick, Canada, an additional eleven million pounds of seafood products have been immobilized in Dutch Harbor, Alaska due to Plaintiffs' inability to transport the additional products without fear of incurring additional penalties. (Durham Dec. (Oct. 8, 2021) ¶ 5.)

[8] Processing factories, like the factory recently built by Eastern Fisheries, will have to close their doors and likely lay off their employees if shipments using the Bayside Program do not continue. (Dkt. 11 at 3). John Connelly, President of the National Fisheries Institute, reports that these layoffs and shut-downs are happening. To make this point, he stated: "No raw material means no processing. No processing means no work hours. No work hours means no paychecks for American Workers." *See* Declaration of John Connelly. Further, if the end-users do not receive their product soon, they will run out of inventory and if they have nothing to sell, they will have to close down and lay off their employees. (Dkt. 10 at 5). For example, one end-customer has indicated that if it

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.    CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' REPLY IN SUPPORT OF RENEWED MOTION    PAGE 11 OF 20
01131961.DOCX

Case 3:21-cv-00198-SLG   Document 84   Filed 10/08/21   Page 11 of 20

The Government argues that Plaintiffs have failed to establish irreparable harm because CBP has "offered Plaintiffs a way to transport" the twenty six million pounds[9] of seafood unable to enter the U.S. *See* Dkt. 77 at 14. As noted above and as explained in various declarations submitted by Plaintiffs, the Government's purported offer does not provide Plaintiffs with an adequate alternative means of transporting their customers' product. The Government next appears to argue that Plaintiffs' request should also be denied because Plaintiffs have failed to demonstrate why the NBSR is not a viable alternative that can currently be used in the interim to transport seafood products. *See* Dkt. 77 at 14. Again, as noted above and in the declarations filed in support of Plaintiffs' request, the NBSR is not an option available.

Also without any merit is CBP's contention that Plaintiffs have failed to demonstrate irreparable harm because they have not shown why, after seven weeks have elapsed since the first penalty notices were issued, they are unable to resume using the NBSR or another route to transport the product. (Dkt. 77 at 14). The Government further claims that just because an alternative route is not "easy" or "swift" does not show irreparable harm. (*Id.*). This argument is flatly contradicted by facts in the record and in

---

does not receive the seafood products that was to be delivered using the Bayside Program, it will run out of inventory, jeopardizing over 200 jobs. (Dkt. 9 at 13). And a KIF customer, Channel Fish Processing, has reported that without full receipt of the seafood products expected, it will likely need to lay off 50 percent or more of its more than 140 employees. (Dkt. 9 at 14; Dkt. 14 at 3).

[9]   Although the Government refers to "twenty five million pounds", Plaintiffs submissions make clear there was twenty six million at issue at Bayside, notwithstanding additional product stored at Dutch Harbor.

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.　　　　　　　CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' REPLY IN SUPPORT OF RENEWED MOTION　　　　　　　　PAGE 12 OF 20
01131961.DOCX

Case 3:21-cv-00198-SLG   Document 84   Filed 10/08/21   Page 12 of 20

the accompanying Declaration of Mikel Durham dated October 8, 2021, and demonstrates CBP's lack of understanding of the intricacies of Plaintiffs' business or the business of others in Plaintiffs' supply chain and what is or is not possible as an alternative.

The President of ARM, Per K. Brautaset, has stated in his Reply Declaration that a return to the CBP-approved NBSR is simply not a feasible nor viable railway option as an alternative to the BCR for various reasons. (Dkt. 49 ¶ 19). Plaintiffs' representatives reached out to the NBSR right after CBP began issuing penalty notices to determine if the previous relationship could be renewed. (*Id.*). The NBSR reported to Plaintiffs that this was not possible for several reasons, including: (i) the section of the NBSR previously utilized is no longer active, (ii) the infrastructure and equipment necessary to load, unload and transport trucks and their cargo are not readily available, and (iii) recreating the previous railway, even assuming the necessary approvals could be obtained, could require the creation of a rail bridge. (*Id.*; Durham Dec. ¶ 6).[10]

