David Karl Gross, ABA #9611065
Birch Horton Bittner & Cherot
510 L Street, Suite 700
Anchorage, Alaska 99501
Telephone: 907.276.1550
dgross@bhb.com

Edward E. McNally, ABA #9203003
Marc E. Kasowitz *(Pro Hac Vice)*
Hector Torres *(Pro Hac Vice)*
David J. Abrams *(Pro Hac Vice)*
Kim Conroy *(Pro Hac Vice)*
David E. Ross *(Pro Hac Vice)*
Kasowitz Benson Torres LLP
1633 Broadway
New York, NY 10019
Telephone: 212.506.1700
emcnally@kasowitz.com
mkasowitz@kasowitz.com
htorres@kasowitz.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| KLOOSTERBOER INTERNATIONAL FORWARDING LLC and ALASKA REEFER MANAGEMENT LLC, <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED STATES OF AMERICA, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. CUSTOMS AND BORDER PROTECTION, and TROY A. MILLER, U.S. Customs and Border Protection Acting Commissioner, in his official capacity, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No.: 3:21-cv-00198-SLG |

## **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                    CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 1 of 83

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ....................................................................................... 8

    A.    The Jones Act, the Third Proviso and CBP ........................................ 8

    B.    Rate Tariff Filing Requirements ................................................. 10

    C.    Plaintiffs' Transportation Business ........................................... 12

    D.    The Bayside Route ...................................................................... 13

    E.    The NBSR Rail Line ................................................................... 15

    F.    CBP Ruling Letters Interpreting the Third Proviso ................... 16

        1.    The Third Proviso Ruling Letters ................................... 17

        2.    The ASC Ruling Letter .................................................. 18

        3.    The Sunmar Ruling Letters ............................................ 19

    G.    *Horizon*, the Court's Remand Decision and its Aftermath ........ 22

    H.    American Seafoods Company and Its Corporate Affiliates Plaintiffs ARM and KIF ........................................................... 23

    I.    The Administrative Record Produced by Defendants ................. 25

ARGUMENT ......................................................................................................... 28

I.    PLAINTIFFS ARE ENTITLED TO A DECLARATORY JUDGMENT THAT TRANSPORTATION OF FROZEN SEAFOOD ON THE BAYSIDE ROUTE COMPLIES WITH THE THIRD PROVISO OF THE JONES ACT ................................................................................. 28

    A.    The Jones Act ............................................................................. 28

    B.    The Bayside Route Constitutes a "Through Route" ................... 29

    C.    The BCR is a "Canadian Rail Line" ........................................... 32

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.    CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT    PAGE i OF viii
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 2 of 83

D.    The Bayside Route Is a Through Route Recognized by the STB and Plaintiffs Are in Compliance with All Rate-Tariff Filing Requirements .................................................................... 35

    1.    The Bayside Route Is a "Recognized" Through Route .................... 35

    2.    Plaintiffs Have Complied with the Rate Tariff Requirement ......... 36

        i.    Plaintiffs Properly Relied on the ASC Rate Tariff Filing For Purposes of Compliance with the Third Proviso .................................................................... 37

        ii.    CBP's Ruling Letters Eliminating the Rate-Tariff Filing Requirement Remains in Effect .................................. 40

        iii.    As "Freight Forwarders," Plaintiffs Are Exempt From Any Tariff Filing Requirement .............................................. 44

        iv.    As Private Carriers, Plaintiffs Are Not Required to File a Tariff .................................................................... 48

II.    PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT THAT CBP VIOLATED 19 U.S.C. §§ 1625(c)(1) AND (c)(2) ...................... 53

    A.    CBP's Statutory Obligation to Provide Public Notice and the Opportunity of Interested Parties to Comment ............................. 53

        1.    CBP's Interpretive Ruling Letters Published for Reliance by the Industry .................................................................... 54

        2.    Plaintiffs Are Entitled to Rely on CBP's "Treatments" of Substantially Identical Transactions" .................................. 55

        3.    CBP's Comment-and-Notice Duty Concerning Modification or Revocation of its Interpretive Rulings and Treatments .............. 56

    B.    CBP Violated 19 U.S.C. § 1625(c)(1) by Modifying or Revoking Interpretive Rulings That Were in Effect Longer Than 60 Days ............... 58

    C.    CBP Violated 19 U.S.C. § 1625(c)(2) by Modifying or Revoking Interpretive Rulings Involving Transactions "Substantially Identical" to Plaintiffs' Bayside Route Transactions .................................... 62

        1.    CPB's Ruling Letters and Decades-Long Treatment Concerning Plaintiffs' Customers' Frozen Seafood ...................... 63

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.    CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT    PAGE ii OF viii
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 3 of 83

2.      Plaintiffs Transactions Are Substantially Identical to Those at Issue in the Ruling Letter and the Entries Subject to CBP's Prior Treatment ................................................................. 66

3.      The Penalty Notices Effectively Modify the Previous Treatment Accorded by CBP to Substantially Identical Transactions ................................................................. 68

4.      CBP Failed to Comply With the Notice and Comment Requirement of § 1625(c) ............................................... 68

D.     The Penalty Notices are Void and Should be Rescinded ........................... 69

III.    THE PENALTY NOTICES VIOLATE KIF'S RIGHTS TO DUE PROCESS UNDER THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION (COUNT IV) ........................................ 70

CONCLUSION ................................................................................. 74

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.      CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT      PAGE iii OF viii
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 4 of 83

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*,
    429 F.3d 1136 (D.C. Cir. 2005) ...................................................................... 43

*Alaska S. S. Co. v. Fed. Mar. Comm'n*,
    399 F.2d 623 (9th Cir. 1968) ........................................................................... 30

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
    988 F.2d 146 (D.C. Cir. 1993) ........................................................................ 43

*Am. Fiber & Finishing, Inc. v. United States*,
    121 F.Supp.3d 1273 (U.S. Ct. Int'l Trade 2015) ..................................... 57, 63

*Am. Mar. Ass'n v. Blumenthal*,
    590 F.2d 1156 (D.C. Cir. 1978) ...................................................... 6, 28, 31, 47

*Am. Orient Exp. Ry. Co., LLC v. Surface Transp. Bd.*,
    484 F.3d 554 (D.C. Cir. 2007) ........................................................................ 51

*California Indus. Prod., Inc. v. United States*,
    436 F.3d 1341 (Fed. Cir. 2006) ................................................................. *passim*

*Cent. Vermont Transp. Co. v. Dunning*,
    71 F.2d 273 (2d Cir. 1934), *aff'd*, 294 U.S. 33 (1935) .............................. 34

*Chen v. Mayflower Transit, Inc.*,
    315 F.Supp.2d 886 (N.D. Ill. 2004) ............................................................. 12

*City of Los Angeles v. Dickson*,
    No. 19-71581, 2021 WL 2850586 (9th Cir. July 8, 2021) .......................... 42

*E.P.A. v. EME Homer City Generation, L.P.*,
    572 U.S. 489 (2014) ........................................................................................ 42

*Env't Integrity Project v. EPA*,
    969 F.3d 529 (5th Cir. 2020) ......................................................................... 33

*Exxon Mobil Corp. v. Mnuchin*,
    430 F.Supp.3d 220 (N.D. Tex. 2019) ......................................................... 72

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.        CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT        PAGE iv OF viii
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 5 of 83

*ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*,
  867 F.3d 564 (5th Cir. 2017) ................................................................ 69, 70

*FCC v. Fox Television Stations, Inc.*,
  567 U.S. 239 (2012) ..................................................................................... 69

*Furie Operating Alaska, LLC v. U.S. Dep't of Homeland Sec.*,
  No. 3:12-CV-00158 JWS, 2015 WL 4076843 (D. Alaska July 6, 2015) ................... 69

*Gen. Elec. Co. v. U.S. E.P.A.*,
  53 F.3d 1324 (D.C. Cir. 1995) .............................................................. 69, 72

*In re Hawaiian & Guamanian Cabotage Antitrust Litig.*,
  754 F.Supp.2d 1239 (W.D. Wash. 2010),
  *aff'd*, 450 F.App'x 685 (9th Cir. 2011) ................................................. 50, 51

*Horizon Lines, LLC. v. United States*,
  414 F.Supp.2d 46 (D.D.C. 2006) ........................................................... *passim*

*Horizon Lines, LLC v. United States*,
  429 F.Supp.2d 92 (D.D.C. 2006) ................................................................. 41

*Horizon Lines, LLC--Petition for Declaratory Ord.*,
  No. FIN 35039, 2007 WL 4429515 (Dec. 18, 2007) .......................................... *passim*

*Howe v. Allied Van Lines, Inc.*,
  622 F.2d 1147, 1152–54 (3rd Cir. 1980) ....................................................... 11

*Int'l Custom Prod., Inc. v. United States*,
  32 C.I.T. 302 (2008) ...................................................................... 57, 59, 68

*Int'l Custom Prod., Inc. v. United States*,
  36 C.I.T. 1482 (2012), *aff'd* 748 F.3d 1182 (Fed. Cir. 2014) ................................ 68

*Int'l Custom Prods., Inc. v. United States*,
  33 C.I.T. 79 (2009) ......................................................................... 62, 64

*Kahrs Int'l, Inc. v. United States*,
  33 C.I.T. 1316 (2009) ....................................................................... 58, 62

*Kent Int'l, Inc. v. United States*,
  17 F.4th 1104 (Fed. Cir. 2021) ................................................................. 64

*Munitions Carriers Conf., Inc. v. United States*,
  147 F.3d 1027 (D.C. Cir. 1998) ................................................................. 11

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.          CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT          PAGE v OF viii
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 6 of 83

*Nat'l Fam. Farm Coal. v. EPA*,
  966 F.3d 893 (9th Cir. 2020) ........................................................................... 42

*Norfolk S. Ry. Co. v. Kirby*,
  543 U.S. 14 (2004) ........................................................................................... 30

*North Carolina v. EPA*,
  550 F.3d 1176 (D.C. Ct. App. 2008) ................................................................ 42

*Peerless Clothing Int'l, Inc. v. United States*,
  33 C.I.T. 24 (2009) ........................................................................................... 66

*Precision Specialty Metals, Inc. v. United States*,
  24 C.I.T. 1016 (2000) ................................................................................. 62, 63

*Precision Specialty Metals, Inc. v. United States*,
  25 C.I.T. 1375, 182 F.Supp.2d 1314 (U.S. Ct. Int'l Trade 2001) ...................... 62

*Revision of Tariff Reguls., All Carriers*,
  1 I.C.C.2d 404 (I.C.C. Sept. 24, 1984) ................................................. 37, 38, 39, 40

*Sea-Land Serv., Inc. v. Fed. Mar. Comm'n*,
  404 F.2d 824 (D.C. Cir. 1968) ............................................................. 30, 43, 44

*Sea-Land Serv., Inc. v. United States*,
  239 F.3d 1366 (Fed. Cir. 2001) ................................................................. 43, 54

*Standard Oil Co. of New York v. United States*,
  179 F. 614 (2d Cir. 1910) ................................................................................. 11

*Tempel Steel Corp. v. Landstar Inway, Inc.*,
  211 F.3d 1029 (7th Cir. 2000) ......................................................................... 12

*Texaco Marine Services, Inc. v. United States*,
  44 F.3d 1539 (Fed. Cir. 1994) ................................................................... 43, 44

*Thompson v. United States*,
  343 U.S. 549 (1952) ................................................................................... 29, 35

*Trailer Marine Transp. Corp. v. Fed. Mar. Comm'n*,
  602 F.2d 379 (D.C. Cir. 1979) ......................................................................... 30

*United States v. Approximately 64,695 Pounds of Shark Fins*,
  520 F.3d 976 (9th Cir. 2008) ........................................................................... 69

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                 CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT                 PAGE vi OF viii
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 7 of 83

*United States v. Atl. Richfield Co.*,
    435 F.Supp. 1009 (D. Alaska 1977) ....................................................... 9

*United States v. Louisiana & P.R. Co.*,
    234 U.S. 1 (1914) ................................................................................... 33

*Williston Basin Interstate Pipeline Co. v. FERC*,
    519 F.3d 497 (D.C. Cir. 2008) ............................................................... 43

**Statutes and Regulations**

19 C.F.R. § 162.31(b) ................................................................................. 72

19 C.F.R. § 177.9(a) ................................................................................... 53

19 C.F.R. § 177.9(c) ................................................................................... 54

19 C.F.R. § 177.12(b) ................................................................................. 43

19 C.F.R. § 177.12(c) ..................................................................... 63, 64, 65

49 C.F.R. § 1312 ................................................................................... 37, 38

49 C.F.R. § 1312.1(a) ................................................................................. 48

49 C.F.R. § 1312.3 ...................................................................................... 38

49 C.F.R. § 1312.14 ............................................................................... 38, 39

49 C.F.R. § 1312.16 ............................................................................... 38, 39

49 C.F.R. § 1319.1 ...................................................................................... 44

46 U.S.C. App. § 883 ............................................................................. 9, 28

5 U.S.C. § 552 ............................................................................................ 55

19 U.S.C. § 1625 .................................................................................. *passim*

19 U.S.C. § 1625(a) ....................................................................... 43, 52, 56

19 U.S.C. § 1625(c) ............................................................................. *passim*

19 U.S.C. § 1625(c)(1) ................................................................... 57, 58, 61

19 U.S.C. § 1625(c)(2) ........................................................................ *passim*

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                    CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT                    PAGE vii OF viii
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 8 of 83

19 U.S.C. § 1625(e) ........................................................................................ 61

46 U.S.C. § 55102(b) ................................................................................. 28, 65

46 U.S.C. § 55102(c) ...................................................................................... 28

46 U.S.C. § 55116 ...................................................................................... *passim*

49 U.S.C. § 13102(3) ...................................................................................... 48

49 U.S.C. § 13702 ...................................................................................... *passim*

49 U.S.C. § 13102(8) ...................................................................................... 44

49 U.S.C. § 13531(a) ...................................................................................... 44

49 U.S.C. § 14101(b)(1) .................................................................................. 48

**Other Authorities**

Arthur Donovan, *Intermodal Transportation In Historical Perspective,*
27 Transp. L. J. 317, 330 (1999) .................................................................. 10

Grassroot Institute of Hawaii, Nov. 17, 2021, *available at*
https://www.grassrootinstitute.org/wp-content/uploads/2021/11/Alaska-
The-Jones-Acts-Original-Victim.pdf ............................................................. 9

Jonathan Helton, *Alaska: The Jones Act's original victim,*
Grassroot Institute of Hawaii, Nov. 17, 2021, *available at*
https://www.grassrootinstitute.org/wp-content/uploads/2021/11/Alaska-
The-Jones-Acts-Original-Victim.pdf. ............................................................ 9

Susan Pace Hamill, *From Special Privilege To General Utility: A*
*Continuation of Willard Hurst's Study of Corporations,* 49 Am. U. L.
Rev. 81, 153-155 (1999) ............................................................................... 11

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.          CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT          PAGE viii OF viii
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 9 of 83

Plaintiffs Kloosterboer International Forwarding LLC ("KIF") and Alaska Reefer Management LLC ("ARM") respectfully submit this Motion for Partial Summary Judgment, pursuant to Federal Rule of Civil Procedure 56, and respectfully show as follows:

## PRELIMINARY STATEMENT[1]

CBP has illegally imposed and may not enforce putative Jones Act penalties, now amounting to over $350 million, on Plaintiffs and other companies involved in a critical seafood supply chain—penalties that are contrary to the Jones Act, contrary to CBP's own long-standing published rulings and regulatory guidance, contrary to binding statutory notice-and-comment requirements, and that violate Plaintiffs' rights under the Due Process Clause of the Fifth Amendment to the United States Constitution. Not only do the CBP penalties lack any statutory or regulatory basis, or, for that matter, any legitimate public policy justification, they threatened to destroy and continued to severely harm—until this Court's emergency intervention—Plaintiffs and the other companies in the supply chain, the supply of frozen seafood to the eastern United States, and hundreds of American jobs. Summary judgment is warranted here.

In 2021, CBP imposed crippling financial penalties of some $25 million, and is threatening to impose further penalties, on Plaintiff KIF, a small freight forwarding company engaged in arranging for the transportation of frozen seafood from Alaska to the east coast of the United States and other locations around the world. Those penalties

---

[1]  All emphasis is added unless otherwise noted.

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.          CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT          PAGE 1 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 10 of 83

were imposed based on what CBP alleges was an over four-year investigation, even though the conduct forming the purported basis for the penalties was at all times conducted openly and with extensive and consistent notice to CBP. Until CBP began assessing penalties, CBP never told KIF—including during its multi-year investigation, which was instigated by a 2017 complaint by a competitor of Plaintiffs—that it had any concerns about KIF's compliance with the Jones Act, and never provided KIF with any notice of its investigation, let alone any opportunity to address CBP's new-found concerns. Instead, after letting the purported violations continue year after year after, in August 2021 CBP suddenly started issuing notices of enormous penalties to KIF and others in the supply chain covering nearly five years worth of voyages. Those notices asserted, without anything close to the required specificity as to the basis for the penalties, that KIF had violated the Jones Act provision prohibiting the use of foreign-flagged vessels for the transportation of merchandise between points in the United States.

The undisputed facts, however, demonstrate that, contrary to CBP's contention, KIF lawfully has been operating pursuant to the Third Proviso of the Jones Act, an explicit exception to the foreign vessel prohibition cited in CBP's notices. Remarkably, CBP's own internal documents reveal that CBP unquestionably knew or should have known from its own investigation that Plaintiffs were in compliance with both the Third Proviso and CBP's applicable regulatory rulings concerning the Third Proviso.

