James E. Torgerson, ABA #8509120
Stoel Rives, LLP
510 L Street, Suite 500
Anchorage, AK 99501
907-263-8404
jim.torgerson@stoel.com

Keith Bradley, *pro hac vice pending*
Squire Patton Boggs (US) LLP
1801 California Street, Suite 4900
Denver, Colorado 80202
303-894-6156
Keith.bradley@squirepb.com

D. Michael Kaye, *pro hac vice pending*
Squire Patton Boggs (US) LLP
2550 M Street NW
Washington, DC 20037
202-457-6000
Michael.kaye@squirepb.com

John J. Reilly, *pro hac vice pending*
Squire Patton Boggs (US) LLP
1211 Avenue of the Americas, 26th Floor
New York, NY 10036
212-872-9865
John.reilly@squirepb.com

Emily Huggins Jones, *pro hac vice pending*
Squire Patton Boggs (US) LLP
4900 Key Tower, 127 Public Square
Cleveland, OH, 44114
216-479-85500
Emily.hugginsjones@squirepb.com

*Attorneys for Amicus Curiae Lineage Logistics Holdings, LLC*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

KLOOSTERBOER INTERNATIONAL FORWARDING LLC, et al.,

Plaintiffs,

v.

UNITED STATES OF AMERICA, et al.,

Defendants.

Case No. 3:21-cv-00198-SLG

## BRIEF OF *AMICUS CURIAE* LINEAGE LOGISTICS HOLDINGS, LLC IN SUPPORT OF PLAINTIFFS

*Kloosterboer, et al. v. United States, et al.*
Case No. 3:21-cv-00198 (SLG)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................... ii

I.    INTERESTS OF *AMICUS CURIAE* ..................................................... 1

II.   THE GOVERNMENT HAS MISUNDERSTOOD KEY ISSUES. ...................... 2

      A.    Constructing a rail line to take advantage of the Third Proviso is not improper. ...................................................................................... 3

      B.    CBP misunderstood key facts about the Bayside Route. ............................. 8

III.  THE GOODS WERE TRANSPORTED OVER A THROUGH ROUTE OVER CANADIAN RAIL LINES. .................................................... 12

IV.   THE *SUNMAR* RULINGS ARE STILL BINDING ON CBP. ............................ 18

V.    CONCLUSION ......................................................................................... 24

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied-Signal v. NRC*,
988 F.2d 146 (D.C. Cir. 1993) ..................................................................... 21

*Am. Maritime Ass'n v. Blumenthal*,
590 F.2d 1156 (D.C. Cir. 1978) ................................................................... 17

*Camreta v. Greene*,
563 U.S. 692 (2011) ..................................................................................... 20

*Cent. Vt. Transp. Co. v. Durning*,
294 U.S. 33 (1935) ......................................................................................... 6

*Chamber of Comm. of the U.S. v. SEC*,
443 F.3d 890 (D.C. Cir. 2006) ..................................................................... 23

*Clean Wis. v. EPA*,
964 F.3d 1145 (D.C. Cir. 2020) ................................................................... 18

*Ctr. for Biological Diversity v. BLM*,
698 F.3d 1101 (9th Cir. 2012) ....................................................................... 3

*Ctr. for Biological Diversity v. Zinke*,
900 F.3d 1053 (9th Cir. 2018) ..................................................................... 15

*Ctr. for Regulatory Reasonableness v. EPA*,
849 F.3d 453 (D.C. Cir. 2017) ..................................................................... 20

*Denver & R.G.W. R. Co. v. Union Pac. R. Co.*,
351 U.S. 321 (1956) ..................................................................................... 16

*Evans v. McDonald's Corp.*,
936 F.2d 1087 (10th Cir. 1991) ................................................................... 11

*Feldman v. Buddy Boy, Inc.*,
No. 2:10-CV-01195-KJD-PAL, 2011 U.S. Dist. LEXIS 58419 (D. Nev.
May 31, 2011) .............................................................................................. 11

*Kloosterboer, et al. v. United States, et al.*

Case No. 3:21-cv-00198 (SLG)      ii

*Frock v. U.S. R. Retirement Bd.*,
    685 F.2d 1041 (7th Cir. 1982) ................................................................. 20

*Heartland Reg. Med. Ctr. v. Sebelius*,
    566 F.3d 193 (D.C. Cir. 2009) ................................................................. 21

*Horizon Lines, LLC. v. United States*,
    414 F. Supp. 2d 46 (D.D.C. 2006) .................................................... passim

*Horizon Lines, LLC v. United States*,
    429 F. Supp.2d 92 (D.D.C. 2006) ............................................................ 19

*Newell Cos. v. Kenney Mfg. Co.*,
    864 F.2d 757 (Fed. Cir. 1988) ................................................................. 19

*Organized Village of Kake v. USDA*,
    795 F.3d 956 (9th Cir. 2015) (*en banc*) ................................................... 18

*Portnoy v. Memorex Corp.*,
    667 F.2d 1281 (9th Cir. 1982) ............................................................. 4, 5

*Reliance Elec. Co. v. Emerson Elec. Co.*
    404 U.S. 418 (1972) ............................................................................. 3, 4

*Sea-Land Service, Inc. v. United States*,
    239 F.3d 1366 (Fed. Cir. 2001) ................................................. 19, 20, 22

*Sebelius v. Cloer*,
    569 U.S. 369 (2013) ................................................................................ 12

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944) ................................................................................ 17

*St. Louis Sw. Ry. Co. v. United States*,
    245 U.S. 136 (1917) ................................................................. 15, 16, 17

*The Bermuda*,
    70 U.S. 514 (1865) .................................................................................. 16

*Thompson v. United States*,
    343 U.S. 549 (1952) ................................................................................ 16

*United States v. Citroen*,
    223 U.S. 407 (1912) .................................................................................. 4