---

[10] Ms. Durham, the CEO of the parent company of ARM, investigated further and confirmed through communications with a senior executive at the owner of the NBSR that they were unable to assist, because the "NBSR was pursuing other strategies and did not have a "set-up, ramp or capacity to handle this and are entirely focused on other activity." (Durham Dec. ¶ 7). Plaintiffs have since learned that CBP has selected NBSR to become a partner in CBP's Reimbursable Services Program, which enables it to be reimbursed by CBP for expanded services involving commercial and cargo traffic. (Durham Dec. ¶ 9). As a result, in addition to logistical barriers, NBSR's curt refusal to work with Plaintiffs may stem from its desire not to adversely impact its partnership with CBP. (Durham Dec. ¶ 10). No matter the reason, any suggestion that Plaintiffs can simply revert back to the NBSR route is simply wrong.

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.  CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' REPLY IN SUPPORT OF RENEWED MOTION  PAGE 13 OF 20
01131961.DOCX

Case 3:21-cv-00198-SLG   Document 84   Filed 10/08/21   Page 13 of 20

Moreover, in addition to the lack of viability of the NBSR, Plaintiffs have amply demonstrated the lack of other viable route options to deliver seafood to the eastern United States without using the Bayside Program. In addition, there are no viable options for using U.S.-flagged vessels, because of the limited availability of appropriate refrigerated vessels that can sufficiently handle the volume of product involved. (*See* Dkt. 7 ¶¶19-29; Dkt. 8 ¶ 28; Dkt. 49 ¶¶ 4-18).

Finally, the Government claims that Plaintiffs are not harmed because they are now transporting Russian pollock. (Dkt. 77 at 17-18). This is a prime example of the Government not only failing to understand Plaintiffs' businesses, but highlights their lack of interest as well. Historically, Russian Pollock cargos moved from the fishing grounds via refrigerated vessels ("trampers") into China; Busan, Korea; and other Asian destinations, where it was stored pending later shipment via container to east coast ports in the United States, such as Boston. That changed as a result of the COVID-19 pandemic and resulting global supply chain catastrophe.

In December of 2020, the Chinese authorities halted all inbound shipments of frozen seafood (U.S. and Russian). After the 2021 Lunar Holiday, they resumed accepting inbound deliveries of frozen seafood by container, but not from trampers. As a result, in March of 2021, KIF was contacted by a Russian fishing representative to discuss their logistics challenges. Once an agreement was reached, the first of three trampers were loaded at the end of June and arrived in Bayside on August 13, 2021, just days before the first Notices of Penalties were received. Thus the penalties had nothing to do with the shipment of this product—rather, that was a result of the global pandemic.

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.  CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' REPLY IN SUPPORT OF RENEWED MOTION  PAGE 14 OF 20
01131961.DOCX

Case 3:21-cv-00198-SLG   Document 84   Filed 10/08/21   Page 14 of 20

Further, the availability of Russian or Chinese Pollack does not satisfy the needs of KIF's customers or its end-customers—as it is U.S. Pollack that is sought. The Governments insinuation that Plaintiffs are double-dealing is not only wrong, but flatly disingenuous.

IV. **The Public Interest Weighs Heavily in Favor of Renewed Motion.**

In addition to all the reasons why the public interest weighs in favor of the Court granting the Renewed Motion (*see* Dkt. 64 at 24-25), the Government's arguments fail to support a contrary conclusion. The declarations submitted by both KIF and ARM, as well as the various declarations submitted by various customers and end-customers, make clear that equity dictates Plaintiffs be granted their requested relief.

In its Opposition, the Government first argues that Plaintiffs' purported evasion of the Jones Act "has allowed them to gain an unfair competitive advantage in the market place for Pollock," citing to a purported pollock competitor, Peter Pan Seafood Company, LLC. (Dkt. 77 at 16). As an initial matter, and as made clear from Peter Pan's website,[11] Peter Pan is not engaged in the transportation of seafood products, thus there is no "competitive advantage" as between the two entities. Secondly, the declaration offered in support seems to take issue with the fact that there is an exception in the Jones Act that Peter Pan claims drives up their operating costs unfairly. (*See* Dkt. 80 at 5-7). The fairness of the Third Proviso, however, is not at issue here. The issue is whether the Government's excessive and erroneous penalties are causing irreparable harm and the

---

[11] *See* Peter Pan Seafood Co., LLC, https://www.ppsf.com/our-products (last visited Oct. 8, 2021).