The Third Proviso, which was amended by Congress to facilitate the economic integration of Alaska with the contiguous United States, provides that the general prohibition on the use of foreign-flagged vessels does *not* apply to the use of those

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.        CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT        PAGE 2 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 11 of 83

vessels for the transportation of merchandise between points in the United States over "through routes *in part* over Canadian rail lines" if those routes are "recognized" by the STB and "rate tariffs" for the routes have been filed with the STB.

I.

Here, the facts known and at all times available to CBP—including CBP's own published and publicly-disseminated ruling letters issued over decades—demonstrate beyond any genuine dispute that KIF was in full compliance with the Third Proviso by utilizing a "through route" that included the use of "a Canadian rail line." That through route, known as the Bayside Route, has been recognized by STB since at least as early as 2006, years before its use by Plaintiffs. And CBP knew that a rate tariff had been filed for the Bayside Route through route. Moreover, CBP knew that KIF was under no obligation to file any "rate tariff" based on, among other things, an exemption promulgated by the STB in 1997 and because it was engaged in private carriage and not a common carrier. CBP knew all of these facts when it issued its unlawful penalty notices.

"Through Route"

The Bayside Route qualifies as a through route under the Third Proviso pursuant to CBP's own ruling letters. Defendants contend that KIF nonetheless could not rely on the Third Proviso because the specific Canadian rail line utilized in the transportation arranged by KIF—the BCR rail line—served no commercial purpose, was allegedly a "sham," and was used solely for purposes of complying with the Third Proviso. Those contentions are belied by the undisputed fact that, as CBP itself insists, the same through route qualified under the Third Proviso when a different rail line was used—the NBSR

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                    CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT                              PAGE 3 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 12 of 83

rail line. But the use of the NBSR rail line was functionally identical to the use of the BCR rail line because it also served no commercial purpose and was utilized solely to comply with the Third Proviso—it just did so over a different Canadian rail track located much further from the Bayside Port and in the wrong direction from the United States border.

Rate Tariff

Defendants also argue that the Third Proviso was inapplicable to KIF's transportation services because KIF was supposedly required—but failed—to file a rate tariff for the Bayside Route prior to this litigation. This argument also lacks any merit, for several independent reasons.

First, the undisputed evidence establishes that a rate tariff was filed and accepted by the STB for the Bayside Route in 2006 by American Seafoods Company ("ASC"), and was in effect during the entire period covered by the penalty notices. ASC is a corporate affiliate of KIF, and as the Court has recognized, was KIF's "predecessor" that had been utilizing the Bayside Route for the transportation of frozen seafood. Nothing in the Third Proviso or the CBP regulations requires that, once a rate tariff is filed for a through route, other carriers or companies utilizing that same through route must be identified on the rate tariff or file their own tariff.

Second, and in any event, during the past three decades, CBP has issued repeated ruling letters unambiguously declaring that the filing of a rate tariff is *not* required for compliance with the Third Proviso. Those ruling letters remain in effect today, even after a district court decision (*Horizon*) finding that the rulings were not factually supported,

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                    CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT                     PAGE 4 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG    Document 117    Filed 12/03/21    Page 13 of 83

because the court elected *not* to vacate CBP's rulings but instead remanded the matter to CBP for further development of the factual record. For some reason, however, on remand, CBP never took any further action and never revoked or modified the ruling letters, which are still posted on CROSS, CBP's consistently-updated official database of authoritative public rulings and guidance.

Third, as a freight forwarder, KIF and other similar companies in the frozen seafood supply chain are expressly covered by an STB exemption—in effect for more than two decades—that unequivocally provides that freight forwarders are *not* required to file rate tariffs.

Fourth, KIF is also exempt from any obligation to file a rate tariff because it is a private carrier that provides transportation services for a select number of shippers pursuant to privately-negotiated contracts.

The Court has stated, and CBP will likely argue, that KIF was on notice that CBP intended to abandon ruling letters on its public database declaring that the filing of a rate tariff was not required to comply with the Third Proviso. This purported notice is based solely on a private letter CBP sent, nearly fifteen years ago, to the outside counsel of ASC, in which CBP states it specifically will not "revoke or modify" its prior interpretive rulings, but at the same time it "intends to abide by" the *Horizon* decision. That letter, however, did not explain whether "abiding by" the *Horizon* decision meant that CBP intended to abide by the court's remand instructions by further developing the factual record, or that CBP intended to modify or revoke the no-tariff-required ruling letters that the court did not vacate, or, if it meant the latter, when it would so modify or revoke

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.        CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT        PAGE 5 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 14 of 83

them.  In any event, CBP admits that it *never* further developed the factual record and *never* revoked or modified the ruling letters, instead leaving them undisturbed on its official public database of binding rulings, and *never* published notice of any proposed revocation or amendment in the *Customs Bulletin*, as required by law.

It is difficult to conceive of conduct that more clearly contravenes *American Maritime Assn. v. Blumenthal*, a leading decision in which the court declared that, because of the "horrendous" and "enormous" nature of its penalties, the Jones Act must be "strictly construed" and that "*persons should receive clear and unequivocal warning before facing exposure to [such] harsh penalties.*"  590 F.2d 1156, 1165 (D.C. Cir. 1978).  CBP here provides nothing even remotely close to the required "clear and unequivocal warning" mandated under the law concerning its interpretation and application of the Third Proviso.

Moreover, the nature of the "through route" is not changed merely because of a change in the Canadian rail line utilized to meet the requirements of the Third Proviso.  It is well-established that a "through route" tariff does not need to identify each of the links in the chain of transportation from the origin to the destination point, nor does it need even to identify the Canadian rail carrier used.  Further, there can be no genuine dispute that in terms of functionality, the NBSR and the BCR were substantially identical—*i.e.*, neither use serves any commercial purpose other than to comply with the Third Proviso—except that the BCR rail line is economically and logistically far more efficient.

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.    CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT    PAGE 6 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 15 of 83

Plaintiffs also demonstrate, based on the undisputed facts, that CBP violated 19 U.S.C. § 1625(c) because its issuance of the penalty notices was premised on a revocation and reversal of its ruling letters and treatments that was effected without providing the notice and comment period required under § 1625(c).

In CBP's interpretation of the Third Proviso, as set forth above, it repeatedly, consistently and publicly ruled that the Canadian rail line requirement is satisfied as long as there is "*any* use of a Canadian rail line," and that there is no minimum-length requirement related to the rail line, that there is no commercial-reasonableness requirement, and that the use of the Canadian rail line could be exclusively for purposes of complying with the Third Proviso. And CBP's published ruling letters repeatedly state that no tariff needed to be filed to comply with the Third Proviso. CBP's penalty notices, as confirmed by the administrative record and CBP's arguments opposing injunctive relief, are premised on a complete reversal of each of the principles set forth in its long-established rulings.

Those ruling letters were issued to ASC and Sunmar in connection with CBP's examination of the same "through route" at issue here—the Bayside Route. That "through route," as set forth above and explained below, was not changed merely because the BCR rather than the NBSR was used by Plaintiffs.

Further, it is undisputed that CBP has not published any rulings or guidance in its *Customs Bulletin* revoking or modifying any of its ruling letters, and that CBP did not provide the required notice and comment period with respect to any revocations or

modifications.  The appropriate remedy for the issuance of penalties in violation of § 1625(c) is an order declaring that all of the penalty notices are null and void.

## III.

CBP's undisclosed reversal of its long-standing ruling letters and positions—coupled with its imposition of enormous penalties on KIF—also violated KIF's rights under the Due Process Clause of the Fifth Amendment.  The centerpiece of that right is fair notice of the law before the deprivation of one's liberty and property.  CBP's secretive revocation and modification of its published positions on what constitutes a through route, transportation, a Canadian Rail, recognition by the STB and the need or not to file a tariff, are paradigmatic violations of KIF's due process rights, which also require the voiding of the penalty notices.

## STATEMENT OF FACTS

### A.    The Jones Act, the Third Proviso and CBP

Under the Jones Act, 46 U.S.C. § 55101 *et seq.*, vessels built in the United States, and owned and registered by American citizens, are granted the exclusive right, with certain exceptions, to transport cargo between points within the United States.  One long-established exception, referred to as the "Third Proviso," relates to the use of Canadian rail lines.  The Third Proviso provides that the prohibition on the use of non-coastwise qualified vessels ("foreign-flagged vessels"):

> does not apply to the transportation of merchandise between
> points in the continental United States, including Alaska, over
> *through routes in part over Canadian rail lines* and
> connecting water facilities if the routes are *recognized* by the

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                    CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT                          PAGE 8 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 17 of 83

> Surface Transportation Board and *rate tariffs* for the routes
> have been *filed with the Board*.

46 U.S.C. § 55116.

Congress amended the Third Proviso to ensure the economic integration of Alaska in the economy of the United States. When Alaska was granted statehood, Congress recognized the need to make special accommodations so that the non-contiguous state would be on an equal footing with other states notwithstanding its geographical location. In the Alaska Statehood Act passed in 1958, Congress revised multiple statutes to assure that the new state would be economically viable. *See* Alaska Statehood Act, § 1, *et seq.*, 48 U.S.C. preceding section 21; *see also United States v. Atl. Richfield Co.*, 435 F.Supp. 1009, 1021 n.47 (D. Alaska 1977), *aff'd*, 612 F.2d 1132 (9th Cir. 1980) (discussing the economic purpose of the Alaskan Statehood Act).

In section 27 of the Alaska Statehood Act, Congress amended the Third Proviso to the Jones Act, then codified at 46 U.S.C. App. § 883, to include transportation to and from Alaska. Laws concerning the use of foreign-flagged vessels were particularly important because virtually all goods had to be moved to and from Alaska by ship and the availability of coastwise vessels (*i.e.*, domestic-flagged vessels) and their cost would impose a serious economic disadvantage on the state.[2] Thus, the Third Proviso was a grant of trade to foreign-flagged vessels limited only by the requirement that their voyages would terminate in Canada for connection to Canadian rail lines. Significantly,

---

[2] *See generally* Jonathan Helton, *Alaska: The Jones Act's original victim*, Grassroot Institute of Hawaii, Nov. 17, 2021, *available at* https://www.grassrootinstitute.org/wp-content/uploads/2021/11/Alaska-The-Jones-Acts-Original-Victim.pdf.

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                    CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT                              PAGE 9 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 18 of 83

Congress, the Federal Maritime Commission, and later the Interstate Commerce Commission ("ICC"), did not limit the "Canadian rail lines" referenced in the Third Proviso to rail lines in existence in 1958. The purpose of the Third Proviso is thus clear from its terms—Congress was ensuring that transportation using Canadian rail lines would be broadly allowed.

Defendant United States Customs and Border Protection ("CBP") is responsible for interpreting and enforcing the Jones Act. (*See* Dkt. 106-5). Pursuant to that responsibility, CBP issues and publishes formal "ruling letters" concerning the interpretation of the Jones Act and the Third Proviso on the Customs Rulings Online Search System ("CROSS"), the regularly-updated repository for CBP's active, binding rulings which are intended to provide fair notice to the public and the regulatory community. *See* CROSS, *available at* https://rulings.cbp.gov/home (last accessed December 3, 2021); *see also* 19 U.S.C. § 1625.

### B. Rate Tariff Filing Requirements

To understand the rate-tariff issue under the Third Proviso, it is important to comprehend the historical rationale for tariff filings and the changing structural regulatory landscape regarding those agencies responsible for regulating rate tariffs. In the late 19th century, in an effort to combat unfair railroad freight rates, the United States Congress established the ICC, pursuant to the Interstate Commerce Act of 1887 (the "ICA"). The ICA initially granted the ICC very restricted powers, but "as shipper complaints increased . . . Congress strengthened the ICC's hand." Arthur Donovan, *Intermodal Transportation In Historical Perspective,* 27 Transp. L. J. 317, 330 (1999).

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.          CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT          PAGE 10 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 19 of 83

In 1920, Congress passed both the Merchant Marine Act, also known as the Jones Act, and the Transportation Act, also known as the Esch-Cummins Act. The Esch-Cummins Act "provided for the return of the railroads to private operation, but it also greatly strengthen[ed] the powers of the ICC[,]" such that it could "set minimum as well as maximum rates and [ensure] that railroads obtained a fair rate of return." *Id.* at 334. Twenty years later, the Transportation Act of 1940, "gave the ICC jurisdiction over coastwise, intercostal, inland and Great Lakes common and contract water-carriers engaged in interstate and foreign commerce." *Id.* at 337.

While the ICC's reach was expanding to cover virtually all modes of transportation during the early decades of the twentieth century, Congress enacted other legislation introducing rate filing requirements. *See* Susan Pace Hamill, *From Special Privilege To General Utility: A Continuation of Willard Hurst's Study of Corporations,* 49 Am. U. L. Rev. 81, 153-155 (1999). The primary purpose of requiring rates to be filed was to "fairly apprise shippers of the rates to be paid and to secure uniformity in charges." *Standard Oil Co. of New York v. United States*, 179 F. 614, 623 (2d Cir. 1910).

Under this system of rate regulation, price competition was prohibited among railroads and interstate motor carriers of freight. *Munitions Carriers Conf., Inc. v. United States*, 147 F.3d 1027, 1028 (D.C. Cir. 1998) (citing *Howe v. Allied Van Lines, Inc.*, 622 F.2d 1147, 1152–54 (3rd Cir. 1980)). This statutory and regulatory system continued for decades, until Congress found that "competition discipline[d] rates far better than tariff filing and regulatory intervention." *Munitions Carriers*, 147 F.3d at 1029. Thus, in 1995, Congress passed the ICC Termination Act, pursuant to which the ICC was replaced

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.      CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT      PAGE 11 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG    Document 117    Filed 12/03/21    Page 20 of 83

by the Surface Transportation Board ("STB"), and all tariff-filing requirements were *abolished* for most carriers. *Tempel Steel Corp. v. Landstar Inway, Inc.*, 211 F.3d 1029, 1030 (7th Cir. 2000).

As a result, in the current, post-ICC, STB context, "[a]t most, the tariff is a document that is written by private bodies, [and is] subject to review by the [STB] at some point after its publication." *Chen v. Mayflower Transit, Inc.*, 315 F.Supp.2d 886, 915 (N.D. Ill. 2004). A tariff is "nothing more" than a form of contract, whose "terms limiting liability are enforceable only if the shippers had actual notice of them." *Mayflower Transit*, 315 F.Supp.2d at 916 (quoting *Tempel Steel*, 211 F.3d at 1030-31). Moreover, "[a]lthough the 'tariff must be available for inspection by the [STB],' there is no requirement that it must be approved by the [STB] prior to publication." *Id*. at 915 (citation omitted).

C.     **Plaintiffs' Transportation Business**

Plaintiff Kloosterboer International Forwarding LLC ("KIF") is an Alaskan registered non-vessel operating common carrier ("NVOCC"), specializing in refrigerated freight services for frozen seafood that is transported from Alaska to the lower 48 states and other regions of the world. (Dkt. 8 ¶¶ 6-8). KIF in turn contracts with Plaintiff Alaska Reefer Management LLC ("ARM") and other third-party business partners for the procurement of shipping vessels, refrigerated warehouse storage and rail and motor transportation services for the delivery of frozen seafood to designated purchasers, including in the eastern United States. (Dkt. 8 ¶ 9; Dkt. 7 ¶ 6).

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.          CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT          PAGE 12 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 21 of 83

KIF negotiates individual private contracts with its customers, seafood companies known as "shippers," which are involved in the harvesting and processing of fish. (Dkt. 8 ¶ 8; Brautaset Dec.[3] ¶ 16, 18). KIF transportation rates charged to each of its individual clients vary depending on numerous factors, including transport timing, availability, volume and delivery time. (*See* Brautaset Dec. ¶ 18 ("KIF has never transported merchandise based on a publicly-available rate, but has always transported merchandise for select clients pursuant to heavily-negotiated private contracts that are individualized and unique to the particular client's needs.")).

Specifically, KIF transports its customers' seafood from Dutch Harbor, Alaska[4] ("Dutch Harbor") via third-party foreign-flagged vessels to, among other locations, the Bayside Port, in New Brunswick, Canada ("Bayside Port"), and then by Canadian rail line and truck into the eastern United States to be delivered to the end customers of the shippers. (Dkt. 8 ¶ 8; Dkt. 7 ¶¶ 9-11).

### D.    The Bayside Route

The transportation route utilized by Plaintiffs—which was selected to comply with the Third Proviso—originates in Dutch Harbor, where the frozen seafood is loaded onto foreign-flagged vessels for shipment to the Bayside Port. (Dkt. 7 ¶ 9; Dkt. ¶ 8). On arrival at the Bayside Port, the seafood is unloaded from the vessels and moved directly

---

[3]  Submitted herewith is the Declaration of Per K. Brautaset ("Brautaset Dec."), dated December 3, 2021.

[4]  In addition to Dutch Harbor, which is the primary port at issue and the largest port in the Aleutian Islands, KIF also services fish loaded at the smaller satellite port in Akutan, Alaska. For purposes of this motion, references to Dutch Harbor include Akutan.