*United States v. Mead Corp.*,
533 U.S. 218 (2001) ................................................................................................ 17

*United States v. Two Hundred Fifty Kegs of Nails*,
61 F. 410 (9th Cir. 1894) ........................................................................................ 17

**Statutes**

5 U.S.C. § 706 ............................................................................................................... 2

19 U.S.C. § 1625 ......................................................................................................... 23

28 U.S.C. § 1295(a) .................................................................................................... 20

28 U.S.C. § 1581 ......................................................................................................... 20

46 U.S.C. § 55102(b) .................................................................................................. 14

46 U.S.C. § 55116 ....................................................................................................... 14

46 U.S.C. App. § 883 .................................................................................................... 6

48 U.S.C. § 23 (1926) ................................................................................................... 6

Act of March 1, 1817, ch. 31, § 4, 3 Stat. 351 ........................................................... 7

Act of July 27, 1868, ch. 273, § 1, 15 Stat. 240 ........................................................ 6

Act of June 5, 1920, § 27, 41 Stat. 999 ...................................................................... 6

Administrative Procedure Act ("APA") .................................................................. 2, 18

Alaska Statehood Act of 1958 ................................................................................. 6, 7

Pub. L. 85-508, § 27(a), 72 Stat. 351 (1958) ........................................................... 6, 7

Securities Exchange Act § 16(b) ............................................................................. 3, 4

**Regulations**

19 C.F.R. § 4.80b ..................................................................................................... 14, 17

19 C.F.R. § 4.80b(a) ................................................................................................... 14

44 Fed. Reg. 42,176 (July 19, 1979) ......................................................................... 17

*Kloosterboer, et al. v. United States, et al.*
Case No.  3:21-cv-00198 (SLG)                    iv

**Other Authorities**

*Associate Members*, RY. ASSOC. OF CAN., https://www.railcan.ca/who-we-are/rac-associate-members/ (last visited Dec. 10, 2021) ................................. 9

CANADIAN NATIONAL RAILWAY CO., https://www.cn.ca/en/ (last visited Dec. 10, 2021)................................................................................................... 9

CANADIAN PACIFIC, https://www.cpr.ca/en/ (last visited Dec. 10, 2021)........................... 9

H.R. Rep. No. 98-214 (1983) ........................................................................... 7

https://www.mcdonalds.com/us/en-us/restaurant-locator.html (last visited Dec. 10, 2021)................................................................................................. 11

OFF. OF THE ATT'Y GEN., LITIGATION GUIDELINES FOR CASES PRESENTING THE POSSIBILITY OF NATIONWIDE INJUNCTIONS (2018), https://www.justice.gov/opa/press-release/file/1093881/download ....................................................... 21, 22, 23

Ruling Letter HQ W116720 (Sept. 12, 2006) ........................................... 16, 17

S. Rep. No. 85-1163 (1957)............................................................................. 7

www.kloosterboer.com................................................................................... 11

# I.
## INTERESTS OF *AMICUS CURIAE*

Lineage Logistics Holdings, LLC (Lineage), files this *amicus curiae* brief in support of the motion for summary judgment of plaintiffs Kloosterboer International Forwarding, LLC (KIF) and Alaska Reefer Management LLC (ARM) (collectively "KIF"),[1] and in opposition to the motion for summary judgment of defendants.[2]

Lineage is a multinational cold storage warehousing and logistics company that helps companies manage temperature-controlled supply chains worldwide. Lineage and its various subsidiaries are engaged in the warehousing and storage of food products and managed logistics and distribution support for temperature-controlled products. Lineage is now the whole owner of Woodstock Cold Storage (1990) Ltd., d/b/a Kloosterboer Bayside (KBB), and through KBB of Bayside Canadian Railway Company Ltd. (BCR). KBB is a Canadian company that operates cold-storage warehouses in Bayside, Canada. BCR is a Canadian company that owns and operates the railroad that, in this case, the government accuses of being an artifice.[3]

KBB provides cold-storage services for companies that are engaged in selling frozen seafood from Alaska to customers in the eastern United States. It received penalty notices from U.S. Customs and Border Protection (CBP), totaling approximately $25 million, apparently for the same alleged violations of the Jones Act that led to the penalty notices

---

[1] ECF No. 117 ("KIF Motion" or "KIF Mot.").

[2] ECF No. 115 ("U.S. Motion" or "U.S. Mot.").

[3] U.S. Mot. at 23.

*Kloosterboer, et al. v. United States, et al.*
Case No. 3:21-cv-00198 (SLG)                    1

issued to KIF.[4] Alaskan seafood clients are an important component of KBB's business, and Lineage consequently has a significant interest in the continued viability of the transportation process that KIF has called the "Bayside Route."[5]

Lineage submits this brief to inform the Court further about the role of the Canadian entities in the Bayside Route, and about the perspective of those non-U.S. persons on the actions of the U.S. government in this matter.

## II.
## THE GOVERNMENT HAS MISUNDERSTOOD KEY ISSUES.

As KIF has noted, CBP's decision process did not reflect the care due for such a serious matter. CBP declared the BCR railway to be a "sham" simply because CBP believed the railroad was built to take advantage of the Third Proviso. Transactions in many different industries are structured to take advantage of regulatory and statutory exceptions, and the only reason the government gives for deeming that approach improper here is that, supposedly, the Third Proviso is a "grandfather clause" that should be interpreted narrowly.[6] But the government has misunderstood central legal and factual issues, with the result that CBP's rationale is unreliable as a whole. The government maintains that KIF's case is a challenge under the Administrative Procedure Act (APA).[7]

---

[4] *See* AR 248 (item 35-9, listing "Kloosterboer - Cold storage facility").

[5] KIF Mot. at 13-14. Citations to the summary judgment briefing and other docket entries uses the pagination of the document itself, rather than the CM/ECF pagination.

[6] U.S. Mot. at 19.