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.     CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' REPLY IN SUPPORT OF RENEWED MOTION     PAGE 15 OF 20
01131961.DOCX

Case 3:21-cv-00198-SLG    Document 84    Filed 10/08/21    Page 15 of 20

equities weigh in favor of granting injunctive relief. Nothing in the May Declaration weighs against granting the Renewed Motion.

The Government next appears to argue that Plaintiffs have failed to make a showing that there is inadequate capacity to transport their customers' seafood products because two competitors claim they believe they could service KIF's customers' volume of seafood products. (*See* Dkt. 77 at 16-17). The evidence the Government seems to rely upon, however, is based upon supposition, hearsay and lacks critical information. The Lauer Declaration from the Chief Commercial Officer of Matson simply states, without any citation, that "based upon market intelligence", Matson could accommodate the domestic seafood market. (Dkt. 81 ¶ 14). And the Strong Declaration from the President of Coastal, claims it moved 6,000 tons of product, and thus could move a substantial portion of Plaintiffs' clients' product. (*See* Dkt. 82 at 12). This of course begs the question. If this was all true, why has the product not been moved? The answer is simple. Because it cannot be done reliably and timely.

The Government's claim that Plaintiffs' transportation system "hurts" ship builders in the United States is unfounded. Indeed, the Nelson Declaration relied upon by the Government simply states that Dakota Creek Industries ("DCI") is harmed when "undue exceptions" to the Jones Act are made and that DCI's new endeavor to build a ship to transport Alaskan seafood "cannot move forward" without being undermined. (*See* Dkt. 83 ¶ 5). DCI's issue is not with Plaintiffs—it is with the existence of the Third Proviso generally. That is a policy disagreement that DCI should take up with Congress, and it does not impact the analysis of the public interest in this case. As Plaintiffs have

demonstrated, the Third Proviso is an integral part of the Jones Act and Plaintiffs have shown the reasons that they have been in full compliance with the Jones Act and any claim to the contrary cannot weigh into the analysis concerning the equities.

## V. The Governments' Opposition Does Not Dispute that Plaintiffs Have Satisfied Key *Winter* Factors.

CBP cannot and does not refute the specific evidence and arguments Plaintiffs have presented showing that the four *Winter* factors[12] have been met.[13]

First, the Court's September 28, 2021 Order (the "Order") recognized that Plaintiffs have made a "showing of at least serious questions going to the merits" of their §1625(c)(2) claim, which is Count III of the Complaint.[14] (*See* Dkt. 64 at 20). Plaintiffs

---

[12] Plaintiffs must satisfy four factors to be entitled to preliminary injunctive relief: (1) they are likely to succeed on the merits of at least one of their claims; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) a preliminary injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The last two elements merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

[13] In assessing likelihood of success on the merits, as this Court (*see* Dkt. 64 at 6, 20) and the Ninth Circuit have held, plaintiffs may also obtain injunctive relief if they show "that there are 'serious questions going to the merits'—a lesser showing than likelihood of success—then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiffs' favor.'" *Friends of the Wild Swan v. Weber*, 767 F.3d 417, 936, 942 (9th Cir. 2014) (internal citations omitted). Although all four *Winter* factors must still be satisfied under the "serious questions" approach, plaintiffs "need not promise a certainty of success, nor even present a probability of success, but must [demonstrate] a 'fair chance of success on the merits.'" *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 422 (9th Cir. 1991) (internal citations omitted).

[14] Plaintiffs have presented evidence sufficient to raise serious questions on every element of this claim: (i) there were previous "treatment[s]" by CBP in the form of numerous Ruling Letters regarding the Third Proviso, (ii) the subject entries at issue here are "substantially identical" to the entries analyzed in those Ruling Letters, (iii) CBP's issuance of the Penalty Notices modifies or revokes these Ruling Letters, and (iv)

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.  CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' REPLY IN SUPPORT OF RENEWED MOTION  PAGE 17 OF 20
01131961.DOCX

Case 3:21-cv-00198-SLG   Document 84   Filed 10/08/21   Page 17 of 20

therefore have satisfied the "most important factor" in determining their entitlement to injunctive relief. (*Id.* at 7 (citations omitted)). The Government does not address the Court's finding in its Opposition.