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                    CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT                    PAGE 13 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 22 of 83

into the Kloosterboer Bayside Cold Storage facility ("KBB") to await further transport. (Dkt. 7 ¶¶ 9, 12; Dkt. 8 ¶¶ 8-9).  The product is then moved from KBB onto trailer trucks that travel on flat rail cars on rail track owned by the Bayside Canadian Rail ("BCR" or "BCR rail line").  (Dkt. 7 ¶¶ 9, 15; Dkt. 8 ¶ 10).  The BCR is a registered Canadian railroad and a member of the Railway Association of Canada.  (Dkt. 7 ¶ 15; Dkt. 8 ¶ 10). The trucks travel on flat rail cars the length of the BCR rail line and back.  (Dkt. 7 ¶¶ 9, 15; Dkt. 8 ¶¶ 8, 10).  The BCR rail line is explicitly identified in every single Bill of Lading ("BOL") presented to CBP at the Calais, Maine border since Plaintiffs began using the BCR in April 2012.  Specifically, each straight BOL identifies the BCR and the intermodal BOL issued by the BCR—and identifying the BCR as the Canadian rail line being used—states:

> Bayside, NB – North Bayside #1 – TO – South Bayside #2 – *And Return*

(*See* Dkt. 7-4 ¶ 5; Dkt. 8 ¶¶ 11-12, pp. 8-9).  Approximately 15,000 of these BOLs have been presented to CBP since 2012.  (*See* Dkt. 8 ¶ 13).

After the trucks are unloaded from the BCR rail line, the trucks proceed directly to the Calais, Maine border crossing, where the drivers submit the required CBP documentation, including the BOL, for active review by CBP personnel, and enter into the United States.  (Dkt. 7 ¶¶ 9, 15; Dkt. 8 ¶¶ 8, 10-12).  This transportation of frozen seafood from Alaska to the Bayside Port and then to the eastern United States, utilizing *a* Canadian rail line, is a "through route" that is referred to herein as the "Bayside Route."

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.          CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT          PAGE 14 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 23 of 83

### E.     The NBSR Rail Line

The Bayside Route historically was used by two other companies, American Seafoods Company ("ASC") and Sunmar Shipping Inc. ("Sunmar"), to transport frozen seafood via foreign-flagged vessels from Alaska to the eastern United States.  The only difference in the intermodal transportation used by ASC/Sunmar and by Plaintiffs was the Canadian rail line utilized—ASC/Sunmar used the NBSR rail line instead of the BCR rail line.[5]  Specifically, once the seafood transported by ASC/Sunmar was moved from cold storage at the Bayside Port warehouse:

> The goods [we]re transported [from Bayside, approximately 6 miles to the U.S. point of entry] by truck to McAdam, New Brunswick (approximately 30 miles from the U.S. point of entry), or Saint John, New Brunswick (approximately 50 miles from the U.S. point of entry), for placement on [the NBSR,] a Canadian rail line.  The goods travel[led] by rail either from McAdam to Saint John or from Saint John to McAdam and [we]re then placed on trucks for transportation into the United States."

*Horizon Lines, LLC--Petition for Declaratory Ord*., No. FIN 35039, 2007 WL 4429515, at *1 n.5 (Dec. 18, 2007) [hereinafter "*Horizon STB*"].  The route approved by CBP and initially used by both Sunmar and ASC is depicted below:

---

[5]  Plaintiffs' Bayside Route also utilized the NBSR rail line from 2009 until April 2012, when the BCR began operating.  (Dkt. 7 ¶ 32; Dkt. 8 ¶¶ 15-16; Dkt. 9 ¶¶ 21-22).



The use of the two rail lines is functionally indistinguishable, with the BCR rail line more economically and logistically efficient because it eliminated the need to transport the seafood either 30 or 50 miles away from the Calais, Maine border crossing, another 90 miles on the NBSR and then another 30 or 50 miles back toward the Bayside Port and into Calais, Maine.[6]

Defendants concede that the use of the NBSR as part of the through route was in compliance with the Third Proviso.  (*See* Dkt. 38 at 2 ("All was good")).

## F.    CBP Ruling Letters Interpreting the Third Proviso

As part of CBP's statutory obligation to provide guidance on the laws and regulations under its purview, CBP issues "ruling letters" that explain the basis for CBP's position and how it will treat various transactions.  CBP has issued numerous ruling

---

[6]   The driving distance from the Bayside Port to the Calais, Maine border crossing is 25.4 miles.  (Dkt. 8 ¶ 10).

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                    CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT                    PAGE 16 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG    Document 117    Filed 12/03/21    Page 25 of 83

letters setting forth CBP's official position on various aspects of the Jones Act and Third

Proviso, with a series of ruling letters, issued between 1992 and 2005, that are directly

relevant here because they confirm the use of a transportation route, indistinguishable in

function from the transportation route utilized by Plaintiffs, that qualified for the Third

Proviso exemption.[7]

### 1.    The Third Proviso Ruling Letters

CBP's ruling letters declare and affirm numerous critical interpretive principles:

*First*, the use of "*any*" Canadian rail line is sufficient to comply with the Canadian rail

line element of the Third Proviso.  (*See* Ruling Letter 116021 (January 21, 2004)

(Dkt. 53-1)).  *Second*, there is no minimum or *de minimis* length requirement with respect

to the length of a Canadian rail line.[8]  *Third*, there is no commercial-reasonableness

requirement for compliance and, by implication, that it was appropriate if the sole

purpose for the use of the rail line was to comply with the Third Proviso.  (*See, e.g., id.*)

*Fourth*, in appropriate circumstances, no rate tariff filing was required for compliance

with the Third Proviso.  (*See id., aff'd* Ruling Letter 116185 (March 28, 2005)

(Dkt. 6-13)).

---

[7] *See* Ruling Letters 112085 (March 10, 1992) (Dkt. 6-12); 114407 (July 23, 1998)
(Dkt. 6-24); 115446 (August 9, 2001) (Dkt. 6-7); 116021 (January 21, 2004) (Dkt. 53-1);
116185 (March 28, 2005) (Dkt. 6-13).

[8] *See* Ruling Letters 105604 (April 30, 1982) (Dkt. 53-2); 111987 (December 2, 1991)
(Dkt. 6-33); 113365 (March 10, 1995) (Dkt. 6-23); 114407 (July 23, 1998) (Dkt. 6-24);
115124 (August 11, 2000) (Dkt. 6-8); 116021 (January 21, 2004) (Dkt. 53-1).

All of these directly-relevant CBP ruling letters continue to be posted on CBP's actively-maintained CROSS repository of rulings designed to inform the public and the regulated community of CBP's position on pertinent laws and regulations. Indeed, none of those relevant ruling letters has ever been modified or revoked by CBP.[9] They remain CBP's formal, official regulatory position. Collectively, the ruling letters indisputably establish that the transportation services provided by Plaintiffs on the Bayside Route are, and always have been, in full compliance with the Third Proviso. As a result, the use of foreign-flagged vessels for the shipment of frozen seafood from Alaska to the eastern United States on the Bayside Route was entirely lawful.[10]

## 2. The ASC Ruling Letter

In 2000, ASC requested a determination from CBP as to whether the route for transportation of frozen seafood on the Bayside Route, *i.e.,* between "a coastwise point in [Dutch Harbor, Alaska] and another coastwise point in the continental United States [Calais, Maine] . . . accomplished in part by foreign-flagged vessels and in part over Canadian rail lines," was in accordance with the Third Proviso. (*See* Ruling Letter 115124 (August 11, 2000) (the "ASC Ruling Letter") (Dkt. 6-8 at *1)). ASC was then shipping the

---

[9] As CBP concedes, ruling letters on the CROSS database are meant to be relied on by the public because they "provide the international trade community with a transparent and efficient means of understanding how CBP will treat a prospective import or carrier transaction." **Error! Hyperlink reference not valid.**U.S. Customs & Border Protection, Rulings and Legal Decisions, https://www.cbp.gov/trade/rulings (last accessed December 3, 2021).

[10] *See* Ruling Letters 115124 (August 11, 2000) (Dkt. 6-8); 115446 (August 9, 2001) (Dkt. 6-7); 116021 (January 21, 2004) (Dkt. 53-1); 116185 (March 28, 2005) (Dkt. 6-13).

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                    CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT                    PAGE 18 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 27 of 83

seafood on foreign-flagged vessels from Dutch Harbor to Pusan, South Korea, and trans-

loading onto another foreign-flagged vessel, which sailed to the Bayside Port. (Dkt. 6-8

at *2.) After arrival at the Bayside Port, the merchandise was unloaded and transferred

onto intermodal reefer (refrigerated) trailers under the control of the NBSR. (*Id.*) The

loaded trailers were then hauled by truck to Saint John, New Brunswick, the nearest full

service rail yard approximately 50 miles from the United States border where flat cars

capable of transporting trailers were available.[11] (*Id.*) From Saint John, the rail cars were

moved by the NBSR over rail trackage in Canada to a subsequent Canadian rail junction

located closer to the United States border. (*Id.*) The truck trailers were then offloaded and

driven into the eastern United States at the Calais, Maine, CBP border crossing. (*Id.*) CBP

concluded and held in its ruling letter that ASC's transportation via the Bayside Route

utilizing "*both foreign-flag vessel* and *rail trackage in Canada . . . is in accord with the*

Third Proviso." (*Id.* at *6).

### 3. The Sunmar Ruling Letters

One year later, CBP considered whether Sunmar Shipping Inc. ("Sunmar"), which

also utilized the Bayside Route for the transportation of frozen seafood from Alaska to

the Bayside Port and into the United States, complied with the Third Proviso.[12] (Ruling

---

[11] ASC, at different points in time, used this route as well as the Sunmar route.

[12] Both ASC and Sunmar utilized the Bayside Route with minor differences. First,
ASC's shipments initially went from Dutch Harbor to Pusan, South Korea, whereas the
Sunmar shipments proceeded directly from Dutch Harbor to the Bayside Port. (*Compare*
Dkt. 6-8 at 1 *with* Dkt. 7-7 at 1-2). Second, the rail trackage and departure/termination
points used by the NBSR varied. Both the Sunmar Route and the ASC Route utilized
foreign-flagged vessels and, upon the merchandise's arrival at the Bayside Port, both
entities used Canadian rail track, *i.e.*, the NBSR rail line, and then trucked the goods to

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                                    CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT                                     PAGE 19 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 28 of 83

Letter 115446 (August 9, 2001) ("Sunmar *I* Ruling Letter") (Dkt. 6-7 at *1-2).  Relying

on the reasoning of the ASC Ruling Letter, CBP likewise confirmed that the

transportation route utilized by Sunmar complied with the Third Proviso.  (*Id.* at *5-6

(citing Ruling Letter 114407 (July 23, 1998) (Dkt. 6-24), and the ASC Ruling Letter

(Dkt. 6-8)).

In its ASC Ruling Letter and the Sunmar *I* Ruling Letter, CBP declared that a

tariff filing was *not* required for the transportation of the frozen seafood to comply with

the Third Proviso.  Specifically, CBP concluded that transportation "between coastwise

points of commodities which are exempt from requirements regarding rate tariffs,

through the utilization of foreign-flag vessels and Canadian rail trackage, is not

prohibited merely because no tariffs may be filed to cover the movements."  (Dkt. 6-7

at *5).

In 2003, Horizon Lines, LLC ("Horizon"), a competitor of ASC and Sunmar,

which used coastwise-qualified vessels, filed a petition with the CBP challenging CBP's

commercial-reasonableness and tariff-related rulings.  *See Horizon Lines, LLC. v. United

States*, 414 F.Supp.2d 46, 49-50 (D.D.C. 2006) [hereinafter ("*Horizon*")].  In response,

CBP sought guidance from the STB concerning whether the STB had authority to accept

tariffs for transportation of frozen fish from Alaska.  STB specifically informed CBP by

letter dated December 4, 2003 that a tariff only needed to be filed by "common carriers"

---

the eastern United States.  (Dkt. 6-8 at 1; Dkt. 6-7 at 2).  ASC has used the Bayside
Route, with both the NBSR and BCR rail lines, for over 20 years as both a carrier and a
customer.

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                    CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT                    PAGE 20 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 29 of 83

(*i.e.,* carriers that hold out their services to the public generally), and the filing requirement did not apply to private carriage. (Gross Dec., Ex. 1, December 4, 2003 Letter from STB to CBP).[13] Because Sunmar was identified as the shipper using chartered vessels, "Sunmar's operations could be considered private carriage and non-jurisdictional to the STB for tariff filing purposes." (*Id*. at 0013).

CBP rejected Horizon's petition. In so doing, CBP affirmed that the Third Proviso did *not* contain any implied commercial-reasonableness requirement with respect to the use of the Canadian rail line, and that Sunmar was *not* required to file a tariff because it was engaged in private carriage, which was not under STB jurisdiction. *See* Ruling Letter 116021 (January 21, 2004) ("Sunmar *II* Ruling Letter") (Dkt. 53-1 at *5).

In 2005, Horizon raised the identical issues in seeking reconsideration of CBP's Sunmar *II* Ruling Letter. CBP once again denied Horizon's request and reaffirmed its ruling that the Third Proviso contained no sham rail movement exception or exclusion, and that no tariff filing was required because the STB no longer required that such tariffs be filed. Ruling Letter 116185 (March 28, 2005 ("Sunmar *III* Ruling Letter") (Dkt. 6-13 at *2-3) (collectively with Sunmar *I* and Sunmar *II*, the "Sunmar Ruling Letters"). None of the published Sunmar Ruling Letters have ever been revoked or modified and they remain publicly available on CROSS.

---

[13]   Submitted herewith is the Declaration of David Karl Gross ("Gross Dec."), dated December 3, 2021.

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                    CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT                    PAGE 21 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 30 of 83

## G. *Horizon*, the Court's Remand Decision and its Aftermath

In 2005, Horizon filed an action in the United States District Court for the District of Columbia, challenging the Sunmar Ruling Letters. Horizon alleged that the Third Proviso was inapplicable because Sunmar's use of Canadian rail trackage was a "sham" and Sunmar had failed to file a rate tariff. (*See* Dkt. 6-17). The District Court approved of CBP's ruling on the "sham" issue and reasoned that the commercial soundness of the route was immaterial so long as a "through route" existed in fact. *Horizon*, 414 F.Supp.2d at 55 n.6.

On the tariff issue, the court determined that the record was insufficiently developed to support CBP's finding that no tariff was required because of the private carriage nature of the Sunmar transportation. *Id*. at 56-58. The court remanded the case for further fact-finding on the validity of CBP's position. *See id*. at 61. While cognizant that a *vacatur* order would revoke the legal effect of CBP's tariff-related rulings, *see id.* at 54 n.5, the *Horizon* court elected instead to *remand* the matter to CBP for further proceedings not inconsistent with its decision. *See id*. at 60.

CBP filed a notice of appeal from the *Horizon* decision, but ultimately moved to dismiss its appeal as moot because in 2006, after the *Horizon* decision, Sunmar and ASC filed rate tariffs for the Bayside Route with the STB. (*See infra* p. 41). Even though ASC was under no obligation to file a rate tariff, it did so out of an abundance of caution.

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
01149339.DOCX

CASE NO. 3:21-cv-00198-SLG
PAGE 22 OF 74

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 31 of 83

(*See* Tariff STB AICN 0001 (the "ASC Tariff") (Dkt. 6-16)). *The ASC tariff for the Bayside Route remains in full force and effect.*[14]

In early 2007, Horizon requested that CBP "promptly carry out" the Horizon court's remand order by "revoking or modifying" the Sunmar Ruling Letters and "all related rulings." CBP rejected that demand. On June 13, 2007, in response to a letter from ASC, CBP informed ASC that it *"declined to adopt the course of action proffered by Horizon."* (*See* Dkt. 6-15). CBP also reaffirmed its determination that it would "*not* promulgate any 'commercial-soundness' regulations as requested by Horizon. *Id*. CBP informed ASC that it would not revoke the Sunmar Ruling Letters and would "abide" by the *Horizon* decision, without indicating how it would do so, or how it would address the ambiguity in the factual record identified by the court.

In the end, after the remand, CBP elected *not* to revoke or modify its interpretive rulings regarding the Third Proviso—including the ruling letters holding that no tariff was required despite the statutory text. Those rulings, as discussed above, remain CBP's official position.

## H.    American Seafoods Company and Its Corporate Affiliates Plaintiffs ARM and KIF

In the early 2000s, ASC procured and contracted with owners of foreign vessels for the transport of its seafood, and that of other shippers, on, among others, the Bayside Route. (Brautaset Dec. ¶ 5; Dkt. 9 ¶ 21). ARM was formed in 2009 as a wholly-owned

---

[14]  On September 30, 2021, specifically in response to the Court's order on Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, KIF filed a tariff with the STB. (Dkt. 66-1).

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.          CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT          PAGE 23 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 32 of 83

subsidiary of American Seafoods Group LLC ("ASG"), the same entity that wholly-owns ASC, with the goal of developing into and operating as a stand-alone full service logistics provider. (Brautaset Dec. ¶¶ 1, 7-8, 11-12). Pursuant to ASG's strategic plan, ASC then transferred to ARM responsibility for procuring vessels to transport ASC's seafood on the Bayside Route and other routes that previously had been provided by ASC. (*Id*. at ¶¶ 12-14). In the process, ASC granted ARM the right to utilize the Bayside Route for which ASC had filed a rate tariff in 2006. (*Id*. ¶ 13).

KIF, one of ARM's strategic partners, was acquired by ASG in May 2016 and became an ARM subsidiary in September 2018. (Brautaset Dec. ¶ 16). At that time, ARM tasked KIF with providing full end-to-end logistics services. (*Id*.) KIF assumed responsibility for all transportation and logistics services for the transport of frozen seafood from Alaska to the eastern United States, with the exception of procuring vessels, which remained ARM's responsibility. (*Id*.) Under this post-2018 model, KIF contracts with ARM for vessels that are chartered by ARM to ship ASC's and other shippers' frozen seafood from Alaska to the Bayside Port in New Brunswick, Canada—along the Bayside Route. (*Id*. at ¶¶ 16, 18). As a direct subsidiary of ARM, ARM granted KIF the right to rely on the tariff that ASC, its corporate affiliate, had filed for that route. (*Id*. at ¶ 16.) Notwithstanding these changes to which entity provides the transportation-related services, ASC, ARM, and KIF continually evaluate the best services and logistical tactics within the Bayside Route. (*Id*. at ¶ 17).