[7] *Id.* at 14; *see* 5 U.S.C. § 706. Lineage does not agree that the penalty notices can only be contested under the APA, but it assumes the government's position for the sake of argument.

*Kloosterboer, et al. v. United States, et al.*
Case No. 3:21-cv-00198 (SLG)                    2

Under that rubric, CBP's decision is arbitrary and capricious, and contrary to the law of the Third Proviso; CBP "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [and] offered an explanation for its decision that runs counter to the evidence before the agency."[8]

## A. Constructing a rail line to take advantage of the Third Proviso is not improper.

The core of CBP's reasoning about why the Bayside Route violates the Jones Act is that CBP believes the BCR rail line was "constructed for no purpose other than to evade the prohibitions of the Jones Act."[9]

### 1. Structuring a business to qualify for an exemption is ordinarily permissible.

The government's rationale is contrary to the statute. Constructing a rail line to bring otherwise prohibited traffic "within the statutory exception" is compliance, not evasion; and structuring transactions to avoid violations or to qualify for exemptions is not improper. In *Reliance Electric Co. v. Emerson Electric Co.*, a defendant was accused of splitting up its sales of stock to avoid liability under section 16(b) of the Securities Exchange Act.[10] The Supreme Court rejected the argument that such efforts should be penalized, so long as the conduct was what the statute permitted. "Liability cannot be imposed simply because the investor structured his transaction with the intent of avoiding liability under § 16(b). The question is, rather, whether the method used to 'avoid' liability

---

[8] *Ctr. for Biological Diversity v. BLM*, 698 F.3d 1101, 1109 (9th Cir. 2012).

[9] U.S. Mot. at 21.

[10] 404 U.S. 418, 421 (1972).

*Kloosterboer, et al. v. United States, et al.*
Case No. 3:21-cv-00198 (SLG)                    3

is one permitted by the statute."  *Id.* at 422.  As the Ninth Circuit subsequently elaborated, section 16(b) "predicate[s] liability upon an objective measure of proof."[11]  The Third Proviso is similarly objective.  There is no anti-evasion provision, and there is nothing in the statute about the state of mind or intentions of the shippers.   The criterion in the statute is solely whether the goods traveled on a Canadian rail line, not why they did.

The government invokes cases stating that a shipper cannot avoid customs duties "by resort to disguise or artifice."[12]  These cases are irrelevant for interpreting the Jones Act, because it is not a customs law and does not impose customs duties.  But even if these cases were apposite, they actually undercut the government's argument.  They prohibit "disguise."[13]  "But when the article imported is not the article described as dutiable at a specified rate, it does not become dutiable under the description because it has been manufactured or prepared for the express purpose of being imported at a lower rate."[14] Thus, even the customs cases permit a company to structure its operations to avoid liability. The BCR railroad is in fact a rail line:  Goods are loaded onto rail cars, and they travel on the railroad tracks.  The BCR railroad is Canadian:  It is physically within Canada, and it is owned and operated by a company that is organized and domiciled in Canada.  CBP has not claimed (and cannot claim) that the railroad is something else disguised as a railroad.

---

[11] *Portnoy v. Memorex Corp.*, 667 F.2d 1281, 1284 (9th Cir. 1982).

[12] U.S. Mot. at 23 (quoting *United States v. Citroen*, 223 U.S. 407, 415 (1912)).

[13] *Citroen*, 223 U.S. at 415.

[14] *Id.*

*Kloosterboer, et al. v. United States, et al.*

Case No.  3:21-cv-00198 (SLG)                    4

CBP's own documents recognize that the railroad physically exists and the goods travel on it.[15] CBP's complaint is not really that the railroad is a sham, but that the railroad was constructed to enable a route that avoids Jones Act violations. That would not be a meritorious objection even under the customs cases.

### 2. The Third Proviso was meant to allow new routes that enjoy the exception.

The government's underlying theory is that the Third Proviso is an "exception to a fundamental ten[e]t of the Jones Act" that "should be construed narrowly."[16] It is, the government says, only a "grandfather clause" designed to preserve routes through the Great Lakes ports that were established before the Jones Act restricted use of non-coastwise qualified vessels.[17] CBP says it has "historically recognized" this to be the purpose of the Third Proviso;[18] and this view of the statutory purpose significantly motivated CBP's decision-making. U.S. PI Opp. at 21 (complaining that "Plaintiffs are not using an existing and recognized route").

The government's purposive understanding is incorrect. It departs from the text of the statute, which the Ninth Circuit has warned is improper. *See Portnoy*, 667 F.2d at 1283 (the text of section 16(b) "cannot be disregarded simply on the ground that it may be inconsistent with the 'wholesome purpose' of the Act"). Moreover, the government's

---

[15] AR 223-25, 1294 n.7.

[16] U.S. Mot. at 18.

[17] *Id.* at 19.

[18] *Id.*

*Kloosterboer, et al. v. United States, et al.*
Case No. 3:21-cv-00198 (SLG)          5

premise about the purpose of the Third Proviso is wrong. For commerce from Alaska, the purpose of the Third Proviso could only have been to enable the creation of new routes, not to preserve old ones.

When the Third Proviso was originally enacted in 1920, it specifically excluded commerce from Alaska. Act of June 5, 1920, § 27, 41 Stat. 999 (codified at 46 U.S.C. App. § 883) ("[T]his section shall not apply to merchandise transported between points within the continental United States, *excluding Alaska*, over through routes . . . in part over Canadian rail lines." (emphasis added)). The Jones Act as a whole did apply to Alaska.[19] Thus, while the original Third Proviso might have been meant (per the Supreme Court's discussion in *Central Vermont Transportation Co. v. Durning*) to "avoid disturbance of established routes . . . between the northwestern and eastern states through the lake ports,"[20] it was not meant to and did not preserve any routes from Alaska. When *Durning* was written in 1935, routes from Alaska did not enjoy the benefit.