Second, the Government ignores that Plaintiffs have complied with the two other requirements identified by the Court for granting an injunction: the filing of a tariff for the BCR Route with the STB, and the filing with CBP of an administrative petition for remission challenging the penalties imposed.[15] (*See* Dkt. 65 at 25). Plaintiffs also have demonstrated that the public interest and balance of the equities overwhelmingly weigh in Plaintiffs' favor based on: (i) the filing of the tariff and the petition, (ii) the enormous harm inflicted and continuing on a daily basis to be inflicted on all the companies involved in the supply chain, and (iii) the grossly disproportionate penalties that were imposed by the Government suddenly and without any notice. (Dkt 5 at 57 and Dkt. 47 at 38-47).

In sum, Plaintiffs have met every requirement under *Winter* and the Ninth Circuit's "serious questions" approach to be entitled to a preliminary injunction. The

---

procedures governing adequate notice and the opportunity of interested parties to comment were not followed. (*See* Dkt. 5 at 48-50; Dkt. 47 at 35-38; Dkt. 64 at 19-20).

[15] KIF's petition to CBP identifies numerous deficiencies with its Penalty Notices and the Penalty Notices not at issue in this action, including, but not limited to: (i) the lack of material facts on the face of the Penalty Notices required by 19 C.F.R. § 162.31(b); (ii) the fines issued are cumulative and exceed the value of the merchandise in violation of the Jones Act and the Eighth Amendment; (iii) the finality of CBP's admissibility decision in liquidation is binding on the agency under 19 U.S.C. § 1514(a); (iv) the Paperwork Reduction Act (44 U.S.C. § 3512) bars collection of the penalties; and (v) CBP's actual knowledge of the BCR and its contributory error in admitting the merchandise requires complete remission of the penalties. (*See* Dkt. 67-1).

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.	CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' REPLY IN SUPPORT OF RENEWED MOTION	PAGE 18 OF 20
01131961.DOCX

Case 3:21-cv-00198-SLG   Document 84   Filed 10/08/21   Page 18 of 20

Court should issue an order enjoining CBP from seeking to enforce any penalties issued before the commencement of this action, and from ever issuing any Penalty Notices to anyone involved in the Bayside Program, regardless of the outcome of this dispute, for conduct in the period between the issuance of the Court's injunction and the final adjudication of the claims in this action. The necessities of this case cry out for precisely this injunctive relief, which is fully authorized by this Court's equitable power as the Court made clear in the Order. *See United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 175 (9th Cir. 1987 ("The essence of equity jurisdiction is the power of the court to fashion a remedy depending on the necessities of the particular case.").

## CONCLUSION

Based on the foregoing, Plaintiffs' respectfully request that the Court grant their renewed Motion for Temporary Restraining Order and Preliminary Injunction.

DATED this 8th day of October, 2021.

        BIRCH HORTON BITTNER & CHEROT
        Attorneys for Plaintiffs

        By:   /s/ David Karl Gross
               David Karl Gross, ABA #9611065

        KASOWITZ BENSON TORRES LLP
        Edward E. McNally, ABA #9203003
        Marc E. Kasowitz (*Pro Hac Vice*)
        Hector Torres (*Pro Hac Vice*)
        David J. Abrams *(Pro Hac Vice)*
        Kim Conroy *(Pro Hac Vice)*
        David E. Ross *(Pro Hac Vice)*

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.     CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' REPLY IN SUPPORT OF RENEWED MOTION     PAGE 19 OF 20
01131961.DOCX

Case 3:21-cv-00198-SLG   Document 84   Filed 10/08/21   Page 19 of 20

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 8th day of October, 2021, a true and correct copy of the foregoing was served via the Court's CM/ECF electronic filing system, on the following:

Seth M. Beausang, Asst. U.S. Attorney
Christine Dollerhide, Asst. U.S. Attorney
U.S. Attorney's Office
seth.beausang@usdoj.gov
christine.dollerhide@usdoj.gov

BIRCH HORTON BITTNER & CHEROT

By: /s/ David Karl Gross

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.     CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' REPLY IN SUPPORT OF RENEWED MOTION     PAGE 20 OF 20
01131961.DOCX

Case 3:21-cv-00198-SLG    Document 84    Filed 10/08/21    Page 20 of 20