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.          CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT          PAGE 24 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 33 of 83

## I.  The Administrative Record Produced by Defendants

In the 16 years between the *Horizon* remand decision and August 2021, CBP had

not issued any penalty notices for violations of the Jones Act to any shipper or entity

using, or arranging transportation on, the Bayside Route "through route," or even

suggested that the use of that through route was in any way problematic.  In August 2021,

CBP commenced, without any notice or warning, to issue a series of unprecedented

penalty notices for alleged violations of the Jones Act, to KIF and its third-party business

partners which were utilizing the Bayside Route for shipment of frozen seafood from

Alaska to the eastern United States.  (Dkt. 7 ¶ 34; Dkt. 8 ¶¶ 17-23; Dkt. 9 ¶¶ 24-27;

Dkt. 10 ¶¶ 4-5; Dkt. 12 ¶ 4; Dkt. 13 ¶ 8.)  As of October 10, 2021, the date that this Court

issued a preliminary injunction enjoining CBP from issuing any new penalty notices,

CBP had issued notices of more than $350 million in penalties.[15]

Pursuant to an order of this Court, on November 15, 2021 CBP produced what is

characterized as the "administrative record" in this action.  (Dkt. 106).  The documents

produced by CBP reveal, among other things, that

(a)     CBP evidently had determined that the BCR Rail Line was a "sham," and

that any company using the BCR Rail Line was not entitled to rely on the Third Proviso,

and would be in violation of the Jones Act if it engaged foreign-flagged vessels to

---

[15]   On October 1, 2021, pursuant to the Court's order, KIF filed a Petition with CBP
challenging its penalty notices with respect to three shipments for alleged Jones Act
violations.  (Dkt. 67 ¶ 6; Dkt. 67-1).

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                    CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT                    PAGE 25 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 34 of 83

transport frozen seafood from Alaska through the Bayside Port and into the eastern United States.

(b)     CBP was aware that the ASC Tariff remained on file with STB.

(c)     CBP was apprised by STB that Plaintiff KIF and possibly other companies in its frozen seafood supply chain were freight forwarders and that, as freight forwarders, KIF and the other companies were exempt from any tariff-filing requirement under the Third Proviso; and

(d)     KIF and other companies may have been exempt from requirement to file a rate tariff because they were providing services as private, rather than common, carriers.

The following are illustrative of the CBP decision-making process with respect to the issuance of the notices of penalty:

- An undated internal memo states that internet searches confirmed that the BCR was a Canadian railway and that the BCR "is approximately 3 tracks with 2 railcars *that leads to nowhere*." CBP, however, admits that the BOLs identify the route as including the BCR. This memo contains no discussion concerning the filing of any rate tariffs.[16] (Dkt. 106-9 at 30-31)

- CBP describes the purported violations by ARM, specifically stating that the transport includes movement over the BCR which CBP believed was designed to circumvent the Jones Act. (*See* Dkt. 106-9 at 30-31).

- In a July 18, 2018 Jones Act Division of Enforcement ("JADE") memo titled "Bullets for the Executive Assistant Commissioner," CBP states that in reviewing Canadian rail lines related to its investigation "to determine if [the] 3rd Proviso could be asserted, no rail line could be located." CBP also states that while KBB's social media site "shows the rail facility that

---

[16]   The memo also discusses the ASC or Sunmar Ruling Letters confirming that those ruling letters continue to reflect CBP's official position on, among other things, the tariff filing requirement, notwithstanding the *Horizon* remand. CBP claims, without any legitimate basis or analysis, that the ruling letters were not applicable. (Dkt. 106-9 at 30-31).

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.          CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT          PAGE 26 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 35 of 83

was being used," *i.e.*, the BCR Rail Line, "[t]he rail facility is believe[d] to be a 'sham' rail line." (*See* Dkt. 106-9 at 34).

- CBP's focus on the BCR as a "sham" is reiterated three years later in a June 3, 2021 memo from Lisa L. Burley, CBP's Chief for the Cargo Security, Carriers and Restricted Merchandise Branch, to the Chief of CBP's Penalties Branch. (*See* Dkt. 106-32 at 2-6 ("[The BCR] rail movement appears to be a sham designed to give the appearance that it falls with[in] an exception to the Jones Act . . .")). Nowhere in Ms. Burley's memo is there any discussion of any tariff-filing requirement.

- In an August 22, 2017 email between CBP and STB, CBP states that it had received reports that ARM allegedly violated the Jones Act by using foreign flagged vessels to transport frozen seafood along the Bayside Route, and inquired if STB had any tariffs on file for ARM. (Dkt. 106-9 at 25-29). In response, STB's legal advisor, Katherine Bourdon, informed CBP that she did not locate a tariff for ARM, but then stated:

  > Note that while carriers engaged in the noncontiguous domestic trade are required to file tariffs containing their rates and service terms, *tariffs are not required for transportation provided under private contracts between carriers and shippers, or for transportation provided by freight forwarders. Id.*[17]

- Before issuing the notices of penalties to KIF, CBP acknowledged that KIF was in fact a freight forwarder. (*See* Dkt. 106-33 at 8-12 ("Thus, it would appear that [KIF] is a freight forwarder transporting frozen seafood")).

The administrative record also confirms that, during CBP's more than four-year

investigation, CBP never provided any notice to Plaintiffs or any of its third-party

business partners that CBP had any concerns with potential violations of the Jones Act, or

any indication that the utilization of the BCR Rail Line presented any risk concerning

---

[17]   In an earlier communication, Bourdon also forwarded to CBP STB's denial of Horizon's petition from 2007 in which STB reaffirmed there was no commercial reasonableness requirement for use of a Canadian rail line and specifically noted that she believed the decision "implicate[d] the shipments your agency is concerned with." (Dkt. 106-9 at 18).

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                    CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT                    PAGE 27 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 36 of 83

non-compliance with the Third Proviso. (*See* Dkt. 106-10 at 10 at 256 ("We have no evidence to show that any involved party was informed by CBP that the nature of this voyage might result in a violation of the Jones Act.")). To the contrary, CBP intentionally and knowingly allowed Plaintiffs and the other companies in the supply chain to continue for years to utilize the Bayside Route, including the BCR rail line, before suddenly changing its position and imposing massive penalties.

## ARGUMENT

**I.     PLAINTIFFS ARE ENTITLED TO A DECLARATORY JUDGMENT THAT TRANSPORTATION OF FROZEN SEAFOOD ON THE BAYSIDE ROUTE COMPLIES WITH THE THIRD PROVISO OF THE JONES ACT**

Plaintiffs are entitled to summary judgment on their declaratory judgment claim (Count I) because there is no genuine dispute that their transportation of frozen seafood from Alaska to the eastern United States, utilizing the Bayside Route, complies with the Third Proviso of the Jones Act.

### A.     The Jones Act

The Jones Act requires that, with certain statutory exceptions, companies transporting merchandise from one point to another within the United States must utilize coastwise-qualified vessels., *i.e.,* American-built, owned, and crewed vessels. *See* 46 U.S.C. § 55102(b) (formerly 46 U.S.C. App. § 883).

The penalty for transporting merchandise in violation of this provision is seizure by and forfeiture to the Government or, alternatively, a monetary penalty equal to the greater of the value of the merchandise or the actual cost of the transportation. 46 U.S.C.

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                    CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT                    PAGE 28 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 37 of 83

§ 55102(c). Because of the "horrendous" nature of the penalty, the Jones Act is strictly

construed:

> It is well understood that statutes imposing a forfeiture,
> particularly the *horrendous* penalty of forfeiture of an entire
> cargo worth millions of dollars, are to be construed strictly.
> The rationale for such strict construction is that *persons should
> receive clear and unequivocal warning before facing exposure
> to harsh penalties* [and] is especially applicable . . . where the
> penalty for noncompliance is *enormous.*

*Am. Mar. Ass'n v. Blumenthal*, 590 F.2d 1156, 1165 (D.C. Cir. 1978).

Under the Third Proviso, the statute's general prohibition:

> does not apply to the transportation of merchandise between
> points in the continental United States, including Alaska, over
> through routes in part over Canadian rail lines and connecting
> water facilities if the routes are recognized by the Surface
> Transportation Board and rate tariffs for the routes have been
> filed with the Board.

46 U.S.C. § 55116. The transportation of frozen seafood arranged by Plaintiffs that is the

subject of the penalty notices is exempt from the Jones Act because it complies with all

of the applicable requirements of the Third Proviso.

## B.      The Bayside Route Constitutes a "Through Route"

Plaintiffs satisfy the first element of the Third Proviso. The transportation of

frozen seafood on the Bayside Route, from Alaska to the eastern United States using, in

part, a Canadian rail line, constitutes "transportation" over a "through route." That

conclusion is compelled by the legal and customary usage of those terms and is

confirmed by CBP's repeated ruling letters addressing this issue.

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.            CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT            PAGE 29 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 38 of 83

First, as the Supreme Court has established, a "through route" refers to intermodal transportation, including both the land (by truck and/or rail) and sea portions of a journey, and refers to the *entirety* of the journey, not just the rail component. *Thompson v. United States*, 343 U.S. 549, 556 (1952) ("through route" covers connecting carriers for the continuous carriage of goods from the *originating point* on the line of one carrier to the *destination point* on the line of another). By definition, a "through route" includes all the points along the route, not just the origin and destination.[18] Because the "through route" is the entire route from point of origin to final destination, it remains consistent even if there are changes in intermediary destination or modes of transport. Contrary to CBP's newly-contrived argument in this action, the Third Proviso's reference to "through route" does *not* refer only to "connecting railroads for the continuous carriage of goods" from the originating point on the line of one carrier to a destination on the line of another. (Dkt. 38 at 15-16).

---

[18] *See e.g., Trailer Marine Transp. Corp. v. Fed. Mar. Comm'n*, 602 F.2d 379, 394 (D.C. Cir. 1979) (through routes may encompass "all-water" or "water-rail" segments depending on whether the origination and termination point of the route is on water or inland); *Alaska S. S. Co. v. Fed. Mar. Comm'n*, 399 F.2d 623, 627 (9th Cir. 1968) (a short ferry leg of a multi-modal transportation chain was part of the through route); *Sea-Land Serv., Inc. v. Fed. Mar. Comm'n*, 404 F.2d 824, 828 (D.C. Cir. 1968) (a common carrier by water, together with a motor carrier by land, were participants in a "through route"). A*ccord Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 25-26 (2004) (discussing the popularity of "through" bills of lading "in which cargo owners can contract for [intermodal] transportation across oceans and to inland destinations in a single transaction"); *Trailer Marine*, 602 F.2d at 396 (defining "through routes" involving rail and water segments of transportation as routes "that extend in their entirety from the coastal points on one water carrier's route to the coastal points on another water carrier's route").

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                    CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT                    PAGE 30 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 39 of 83

Second, CBP's Ruling Letters concerning the use of the Bayside Route by ASC and Sunmar establish that Plaintiffs' current use of the BCR rail line as part of the Bayside Route complies with the Third Proviso. The Bayside Route as utilized by ASC, Sunmar and Plaintiffs involves intermodal transportation of frozen seafood on a "through route" that originates in Alaska and terminates in the eastern United States. The merchandise is transported from Alaska to the Bayside Port in New Brunswick, Canada using foreign-flagged vessels. (Dkt. 7 ¶ 9; Dkt. 8 ¶ 8). Upon arrival at the Bayside Port, the merchandise is moved into a cold-storage facility, and is then loaded onto trailer trucks and transported on a Canadian rail line. (Dkt. 7 ¶¶ 9, 12, 15; Dkt. 8 ¶¶ 8-10). The merchandise then is trucked to the CBP border crossing at Calais, Maine, where the truck driver submits a bill of lading and other documentation to CBP and enters the United States. (Dkt. 7 ¶¶ 9, 15; Dkt. 8 ¶¶ 8, 10-12). The merchandise is delivered to customers throughout the eastern United States. (Dkt. 7 ¶¶ 9, 15; Dkt. 8 ¶¶ 8, 10).

The Bayside Route used by ASC and Sunmar and the Bayside Route used by Plaintiffs contain only a single non-material difference—the use of functionally-indistinguishable Canadian rail trackage—the NBSR and the BCR—to comply with the Third Proviso. *Horizon STB*, 2007 WL 4429515, at *3; *see also* Dkt. 9 ¶ 21. Sunmar, and ASC at times, as discussed above, utilized the NBSR rail line to transport merchandise along a circuitous rail route, either from St. John to McAdam or from McAdam to St. John. (*See supra* pp. 15-16). CBP determined on four separate occasions that the Bayside Route, including those rail movements—which indisputably were commercially unnecessary and conducted for the sole purpose of complying with the

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.        CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT        PAGE 31 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 40 of 83

Jones Act—satisfied the requirements of the Third Proviso. (*See* ASC Ruling Letter, Sunmar *I*, *II*, and *III* Ruling Letters). The BCR rail line likewise serves no commercial utility and the transportation of all merchandise on that rail trackage is solely for the purpose of complying with the Third Proviso. *See Blumenthal*, 590 F.2d at 1164 (holding "intent" to comply with or circumvent the Jones Act is irrelevant in determining if there is an "actual violation" based on the transport of merchandise).

As a result, the transportation of frozen seafood on the Bayside Route—from Alaska to the eastern United States using, in part, a Canadian rail line—by CBP's own admission, complies with the through route requirement of the Third Proviso.

## C. The BCR is a "Canadian Rail Line"

Plaintiffs' Bayside Route also satisfies the Third Proviso's requirement that the through route used for the transportation of merchandise be "in part over Canadian rail lines." 46 U.S.C. § 55116. Defendants do not dispute that the BCR rail line is a Canadian rail line. (*See* Dkt. 105).[19]

CBP instead contends that the so-called "inherent nature" of the BCR rail line purportedly "does not meet the statutory requirements of the Third Proviso."[20] (*See*

---

[19]   The Court acknowledged in its September 28, 2001 Order (Dkt. 64) that CBP has "long held that 'in part over Canadian rail lines' is *any* use of Canadian rail" and that "[c]learly, the BCR Route includes, in part, the use of a rail in Canada." (*See* Dkt. 64 at 19-20).

[20]   CBP's contention that the BCR rail line did not meet the statutory requirements of the Third Proviso, made for the first time in the Government's opposition (Dkt. 38) to Plaintiffs' motion for TRO and preliminary injunction (Dkt. 4, Dkt. 5), was not identified on the face of the Penalty Notices received by KIF or, to the knowledge of Plaintiffs, any other third-party. (*See* Dkt. 8-9 and Dkt. 8-10).

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                    CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT                    PAGE 32 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 41 of 83

Dkt. 38 at 18). This newly-concocted "inherent nature" argument is premised on the fact that the BCR rail line is less than 100 meters in length and that the transport of the frozen seafood on the rail line consists of a round-trip movement of the cargo. (*See id.* at 18-19.) Defendants' argument has no support in the Third Proviso.

*First*, the plain language of the Third Proviso lists only two requirements with respect to the rail line—that it be "Canadian" and that it be a "rail line." The Third Proviso contains no minimum-length requirement. To the contrary, it simply states that the transportation must be "in part" over a Canadian rail line, without any caveats, qualifications or restrictions. *See* 46 U.S.C. § 55116. Under well-established principles of statutory construction, CBP cannot validly contend that there is a minimum rail length requirement where no such requirement is set forth in the statute. *See Env't Integrity Project v. EPA*, 969 F.3d 529, 541 (5th Cir. 2020) ("a statute should not be read to include matter it does not include").[21]

*Second*, Defendants' argument is contradicted by an unbroken line of CBP ruling letters, which expressly and consistently have declared the absence of any minimum-length requirement for a Canadian rail line for purposes of satisfying the Third Proviso. (*See supra* pp. 17-18). Those Ruling Letters have never been modified or revoked. (*See*

---

[21] The Supreme Court has recognized through routes containing railroads even shorter than the BCR Line. *See, e.g., United States v. Louisiana & P.R. Co.*, 234 U.S. 1, 7 (1914) (establishing a through route utilizing, in part, a rail line that extended only 25 feet).

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.          CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT          PAGE 33 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 42 of 83

*infra* pp. 52-69). This has been CBP's position for more than 40 years and those rulings, which bind CBP officials, remain on CBP's published and publicly-available database.[22]

*Third*, *Horizon* approved CBP's ruling confirming the lack of any minimum-length standard or of any requirement that the Canadian rail line be "commercially sound" to satisfy the Third Proviso. *Horizon*, 414 F.Supp.2d at 55 n.6. *Horizon* reasoned, "[i]f Congress wishes to limit the use of the Third Proviso to specific routes or to require the STB to evaluate the commercial soundness of a proposed route, it has the authority to do so, but the Third Proviso as currently written contains no such requirement.").[23] *Id.* The STB likewise rejected Horizon's petition seeking a declaration that the Third Proviso contained an implied commercial-reasonableness requirement.[24] No basis exists for deviating from this established, consistent precedent, or for engrafting on the Third Proviso a requirement not prescribed by Congress.

In sum, the transportation of frozen seafood on the Bayside Route, using the BCR rail line, which was disclosed to CBP in thousands of BOLs since the commencement of

---

[22]  *See* 1978 letter from Assistant Commissioner of the Custom Services to a member of Congress: "The Customs Service has since interpreted the words "Canadian rail lines" to mean *any* rail trackage in Canada."  (Dkt. 6-14).