The Alaska Statehood Act of 1958 changed matters: It amended the Third Proviso so that it now exempts routes between coastwise points "including Alaska."[21] That choice by Congress cannot have been meant for the same purpose that *Durning* found in the

---

[19] *See* Act of June 5, 1920, § 27, 41 Stat. 999 (Jones Act prohibition applies to transportation "including Districts, Territories, and possessions . . . embraced within the coastwise laws"); Act of July 27, 1868, ch. 273, § 1, 15 Stat. 240 ("The laws of the United States relating to customs, commerce, and navigation . . . [are] extended to [Alaska]."); 48 U.S.C. § 23 (1926) (all U.S. laws apply in Alaska).

[20] *Cent. Vt. Transp. Co. v. Durning*, 294 U.S. 33, 39 (1935).

[21] Pub. L. 85-508, § 27(a), 72 Stat. 351 (1958).

*Kloosterboer, et al. v. United States, et al.*
Case No. 3:21-cv-00198 (SLG)                6

original Proviso, because there would have been no "established routes . . . between the northwestern and eastern states through the lake ports [and which transited Alaska]" to preserve. Any route from Alaska that the new version of the Third Proviso would protect would have been unlawful for the previous three decades or more.[22] So Congress's purpose in extending the Third Proviso to Alaskan commerce cannot have been the preservation of pre-existing routes to Alaska. There could not have been any such routes available to enjoy the extended Proviso, so an amendment for that purpose would have been pointless. The purpose can only have been to enable the creation of new routes.[23] *See* H.R. Rep. No. 98-214, at 2 (1983) (later deliberations on whether to repeal the Third Proviso: "Alaska was included in the Third Proviso in an attempt to reduce transportation costs to that State.").

Before the Alaska Statehood Act, there were no routes between Alaska and the rest of the United States that qualified for the Third Proviso. Any route that qualified for the

_____

[22] Before the Jones Act, there had long been a prohibition on using non-coastwise qualified vessels for purely sea-based shipping between U.S. coastwise points. Act of March 1, 1817, ch. 31, § 4, 3 Stat. 351 ("[N]o goods, wares, or merchandize shall be imported . . . from one port of the United States to another port of the United States, in a vessel belonging wholly or in part to a subject of any foreign power."). The 1920 statute expanded that prohibition to cover routes that were partly on land. Thus, at the time of enactment, there were intermodal routes to be grandfathered by the Third Proviso, although Congress chose to protect only routes among the lower 48 states. When the Alaska Statehood Act extended the Third Proviso to routes from Alaska, land-sea routes between Alaska and the rest of the United States had been restricted to coastwise qualified vessels since 1920, and sea routes for decades before that.

[23] This purpose was well understood at the time. The Federal Maritime Board opposed the change to the Third Proviso, because it believed "[f]urther relaxation of the coastwise laws as proposed in this amendment are unnecessary." S. Rep. No. 85-1163, at 45 (1957) (remarks of Federal Maritime Board regarding the draft Alaska Statehood Act). Congress chose to expand the Third Proviso despite that opposition.

Third Proviso, after it was made available for the Alaska trade, would have been impermissible previously. Naturally the developers of any new route would design it specifically to qualify for the new exemption. When Congress creates a new exemption from a prohibition that has been in place for decades, it surely expects and intends that some businesses will develop to take advantage of the exemption. CBP's policy that penalizes companies precisely because CBP thinks they designed the Bayside Route to take advantage of the Third Proviso is contrary to the statute and to the congressional policy that motivates it with respect to Alaska.

### B.  CBP misunderstood key facts about the Bayside Route.

The government has no record to show the BCR rail line is a sham even in the inaccurate sense that the government uses that term. The government does not know whether the rail portion of the Bayside Route has a commercial function; it insists that CBP has not even evaluated that question. U.S. Mot. at 26 (reiterating that arguments about commercial soundness are irrelevant). Nothing in the record supports the government's statements about why the BCR railroad was built. It does not appear, in the record that the government filed, that CBP investigated the construction of the railroad or the development of the Bayside Route, or inquired of BCR—the railroad's owner and operator—about its motivations. In fact, the government is adamant that it does not matter whether the railroad has a commercial utility.[24] Accordingly, CBP evidently did not assess what the uses of the

---

[24] U.S. Mot. at 22-23.

railroad might be. Nor did it provide any explanation of why it concluded the railroad was designed for the purpose of evading the Jones Act. AR 1294 n.7 ("This rail movement *appears to be* a sham designed to give the appearance that it falls within an exception to the Jones Act [in the Third Proviso]." (emphasis added)).

CBP apparently searched databases at Canada's "two primary railway systems," the Canadian National Railway and the Canadian Pacific Railway. AR 223. These are two companies operating transcontinental rail networks.[25] There is no reason to expect that a short rail line not connected to the transcontinental network would appear in a database of either company. The Railway Association of Canada lists multiple industrial railway members that operate local, industrial-use rail lines that are not connected to the two transcontinental railroads that CBP chose to investigate and consequently are not listed in the Canadian National Railway or Canadian Pacific Railway data that CBP searched.[26] BCR is among them. CBP has no evidence and has offered no explanation why an operation that is obviously a railroad—it has railroad cars traveling and carrying cargo over railroad track—is not a railroad simply because it does not connect to the transcontinental rail network. Certainly the Third Proviso does not impose, as a precondition, that the rail line be capable of facilitating a transcontinental rail-only transit.

---

[25] CANADIAN NATIONAL RAILWAY CO., https://www.cn.ca/en/ (last visited Dec. 10, 2021); CANADIAN PACIFIC, https://www.cpr.ca/en/ (last visited Dec. 10, 2021).

[26] *See Associate Members*, RY. ASSOC. OF CAN., https://www.railcan.ca/who-we-are/rac-associate-members/ (last visited Dec. 10, 2021).