[23]  This Court's prior ruling recognized the *Horizon* holding concerning the absence of any commercially-reasonable requirement.  (*See* Dkt. 64 at 14 ("The district court [in *Horizon*] upheld CBP's interpretation of the Third Proviso to not contain an 'implied prohibition on sham or commercially impractical Canadian rail movement to achieve technical compliance with the literal terms of the statute'")).

[24]  *See Horizon STB*, 2007 WL 4429515, at *3 ("Absent a credible allegation of harm to a shipper, we are not prepared to second guess the commercial reasonableness of the carriers' decision to offer the route and the shippers' decision to utilize it").

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                    CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT                    PAGE 34 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 43 of 83

the utilization of the BCR rail line in 2012, complies with the "Canadian rail line" requirement of the Third Proviso.

**D.    The Bayside Route Is a Through Route Recognized by the STB and Plaintiffs Are in Compliance with All Rate-Tariff Filing Requirements**

**1.    The Bayside Route Is a "Recognized" Through Route**

The Third Proviso provides that the through route utilized must be "recognized" by the STB. *See* 46 U.S.C. § 55116. "Courts have treated the filing of tariff sheets as recognition [of the route] by the [Interstate Commerce Commission ("ICC")] under the Third Proviso." *Horizon STB*, 2007 WL 4429515, at *2 (Dec. 18, 2007) (citing *Cent. Vermont Transp. Co. v. Dunning*, 71 F.2d 273, 274 (2d Cir. 1934), *aff'd*, 294 U.S. 33 (1935)).

Here, the ASC Tariff was filed for the Bayside Route by ASC on August 28, 2006. (Dkt. 6-16.) That filing was accepted in 2006 and the ASC Tariff remains in effect because it has never been rejected or invalidated by the STB.[25] The through route identified in the ASC Tariff is the Bayside Route—intermodal transport of frozen seafood from Dutch Harbor, Alaska to the Bayside Port in New Brunswick, Canada and then to the eastern United States. (*See* Dkt. 6-16). While Plaintiffs' use of the Bayside Route

---

[25] The STB "may" invalidate tariffs for not including information required by § 13702(b), but invalidation is not automatic, and an affirmative action must be taken by the STB to effectuate the invalidation. *See* 49 U.S.C. § 13702(d) ("The [STB] *may* invalidate a tariff prepared by a carrier or carriers under this section if that tariff violates this section or a regulation of the [STB] carrying out this section."). The Bayside Route identified in the ASC Tariff continues to be recognized because the STB has never invalidated that tariff.

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.          CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT          PAGE 35 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 44 of 83

involves a different Canadian rail line than that utilized by ASC when it filed the Tariff, that is not a material difference with respect to the through route recognized by the STB.

Indeed, the United States Supreme Court, as discussed above, long ago established that "through route" refers to the entirety of the journey, not just the rail component or any other intermediate part of the journey. *Thompson v. U.S.*, 343 U.S. at 556 ("through route" covers connecting carriers for the continuous carriage of goods from the *originating point* on the line of one carrier to the *destination* on the line of another). Moreover, Defendants have cited no authority, and we know of none, supporting any contention that a change in the rail line used to transport merchandise effects a fundamental change to a "through route" as that term is used in the Third Proviso and has been interpreted by the Supreme Court.

Accordingly, Plaintiffs' through route satisfies the "recognition" element of the Third Proviso.[26]

## 2. Plaintiffs Have Complied with the Rate Tariff Requirement

The undisputed facts demonstrate that Plaintiffs satisfied the rate tariff filing requirement of the Third Proviso for several independent reasons.

*First*, the ASC Tariff as accepted by STB covers the same through route—the Bayside Route—as that utilized by Plaintiffs for their transportation of the frozen seafood from Alaska to the eastern United States, and nothing requires other carriers utilizing the

---

[26] Horizon challenged the validity of the ASC Tariff but the STB rejected the challenge in 2007 and the ASC Tariff remains on file with STB today. *See Horizon STB*, 2007 WL 4429515, at 3.

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                    CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT                    PAGE 36 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 45 of 83

same through route to file their own tariff independently. *Second*, Plaintiffs complied with CBP's Ruling Letters, which unequivocally have declared, for the past 20-plus years, that no tariff filing was required to comply with the Third Proviso. Those Ruling Letters have never been revoked or modified by CBP, even after the *Horizon* decision, and are still accessible on CBP's CROSS directory of controlling CBP ruling letters. *Third*, pursuant to STB regulations also in effect for more than 20 years, Plaintiffs are exempt from having to file a tariff because they are "freight forwarders." *Fourth*, Plaintiffs are not required to file a rate tariff because they are private carriers providing transportation services for select shippers pursuant to privately-negotiated contracts.

### i. Plaintiffs Properly Relied on the ASC Rate Tariff Filing For Purposes of Compliance with the Third Proviso

Plaintiffs satisfied the tariff filing requirement of the Third Proviso because ARM's predecessor and corporate affiliate—ASC—filed a rate tariff that applied to the transport of frozen seafood on the Bayside Route in 2006. (Dkt. 6-16 at 1). Once a rate tariff has been filed for a through route in compliance with the Third Proviso, nothing in the statutory language requires that another shipper or carrier utilizing the same through route independently file its own separate tariff. To the contrary, the statute requires only that *tariffs* "*have been filed*" identifying the through route. 46 U.S.C. § 55116. That requirement has been satisfied. CBP's focus on *who* filed the tariff is simply not relevant.

Further, nothing in the Third Proviso or any applicable regulation requires that a rate tariff identify the precise constituent modes of transportation, or the precise rail line

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.          CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT          PAGE 37 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 46 of 83

or port used for the transport of merchandise from Alaska to Canada and then to the eastern United States.  Nor does the switch from the NBSR rail line to the BCR rail line, which functionally are indistinguishable for purposes of compliance with the Third Proviso, change the "through route" that was recognized by the STB.

In its September 28, 2021 Order (Dkt. 64), the Court construed 49 U.S.C. § 13702(b)(2)(A) and 49 C.F.R. § 1312 as requiring that *all* carriers needed be identified on a rate tariff.  (Dkt. 64 at 15-16).  Plaintiffs respectfully submit that a holistic analysis of the controlling statute and regulations demonstrates the absence of any requirement that all carriers must be identified on rate tariffs.  Thus, 49 U.S.C. § 13702(b)(2) specifically states "[t]he [STB] may prescribe any specific information and charges to be identified in a tariff . . . ."  STB's implementing regulation, 49 C.F.R. § 1312, makes clear that there is no requirement that a rate tariff identify all carriers and that such information is not even considered essential.  The precise regulation that sets forth the information that must be included in the tariff, 49 C.F.R. § 1312.3—entitled "Tariff contents and standards; *Essential criteria*"—does *not* include the names of carriers, much less *all* carriers:

> (a) *Contents.* Tariffs filed with the [STB], including tariffs published, filed, and kept electronically in accordance with § 1312.4(b), *must*:  Be filed in English; include an accurate description of the services offered to the public; provide the specific applicable rates explicitly stated in U.S. dollars and cents (or the basis for calculating the specific applicable rates) and service terms; and be arranged in a way that allows for the determination of the exact rate(s) and service terms applicable to any given shipment (or to any given group of shipments).

49 C.F.R. § 1312.3(a).  *See also* 49 C.F.R. § 1312.16 (allowing for *substitution* of carriers without amendment to a tariff); 49 C.F.R. § 1312.14 (not requiring all carriers be

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT                PAGE 38 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 47 of 83

identified in tariff).  These essential criteria underscore the point that rate tariffs may cover different carriers utilizing the same through route described in the tariff, consistent with the Third Proviso.  Further, there is nothing in the Administrative Record and no CBP ruling letter presented by Defendants establishing that *all* carriers seeking to rely on the Third Proviso must be identified on a rate tariff filed with the STB for the applicable through route.  For purposes of satisfying the tariff filing requirement of the Third Proviso, all carriers may rely on any tariff filing that identifies the same through route.

Further, under 49 C.F.R. § 1312.14(a)(2), "[r]ates and services of a carrier" need *not* be filed in a carrier's name where "a tariff of another carrier through issuance of a concurrence to the latter carrier [authorizes] the first carrier's participation in joint rates and through routes.  *See also* 49 C.F.R. § 1312.16 (allowing for substitution of carriers without amendment to a tariff).  Here, as demonstrated in the Brautaset Declaration, such a concurrence was effectuated by means of the 2009 corporate reorganization of ARM and KIF, pursuant to which ASC granted ARM the right to utilize the Bayside Route for which it had filed a tariff in 2006.  (Brautaset Dec. ¶¶ 13-14). ("Following ARM's 2009 formation, ASC ceased its transportation-related activities and instead contractually engaged ARM to handle and coordinate the vessel transportation of ASC's frozen seafood, granting ARM the right to utilize the Bayside Route, including reliance on the ASC Tariff")).  And a similar concurrence was effectuated as between ARM and KIF during their 2018 corporation reorganization.  (Brautaset Dec. ¶ 16 ("As a direct subsidiary of ARM, ARM granted KIF the right to utilize the Bayside Route, including reliance on the ASC Tariff")).  The STB also does not require the filing of such authorization, *see*

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                                CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT                        PAGE 39 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 48 of 83

49 C.F.R. § 1312.14(b), nor does it monitor such authorizations. *See, e.g., Revision of Tariff Reguls., All Carriers*, 1 I.C.C.2d 404, 408 (I.C.C. Sept. 24, 1984) (noting that the cost in continuing the effort to maintain and review such authorizations "is not warranted" because the documents "are not used by us [the ICC]"). Thus, ARM and KIF succeeded to ASC's Tariff by means of the foregoing concurrence.

In sum, Plaintiffs have satisfied the tariff filing requirement of the Third Proviso because the tariff filed in 2006 by ASC, Plaintiffs' predecessor, covers the Bayside Route, and nothing in the Third Proviso, the CBP regulations or ruling letters, or the STB regulations or decisions requires that *all* carriers be identified in a tariff or that the utilization of a new Canadian rail line needs to be specified. And, in addition, ARM and KIF succeeded to the ASC Tariff through a concurrence expressly recognized by CPB's regulations. All of this information, of course, could have been conveyed to CBP in less than an hour, had it provided Plaintiffs an opportunity to be heard, rather than conduct its investigation in complete secrecy for four plus years.

### ii. CBP's Ruling Letters Eliminating the Rate-Tariff Filing Requirement Remains in Effect

Plaintiffs properly relied on the CBP's Ruling Letters, which consistently and publicly declare that a tariff filing was not required under the Third Proviso. Those Ruling Letters have never been revoked or modified by CBP, and they remain on the CBP's database, providing notice to the public of CBP's position that no tariff was required to be filed. (*See, e.g.*, Sunmar *I* Ruling Letter ("[T]he indirect transportation between coastwise points of commodities which are exempt from requirements regarding

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.          CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT          PAGE 40 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 49 of 83

rate tariffs, through the utilization of foreign-flag vessels and Canadian rail trackage, is not prohibited merely because no tariffs may be filed to cover the movements.)).[27]

The *Horizon* decision does not dictate a contrary result. There, the court did *not* vacate the CBP Ruling Letters because of the incomplete factual record supporting CBP's position that no tariff was required to be filed by a private carrier. Instead, the court remanded the issue and the entire case to CBP for further consideration and clarification. *See Horizon*, 414 F.Supp.2d at 60-61. In doing so, the *Horizon* court recognized that, in the absence of a vacatur, CBP's prior Ruling Letters concerning the rate-tariff requirement continued to have precedential effect. *See Horizon*, 414 F.Supp.2d at 54 n.5 ("*the [rate-tariff] rulings retain legal effect*" and will be revoked only if vacated). Thus, the *Horizon* court acknowledged *if* it had issued a vacatur, the CBP's ruling letters would have been revoked as a matter of law. Because the court was *not* seeking such a revocation, it instead remanded, providing CBP the opportunity to reconsider its tariff-related rulings in light of the Court's decision.[28]

In addition, the *Horizon* court explained that its decision concerned only the facts and reasoning stated in the CBP Ruling Letters. The court did not reach the ultimate

---

[27]  *See also* Ruling Letters 112085 (March 10, 1992), 113141 (June 29, 1994); 114407 (July 23, 1998); 115124 (August 11, 2000); 116021 (January 21, 2004); 116185 (March 28, 2005).

[28]  After the *Horizon* decision, CBP concluded that the *Horizon* legal analysis was erroneous and filed a notice of appeal. (*See* Gross Dec. Ex. 4, Letter from CBP to U.S. Dep't of Justice, dated May 19, 2006). However, because Sunmar and ASC subsequently filed rate tariffs out of an abundance of caution, rendering moot the underlying dispute, CBP withdrew its appeal. (*See* Dkt. 6-15).

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                    CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT                    PAGE 41 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 50 of 83

correctness of those ruling concerning the Third Proviso. *Horizon Lines, LLC v. United States*, 429 F.Supp.2d 92, 99 (D.D.C. 2006) ("The extent of inconsistency and error throughout CBP's Sunmar Rulings rendered the Court unable to conclude that the agency had examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made" (citations and quotation marks omitted) (alterations in original)). The court's decision to remand in *Horizon* was plainly intended to allow CBP the opportunity to resolve the inconsistencies perceived by the court in the administrative record, and to determine whether the same or a different result would be required, based on additional CBP fact-finding and application of the principles enunciated in the *Horizon* decision. The *Horizon* court plainly would not have remanded the case to CBP if it had determined that a tariff filing was an absolute requirement under the Third Proviso, and there would have been no reason to seek further development of the record by CBP on the private carriage issue. In doing so, the court left the door open to CBP to modify or vacate its prior rulings, particularly with respect to private carriers—but CBP never did so.

The *Horizon* court's reasoning is consistent with Supreme Court and Ninth Circuit decisions establishing that "remanding without vacatur [effectively] leave [administrative] rulings in place." *See, e.g., E.P.A. v. EME Homer City Generation, L.P.*, 572 U.S. 489, 500 (2014) (citing *North Carolina v. EPA*, 550 F.3d 1176, 1178 (D.C. Ct. App. 2008); *City of Los Angeles v. Dickson*, No. 19-71581, 2021 WL 2850586, *3 (9th Cir. July 8, 2021) ("although the typical remedy when we hold an agency's action unlawful is vacatur, we have discretion to remand without vacatur when equity

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.          CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT          PAGE 42 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 51 of 83

demands.").  In *Dickson*, the Ninth Circuit expressly recognized that the district court's remand to the agency without vacatur left the amended rule at issue in place while the agency undertook the proper analysis on remand.  *See also Nat'l Fam. Farm Coal. v. EPA*, 966 F.3d 893 (9th Cir. 2020) (remanding an issue in lieu of vacatur leaves the administrative regulation in place).[29]

CBP does not dispute that, after remand, it did not revoke or modify its Ruling Letters concerning the absence of a tariff-filing requirement.  Those Ruling Letters remain on CBP's CROSS directory of controlling rulings, which CBP actively updates and manages to provide notice to the public of CBP's interpretation of the Third Proviso.  Ruling letters are identified as current and controlling CBP interpretation of the law.  19 U.S.C. § 1625(a) ("[t]he Secretary shall have such ruling [letters] or decision[s] published in the Customs Bulletin or shall otherwise make such ruling or decision

---

[29]   In the D.C. Circuit—which is within the *Horizon* court's jurisdiction—"while unsupported agency action normally warrants vacatur, [a] court is not without discretion" to leave agency action in place while the decision is remanded for further explanation. *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1151 (D.C. Cir. 2005) (citation omitted).  In *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993), the D.C. Circuit Court set forth the two factors governing that exercise of discretion:  "The decision whether to vacate depends on the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed" (internal quotation marks omitted).  The "seriousness" of a deficiency is determined at least in part by whether there is "a significant possibility that the [agency] may find an adequate explanation for its actions" on remand. *Williston Basin Interstate Pipeline Co. v. FERC*, 519 F.3d 497, 504 (D.C. Cir. 2008).

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                    CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT                    PAGE 43 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 52 of 83

available for public inspection."); *see also* 19 C.F.R. § 177.12(b).  Plaintiffs therefore

properly relied on the Ruling Letters.[30]

### iii.    As "Freight Forwarders," Plaintiffs Are Exempt From Any Tariff Filing Requirement

Plaintiffs KIF and ARM are both exempt from any tariff-filing requirement under

the Third Proviso pursuant to regulation promulgated in 1997 by the Surface

Transportation Board (STB).  Specifically, the STB regulation provides that "freight

forwarders" in the noncontiguous domestic trade, which are thus subject to STB

---

[30]    Plaintiffs respectfully submit that the Court should reconsider and reverse its initial finding that the *Horizon* decision had the effect of modifying CBP's rate-tariff ruling letters.  The Court's sole basis for that ruling, *Sea-Land Serv., Inc. v. United States*, 239 F.3d 1366, 1373 (Fed. Cir. 2001), is inapposite because that case was not decided on an administrative record, did not involve interpretation of CBP ruling letters, and involved a purely legal issue and no administrative findings.  *Sea-Land* relied on the Federal Circuit's earlier decision in *Texaco Marine Services, Inc. v. United States*, 44 F.3d 1539, 1534-44 (Fed. Cir. 1994), which overturned the legal interpretation at issue and found no § 1625(c) proceeding was necessary.