*Kloosterboer, et al. v. United States, et al.*
Case No. 3:21-cv-00198 (SLG)                    9

In addition, CBP assigned penalties on the assumption that Kloosterboer Dutch Harbor LLC ("KDH")—which CBP said owns the Alaska loading facility—and KBB are in an "integrated business or business relationship," with both entities affiliated through ownership by Kloosterboer Group BV.  AR 1010 (referring to KDH and Kloosterboer Group BV "collectively" as "Kloosterboer"; "[a]s such, the case file indicates Kloosterboer provided cold storage and warehousing services to the subject shippers in both Dutch, Harbor Alaska [sic] and New Brunswick, Canada").  In fact, KDH is wholly owned by American Seafoods Group LLC, and it has been since 2018.  Before that, it was owned by American Seafoods Holdings LLC.  It has never been owned by Kloosterboer Group BV.  These ownership details are readily available from the database of the Alaska Department of Commerce, Community, and Economic Development, which the administrative record says CBP searched.[27]

Although readily available public records belie CBP's premise that KDH and KBB are affiliated, CBP apparently made such an assumption based on the fact that "the entities share a similar logo used on both of their websites."[28]  Taking punitive regulatory action based upon shared logos is arbitrary and irresponsible.  Companies license their logos and trademarks to other companies frequently, in a wide variety of situations that do not involve

---

[27] AR 1010.  CBP's certified record does not include the results of its search in the Alaska Department of Commerce database.  Lineage, as an *amicus*, cannot move this Court to supplement the record with materials that CBP clearly considered but then omitted.  But *amicus* submits documentation from the website of the Alaska Department of Commerce, for the Court to consider to whatever extent it can.  Exhibits 1-3.

[28] AR 1010.

*Kloosterboer, et al. v. United States, et al.*
Case No.  3:21-cv-00198 (SLG)                    10

integrated business relationships much less affiliation. The VISA and MasterCard logos appear on the storefronts and websites of merchants around the world, without their being affiliated or in any business relationship at all. In franchise arrangements, it is commonplace for multiple franchisees to use the same branding, without being "integrated enterprise[s]." *See, e.g.*, *Feldman v. Buddy Boy, Inc*., No. 2:10-CV-01195-KJD-PAL, 2011 U.S. Dist. LEXIS 58419, *5-*7 (D. Nev. May 31, 2011) (even though "[the] menus at all Capriotti's sandwich shops are identical" and they use common marketing techniques, "nothing in the record indicates" they are "an integrated [business] enterprise").[29] CBP imposed liability on KDH and KBB, among others, without having any evidence of what their business relationships and respective roles in the accused process might actually be.

---

[29] The Ninth Circuit affirmed *Feldman v. Buddy Boy* with an unpublished summary order. 491 F. App'x 856 (9th Cir. 2012) (unpublished). The website www.kloosterboer.com presents locations of "Kloosterboer," among them Dutch Harbor. https://www.kloosterboer.com/en/contact/kloosterboer-dutch-harbor-llc. But it indicates clearly that the Dutch Harbor location refers to a particular entity, KDH, which as noted above the publicly available records show is not owned by Kloosterboer Group BV. As a comparison, the McDonald's website lets a user search for restaurant locations, and of course those restaurants prominently bear the McDonald's trademarks and logos. https://www.mcdonalds.com/us/en-us/restaurant-locator.html (last visited Dec. 10, 2021). But those restaurants are independent businesses with franchise agreements, and the Tenth Circuit has held that McDonald's Corp. is not an integrated enterprise with restaurant franchises. *Evans v. McDonald's Corp.*, 936 F.2d 1087, 1090 (10th Cir. 1991).

## III.
## THE GOODS WERE TRANSPORTED OVER A THROUGH ROUTE OVER CANADIAN RAIL LINES.

The government contends that, even assuming the BCR rail line is real, the Bayside Route does not qualify for the Third Proviso because the transportation of goods was not on a "through route[] in part over" the BCR railway.[30]

First, the government says that the BCR railroad is not "transportation," because "transportation" necessarily entails movement of goods from one place to another. U.S. Mot. 24-25; U.S. PI Opp. 17-18. That is, indeed, what the BCR railroad does. The goods are loaded at one place; then they are moved down the track, and back again.[31] In ordinary English, such a movement, on a rail car, is called transportation. The government has misinterpreted the ordinary word to incorporate a criterion that the final destination must be different from the origin. U.S. PI Opp. 17 (asserting the BCR railroad is not "transportation" because the goods "begin[] and end[] in the same place"). That is not what the ordinary concept of "convey[ing] from one place to another," *id.* (quoting OED Online), entails. Transportation requires movement in space, irrespective of the distance moved.

The government's interpretation would be absurd in ordinary usage. *Cf. Sebelius v. Cloer*, 569 U.S. 369, 376 (2013) ("[S]tatutory terms are generally interpreted in accordance with their ordinary meaning."). Suppose a person leaves home for an errand, with his

_____

[30] U.S. Mot. at 23-24.
[31] AR 223.

*Kloosterboer, et al. v. United States, et al.*
Case No. 3:21-cv-00198 (SLG)                12

wallet in the car, and a passenger. He travels to a store, realizes he forgot the shopping list, and goes home. In the government's view, there has been *no transportation at all*, because the wallet and the passenger ended up in the same place that they started. Suppose a passenger gets on the bus. Ordinarily one would understand that the bus is providing transportation; it is transporting the passenger. So long as the passenger gets off at another stop, the government would agree there was transportation. But if the passenger falls asleep and ends up making a complete circuit, then gets off at her original stop, then the government would say there was *no transportation at all* because the passenger's journey "begins and ends in the same place." Suppose a package delivery worker picks up 10 packages at a warehouse. Nine of them get delivered to their recipients, but for the tenth, the address is incorrect so the worker brings it back to the warehouse. Under the government's view, the worker has engaged in transportation of the nine packages, but for the tenth package that rode in the truck all day, there was *no transportation at all*. Even more absurd, it is impossible to know, during the day, whether the tenth package was transported. If someone asked the government, in the middle of the day, whether the delivery truck was engaged in transportation of the packages, the government would have to respond that it does not yet know. There might be transportation or might not, for some but maybe not for others, and there is no way to tell until one sees which packages "end[]" in the same place" as they started. None of the government's authorities espouses such a nonsensical understanding of the ordinary English word "transportation."