In contrast to *Horizon*, *Texaco* was decided under a different standard of review and did not involve a remand without vacatur and an order for further agency proceedings in light of open factual questions and inconsistent reasoning by the agency.  In addition, *Horizon* did not result in a final decision subject to appeal, as was the case in *Sea-Land* and *Texaco*.  By remanding the matter for CBP's further proceedings, in contrast to *Texaco*, *Horizon* allowed CBP to find and confirm facts and articulate alternative reasoning for its legal position.  The *Horizon* court's finding that the STB might accept a voluntary rate filing for informational purposes left unresolved the following additional questions: (1) whether a rate tariff filed with the STB for informational purposes is allowed in light of other statutory constraints; and (2) whether a rate tariff filed with the STB for informational purposes is required for compliance with the Third Proviso as properly interpreted.  An appealable final remand decision or a § 1625(c) modification or revocation was required for CBP to formalize whatever change in position CBP might articulate.  (*See infra* at pp. 53-69).

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                    CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT                         PAGE 44 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 53 of 83

jurisdiction, "are *exempted* from the tariff filing requirements of 49 U.S.C. 13702." *See* 49 C.F.R. § 1319.1.[31]

The background and rationale for the issuance of the exemption to freight forwarders is set forth in a 1997 STB decision. *See* STB Decision 21543, STB Ex Parte No. 598 (Feb. 21, 1997) (the "STB Decision"). The STB Decision concluded, after a period of public comment and an analysis of comments from agencies and the regulated community, that the freight forwarder market is highly competitive, that "elimination of the tariff filing requirement will eliminate an unnecessary burden" and that "the reduced burden will result in lower rates and additional competition." STB Decision at 6. The United States Department of Transportation, which previously had exercised shared regulatory authority over CBP's predecessor, was strongly in favor of the exemption because of the resulting enhanced competitiveness and transportation efficiency. *Id.* at 3. This STB regulatory exemption, which remains in effect today, indisputably applies to

---

[31]   The term "freight forwarder" is defined as "a person holding itself out to the general public (other than as a pipeline, rail, motor, or water carrier) to provide transportation of property for compensation and in the ordinary course of its business: (A) assembles and consolidates, or provides for assembling and consolidating, shipments and performs or provides for break-bulk and distribution operations of the shipments; (B) assumes responsibility for the transportation from the place of receipt to the place of destination; and (C) uses for any part of the transportation a carrier subject to jurisdiction under this subtitle." 49 U.S.C. § 13102(8).

Carriers transporting merchandise on the Bayside Route are indisputably subject to STB's jurisdiction, pursuant to 49 U.S.C. § 13531(a). That law provides that the STB has jurisdiction "over service that a freight forwarder undertakes to provide, or is authorized or required under this part to provide, to the extent transportation is provided in the United States and is between—(1) a place in a State and a place in another State, even if part of the transportation is outside the United States; . . . (3) a place in the United States and a place outside the United States." *Id.*

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT              PAGE 45 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 54 of 83

Plaintiffs, both of whom are freight forwarders, as confirmed by the nature of their business operations, and the facts and reasoning of the STB Decision.

Further, as discussed above, the administrative record produced by Defendants reveals that STB expressly apprised CBP of the tariff exemption applicable to freight forwarders, such as Plaintiffs. After CBP initiated its investigation of alleged potential violations of the Jones Act in connection with the transportation of frozen seafood on the Bayside Route, Michael Hebert ("Hebert"), who led the JADE investigation, wrote to the STB to inquire whether KIF and certain other entities involved in its supply chain had filed a tariff with the STB. The STB responded in August 2017 by informing CBP of the freight-forwarder exemption from any tariff-filing requirement. (Dkt. 106-9 at 25). The STB states that "while carriers engaged in the noncontiguous domestic trade are required to file tariffs containing their rates and service terms, *tariffs are not required for transportation provided . . . by freight forwarders*." *Id.*

CBP's own internal documents also reveal that CBP learned, during the course of its Jones Act investigation, that KIF was a freight forwarder. An internal CBP memo from George Samiotes ("Samiotes"), Attorney-Advisor in the Penalties Branch of the CBP Office of Trade-Regulations & Rulings, to Charles Steuart, Director, Border Security and Trade Compliance Division, discusses the "freight forwarder" issue. Samiotes reviewed KIF's website and concluded: "Thus, it would appear that [KIF] is a freight forwarder transporting frozen seafood." (*See* Dkt. 106-33 at 9 n.4). The reason Samiotes undertook independently to review the KIF website was because CBP had been evasive when questioned about the nature of KIF's business (*id.* (noting that upon inquiry

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.          CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT          PAGE 46 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG    Document 117    Filed 12/03/21    Page 55 of 83

from a CBP attorney, Hebert at JADE "did not directly answer the question of whether [KIF] is a freight forwarder")).  Moreover, in the section of the document listing the alleged Jones Act violators and the proposed penalties, the entry for KIF specifically states, without any analysis or elaboration, "appears to be a freight forwarder."  *Id.*

Any belated attempt by Defendants to contend that KIF is not a freight forwarder should be rejected based on the indisputable facts.  "KIF is a registered non-vessel operating common carrier [NVOCC][32] specializing in refrigerated-freight services for seafood products originating in Alaska.  This includes the arrangement of transportation and cold storage from place of receipt of the fish products to its ultimate destination on behalf of shippers, including for those frozen seafood products originating in Alaska and moving through the port of Bayside."[33]  (Dkt. 8 ¶ 6).  There can be no genuine dispute that KIF and ARM are "freight forwarders" as defined by STB, and therefore are exempt from any tariff-filing requirement.

---

[32]   The STB Decision states that the ICC, the ICC Termination Act and the STB notice of proposed rulemaking used the term "freight forwarder" to refer to "an entity that, acting as a carrier, consolidates shipments for further movement, and that then uses an underlying carrier for line-haul transportation."  In contrast, the Federal Maritime Commission referred to this type of entity as a NVOCC.  The STB Decision further states that although the terminology is different, the two terms are equivalent.

[33]   Ms. Adamski, the Director of Operations & Logistics for KIF and ARM, also states in her Declaration in support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction that "KIF contracts with ARM for transportation of its customers' seafood products on non-coastwise qualified vessels."  (Dkt 8 ¶ 9.)  The President of ARM, Per Brautaset, notes that "ARM and KIF together offer an end-to-end service to shippers, ensuring quality standards and timeliness, while handling the complexity of negotiating with multiple vendors and managing the documentation requirements." (Dkt. 7 at ¶ 8; *see also id.* ¶ 10 (describing ARM's logistics services)).  These are quintessential freight forwarder services.

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                    CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT                        PAGE 47 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 56 of 83

CBP either elected to ignore the applicability of the freight-forwarder exemption *or* considered this regulatory exemption but refused, improperly and without any legitimate justification, to adhere to its clear terms. Under either scenario, because of the applicability of the STB freight-forwarder exemption, there is no legitimate basis on which to assess penalties against either KIF or ARM predicated on their failure to file a tariff with STB. At a minimum, Defendants' conduct here constitutes a dramatic departure from the *Blumenthal* mandate that "*persons should receive clear and unequivocal warning before facing exposure to [the] harsh penalties*" of the Jones Act. *Am. Mar. Ass'n v. Blumenthal*, 590 F.2d 1156, 1165 (D.C. Cir. 1978).

### iv.  As Private Carriers, Plaintiffs Are Not Required to File a Tariff

Plaintiffs also are exempt from any purported tariff-filing requirement because they are "private" carriers and transport merchandise for their clients based solely upon private negotiated contracts.[34] Although a rate-filing requirement still applies to water carriers engaged in non-contiguous trade, 49 U.S.C. § 13702, Congress has limited that requirement to apply only to common carriers, i.e., those that hold out their services to the public generally. The filing requirement does not apply to contracts for private carriage. 49 U.S.C. § 14101(b)(1); 49 C.F.R. § 1312.1(a). CBP has long acknowledged in its ruling letters that entities using chartered vessels—as opposed to common carrier vessels—to transport frozen seafood from Alaska to the United States pursuant to private

---

[34]  A freight forwarder can also be a carrier. *See* 49 U.S.C. § 13102(3).

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                    CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT                    PAGE 48 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 57 of 83

agreements are "private carriers" that are not required to file a tariff to comply with the

Third Proviso:

> [A]s the STB opinion clearly states, since . . . Sunmar is using *chartered* foreign-flagged vessels, which are *private carriage*, Sunmar's operations are not within the jurisdiction of the STB. *Sunmar, utilizing private carriage, cannot file rate tariffs with the STB for any purpose*, *even informational.*   [T]he only reading that gives full effect to the Third Proviso for all vessels is that non-chartered non-coastwise-qualified, or in other words vessels that are *public (i.e. common) carriers*, are *required to file rate tariffs* with the STB, even if only for informational purposes, *and chartered vessels (i.e., private carriers) are thus exempted from such filing*.

(*See* Sunmar *II* Ruling Letter at 4).  That has been confirmed by the STB: "[the]

requirement that water carriers file tariffs with the Board applies only to such carriers

who are common carriers, meaning that they are carriers that hold out their services to the

public generally, and does not apply to private carriage."  (*Id.* at 3).

   In addition, in August 2017, soon after the commencement of its Jones Act

investigation into Plaintiffs' operations, CBP was apprised by STB of the applicability of

the private-carriage exemption to entities such as Plaintiffs.  Specifically, STB attorney

Bourdon advised CBP that:

> [W]hile carriers engaged in the noncontiguous domestic trade *are* required to file tariffs containing their rates and service terms, *tariffs are not required for transportation provided under private contracts between carriers and shippers*[.]

Dkt. 106-9 at 25 (Admin. Record at 218).

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                    CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT                    PAGE 49 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 58 of 83

Here, it is indisputable that the "private carriage" tariff filing exemption applies to Plaintiffs. KIF, through contracts with ARM, privately charters vessels[35] and privately contracts with a select number of shippers. (Brautaset Dec. ¶ 18). KIF does not offer transportation services to the public, but instead entirely transports merchandise for select clients pursuant to heavily-negotiated and individualized contracts unique to each particular client's needs. *See id.*

*Horizon* also recognized the private-carrier exemption from the tariff-filing requirement:

- The STB confirmed it did *not* accept tariffs from *private carriers* (*see Horizon* at 50, 56, 60);

- The STB opined that a carrier who is engaged in transporting private carriage could be a private carrier and thus not required to file a tariff (*Id.* at 56-58); and

- The Third Proviso could "*be reconciled with the STB's existing tariff filing requirements by excluding only those chartered vessels who engage in private carriage.*" (*Id.* at 58).

*Horizon* did not reach a final decision as to the application of the private-carrier exemption because, as discussed, the court determined that the factual record in that case was incomplete and needed to be further developed. *See id.* at 56, 58 ("[I]n the absence of any 'reasoned explanation' for classifying Sunmar as a private carrier, it is difficult to credit [CBP's] conclusion that Sunmar is exempt from the Third Proviso because it may

---

[35] KIF contracts with ARM for vessel services, and ARM separately negotiates private contracts with the owners of foreign flagged vessels to transport the frozen fish from Alaska to the Bayside Port. (*See* Dkt. 8 ¶ 7; Dkt. 7 ¶¶ 7, 9-11).

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT              PAGE 50 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 59 of 83

be a private carrier.").[36]  This was one of the primary reasons for the *Horizon* court's remand decision.

The fundamental difference between private and common carrier for purposes of tariff filings also has been recognized by the Ninth Circuit Court of Appeals in analogous contexts. *See In re Hawaiian & Guamanian Cabotage Antitrust Litig.*, 754 F.Supp.2d 1239 (W.D. Wash. 2010), *aff'd*, 450 F. App'x 685 (9th Cir. 2011).  There, in evaluating the tariff-filing requirement under the Shipping Act, the Ninth Circuit explained:

> *Common carriers hold themselves out to serve the public* in a *nondiscriminatory* manner and on a *regularly scheduled*, previously announced basis, usually moving a variety of materials ('general cargo') for numerous different shippers at the same time.  *In contrast*, *contract carriers* . . . load lots for a shipper who hires the vessel for a single trip. . . [S]etting up and operating a regularly scheduled liner service costs a great deal.  Moreover, a *common carrier vessel sails and incurs the expenses of a voyage whether full or three-quarters empty. The same is not true for [private carriers]*.

*Id*. at 1254 (internal quotation marks omitted).  *See also* 5 West's Fed. Admin. Prac. § 5379 ("To be a common carrier, a company need only, in practice, serve the public indiscriminately . . .") (citing *Am. Orient Exp. Ry. Co., LLC v. Surface Transp. Bd.*, 484 F.3d 554 (D.C. Cir. 2007) (for purposes of an STB filing, an owner of vintage rail cars that markets and sells vacations aboard luxury train accommodations with fine dining,

---

[36]  *See also id*. at 56 ("The STB also noted that while it did accept rate tariff filings for 'common carriers,'" it had no jurisdiction over private carriage.  Because Sunmar 'chartered' the foreign vessels at issue, the STB opined, it may be engaged in private carriage and therefore non-jurisdictional with respect to the rate tariff filing requirement") (internal citations omitted).

and activities was a common carrier because "[i]t distributes to the public brochures advertising specific prices for its vacation packages")).

The undisputed facts here establish that Plaintiffs are private rather than common carriers. Plaintiffs do not hold themselves out to serve the public in a nondiscriminatory manner, they do not operate their transportation services on any previously-announced, regularly scheduled basis, and do not transport an unlimited variety of different materials for an unlimited number of different shippers at the same time. To the contrary, they enter into private contracts for specified trips with a limited number of seafood shippers to transport, at negotiated times and rates, frozen seafood primarily from Alaska to the eastern United States. (Brautaset Dec. ¶¶ 15, 18). And, unlike commercial carriers, Plaintiffs are under no obligation to incur the expense of a voyage on a vessel that does not meet minimum, negotiated capacity volumes. (Brautaset Dec. ¶ 19).

Accordingly, Plaintiffs, as private carriers, are not required to file a tariff to satisfy the Third Proviso.

\*    \*    \*

Because there is no genuine dispute that Plaintiffs' transportation of frozen seafood from Alaska to the eastern United States utilizing the Bayside Route complies with the Third Proviso of the Jones Act, Plaintiffs are entitled to summary judgment on their declaratory judgment claim (Count I).

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                    CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT                    PAGE 52 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 61 of 83

## II. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT THAT CBP VIOLATED 19 U.S.C. §§ 1625(C)(1) AND (C)(2)

Plaintiffs have established, based on the undisputed and indisputable facts, that they are entitled to summary judgment that in issuing the penalty notices, Defendants violated both 19 U.S.C. § 1625(c)(1) and § 1625(c)(2).

### A. CBP's Statutory Obligation to Provide Public Notice and the Opportunity of Interested Parties to Comment

CBP has a statutory obligation, codified at Section 625(a) of the Tariff Act of 1930, as amended by 19 U.S.C. § 1625(a), to make available information necessary for "informed compliance," so that importers and others may exercise "reasonable care" in conducting business regulated by CBP. (Gross Dec. Ex. 3, December 2009 U.S. Customs & Border Protection Rulings Program Informed Compliance Publication, at 47). "Informed compliance" means that "[i]mporters have the right to be informed about Customs rules and regulations, and its interpretive rulings and directives, and to expect *certainty* that the ground rules would not be *unilaterally* changed by Customs without the proper notice and opportunity to respond." *Precision Specialty Metals, Inc. v. United States*, 25 CIT 1375, 1388, 2001) (citation omitted).

Importers properly may rely on CBP's official written positions in the form of "interpretive *rulings* or decisions," as well as CBP's *actions*—referred to in § 1625(c)(2) as "treatments"—for purposes of structuring their transactions in a manner that ensures compliance with laws and regulations under CBP jurisdiction. Plaintiffs thus, by law, are entitled to rely on the applicable ruling letters interpreting the Third Proviso and on

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.      CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT      PAGE 53 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 62 of 83

CBP's treatments of substantially identical transactions in structuring their transportation transactions.

### 1. CBP's Interpretive Ruling Letters Published for Reliance by the Industry

According to CBP's own regulations, Plaintiffs are entitled to rely on CBP *ruling letters* involving *other* parties, transactions and issues that are substantially similar to their own transactions and issues. (*See* Dkt. 64 at 19). In its Informed Compliance Publication ("ICP") on CBP's Rulings Program, CBP states that "[t]he *published rulings* provide the international trade community with guidance on how CBP will handle *similar transactions*." (Gross Dec. Ex. 3 at 9). The ICP also provides that "[a]ny importer that wishes to rely on a ruling letter *issued to someone else* should make sure that the letter has not been modified or revoked."[37]

CBP ruling letters are thus intended to provide notice—not only to the direct recipient of the ruling—but also to the public regarding the manner in which CBP will interpret and apply the laws and regulations under its purview, including the Jones Act, when merchandise is imported into the United States.[38] The ICP states that CBP expects

---

[37] *See also* 19 C.F.R. § 177.9(a) ("A ruling letter issued by the Customs Service . . . represents the *official position* of the Customs Service with respect to the particular transaction *or issue* described therein and is *binding on all Customs Service personnel* in accordance with the provisions of this section until modified or revoked. In the absence of a change of practice or other modification or revocation which affects the principle of the ruling set forth in the ruling letter, *that principle may be cited as authority in the disposition of transactions involving the same circumstances*").

[38] To the extent the CBP argues that the regulations should be interpreted to restrict the members of the public able to rely on CBP ruling letters, *see* 19 C.F.R. § 177.9(c), such interpretations would be directly contrary to the intent of the statute. *See California Indus. Prod., Inc. v. United States*, 436 F.3d 1341, 1356 (Fed. Cir. 2006) (invalidating

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.        CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT        PAGE 54 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 63 of 83

the international trade community to rely on CBP's formal rulings concerning "transactions or issues" in assessing whether its transactions are lawful.