*Kloosterboer, et al. v. United States, et al.*
Case No. 3:21-cv-00198 (SLG)          13

The government's reliance on 19 C.F.R. § 4.80b [32] shows how flawed its interpretation is. The regulation explains that "[a] coastwise transportation of merchandise takes place, within the meaning of the coastwise laws, when merchandise laden at a point embraced within the coastwise laws ('coastwise point') is unladen at another coastwise point." [33] "A coastwise transportation of merchandise" is obviously a technical term referring to an event; presumably the same event to which the Jones Act applies, namely "the transportation of merchandise . . . between points in the United States to which the coastwise laws apply." [34] The government's observation amounts to saying that the phrase "transportation . . . between points" means between two different points. And then the government infers that *all* transportation must go between two different points—an interpretation that, if it were correct, would make the phrase "between points" unnecessary. In ordinary English, and also in the coastwise regulation, the word "transportation" means something is moving, and an adverbial phrase might describe where it is moving.

What is actually required to go between two points, under the Third Proviso, is that the "transportation of merchandise" be "between points in the continental United States." [35] The statute obviously does not require that each component of the route be between two

---

[32] U.S. Mot. at 24-25.

[33] 19 C.F.R. § 4.80b(a).

[34] 46 U.S.C. § 55102(b).

[35] *Id*. § 55116.

*Kloosterboer, et al. v. United States, et al.*
Case No. 3:21-cv-00198 (SLG)          14

points in the United States, and it surely does not require that of the Canadian rail line used in the route.

Second, the government maintains that a "through route" must be "continuous." U.S. Mot. 25 (citing *St. Louis Sw. Ry. Co. v. United States*, 245 U.S. 136, 139 n. 4 (1917)).[36] KIF has cogently argued why continuity is not a requirement.[37] But even if a "through route" has to be "continuous" in the sense of *St. Louis Southwestern Railway*, the government has offered no explanation of why the Bayside Route is not.

CBP itself did not consider this issue at all, and the Court should not accept the contentions offered by trial counsel. CBP "cannot rely on its briefing in this case to explain why . . . . The explanation must be evidenced from the [agency's] decision itself. . . . '[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself, not post-hoc rationalizations.' "[38]

Even considering the arguments in the government's trial briefs, they are inadequate. The government's sole explanation is the fact that the railroad goes one way and then back again.[39] That is continuous in the ordinary English sense; the goods arrive by vessel, move onto the railroad, continue moving, and then are loaded onto trucks for the continued journey. Those movements are just as continuous as any other journey that spans

---

[36] *See also* U.S. P.I. Opp. at 16-17.

[37] KIF Mot. at 39.

[38] *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1069 (9th Cir. 2018) (second alteration in original; citation omitted).

[39] U.S. PI Opp. at 17.

*Kloosterboer, et al. v. United States, et al.*
Case No. 3:21-cv-00198 (SLG)                    15

multiple transportation modes (and thus requires transfer between vehicles). Regardless, *St. Louis Southwestern Railway* explained what the Court meant by "continuous," and it had nothing to do with whether the goods are physically paused during the course of transportation or go back and forth at some point. Whether the route is "continuous" depends on whether there is "an intermediate point at which, in common railroad practice, the rate 'breaks,' " *i.e.*, "the 'joint rate' from the point of origin ends . . . and there is charged for the distance beyond the same local rate or joint rate that would have been charged had the business originated at this intermediate point."[40] As the Supreme Court has further explained, "the test of the existence of a 'through route' is whether the participating carriers hold themselves out as offering through transportation service." *Thompson v. United States*, 343 U.S. 549, 557 (1952); *Denver & R.G.W. R. Co. v. Union Pac. R. Co.*, 351 U.S. 321, 327 (1956) ("[A] through route is ordinarily a voluntary arrangement, express or implied, between connecting carriers."). As CBP's published rulings explain: "A transportation from one point to another remains continuous, so long as intent remains unchanged, no matter what stoppages or transshipments intervene."[41] Thus, to show that the BCR rail line is not part of a continuous route so that there is no through route over it, the government would have to show that the railway represents a "break" point; "an 'honest intention to bring the goods [transported] into the common stock

---

[40] 245 U.S. at 139 n.2.

[41] Ruling Letter HQ W116720 (Sept. 12, 2006) (quoting *The Bermuda*, 70 U.S. 514, 553 (1865)).

*Kloosterboer, et al. v. United States, et al.*
Case No. 3:21-cv-00198 (SLG)        16

of the [intermediate foreign] country' is required to break the continuity of transportation between coastwise points."[42] The government has not even attempted that showing. The government has plucked the word "continuous" from *St. Louis Southwestern Railway*, divorced it from the legal standard in which the Supreme Court used the word, and developed its own brand-new legal standard based on the word alone.[43]

In truth, the government is trying to interpret the Jones Act in opposite ways simultaneously. The Ninth Circuit has long held that "to transport goods from one domestic port to another"—the phrase in the predecessor to the Jones Act—"means to carry goods in one continuous voyage."[44] CBP has also maintained that interpretation of the Jones Act, and it successfully persuaded the D.C. Circuit to adopt the same view. *Am. Maritime Ass'n v. Blumenthal*, 590 F.2d 1156, 1164-65 (D.C. Cir. 1978); 44 Fed. Reg. 42,176, 42,176 (July 19, 1979) (Customs Service final rule adopting the original version of 19 C.F.R. § 4.80b: "The rationale behind . . . rulings [that processing at an intermediate port can eliminate a Jones Act violation] is that the continuity of the transportation is broken at the intermediate port or place."); *id.* (noting that the D.C. Circuit case "upheld the principles incorporated within" the rule). Thus, if the BCR rail line breaks the

---

[42] *Id.*

[43] CBP's decisions in this matter cannot claim *Chevron* deference, as the government appears to recognize. U.S. Mot. at 17 (citing *United States v. Mead Corp.*, 533 U.S. 218, 235 (2001)). The government's interpretation of "through route" deserves no deference at all, not even under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), because it bears no relation to any interpretations previously adopted by CBP, and did not even appear in the decisions of the agency itself in this matter.