Indeed, the notice-and-comment procedure CBP is required to follow when modifying or revoking prior ruling letters is premised on the recognition that the regulated trade community, in structuring transactions, properly relies on CBP's published ruling letters. There would be no need for public notice and a mandatory period that authorizes "interested parties" to comment on proposed modifications or revocations, if CBP ruling letters were only binding on—and relevant to—the direct recipients of the ruling. *See Sea-Land Serv., Inc. v. United States*, 239 F.3d 1366, 1373 (Fed. Cir. 2001) ("Section 1625(c)'s notice and comment requirements are intended to ensure that the *interested public* has notice of a proposed change in Customs' policy and to allow the public to make comments on the appropriateness of the change and to modify any current practices that were based in reliance on Customs' earlier policy.").

### 2.     Plaintiffs Are Entitled to Rely on CBP's "Treatments" of Substantially Identical Transactions"

Even assuming no ruling letter has been issued with respect to a particular transaction or issue, importers are entitled to rely on the "treatment" accorded by CBP to "substantially identical transactions." *See* 19 U.S.C. § 1625(c)(2); *California Indus.*

---

CBP regulations that impermissibly narrowed the meaning of § 1625(c)(2)'s "substantially identical transaction" language and finding that CBP was not entitled to deference in promulgating regulations under § 1625(c) due to the "clear intent of Congress").

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                    CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT                    PAGE 55 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 64 of 83

*Prod.*, 436 F.3d at 1354. The ICP describes the distinction between a "ruling letter" and a "treatment" as follows:

> There may be times when *CBP has not issued a ruling*, internal advice or a protest review decision, *concerning a particular issue*, *but has made decisions* involving that matter at one or more ports of entry so that consistent treatment has been given . . . In essence [the regulation] requires an *actual determination* by a CBP officer that resulted in a *consistently applied decision over a two year period on a national basis*. The law requires that if CBP wishes to issue a prospective ruling, internal advice, *or other decision which would have the effect of changing that treatment*, it *must* follow the same notice and comment procedure described for modifying or revoking previously issued ruling letters. *See* 19 U.S.C. § 1625(c)(2).

(Gross Dec. Ex. 3 at 23). Thus, even absent a ruling letter addressing a particular transaction or issue, importers properly also are entitled to rely on CBP's "consistently-applied decisions" in determining the validity of their transactions.

### 3. CBP's Comment-and-Notice Duty Concerning Modification or Revocation of its Interpretive Rulings and Treatments

Similar to other federal agencies engaged in notice-and-comment rulemaking, *see* 5 U.S.C. § 552, CBP must comply with strict statutorily-prescribed procedures when it modifies or revokes its "interpretive rulings," including "*ruling letters* or internal advice memorandum," *see* 19 U.S.C. § 1625(a), or "treatment[s]" accorded to "substantially identical transactions." 19 U.S.C. § 1625(c); *see generally California Indus. Prod.,* 436 F.3d 1341, 1351 (Fed. Cir. 2006) (analyzing requirements of § 1625(c)).

Under § 1625(c), "a proposed interpretive ruling or decision" must be published in the Customs Bulletin if that ruling or decision will:

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.     CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT     PAGE 56 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG     Document 117     Filed 12/03/21     Page 65 of 83

(1)    modify (other than to correct a clerical error) or revoke a prior *interpretive ruling or decision* which has been in effect for at least *60 days*; or

(2)    have the effect of modifying the *treatment* previously accorded by the Customs Service to *substantially identical transactions*.

19 U.S.C. § 1625(c)(1)-(2).  Under either scenario, CBP must provide "interested parties" an opportunity to submit "comments on the correctness of the proposed ruling or decision" for at least 30 days after publication in the *Customs Bulletin*.[39]  19 U.S.C. § 1625(c).  After this comment period, CBP "shall publish a final ruling or decision in the *Customs Bulletin* within 30 days after the closing of the comment period," with the final ruling or decision becoming effective 60 days after the date of its publication.  *Id*.

Here, the undisputed facts establish that CBP has issued ruling letters interpreting the Third Proviso, *and* has accorded treatments to substantially-identical transactions, both of which were relied on by Plaintiffs.  As demonstrated below, CBP has violated § 1625(c)(1), by issuing the penalty notices that are premised on non-public and undisclosed revocations of Ruling Letters that were in effect for more than 60 days— revocations effectuated without providing notice or an opportunity for comment (Count II)—and violated § 1625(c)(2), by improperly modifying or revoking—through

---

[39]   The *Customs Bulletin*, which is published by CBP, "provides a weekly compilation of decisions, rulings, regulations, notices, and abstracts concerning customs and related matters of the U.S. Customs and Border Protection, U.S. Court of Appeals for the Federal Circuit and U.S. Court of International Trade."  (Dkt. 6-26, U.S. Customs & Border Protection, Customs Bulletin and Decisions, https://www.cbp.gov/trade/rulings/bulletin-decisions (last accessed December 3, 2021)).  Ruling Letters have been published in the *Customs Bulletin* since 1989 and are publicly available on CROSS.

the issuance of the penalty notices—the treatment it has accorded to transactions that are substantially identical to the transactions unlawfully penalized by CBP (Count III).

## B. CBP Violated 19 U.S.C. § 1625(c)(1) by Modifying or Revoking Interpretive Rulings That Were in Effect Longer Than 60 Days

To prevail on a claim under § 1625(c)(1), a plaintiff must prove that CBP (i) issued a new interpretive ruling or decision which has not been subjected to the notice-and-comment process outlined in § 1625(c); and (ii) that new interpretive ruling or decision modifies or revokes a "prior interpretive ruling or decision" that has been in effect for at least 60 days. *See* 19 U.S.C. § 1625(c)(1); *Int'l Custom Prod., Inc. v. United States*, 32 C.I.T. 302, 306 (2008).

The first element of Plaintiffs' § 1625(c)(1) claim is satisfied because CBP's penalty notices constitute interpretive rulings or "decisions" under § 1625(c). *See, e.g., Int'l Custom Prod.,* 32 C.I.T. at 310 (CBP Notice of Action was a "decision" under § 1625(c)); *Am. Fiber & Finishing, Inc. v. United States*, 121 F.Supp.3d 1273, 1280 (U.S. Ct. Int'l Trade 2015) (same).[40] The penalty notices—as revealed for the first time in the recently-produced CBP administrative record—are premised on internal CBP memoranda that set forth new interpretations of the Third Proviso related to the use of any Canadian

---

[40]   As noted in *Am. Fiber & Finishing*, 121 F.Supp.3d at 1280, "[i]f a determination is the result of considered deliberations, if it interprets and applies the provisions of the Customs and related laws to a specific set of facts, if it has the effect of unilaterally changing the rules upon which importers have come to rely, if it is otherwise the functional equivalent of interpretive rulings or decisions, then it may be an interpretive ruling or decision and thereby may trigger 19 U.S.C. § 1625 notice and comment requirements" (internal citations and quotation marks omitted).

rail line. Those new interpretations have never been subject to the notice-and-comment process. (*See, e.g.*, Dkt. 106-9 at 30-31).

Internal CBP memoranda also constitute a "decision" under § 1625(c). *See Kahrs Int'l, Inc. v. United States*, 33 C.I.T. 1316, 1353 (2009) ("[T]he text of § 1625 covers interpretive rulings, ruling letters, *internal advice memoranda*, protest review decisions, or decisions that are the functional equivalent of interpretive rulings or decisions"). Because it is undisputed that the internal advice memoranda supporting issuance of the penalty notices were not published through the notice and comment procedure mandated by § 1625(c),[41] the first element of Plaintiffs' Count II claim is established.

The second element under § 1625(c)(1) also has been satisfied because it is beyond dispute that CBP's new interpretive rulings modify or revoke a "prior interpretive ruling or decision" that has been in effect for at least 60 days. Specifically, during the past four decades, CBP has issued a series of public ruling letters[42] concerning the interpretation of the Third Proviso, including the interpretation of the statutory phrase "in part over Canadian rail lines." Those interpretations, as discussed above, relate to three issues.

*First*, CBP has declared in a public ruling letter that the Third Proviso's Canadian rail requirement is satisfied provided there is "*any* use of Canadian rail." (Dkt. 53-1 at 5

---

[41]    CBP admits in its Answer that it did not publish an interpretive ruling or decision in the *Customs Bulletin* as required by § 1625(c). (*See* Dkt. 105 ¶ 70 ("Admitted that there are no decisions published in the Customs Bulletin modifying or revoking the Ruling Letters . . .")).

[42]    *See* discussion of the ruling letters *supra* at pp 16-21.

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                    CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT                         PAGE 59 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG    Document 117    Filed 12/03/21    Page 68 of 83

(Sunmar *II* Ruling Letter)).[43]  *Second*, with respect to the *length* of the Canadian rail line, and consistent with the use of the term "any," CBP's public ruling letters repeatedly and unequivocally declared that there is no minimum length rail requirement.  (*See, e.g.,* Dkt. 53-1 at 5 (Sunmar *II* Ruling Letter)).[44]

*Third*, with respect to the nature and function of the Canadian rail line, CBP declared that there is no requirement that the rail line be "commercially reasonable." (*See* Dkt. 53-1 at 5 (Sunmar *II* Ruling Letter)).[45]

CBP's internal memoranda, which are the predicate for the penalty notices, plainly revoke or modify CBP's ruling letters on each of these three issues.  *See Int'l Custom Prod.,* 32 C.I.T. at 311 ("[I]f the actions alleged of Customs are proven, Customs effectively revoked [the importer's] classification ruling" by issuing the Notice of Action, which is akin to a penalty notice).

---

[43]  *See* Ruling Letters 116021 (Dkt. 53-1) ("We have long held that 'in part over Canadian rail lines' is *any* use of Canadian rail."); 116185 (affirming 116021); (Dkt. 16-3); *see also* Ruling Letters 105604 (Dkt. 53-2); 111987 (Dkt. 6-33) ("The Customs Service has held that 'over Canadian rail lines" means over rail trackage in Canada"); 112085 (Dkt. 6-12) (same); 113365 (Dkt. 6-23) (same); 114407 (Dkt. 6-24) (same); 115124 (Dkt. 6-8) (same); 115446 (Dkt. 6-7) (same).

[44]  *See also* Ruling Letters 111987 (Dkt. 6-33); 112085 (Dkt. 6-12); 113365 (Dkt. 6-23); 114407 (Dkt. 6-24), and 115124 (Dkt. 6-8).

[45]  Similarly, the STB, in denying Horizon's petition for re-argument, refused to inject a commercial reasonableness requirement into the statute.  (*See Horizon STB*, 2007 WL 4429515, at *3 ("Horizon argues that this route is unreasonable because it is a "sham movement" designed for the sole purpose of avoiding the Jones Act . . . Absent a credible allegation of harm to a shipper, we are not prepared to second guess the commercial reasonableness of the carriers' decision to offer the route and the shippers' decision to utilize it")).

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                    CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT                    PAGE 60 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 69 of 83

The penalty notices are explicitly premised on CBP's new position that the BCR Rail Line is too short, does not connect two separate points and is therefore commercially unreasonable. (*See* Dkt. 38 at 2 (stating that CBP based the Penalty notices on Plaintiffs' use of "a specially-built mini-rail track, approximately 100 feet in length, that goes nowhere")).

CBP likewise changed its position on the lack of a rail-length requirement. In an undated internal memorandum, entitled "JADE-prepared Industry Allegation Narrative and Analysis," (Dkt. 106-9 at 30), CBP essentially determines that the short length of the BCR rail line renders the transportation non-compliant with the Third Proviso:

> CBP has verified that the routing of the vessels involved are Dutch Harbor, through the Panama Canal, then to Bayside, Canada. From Bayside, the merchandise is offloaded in Bayside, CA from the vessel to either be stored in the warehouse or to refrigerated trucks. Prior to the trucks transporting the merchandise over the border in-to Calais, Maine, the trucks are loaded onto a rail car on a rail track, sent down approximately *50 yards* and *then return* to the point where the truck was originally loaded. The truck is then driven off the rail car, then driven across the U.S./Canadian border. *The track being used consists of approximately 3 lengths of track and 2 rail cars. This appears to circumvent the requirements of 46 U.S.C. 551116* [sic] *which requires the movement to be conducted in part over Canadian rail lines.*

The reasoning and conclusion in this undisclosed, internal memorandum, when coupled with the penalty notices, revokes or modifies CBP's ruling letters concerning the Third Proviso. As a result, these new interpretations should have been published publicly to afford Plaintiffs and other interested parties the opportunity to contest the radical

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                    CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT                    PAGE 61 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 70 of 83

change in CBP's long-standing interpretation of the Third Proviso.[46] CBP's violation is

further demonstrated by the absence of any notice on CROSS concerning any change in

status of any of the applicable ruling letters.[47]

Accordingly, Plaintiffs have demonstrated, as a matter of law, that Defendants,

through their issuance of the penalty notices, have violated § 1625(c)(1).[48]

### C. CBP Violated 19 U.S.C. § 1625(c)(2) by Modifying or Revoking Interpretive Rulings Involving Transactions "Substantially Identical" to Plaintiffs' Bayside Route Transactions

CBP also violated § 1625(c)(2) with respect to treatments previously afforded to

substantially identical transactions. To establish a CBP violation of § 1625(c)(2), a

plaintiff must establish each of the following requirements:

(i)     A "treatment [was] previously accorded by [CBP];"

(ii)    The conduct challenged in CBP's enforcement action constitutes a
        "substantially identical transaction" to the previous treatment;

---

[46] This Court previously noted that a judicially-mandated change in a CBP interpretation is not subject to the § 1625(c) notice-and-comment requirement. (Dkt. 64 at 16, n.54.) That reasoning is not applicable here because no judicial decision mandated any change in CBP's interpretation of the Canadian rail line requirement. To the contrary, as shown above, *Horizon* judicially reaffirmed that compliance with the Canadian rail component of the Third Proviso need not be "commercially sound." *Horizon*, 414 F.Supp.2d at 55 n.6.

[47] This obligation is at the heart of § 1625, which was amended by Congress in the Customs Modernization Act to require CBP to provide the "advice necessary for importers and exporters to comply with the Customs laws" in response to concerns about the lack of transparency and uniformity in the application of CBP's rulings and changes of position. *See* 19 U.S.C. § 1625(e). (*See supra* pp. 28-29).

[48] The foregoing analysis applies with equal force to CBP's tariff-related ruling letters, which consistently have held, as discussed above, that no tariff filing is required to comply with the Third Proviso. (*See supra* pp. 40-43). It is undisputed that CBP never revoked or modified those tariff rulings, which are still posted on CROSS.

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                    CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT                     PAGE 62 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 71 of 83

(iii)   CBP issued a "'proposed interpretive ruling or decision' that would have the effect of modifying the previous treatment with respect to the entries in question;" and

(iv)   The proposed interpretive ruling or decision violated the notice and comment requirements of Section 1625(c).

19 U.S.C. § 1625(c)(2); *see also Kahrs,* 33 C.I.T. at 1354; *Int'l Custom Prods., Inc. v. United States,* 33 C.I.T. 79, 86-87 (2009).  Here too, the undisputed facts show that Plaintiffs satisfy all elements necessary to prevail on their § 1625(c)(2) claim.

1.   **CPB's Ruling Letters and Decades-Long Treatment Concerning Plaintiffs' Customers' Frozen Seafood**

A "treatment" for purposes of § 1625(c)(2) may be established in one of two separate and independent ways.

First, ruling letters may form the basis for a "treatment" for purposes of § 1625(c)(2).  *See California Indus. Prod.,* 436 F.3d at 1346 (CBP rulings in the form of "Treasury Decision[s]" on and liquidation of 145 entries over a five-year period for a separate importer was a "treatment" under § 1625(c)(2)); *see also Precision Specialty Metals, Inc. v. United States*, 24 C.I.T. 1016, 1017 (2000) (discussing the Treasury Decisions cited in *California Industrial Products*); *Precision Specialty Metals, Inc. v. United States*, 25 C.I.T. 1375, 182 F.Supp.2d 1314, 1317 (U.S. Ct. Int'l Trade 2001) (same).  Here, it is beyond any dispute that CBP's ruling letters interpreting the Third Proviso constitute its treatment with respect to intermodal transportation of frozen seafood from Alaska to the eastern United States, which in part involved the use of a Canadian rail line.

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                    CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT                    PAGE 63 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 72 of 83

Second, "importers may order their actions based not only on Customs' formal policy, 'position,' 'ruling' or 'decision,' but on its prior *actions*." *Precision Specialty Metals, Inc. v. United States*, 24 C.I.T. 1016, 1044 (2000). Those actions are considered "treatment[s]" under § 1625(c)(2). Courts routinely have ruled that "entries"—*i.e.*, CBP action allowing merchandise to be admitted into the United States—may constitute a "treatment" for purposes of § 1625(c)(2).[49] *See*, e.g., *Am. Fiber & Finishing,* 121 F.Supp.3d at 1287 (first entry constituting a treatment for purposes of § 1625(c)(2) occurred when CBP reclassified the merchandise being imported from a duty-free to a dutiable provision; noting that the first entry marked the point "when the 'pattern of actions taken by Customs on [Plaintiff's] import transactions, on which [Plaintiff claims it] has reasonably relied,' putatively changed without notice or comment." (citations omitted)); *Int'l Custom Prod.,* 33 C.I.T. at 88 (entries of plaintiff's merchandise could constitute a prior treatment under § 1625(c)(2)).[50]

---

[49] CBP's regulations interpreting the term "treatment" are inconsistent with the text and intent of § 1625(c)(2) in numerous ways. For example, CBP's regulations state that "Customs will not find a treatment was accorded to a person's transactions if," among other reasons, "the person's *own transactions* were not accorded the treatment in question over the 2-year period immediately preceding the claim of treatment." 19 C.F.R. § 177.12(c)(iii)(A). Limiting the term "treatment" in this way is incompatible with § 1625(c)(2)'s construction, which looks to "substantially identical transactions." Courts have made clear that § 1625(c)(2) applies to transactions made by "other parties" and cannot be so limited by CBP. *See, e.g., California Indus. Prod.*, 436 F.3d at 1355 ("[W]hen Congress wrote section 1625(c), it knew that under Customs regulations, 'treatment' included 'substantially identical transactions' of 'other parties,' making it unnecessary for it to specify that it was referring to 'substantially identical transactions' of a single party or multiple parties").