[44] *United States v. Two Hundred Fifty Kegs of Nails*, 61 F. 410, 411 (9th Cir. 1894).

*Kloosterboer, et al. v. United States, et al.*

Case No. 3:21-cv-00198 (SLG)         17

continuity of the Bayside Route as the government says, then the goods involved were not being "transported . . . between ports in the United States" at all. They were being transported from Alaska to Bayside, and then later, after the "break point," being transported from Bayside to Maine. So there would be no violation of the Jones Act in the first place.

The government surely does not really doubt that the shipments from Alaska to Maine were continuous, so that they could in principle violate the Jones Act. But the government then turns around and contends that the shipments were not continuous, so that the government can show there was no through route. "[I]nconsistent treatment is the hallmark of arbitrary agency action" violating the APA.[45] The government cannot coherently maintain both that the route violates the Jones Act and that the movement— actual physical movements, on actual physical rail cars, that happened on the way—was not "transportation" within a through route.

## IV.
## THE *SUNMAR* RULINGS ARE STILL BINDING ON CBP.

Finally, Lineage respectfully asks the Court to rethink its earlier statement that the *Sunmar* rulings have been abrogated.[46] As KIF has explained, CBP's published *Sunmar*

---

[45] *Clean Wis. v. EPA*, 964 F.3d 1145, 1163 (D.C. Cir. 2020); *see also Organized Village of Kake v. USDA*, 795 F.3d 956, 966 (9th Cir. 2015) (*en banc*) ("Unexplained inconsistency between agency actions is a reason for holding an interpretation to be . . . arbitrary and capricious."). Of course, CBP did not actually adopt the concept of continuity that appears in the government's briefs.

[46] Order re Motion for Temporary Restraining Order and Preliminary Injunction, ECF No. 64, at 16.

*Kloosterboer, et al. v. United States, et al.*
Case No. 3:21-cv-00198 (SLG)          18

rulings established its policy and interpretation that no direct tariff filing is required for a route to qualify for the Third Proviso if the route is exempt from filing under Surface Transportation Board regulations.[47] As the Court has recognized, those rulings remain CBP's extant published views on this point and CBP has taken no action, public or private, to rescind, revoke, or revise them.[48]

The Court concluded that, nonetheless, the *Sunmar* rulings have no effect because the decisions of the U.S. District Court for the District of Columbia in *Horizon Lines, LLC. v. United States*, 414 F. Supp. 2d 46 (D.D.C. 2006), and *Horizon Lines, LLC v. United States*, 429 F. Supp.2d 92 (D.D.C. 2006), "had the effect of modifying" CBP's rulings. Lineage respectfully suggests that, as a description of the effect of the D.C. district court's decision, this is incorrect.

The Court based its conclusion on *Sea-Land Service, Inc. v. United States*, 239 F.3d 1366 (Fed. Cir. 2001), a Federal Circuit decision holding that once a previous Federal Circuit case had decided the meaning of a statute, prior CBP rulings to the contrary were no longer binding. ECF No. 64, at 16 & n.54. The *Horizon* decisions are different in at least two key respects. First, they were decisions of a district court, not a circuit court. The previous decision that motivated *Sea-Land* was a decision by the Federal Circuit, which is binding precedent on subsequent panels of, and all lower courts within, that circuit. *Newell Cos. v. Kenney Mfg. Co.*, 864 F.2d 757, 765 (Fed. Cir. 1988). By contrast, "[a] decision of

---

[47] KIF Mot. at 40-42.

[48] ECF No. 64, at 16.

*Kloosterboer, et al. v. United States, et al.*
Case No. 3:21-cv-00198 (SLG)         19

a federal district court judge," like the *Horizon* opinions, "is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011). Second, the *Sea-Land* decision was from the Federal Circuit, which has exclusive jurisdiction over (*inter alia*) appeals from the Court of International Trade, which in turn has exclusive jurisdiction over cases under the tariff laws (the sort that was at issue in *Sea-Land*). 28 U.S.C. § 1295(a) (Federal Circuit jurisdiction); *id.* § 1581 (Court of International Trade jurisdiction). By contrast, the issues that the *Horizon* court considered could come up in any district court in the country. In a second case, CBP would be entitled to argue afresh that the *Sunmar* rulings were correct and reasonable.