[50] "Entries" are distinct from "bypass entries" in which CBP officials do not examine or review what is being admitted into the United States, such as when large container ships

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                    CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT                    PAGE 64 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 73 of 83

Here, since 2012, over a period of nearly a decade, CBP consistently has approved

entry into the United States of trucks containing Plaintiffs' customers' frozen seafood,

which was transported on the Bayside Route from Alaska to the United States.  In the

two-year period[51] before the issuance of the penalty notices to KIF, between August 2019

(indeed since 2012) and August 2021, Plaintiffs provided thousands of BOLs to CBP

officials at the Calais, Maine border crossing.  (Dkt. 8 ¶ 11-13).  Those BOLs all identify,

among other items: (i) the use of foreign-flagged vessels for the transportation of the

frozen seafood from Alaska to the Bayside Port, and (ii) the use of the BCR rail line on

the Bayside Route.  (Dkt. 8 ¶ 11-13).  All material facts relating to the BCR rail line

component of the Bayside Route were disclosed to CBP on *every single shipment* of

---

deliver a load of containers to a port that cannot all be expediently inspected.  *See, e.g.,
Kent Int'l, Inc. v. United States*, 17 F.4th 1104 (Fed. Cir. 2021) (discussing bypass
entries).  The entries at issue here were transported into the United States in individual
truck-loads, all of which required a CBP official at the Calais border crossing to review
the paperwork (including BOLs) provided by the trucking company to ensure that the
merchandise was eligible to be admitted across the border.  The entries at issue here are,
therefore, distinct from bypass entries which CBP does not consider treatments under its
regulations.  *See* 19 C.F.R. § 177.12(c)(1)(iv).

51   *See* 19 C.F.R. § 177.12(c)(1)(i)(C) (requiring that CBP consistently apply the
treatment on a national basis over a two year period immediately preceding the claim of
treatment).  This regulation is also inconsistent with the text and intent of § 1625(c)(2).
Simply because certain shipments—including those made by ASC and Sunmar—
occurred outside an arbitrary two-year period prior to the imposition of the Penalty
Notices does not make the treatment of those transactions any less "substantially
identical."

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                    CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT                     PAGE 65 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 74 of 83

frozen seafood ultimately headed to the eastern United States through the Bayside Port.[52] During that period, CBP did not reject or even question a single shipment.[53]

Plaintiffs thus satisfy the first requirement of § 1625(c)(2) because the undisputed facts concerning CBP's ruling letters involving the Third Proviso, combined with CBP's actions over a period of nearly a decade in allowing entry of Plaintiffs' customers' frozen seafood into the United States, constitute the treatment that CBP has accorded to the frozen seafood at issue.

### 2. Plaintiffs Transactions Are Substantially Identical to Those at Issue in the Ruling Letter and the Entries Subject to CBP's Prior Treatment

Plaintiffs meet the second requirement of § 1625(c)(2) because the transactions covered by the penalty notices are substantially identical to the transactions covered by the ruling letters and CBP's entry decisions concerning Plaintiffs' customers' frozen seafood.

---

[52]   Through those shipments, tens of millions of pounds of frozen seafood were permitted entry into the United States.  Plaintiffs "transactions" did not involve transporting "small quantities or values" that, under CBP's regulations, would be entitled to "diminished weight."  *See* 19 C.F.R. § 177.12(c)(1)(ii).

[53]   CBP explicitly prioritizes the enforcement of laws such as the Jones Act when it makes entry determinations.  For example, in a September 2019 PowerPoint presentation detailing the enforcement priorities at the Calais border crossing, CBP notes that one of its priorities as part of its screening and inspections process is the enforcement of "Point to Point violations."  (*See* Gross Dec. Ex. 5, CBP Trade Overview, September 16 2019 at 9; *see also* 46 U.S.C. § 55102(b) (prohibiting non-coastwise vessels from transporting merchandise "between *points* in the United States"); Ruling Letter 110967 (April 12, 1990) (discussing the Jones Act's prohibition on the transportation of passengers "point to point").

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                    CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT                    PAGE 66 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 75 of 83

"[T]he requirement that transactions be 'substantially identical' does not require complete identity." *California Indus. Prod.,* 436 F.3d at 1352. Courts have routinely rejected a narrow reading of the term "substantially identical" and have determined that "the language of the statute indicates that Congress clearly intended transactions between Customs and *multiple parties* to be "substantially identical transactions." *Id.* at 1353; *see also Peerless Clothing Int'l, Inc. v. United States,* 33 C.I.T. 24, 36 (2009) (noting multiple courts have rejected the argument that complete identity of the parties and transactions were required under § 1625(c)(2)).

Many of CBP's ruling letters involve the transportation of frozen seafood on the Bayside Route. Those transactions are essentially identical to those described in the ASC Ruling Letter and Sumnar Ruling Letters.[54] While the Canadian rail line at issue in those ruling letters was the NBSR, rather than the BCR, that is not a material distinction because, as discussed above, that distinction did not alter the fundamental nature of the Bayside Route "through route."[55] (*See supra* pp. 35-36). Moreover, because it is equally indisputable that the transactions subject to the penalty notices are *identical* to Plaintiffs' customers' prior entries of frozen seafood since 2012 using the Bayside Route and the BCR Rail Line, the indisputable facts here demonstrate that Plaintiffs have satisfied the second requirement of § 1625(c)(2).

---

[54] The principle underscored in the ruling letters was that *any* transportation over Canadian rail lines suffices for purposes of the Third Proviso. (*See supra* 17-18).

[55] The Court has previously stated that "in terms of functionality, the BCR rail line would appear to be substantially identical to the other Canadian rail line—referring to the NBSR—"on which merchandise is carried solely to comply with the Third Proviso."

### 3. The Penalty Notices Effectively Modify the Previous Treatment Accorded by CBP to Substantially Identical Transactions

The third requirement of § 1625(c)(2) is met because CBP's issuance of penalty notices exceeding $25 million to KIF, and exceeding $350 million to Plaintiffs' third-party business partners, as demonstrated above, indisputably had the effect of revoking or modifying the treatment previously accorded to the use of the Bayside Route for the transportation of frozen seafood from Alaska into the eastern United States. CBP's penalty notices necessarily are premised on its undisclosed, illegal, improper, and ineffective revocation of its long-established ruling letters. At no point during the past decade, when Plaintiffs were utilizing the Bayside Route with the BCR rail line, the use of which repeatedly was disclosed by Plaintiffs to CBP through the submission of thousands of BOLs, did CBP ever provide any notice to Plaintiffs that they could no longer rely on its ruling letters concerning the Third Proviso that were published on CBP's database or that those Ruling Letters were no longer in effect.

Thus, CBP's decision to issue the penalty notices to KIF and Plaintiffs' third-party business partners impermissibly had the effect of "modifying the previous treatment with respect to" its interpretation of the Third Proviso and should be rescinded.

### 4. CBP Failed to Comply With the Notice and Comment Requirement of § 1625(c)

There also is no dispute that, as this Court has recognized, CBP has not published *any* notices or rulings in the *Customs Bulletin* revoking or modifying any of its Ruling Letters interpreting the Third Proviso. (*See* Dkt. 64 at 20 ("[I]t is undisputed that CBP did not accord any notice or comment period prior to issuing the penalty notices in this

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.          CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT          PAGE 68 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 77 of 83

case").  Plaintiffs have therefore satisfied the fourth and final element to establish that CBP violated § 1625(c)(2).

### D. The Penalty Notices are Void and Should be Rescinded

The appropriate remedy for failure to properly follow the notice and comment procedures of § 1625(c) is to void the penalty notices and order CBP to rescind them. *Int'l Custom Prod.,* 748 F.3d at 1189.[56]

*        *        *

Plaintiffs have established, pursuant to Fed. R. Civ. P. 56, the absence of any genuine factual dispute that CBP's issuance of the penalty notices violates 19 U.S.C. § 1625(c)(1) and § 1625(c)(2).  Plaintiffs therefore are entitled to summary judgment on Counts II and III of the Complaint, and an order declaring the penalty notices null and void and directing CBP to rescind those penalties.

---

[56] *Int'l Custom Prod., Inc. v. United States*, 36 C.I.T. 1482, 1507 (2012), *aff'd* 748 F.3d 1182 (Fed. Cir. 2014), exemplifies the nature of the appropriate remedy here.  There, an importer received a ruling letter from CBP classifying its product—a white pasta sauce— as "sauces and preparations thereof" but then, years later, without any action publicly revoking or modifying the ruling, reclassified the product as "[b]utter and . . . dairy spreads." *Id*. at 1483.  That reclassification increased the importer's tariff duty by approximately 2,400 percent.  The court held that CBP's failure to accord the importer the procedural safeguards guaranteed by § 1625(c) invalidated CBP's assessments. *Id*. at 1507.  The Federal Circuit affirmed the district court's decision.

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.               CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT                        PAGE 69 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 78 of 83

### III. THE PENALTY NOTICES VIOLATE KIF'S RIGHTS TO DUE PROCESS UNDER THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION (COUNT IV)

Under the Fifth Amendment's Due Process Clause,[57] "laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.,* 567 U.S. 239, 253 (2012). This principle applies to regulations issued by administrative agencies of the federal government. "Fair notice requires [an administrative] agency to [] 'state[] with ascertainable certainty what is meant by the standards it has promulgated.'" *ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.,* 867 F.3d 564, 578 (5th Cir. 2017) (citation omitted). "In the absence of notice—for example, where the regulation is not sufficiently clear to warn a party about what is expected of it—an agency may not deprive a party of property by imposing civil or criminal liability." *Gen. Elec. Co. v. U.S. E.P.A.,* 53 F.3d 1324, 1328-29 (D.C. Cir. 1995). "To provide sufficient notice, a statute or regulation must 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he may act accordingly.'" *United States v. Approximately 64,695 Pounds of Shark Fins*, 520 F.3d 976, 980 (9th Cir. 2008) (citation omitted); *see also* Dkt. 106-5 at 7 (discussing the

---

[57] A Fifth Amendment Due Process Claim is independent of a plaintiff's other claims, even if the claims arise from essentially the same allegations. *See Furie Operating Alaska, LLC v. U.S. Dep't of Homeland Sec.,* No. 3:12-CV-00158 JWS, 2015 WL 4076843, at *7 (D. Alaska July 6, 2015) (considering claims arising from penalties issued by CBP under the Jones Act).

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.               CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT                              PAGE 70 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 79 of 83

purpose of CBP's Jones Act Informed Compliance Publication is to "identify the laws and regulations pertaining to the coastwise transportation of merchandise").[58]

Here, CBP failed to provide *any* notice that it was abandoning and effectively reversing decades of consistent administrative rulings interpreting the statutory language—"in part over Canadian rail lines"—that is included in the Jones Act as one of the requirements that must be satisfied to comply with the Third Proviso. In a complete reversal and without any notice—let alone *fair* notice—CBP now claims that some *de minimis* Canadian rail line length is necessary, that the transport "in part over the Canadian rail line" must be "continuous" and connect two distant points, and that the transportation on the rail line must be commercially reasonable. (Dkt. 38 at 15-18). CBP's newly-minted interpretation of the Third Proviso fails to provide the requisite fair notice and ascertainable certainty required under the law and, therefore, constitutes a gross violation of KIF's due process rights. *ExxonMobil Pipeline Co.,* 867 F.3d at 578.

The egregiousness of this violation is deepened here because CBP's new and secretive interpretation of the "in part over Canadian rail lines" language not only is unsupported by the statutory text but also is directly contrary to CBP's long-standing

---

[58] Plaintiffs were not on notice that CBP had revoked or modified the principles set forth in its published and longstanding ruling letters concerning the use of a Canadian al line and the filing of rate tariffs. While the Court's initial Order on Plaintiffs' preliminary injunction motion did not find a likelihood of success on the due process claim 'at this time,' because KIF had a "reasonable opportunity to know . . . that a rate tariff needed to be filed with the STB to comply with the Third Proviso[]," (Dkt. 64 at 21-22), at that preliminary stage of this action, the Court did not have the benefit of the full record with respect to the relevant facts, including the accompanying Declaration of Per K. Brautaset, and full briefing on the tariff issue.

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.          CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT                    PAGE 71 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 80 of 83

declaration that the statutory text means exactly what it says, and requires nothing more. (*See, e.g.*, Dkt. 6-15 at 1 (2007 letter from CBP stating it "will not promulgate 'commercial soundness' regulations")).

Moreover, during the past decade, as discussed above, CBP—without notice or protest—has received from KIF and others more than 15,000 separate bills of lading that advised of the use of the BCR rail line and the roundtrip travel of the merchandise, and CBP has consistently admitted the frozen seafood at issue into the United States. (*See* Dkt. 8 ¶ 13). Thus, CBP's consistent public rulings, treatment and guidance provided to Plaintiffs and the regulated community inexorably led to the conclusion conclude that the BCR rail line was compliant with the Third Proviso. Plaintiffs therefore had no fair notice that the CBP regarded the BCR as deficient in any way, much less fair notice that any claimed deficiency could subject them to tens of millions of dollars in fines and hundreds of millions of dollars in fines to their supply chain partners. The same due process defects vitiate CBP's (i) ignoring the ASC Tariff actually on file; and (ii) its new, secretive interpretation of the requirement in the Third Proviso concerning the filing of a rate tariff, which directly contradicts CBP ruling letters that have remained in effect for decades and remain on CBP's public database of published ruling letters.

The foregoing due process violations are further compounded by CBP's penalty notices, which provide no notice as to the claimed nature of the purported violations. While imposing some $25 million of fines on KIF, and hundreds of millions of dollars on other in the supply chain, the penalty notices lack any description of the claimed violations, the merchandise involved, and the claimed entries of same into the United

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                    CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT                    PAGE 72 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 81 of 83

States.  These deficient and vague penalty notices offend "elementary fairness" and violate KIF's right to due process.[59]  *See Gen. Elec.,* 53 F.3d at 1329 (EPA's failure to provide General Electric with fair warning of its interpretation of regulations resulting in a "drastic" $25,000 penalty); *Exxon Mobil Corp. v. Mnuchin*, 430 F.Supp.3d 220, 229 (N.D. Tex. 2019) (an agency's failure to provide fair notice of a regulatory violation before issuing an administrative penalty justifies setting aside the imposed [$2,000,000] fine on due process grounds).[60]

Accordingly, CBP's penalty notices violate Plaintiffs' rights under the Due Process Clause in multiple respects and should be invalidated.

. . .

. . .

. . .

. . .

. . .

---

[59]  The Penalty Notices also violate 19 C.F.R. § 162.31(b), which requires that penalty notices contain, among other things: (1) a description of the specific acts or omissions forming the basis of the alleged violations; and (2) if the alleged violations involve the entry or attempted entry of merchandise, (i) a description of the merchandise and the circumstances of its entry or attempted entry; and (ii) the identity of each entry, if specific entries are involved.  The Penalty Notices lack any such required detail.  (*See, e.g.*, Dkt. 48-2).

[60]  KIF's due process rights are being further violated by CBP's ongoing failure to engage in the administrative process by issuing a decision on or otherwise considering KIF's Petition, which was filed on October 1, 2021, despite its prior representation to this Court that the "Notices of Penalty are not self-executing, Plaintiffs have a right to be heard in an administrative process, and Plaintiffs will receive . . . additional due process before they ever will be obligated to pay a penalty."  (Dkt. 38 at 30).

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                    CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT          PAGE 73 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 82 of 83

## **CONCLUSION**

Based on the foregoing, Plaintiffs' motion for partial summary judgment should be

granted.

DATED this 3rd day of December, 2021.

BIRCH HORTON BITTNER & CHEROT
Attorneys for Plaintiffs


By:     /s/ David Karl Gross
        David Karl Gross, ABA #9611065

KASOWITZ BENSON TORRES LLP
Edward E. McNally, ABA #9203003
Marc E. Kasowitz (*Pro Hac Vice*)
Hector Torres (*Pro Hac Vice*)
David J. Abrams (*Pro Hac Vice*)
Kim Conroy (*Pro Hac Vice*)
David E. Ross (*Pro Hac Vice*)


CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the   3rd  day of
December, 2021, a true and correct copy of the foregoing was
served via the Court's CM/ECF electronic filing system, on the
following:

Seth M. Beausang, Asst. U.S. Attorney
Christine Dollerhide, Asst. U.S. Attorney
Jacquelyn A. Traini, Asst. U.S. Attorney
U.S. Attorney's Office
seth.beausang@usdoj.gov
christine.dollerhide@usdoj.gov
jackie.traini@usdoj.gov

BIRCH HORTON BITTNER & CHEROT

By:      /s/ David Karl Gross

KLOOSTERBOER V. UNITED STATES OF AMERICA, ET AL.                    CASE NO. 3:21-cv-00198-SLG
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT                    PAGE 74 OF 74
01149339.DOCX

Case 3:21-cv-00198-SLG   Document 117   Filed 12/03/21   Page 83 of 83