Indeed, agencies routinely disagree with the decisions of isolated district courts, and even refuse to apply the decisions of circuit courts for matters in other circuits. *See, e.g.*, *Ctr. for Regulatory Reasonableness v. EPA*, 849 F.3d 453, 454 (D.C. Cir. 2017) (describing an instance of EPA's refusal to acquiesce in an Eighth Circuit decision, with respect to cases elsewhere in the country). As the Seventh Circuit has explained, "[w]e are unaware of any decision requiring an agency to either appeal a circuit court's holding or accept it as binding on the agency in all circuits."[49] In fact, the official policy of the Department of Justice is that agencies should object to attempts to have a single district court's decision have nationwide consequence. "Traditionally, the Executive has had the discretion, taking

---

[49] *Frock v. U.S. R. Retirement Bd.*, 685 F.2d 1041, 1046 (7th Cir. 1982).

into account the contours of an adverse lower court ruling, its own policy priorities, and other prudential factors, to decide whether to abide by an adverse ruling even outside of the geographical area in which the ruling is legally binding."[50]

Against that backdrop, the public—including KBB, which as discussed above is not affiliated with KIF or ARM—had to assume that the *Sunmar* rulings were in effect. The *Horizon* court did not vacate them. It criticized the rulings, but under D.C. Circuit precedent calling a rule "invalid" does not vacate the rule. *Heartland Reg. Med. Ctr. v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009) ("[T]he terms 'invalid' and 'vacated' are not synonyms. . . . [W]e may label an agency's action 'invalid' even when we have remanded it for further proceedings without having vacated it."). The very fact that the *Horizon* court remanded without vacatur implied that CBP might be able to justify and substantiate the *Sunmar* rulings. Under D.C. Circuit precedent, if the rulings were simply contrary to the statute and unsalvageable, the correct course would have been to vacate them. *See Allied-Signal v. NRC*, 988 F.2d 146, 150 (D.C. Cir. 1993) (decision whether to remand without vacatur depends on "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly)"). CBP then responded by not taking action to revise the *Sunmar* rulings and not making any public statement that it acquiesced in, agreed with, or would take any further action based on the *Horizon* decisions. Apparently CBP sent a

---

[50] OFF. OF THE ATT'Y GEN., LITIGATION GUIDELINES FOR CASES PRESENTING THE POSSIBILITY OF NATIONWIDE INJUNCTIONS at 6 (2018), https://www.justice.gov/opa/press-release/file/1093881/download [hereinafter LITIGATION GUIDELINES].

letter privately to American Seafoods Company LLC ("ASC") informing ASC that CBP would "abide by" the district court's decision. ECF No. 64, at 17 & n.55. Under longstanding government practice, that private letter did not mean CBP would either change its position on the need for a tariff or apply any part of the *Horizon* decisions to cases, nationwide and in future.[51] To the contrary, CBP's public silence was consistent with the regular government practice of not accepting the decision of a single district court as governing the policy of the agency for the rest of the country.[52]

"Abiding by" the *Horizon* decisions did not inevitably, or even most naturally, mean that CBP would treat the *Sunmar* rulings as void. The letter, to Lineage's eyes seeing the letter some years later, the letter simply indicated that CBP would comply with the district court's judgment (which simply directed CBP to reevaluate its position) rather than appealing the decision. For CBP to communicate, by that means, that it actually regarded the *Sunmar* rulings as vacated, or that it would disregard the published *Sunmar* rulings, would have been the opposite of how the government usually operates.

The longstanding practice by the government, and the policy noted above, are part of the reason why *Sea-Land* is different. Because the prior decision that *Sea-Land* noted was binding precedent, and because the courts involved have exclusive jurisdiction over the subject matter at issue there, CBP had no choice but to accept the Federal Circuit's

---

[51] The Justice Department "consistently has argued against granting relief outside of the parties to a case." LITIGATION GUIDELINES at 1(citing briefs filed in 2009 and 2010).

[52] LITIGATION GUIDELINES at 4.

*Kloosterboer, et al. v. United States, et al.*
Case No. 3:21-cv-00198 (SLG)          22

prior decision. Its ordinary reaction to the *Horizon* decision was the opposite. Usually, the government would not regard a remand by a single district court, without exclusive jurisdiction, as undoing a rule. Indeed, because the district court did not vacate the *Sunmar* rulings, CBP would ordinarily be obligated to undertake notice and comment if it wanted to change them. *Cf. Chamber of Comm. of the U.S. v. SEC*, 443 F.3d 890, 900 (D.C. Cir. 2006) (after remand of a rule, SEC could adhere to its previous rule without notice and comment, but only if it simply "confirm[s] prior assessments without changing methodology"); *see also* LITIGATION GUIDELINES at 6 n.6 ("[A]n agency [can]not choose to give broader effect to a vacatur ruling that is limited in scope—that is, it may not itself effectively repeal the challenged rule—without again going through notice and comment.").

It bears emphasis, too, that the letter the Court mentioned was a private letter to ASC. It was not published or made public in any other manner. KBB, like the many other companies that have provided services related to the overall Bayside Route, should not be expected to know about letters that CBP privately sends to litigants in particular matters, particularly when the CBP rulings at issue remain posted without comment on the CBP public website. The policy of Congress, as laid out in 19 U.S.C. § 1625, is precisely that CBP's position should be published, so that the public has notice.

*Kloosterboer, et al. v. United States, et al.*
Case No. 3:21-cv-00198 (SLG)          23

## V.

## CONCLUSION

Lineage respectfully urges the Court to grant the plaintiffs' motion for summary

judgment and deny summary judgment to the defendants.


DATED:  December 13, 2021       STOEL RIVES LLP

                                 By:/s/ James E. Torgerson
                                   James E. Torgerson (Bar No. 8509120)

                                 SQUIRE PATTON BOGGS (US) LLP
                                 Keith Bradley (*pro hac vice* pending)
                                 D. Michael Kaye (*pro hac vice* pending)
                                 John J. Reilly (*pro hac vice* pending)
                                 Emily Huggins Jones (*pro hac vice* pending)

                                 Attorneys for Amicus Curiae Lineage Logistics Holdings, LLC


## CERTIFICATE OF SERVICE

I hereby certify that on December 13, 2021, I filed a true and correct copy of the foregoing document with the Clerk of the Court for the United States District Court, District of Alaska, by using the CM/ECF system.  Participants in this Case No. 3:21-cv-00198 (SLG), who are registered CM/ECF users, will be served by the CM/ECF system.


/s/ James E. Torgerson
James E. Torgerson


*Kloosterboer, et al. v. United States, et al.*
Case No.  3:21-cv-00198 (SLG)      24